**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| CECELIA OWENS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **CASE NO.:  2:06CV999-1D** |
| **LIGHTHOUSE COUNSELING** | ) | |
| **CENTER, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**DEFENDANT LIGHTHOUSE COUNSELING CENTER'S
MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT**

**COMES NOW** the Defendant Lighthouse Counseling Center, Inc. (hereinafter "Lighthouse") and pursuant to Rule 56 of the Federal Rules of Civil Procedure, respectfully submits the following Memorandum of Law in Support of Defendant's Motion for Summary Judgment filed contemporaneously herewith.

## I.    STATEMENT OF FACTS

**A.    LIGHTHOUSE BACKGROUND.**

Lighthouse is a not-for-profit organization that provides chemical dependency services on an intensive outpatient basis for the general population and for several specific population groups (the dually-diagnosed women who are pregnant and/or have dependent children, and those incarcerated in the Montgomery County Detention Facility).  Additionally, Lighthouse provides supportive housing for homeless persons with a substance abuse disorder and another qualifying condition (HIV or AIDS, women who are pregnant and/or have dependent children and have a chronic health condition or

a co-occurring mental illness). Lighthouse also provides sexual assault forensic evidence exams, counseling, and prevention education for HIV and substance abuse problems. *See* Affidavit of Carianne Stinson at ¶ 2, attached hereto as Ex. A (hereinafter "Ex. A").

Lighthouse does not keep records of the racial breakdown of its client base, though the majority is African American. The only prerequisite for Lighthouse's assistance is the need of the client and their suitability to Lighthouse treatment programs. Any clients who would not benefit from treatment at Lighthouse are referred to another treatment facility that would better suit their specific diagnosis and needs. *Id.* at ¶ 3.

Lighthouse's staff is two-thirds African American (currently, 20 African American employees and 10 Caucasian employees). The counselors and case managers make funding requests to the various Program Directors who will either approve the request, or pass the request along to the Deputy or Executive Director for approval when over the $250.00 authorizing limit approved for Program Directors. *Id.* at ¶ 4.

**B.     PLAINTIFF'S BACKGROUND.**

The Plaintiff, Cecilia Owens, is a highly-aggrieved person who admits to having sued four of her employers [Owens depo. Vol. I, p. 196 l. 12-20] [hereinafter "Owens I"], over what she describes as the same reason:

> "… [A]ll of these cases are pretty much the same where organizations want to hire me in as the African-American token, and then when I won't do their discriminatory practices reason [Owens I, p. 196 l. 23 – p. 197 l.10].[1]

Immediately prior to accepting work at Lighthouse, she worked for six or seven years for a not-for-profit organization she formed, Keeping Our Village Alive ("KOVA"). [Owens I, p. 147, l. 9-21]. Plaintiff does not know her annual salary during

---

[1] All references to Plaintiff's deposition transcript are attached as Ex. J.

those years, other than to say: "It just varied. Sometimes— initially nothing." [Owens I, p.147, l. 18-19]. Plaintiff agreed to provide her tax returns, but claims only to have those for 2006 and 2007, which she produced without attachments. Plaintiff lived in Georgia with her husband until she moved alone to Montgomery to be nearer her ailing father. [Owens I, p. 150, l. 10-22].

Owens has an extensive criminal history of which Lighthouse was unaware when it hired her. She claims to have no records of these crimes. [Owens I, p. 58, l. 11-17]. Also, her memory of these crimes is exceedingly vague. She knows that she was arrested in Montgomery during college, but remembers nothing about it. [Owens I, p. 81, l. 8 – p. 84, l. 3]. She was also arrested in Georgia but cannot remember the specifics other than it was for changing the price on items [Owens I, p. 86, l. 18 – p. 87, l. 9], and was accused of falsely reporting the theft of her computer at Communities and Schools of Georgia which was "dealt with by the judge," [Owens I, p. 87, l. 14 – p. 88, l. 12], and which was deducted from her pay check [Owens I, p. 90, l. 14 - 23]. She also "thinks" she was arrested in Florida but can offer no specifics. [Owens I, p. 92, l. 1 - 23]. This criminal history, which she attempted to dismiss as "… just part of [her] past…" [Owens I, p. 92, l. 1 – p. 95, l. 18] became very relevant when she stole property from the U.S. government at the Maxwell Air Force Base Exchange ***while employed as the second-highest executive employee of Lighthouse.*** *See* Charge and Plaintiff's Acknowledgement of Guilt, attached hereto as Ex. B.

## C.     PLAINTIFF'S WORK HISTORY AT LIGHTHOUSE.

The Executive Director of Lighthouse, Ms. Candyce DeKruyff, hired Plaintiff as her Deputy Director on September 12, 2005. Ms. DeKruyff interviewed three candidates

for the position as her Deputy and selected Plaintiff over two equally-qualified white candidates.   In fact, Plaintiff did not meet all the written qualifications that had been set for the position, so Ms. DeKruyff went to Lighthouse's Board of Directors and obtained a waiver for those un-met qualifications.   Shortly after interviewing Plaintiff, Ms. DeKruyff took a maternity leave of absence and returned to work on or approximately November 14, 2005.   Before November 14, 2005, Ms. DeKruyff was available from home but relied on her staff, including Plaintiff, to handle the day-to-day operations.  *See* Affidavit of Candyce DeKruyff at ¶ 2, attached hereto as Ex. C (hereinafter "Ex. C").

Plaintiff was employed at Lighthouse as the Deputy Director from September 12, 2005 to November 18, 2005.   The operations chart for Lighthouse put all of the executive staff under the Executive Director and Deputy Director and showed a direct reporting line from the department heads to both the Deputy Director and Executive Director.   *See* Operations Chart, attached hereto as Ex. D (authenticated in Ex. C at ¶ 7).   The long-time practice at Lighthouse had been for the Executive Director and Deputy Director to work as a team with the department heads, but immediately after her arrival, Plaintiff began to assert her position and cause problems whenever a department head did not go through her to present anything to the Executive Director.   The Business Manager, Ms. Carianne Stinson, was one of these department heads.   She had always worked closely with the Executive Director, but Plaintiff began to express disapproval anytime she did so.   Gradually, the Executive Director began to detect that Plaintiff was destroying the harmony that had existed in the executive group.   Plaintiff appeared to be pitting one employee against another and trying to create a clique of employees loyal to Plaintiff who would be allied against employees who preferred the Executive Director.   This problem

became acute when the issue arose of whether Ms. Stinson was going to be allowed to work from home all but about one day a week.  While this issue is explained in more detail below, it is an example of how Plaintiff's uncongenial style of management led to her discharge.  Ex. C at ¶ 3.

Plaintiff had other performance problems as well.  Because Plaintiff's tenure with Lighthouse was only two months, she did not receive any performance evaluations, but problems in addition to her divisive attitude were apparent upon Ms. DeKruyff's return from maternity leave.  Plaintiff was under Ms. DeKruyff's remote supervision until Ms. DeKruyff's return from maternity leave.  Gradually, it became apparent that Plaintiff refused to accept her supervisor's authority.  Within five days of Ms. DeKruyff's return, Ms. DeKruyff terminated Plaintiff's employment because Plaintiff's work product was substandard and because Plaintiff's conduct was unprofessional, insubordinate, and uncooperative.  Ex. C at ¶ 4.

Also, Plaintiff's work product was unacceptable in quality, which led Ms. DeKruyff to conclude that Plaintiff had seriously exaggerated her grant writing abilities. However, Plaintiff's performance was also symptomatic of her larger problem, her inability or unwillingness to accept the Executive Director's authority.   Plaintiff attempted to write two grant proposals during her employment.  Ms. DeKruyff made numerous corrections to Plaintiff's first proposal, only to find that the Plaintiff had turned in the proposal prior to receiving the corrections.  In the second proposal, Plaintiff failed to incorporate any of the corrections that Ms. DeKruyff made to the first proposal, even though Ms. DeKruyff specifically instructed Plaintiff by e-mail that she needed to approve the proposal before submission.  Lighthouse's procedures also provided for the

Executive Director to sign the proposal as the agency's authorized official. Nevertheless, Plaintiff signed the proposal herself, made none of the corrections, and attempted to submit it without Ms. DeKruyff's approval. This was typical of Plaintiff's refusal to accept supervision. In short, Plaintiff was terminated because her work product was poor and because she was insubordinate and uncooperative, these latter traits being key reasons why her performance was poor. Ex. C at ¶ 5.

Lighthouse also questioned the necessity of some of Plaintiff's travel, such as an unauthorized trip to the Center for Disease Control ("CDC") in Atlanta, her long time home before moving to Montgomery. On November 11, 2005, shortly before Ms. DeKruyff's return from maternity leave, Plaintiff announced that she was going to the CDC to pursue a grant. Ms. DeKruyff did not make an issue of the trip since it already appeared that Plaintiff was not going to work out. However, she questioned its legitimacy. When asked in her deposition about this trip, Plaintiff said that she had arranged to meet a fellow student from a graduate program she attended who worked for the CDC; that she called her to see if she was familiar with the grant in question; that the fellow student offered to give Plaintiff tips on writing the grant, but could only meet on Friday; and that she met with this graduate friend for several hours [Owens I, p. 222, l. 20 – p. 226, l. 9]. Despite the fact that her graduate class contained only 30-40 people [Owens I, p. 229, l. 8], Plaintiff could not identify this friend with whom she allegedly met for several hours. [Owens I, p. 228, l. 3-7]; [Owens depo. Vol. II, p.9, l. 17-21] [hereinafter "Owens II"]. When Plaintiff was asked: "If it were of extreme importance to you to know who your classmate [who was] at the CDC was, how would you go about

finding that person?"  Plaintiff replied that it was not extremely important to her, and that she could not "remember anything."  [Owens II, p.11, l. 4-11].

**D.    PLAINTIFF'S ALLEGATIONS.**

Plaintiff alleges that Lighthouse unlawfully terminated her employment in violation of Title VII and tortiously interfered in her business relationships.  Plaintiff's Title VII allegations generally fall under the following three categories:

1)    Ms. DeKruyff was more likely to authorize the expenditure of funds for white clientele, thus discriminating against black clients.  *See* Complaint (Doc. No. 1) at ¶9.  Plaintiff does not allege that she ever voiced her concerns to anyone regarding this alleged disparate treatment of clients.

2)    Ms. DeKruyff handled the resignation of a black employee, Ms. Hibbler, differently that she handled the resignation of a white employee, Ms. Stinson.  Plaintiff alleges that because she voiced her disapproval of Ms. DeKruyff's alleged discriminatory treatment of Ms. Hibbler in relation to Ms. Stinson at a management meeting, that Ms. DeKruyff retaliated by disciplining her and then terminating Plaintiff's employment.  *See* Complaint at ¶¶ 10-18.

3)    Plaintiff also sent an e-mail to Ms. DeKruyff after receiving a verbal counseling from Ms. DeKruyff questioning whether discrimination was occurring.  *See* Plaintiff's E-mail, attached hereto as Ex. E (authenticated in Ex. C at ¶ 8).

Thus, Plaintiff's allegations appear to center around three operative set of facts, those involving the disparate treatment of clientele, and those concerning Ms. Hibbler's resignation and Plaintiff's opposition to Ms. Hibbler's alleged disparate treatment.

**D.    FACTS SURROUNDING PLAINTIFF'S ALLEGATIONS.**

  **a)    ALLEGATIONS CONCERNING DISPARATE TREATMENT OF BLACK CLIENTELE.**

As stated above, Lighthouse is a not-for-profit organization that provides chemical dependency services on an intensive outpatient basis for the general population and, among other things, provides supportive housing for homeless persons with substance abuse disorders.  There are few, if any, expenditure requests that Lighthouse's Executive Director denies unless they do not qualify as program expenditures or unless the money is not available to provide for the request.  Importantly, most expenditure requests are made for items or programs and are not made for particular clients.  Thus, it would be impossible to make expenditure authorization decisions based on the race of the client.  In short, the Executive Director is not aware of the race of the clients when budget decisions are made, so budget requests necessarily cannot be racially discriminatory.  Ex. C at ¶ 9.

During Plaintiff's employment, there was one expenditure request that Ms. DeKruyff can recall that was denied, a request for an additional van driver for Lighthouse's New Beginnings treatment program, which is open to persons of all races. The request was denied because there were no additional funds in the New Beginnings program grant budget for additional personnel.  Additionally, the New Beginnings

program directors asked for several positions at that time – counselor, van driver, and an additional case manager. Ms. DeKruyff asked the New Beginnings directors to prioritize their requests since all three could not be granted due to the lack of grant funds. The directors reported that the counselor was the most important request, so Ms. DeKruyff asked the Board to approve that request, despite the absence of grant funds. Ex. C at ¶ 10.

> **b)    ALLEGATIONS CONCERNING DISPARATE TREATMENT OF MS.
> HIBBLER.**

The facts surrounding Ms. Stinson and Ms. Hibbler's "resignations" can be summarized as follows. Lighthouse's Business Manager, Ms. Stinson, attempted to turn in her resignation on October 25, 2005 because her husband had accepted a job in Birmingham. In fact, she gave her letter of resignation to Plaintiff. Ms. Stinson informed Lighthouse's Board of Directors during its meeting on that same day that she and her husband were moving to Birmingham, so she felt that she would have to resign. Ex. A. at ¶ 6. The Board considered her to be a very valuable employee and did not want to lose her expertise and experience. *See* Affidavit of David Belser at ¶¶ 5-7, attached hereto as Ex. F (hereinafter "Ex. F"). Therefore, members of the Board instructed Ms. DeKruyff to investigate the possibility of allowing Ms. Stinson to work remotely in Birmingham and come into the office one or two days per week. *See* 10/25/05 Board of Director's Meeting Notes, attached hereto as Ex. I (authenticated in Ex. C at ¶ 11). Therefore, while proceeding to recruit applicants for the position of Business Manager, Ms. DeKruyff also negotiated with Ms. Stinson over the particulars of the Board's suggestion. Ms. DeKruyff noticed that Plaintiff resented the fact that Ms. DeKruyff conducted these negotiations directly with Ms. Stinson rather than involving her and began to obstruct

Ms. DeKruyff's efforts. With the Board's approval, Ms. DeKruyff ultimately asked Ms. Stinson to continue her employment, and she agreed, working remotely in Birmingham and coming to Montgomery one or two days a week. Ex. C at ¶ 12.

Ms. DeKruyff informed Plaintiff on November 9, 2005 that she had discussed with Ms. Stinson the possibility of her continuing her employment with Lighthouse and working remotely from Birmingham. Therefore, Mrs. Stinson would not be resigning as initially thought. This discussion and decision was made under the direction of the Board of Directors. Ms. Stinson continued to be a full-time employee. The Board of Directors unanimously decided to allow Mrs. Stinson to work primarily from Birmingham because of the excellence of her work, because of her years of experience with the agency in the crucial financial capacity, and because she could not easily be replaced. Ex. C at ¶ 13.

In contrast, Ms. Hibbler's situation was not remotely similar to that of Ms. Stinson. Ms. Hibbler was a substandard, entry-level employee who resigned of her own volition during an extended probationary period. Lighthouse is not aware of any attempt by Ms. Hibbler to actually withdraw her resignation. At the most, Ms. Hibbler stated in an exit interview that she had thought about rescinding, but decided not to do so. If Ms. Hibbler attempted to rescind her resignation, she did not bring it to the attention of the Executive Director. Ex. C at ¶ 14.

Ms. Hibbler was not similarly-situated to Ms. Stinson, the Business Manager of the organization, with respect to her job performance or qualifications either. Ms. Hibbler began her employment on February 23, 2005 as a case manager in the Center's HUD Housing for clients with substance abuse and HIV diagnoses. In her first six months in the position, Ms. Hibbler received two coaching notes for poor performance:

one dated July 25, 2005 and one dated August 15, 2005. As a result of her poor performance, Ms. Hibbler was not taken off of her probationary status on September 2, 2005 at the end of her six-month probationary period. Instead, she was given explicit direction regarding the required improvements that would have to occur in order to have her probationary status removed after another 90 days. Ms. Hibbler acknowledged this memorandum on September 6, 2005. Less than 30 days later, on October 3, 2005, Ms. Hibbler was given a third coaching note regarding Leave Procedures. On October 6, 2005 Ms. Hibbler turned in her resignation while Ms. DeKruyff was on maternity leave, and it was accepted *by Plaintiff* the same day. Ex. C at ¶ 15.

On November 9, 2005, Plaintiff called an unauthorized meeting of the managing staff, excluding Ms. Stinson and without notifying Ms. DeKruyff. On the morning of November 10, 2005, Ms. DeKruyff called Plaintiff after discovering her unauthorized meeting of the management team on November 9, 2005. Ms. DeKruyff gave her a strong verbal warning regarding her actions. When counseled about the unauthorized meeting, Plaintiff was unapologetic, uncooperative and belligerent to the Executive Director. This was all before the Plaintiff ever mentioned the word "discrimination" to Ms. DeKruyff. Plaintiff's position was that the members of the management team were below her, and she should be able to call a meeting of them, excluding whomever she wished, without the Executive Director's approval. Ex. C at ¶ 16.

On November 14, 2005, Ms. DeKruyff conducted a regularly-scheduled Management Team Meeting, which were held every Monday and included all members of the management – Executive Director, Deputy Director, Business Manager and the four Program Directors. Ms. DeKruyff reminded the team that at the previous Board

Meeting, she was given a directive by the Board to explore the option of Mrs. Stinson working remotely from Birmingham and coming into the Montgomery office one or two days a week.  Mrs. Stinson and Ms. DeKruyff discussed the issue with the Board as well, and the consensus was to pursue this arrangement with a three-month trial and then reevaluate the situation.  At that point, Ms. DeKruyff asked the other members of the team if they had any concerns.  Plaintiff responded that she had already expressed her concerns, and made several statements that Ms. DeKruyff perceived as disingenuous, bizarre, and insubordinate.[2]  Ex. C at ¶ 17.

After the meeting on November 14, 2005, Ms. DeKruyff gave Plaintiff a written coaching note addressing her unprofessional behavior at the management team meeting and Plaintiff's lack of judgment in calling an unauthorized meeting of the management team while excluding Mrs. Stinson, and discussing Mrs. Stinson and her position with the agency.  *See* 11/10/05 Coaching Note, attached hereto as Ex. G.  After Ms. DeKruyff's warning, Plaintiff e-mailed a response and asserted that allowing Ms. Stinson to remain employed somehow violated the Civil Rights Acts and offended Lighthouse policy.  *See* Ex. E.[3]  Since race discrimination laws had no application to the situation and because no such Lighthouse policy existed, Ms. DeKruyff summarily dismissed Plaintiff's

---

[2]    Plaintiff accused Ms. DeKruyff of discrimination and stated that she had consulted lawyers over the weekend regarding her belief that discrimination was occurring over the rescinding of resignations.  She also mentioned that her husband had a high level national security clearance with the military and that the JAG office needed to be informed of anything that might compromise his security clearance.  Defendants submit that the personnel situation at Lighthouse bore no relevance to the military, and that Plaintiff's own criminal conviction for theft of government property, along with her other criminal convictions, would have a greater affect on Plaintiff's husband's security clearance.

[3]    Plaintiff's e-mail also reveals that Plaintiff was unapologetic for the matters about which she had received the verbal warning and that Plaintiff remained adamant that Ms. DeKruyff should not follow the Board's instruction and secure Ms. Stinson's continued employment.  In hindsight, it appears that Plaintiff was not concerned about retaining her employment at Lighthouse because she was already pursuing a new, higher-paying job with COSA.

allegations.  In fact, the comparison between Ms. Stinson and Ms. Hibbler was never made by Plaintiff before her termination, and was first made known to Ms. DeKruyff in Plaintiff's EEOC Charge.  However, even if Ms. DeKruyff had known that Plaintiff was relying on Ms. Hibbler as a comparator for Ms. Stinson, she would not have taken this as legitimate opposition to what was non-existent discrimination, and it would have not been the reason for her discharge. Ex. C at ¶ 18.

Plaintiff reacted to the events in a belligerent manner by giving Ms. Stinson a harsh coaching note.  Additionally, Plaintiff exceeded her authority by attempting to order an audit of Lighthouse's finances despite the fact that a thorough audit had just been made.  Ms. DeKruyff perceived Plaintiff's actions as an ultimatum that it was going to be "her way or the highway."  Faced with a Deputy Director who was insubordinate and uncooperative, Ms. DeKruyff recommended Plaintiff's discharge to the Board, and Lighthouse's Board of Directors readily agreed.  On November 18, 2005, Ms. DeKruyff terminated Plaintiff's employment in the presence of the Board Chairman, Mr. David Belser, and another Board member, Mr. Robert Sells.  At that time, Ms. DeKruyff informed Plaintiff that it had become very apparent that their management styles were very different and that this had created some confusion among the management and staff of the agency.  Ms. DeKruyff told Plaintiff that she was not a good fit for Lighthouse at that time. Ex. C at ¶ 19.  The present lawsuit followed.

For the reasons that follow, the Court should grant summary judgment in Lighthouse's favor as to her discrimination claims because Plaintiff has no evidence to support her allegations and thus, cannot make out a *prima facie* case of discrimination.

### c)  ALLEGATIONS CONCERNING TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP.

Plaintiff identifies two acts committed by Lighthouse that allegedly constitute tortious interference with a business relationship. When questioned about Lighthouse's interference, Plaintiff stated:

> I feel like the Lighthouse either [sic] made derogatory statements through communications with Alice Murphy, because it was directly after January 25[th], a meeting when Candyce DeKruyff came to COSA and physically saw me there—I was in charge of the meeting—that my employment was terminated.  And, then, again, when the Lighthouse showed up at this court proceeding between myself and Alice Murphy—the Lighthouse was there. There was a tape recording put up.[4]  [Owens I, p. 206, l. 16 – p. 207, l. 3].

Plaintiff has no proof of this alleged conversation between Ms. DeKruyff and Ms. Murphy, and could say nothing more than that she believed it occurred.  [Owens I, p. 208 l. 22].

### E.  PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S DAMAGES.

In the alternative to summary judgment and dismissal of all three claims, Lighthouse is entitled to partial summary judgment as to damages for two reasons. The Plaintiff was only out of work for a week [Owens II, p. 98, l. 4-5], Lighthouse paid Plaintiff a two-week severance, and her annual salary with COSA was more than her pay from Lighthouse.  Therefore, Plaintiff suffered no economic loss from her termination.

Second, Plaintiff committed a criminal offense while employed by Lighthouse, which, if known by Lighthouse, would have led to her discharge.  *See* Ex. C at ¶ 20; Ex.

---

[4]    When questioned by Lighthouse's counsel about what was wrong with tape recording her post-termination suit against COSA, she admitted that there was no issue with it being tape recorded: "If I had a problem speaking into the tape recorder, then, you know, I would have just stopped it."  [Owens I, p. 211, l. 11-13].

F at ¶ 9.  This criminal conviction was uncovered during discovery and acts as a bar to back pay following its discovery.

## II.    SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Jameson v. Arrow Co*., 75 F.3d 1528 (11th Cir. 1996).  The party asking for summary judgment bears the initial burden of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or by pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-24.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.' "  *Id*. at 324.  Thus, in response to Lighthouse' submissions, Owens must by her own affidavits, deposition excerpts, answers to interrogatories or other proper evidence, designate the specific material facts showing that there is a genuine issue for trial.  *Celotex*, 477 U.S. at 324.  A dispute about a

material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Owens must meet her burden by doing more than "simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Furthermore, "[i]n an employment discrimination case, the plaintiff must produce sufficient evidence to support an inference that the defendant employer based its employment decision on an illegal criterion." *Jameson*, 75 F.3d at 1531; *see also Alphin v. Sears Roebuck & Co.*, 940 F.2d 1497, 1500 (11th Cir. 1991).

Thus, to the extent that Lighthouse shows that Owens will be unable to offer evidence sufficient to establish an element essential to any of her claims on which she will bear the burden of proof at trial or to the extent that Lighthouse argues that such a deficiency exists and Owens fails to offer the Court sufficient evidence in her responsive summary judgment submissions, Lighthouse is entitled to summary judgment.

## III.    ARGUMENT

### A.    PLAINTIFF DOES NOT MAKE OUT A *PRIMA FACIE* CASE FOR RACE DISCRIMINATION OR FOR RETALIATION UNDER TITLE VII.

Title VII provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. 2000e-2(a)(1). Generally, plaintiffs can establish employment discrimination under Title VII using the direct evidence framework set forth in *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989), or the circumstantial evidence

framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Under either the direct evidence or circumstantial evidence models, the plaintiff bears the burden of showing that the employer purposely took adverse action against her because of her race. *Hipp v. Liberty Nat. Life Ins. Co.,* 252 F.3d 1208, 1230 n. 34 (11th Cir. 2001).

The Supreme Court has used the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) to evaluate claims of indirect evidence of discrimination in employment actions. First, the plaintiff in a Title VII case carries the burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas Corp.,* 411 U.S. at 802. A plaintiff establishes a *prima facie* case of discrimination under Title VII by showing: (1) she belongs to a "protected" class; (2) she was qualified to do her job; (3) she suffered an adverse employment action; and (4) her employer treated similarly situated employees outside her classification more favorably. *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997) (citing *McDonnell Douglas,* 411 U.S. at 802); *see also Armstrong,* 33 F.3d at 1314 (describing the fourth prong as follows: "that she suffered from differential application of work or disciplinary rules").

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must establish the following elements: 1) she engaged in statutorily protected expression; 2) she suffered an adverse employment action; and 3) the existence of a causal connection between the two events. *Cooper v. Southern Co.,* 390 F.3d 695, 740 (11th Cir. 2004) (citing *Meeks v. Computer Assocs. Int'l,* 15 F.3d 1013, 1021 (11th Cir. 1994)); *Brochu v. City of Riviera Beach,* 304 F.3d 1144, 1155 (11th Cir. 2002). Once the plaintiff makes out a *prima facie* case of retaliation, the burden shifts to the defendant to produce

legitimate, non-retaliatory reasons for the adverse employment action. *Id.* If the defendant meets this burden of production, the plaintiff has a final opportunity to prove that the defendant's proffered reasons are a pretext for retaliation. *Id.*

The "opposition clause" under Title VII protects an employee who has "opposed any practice made an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-3(a). Under the opposition clause, a plaintiff engages in "statutorily protected activity" when he protests an employer's conduct which is actually lawful, so long as he demonstrates "a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Little v. United Tech., Carrier Transicold Div.,* 103 F.3d 956, 960 (11th Cir. 1997). It is, however, insufficient for a plaintiff "to allege his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable." *Id.*

In other words, in addition to simply voicing complaints about discrimination to supervisors, the Eleventh Circuit requires an employee seeking opposition clause protection to establish that she had "a good faith, reasonable belief that the employer has engaged in unlawful discrimination." *Little,* 103 F.3d at 960. This standard involves both a subjective and objective component:

> A plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

*Id. See also Eastman v. Tropicana Products, Inc.*, 2006 WL 3791255 at *1 (11th Cir. Dec. 27, 2006) (affirming summary judgment in favor of defendants because plaintiff's

good faith belief that defendant engaged in unlawful race discrimination was not protected by the opposition clause of Title VII because her belief was not objectively reasonable).

In the case at bar, Plaintiff cannot make out a *prima facie* case of discrimination or retaliation because there is no evidence that Lighthouse treated Plaintiff or any other employee in a discriminatory manner based on their race. Therefore, Plaintiff's opposition to the alleged racial discrimination was not objectively reasonable. In sum, Plaintiff cannot establish a *prima facie* case of retaliation under Title VII because she did not engage in any statutorily protected opposition and because she cannot demonstrate a causal connection between the alleged protected activity and her subsequent termination.[5]

**1.  THERE IS NO EVIDENCE THAT PLAINTIFF PARTICIPATED IN ANY STATUTORILY PROTECTED OPPOSITION UNDER TITLE VII BECAUSE PLAINTIFF'S ALLEGATIONS OF RACIAL DISCRIMINATION ARE NOT OBJECTIVELY REASONABLE.**

There is no evidence that Plaintiff participated in any statutorily protected opposition under Title VII because there are no facts supporting Plaintiff's allegation that her termination was the result of racial discrimination or any alleged opposition to racial discrimination. Plaintiff's alleged opposition does not make out a *prima facie* claim under Title VII because her allegations of racial discrimination are not objectively

---

[5]    For purposes of any claims of race discrimination, in contrast to Plaintiff's opposition claims, Lighthouse admits that Plaintiff is a member of a protected class and that she suffered an adverse employment action, two of the elements of Plaintiff's *prima facie* case for Title VII discrimination. For purposes of summary judgment and to avoid creating an issue of fact, Lighthouse will also concede that when they hired Plaintiff, they believed that she was qualified for the Deputy Director position. Specifically, Ms. DeKruyff interviewed three candidates for the position as her Deputy and selected Plaintiff over two equally-qualified white candidates. In fact, Plaintiff did not meet all of the written qualifications that had been set for the position, so Ms. DeKruyff went to Lighthouse's Board of Directors and obtained a waiver for those un-met qualifications. In short, Ms. DeKruyff chose to hire Plaintiff over two equally-qualified white applicants and overlooked her lacking qualifications, only to be accused two months later of discharging Plaintiff based on her race.

    However, Plaintiff fails to make a *prima facie* case of Title VII discrimination because she does not identify a similarly situated white employee who was treated more favorably that her. Thus, to the extent that Plaintiff claims that she was discriminatorily discharged, her claim fails as a matter of law.

reasonable.  *See Little v. United Tech., Carrier Transicold Div.,* 103 F.3d 956, 960 (11th Cir. 1997) (plaintiff must have a good faith, reasonable belief that the employer was engaged in unlawful employment practices);  *Eastman v. Tropicana Products, Inc.*, 2006 WL 3791255 at *1 (11th Cir. Dec. 27, 2006) (affirming summary judgment in favor of defendants because plaintiff's good faith belief that defendant engaged in unlawful race discrimination was not protected by the opposition clause of Title VII because her belief was not objectively reasonable).

>    **a)**    **PLAINTIFF CANNOT PROVE HER BASELESS ALLEGATIONS CONCERNING THE DISPARATE TREATMENT OF BLACK CLIENTELE.**

The Court should summarily dismiss Plaintiff's allegation that Ms. DeKruyff was more likely to authorize the expenditure of funds for white clientele, thus discriminating against black clients.  *See* Complaint at ¶9.  First, this allegation cannot be the basis of Plaintiff Title VII claim of retaliation because Plaintiff does not allege that she ever voiced her concerns to anyone at Lighthouse regarding this alleged disparate treatment of black clients.[6]  The decision maker must be aware of the discrimination complaint in order for there to be a *prima facie* case of retaliation.  *Streeter v. The Bridge, Inc.*, 2006 WL 680573 at *6-7 (M.D. Ala. March 16, 2006) (defendant entitled to summary judgment on retaliation claim because plaintiff never voiced claim of discrimination to decision maker although she told co-workers that her treatment was "unfair").  General complaints to other employees of "unfair treatment," if they included no reference to race discrimination, are not opposition to "any practice made an unlawful employment

---

[6] In fact, Plaintiff was the person at Lighthouse authorizing expenditures during the Executive Director's leave and did so between September 12 and November 12, 2005.  Since Plaintiff was only employed for five days following Ms. DeKruyff's return, there was hardly any time to discern any racial pattern in expenditure approval.

practice by [Title VII]" and do not constitute activity protected by Title VII's anti-retaliation provision.  *See* 42 U.S.C. §  2000e-3(a).  In other words, Ms. DeKruyff could not have retaliated against Plaintiff for opposing this alleged discrimination when Plaintiff never complained to Ms. DeKruyff or anybody else at Lighthouse that black clientele were being treated differently than white clientele.  Ex. C at ¶ 21.  Therefore, her opposition to the alleged disparate treatment of black clientele cannot form the basis of her discriminatory discharge claim.

Additionally, Plaintiff's allegations of racial discrimination, namely the disparate treatment of black clientele, are not objectively reasonable and are, thus, not protected opposition under Title VII.   There are few, if any, requests that the Executive Director denies unless it does not qualify as a program expenditure or if the money is not available to provide for the request.  Furthermore, most expenditure requests are made for items and are not made for particular clients.  Thus, it would be impossible to make expenditure authorization decisions based on the race of the client.  In short, the Executive Director is not aware of the race of the clients when budget decisions are made, so budget requests necessarily cannot be racially discriminatory.

However, during Plaintiff's employment, there was one expenditure request that Ms. DeKruyff can recall that was denied, a request for an additional van driver for Lighthouse's New Beginnings treatment program, which is open to persons of all races.  The request was denied because there were no additional funds in the New Beginnings program grant budget for additional personnel.   Additionally, the New Beginnings program directors asked for several positions at that time – counselor, van driver, and an additional case manager.  Ms. DeKruyff asked the New Beginnings directors to prioritize

their requests since all three could not be granted.  The directors reported that the counselor was the most important request, so Ms. DeKruyff asked the Board to approve that request, despite the absence of grant funds.  Thus, this "proof" of discriminatory motive is absurd. What the Plaintiff alleges did not happen and could not have happened. Clearly, this example of the denial of an expenditure request cannot form the basis for Plaintiff's claim of disparate treatment of black clientele.

In sum, there is no evidence supporting Plaintiff's allegation that she was discriminatorily discharged in violation of Title VII for opposing any alleged disparate treatment of black clientele.  Additionally, Plaintiff's allegation that Lighthouse treated black clientele any differently that white clientele is not objectively reasonable.

> **b)** **PLAINTIFF CANNOT PROVE HER BASELESS ALLEGATIONS CONCERNING THE DISPARATE TREATMENT OF MS. HIBBLER AND ANY ALLEGED RETALIATION BY LIGHTHOUSE FOR OPPOSITION THERETO.**

The Court should also summarily dismiss Plaintiff's allegation that Ms. DeKruyff handled the resignation of a black employee, Ms. Hibbler, differently than she handled the resignation of a white employee, Ms. Stinson, and that when Plaintiff voiced her disapproval of Ms. DeKruyff's alleged discriminatory treatment of an unnamed employee, who Plaintiff later identified as Ms. Hibbler, at a management meeting, Ms. DeKruyff retaliated against Plaintiff by disciplining her and then terminating Plaintiff's employment in violation of Title VII.  *See* Complaint at ¶¶ 10-18.  Again, Plaintiff's alleged opposition does not make out a *prima facie* claim under Title VII because her allegations of racial discrimination are not objectively reasonable.  *See Eastman*, 2006 WL 3791255 at *1 (11th Cir. Dec. 27, 2006); *Little v. United Tech., Carrier Transicold*

*Div.,* 103 F.3d 956, 960 (11th Cir. 1997) (plaintiff must have a good faith, reasonable belief that the employer was engaged in unlawful employment practices).

The facts surrounding these allegations can be summarized as follows. Lighthouse's Business Manager, Ms. Stinson, attempted to turn in her resignation on October 25, 2005. Mrs. Stinson informed Lighthouse's Board of Directors during its meeting on that date that she and her husband were moving to Birmingham, so she felt that she would have to resign. The Board considered the Business Manager to be a very valuable employee and did not want to lose her expertise and experience and unanimously decided to allow Mrs. Stinson to work primarily from Birmingham because of the excellence of her work, because of her years of experience with the agency in the crucial financial capacity, and because she could not easily be replaced. Consequently, Mrs. Stinson did not resign and continued to be a full-time employee.

Ms. Hibbler was not Plaintiff's subordinate but, rather, the subordinate of one of the Program Directors, Ms. Lisa Carroll. Ms. Hibbler began her employment on February 23, 2005 as a case manager in the Center's HUD Housing for clients with substance abuse and HIV diagnoses. In her first six months in the position, Ms. Hibbler received two coaching notes for poor performance: one dated July 25, 2005 and one dated August 15, 2005. As a result of her poor performance, Ms. Hibbler was not taken off of her probationary status on September 2, 2005 at the end of her six-month probationary period. Instead, she was given explicit direction regarding the required improvements that would have to occur in order to have her probationary status removed after another 90 days. Ms. Hibbler acknowledged this memorandum on September 6, 2005. Less than 30 days later, on October 3, 2005, Ms. Hibbler was given a third

coaching note regarding Leave Procedures.  On October 6, 2005 Ms. Hibbler turned in her resignation while the Executive Director was on maternity leave, and it was accepted by Plaintiff the same day.  According to Ms. Hibbler's resignation letter, her intention was to work out her two-week notice, but Plaintiff elected instead to pay her two-week's salary as severance.  Ms. Hibbler never rescinded her resignation, but may have stated in an exit interview that she thought about retracting her resignation.

There is no Lighthouse policy or rule about rescinding resignations, nor would such a policy even be applicable to Ms. Hibbler or Ms. Stinson since neither party attempted to rescind their resignations.  Rather, Plaintiff was totally unwilling or incapable of seeing the difference in the two situations, and she called an unauthorized meeting of the managing staff without notifying the Executive Director to try to form dissent.  On the morning of November 10, 2005 the Executive Director called Plaintiff after discovering her unauthorized meeting of the management team on November 9, 2005.  The Executive Director gave her a verbal warning regarding her actions.  When counseled about the unauthorized meeting, Plaintiff was uncooperative and belligerent to the Executive Director.

On November 14, 2005, Ms. DeKruyff conducted a regularly-scheduled Management Team Meeting, which are held every Monday and include all members of the management – executive director, deputy director, business manager and the four program directors.  She reminded the team that at the previous Board Meeting, she was given a directive by the Board to explore the option of Mrs. Stinson working remotely from Birmingham and coming into the office one or two days a week.  *See* Ex. I.  Mrs. Stinson and Ms. DeKruyff discussed the issue with the Board as well, and the consensus

was to pursue this arrangement with a three-month trial and then reevaluate the situation. At that point, Ms. DeKruyff asked the other members of the team if they had any concerns. Plaintiff responded that she had already expressed her concerns, and made several statements that Ms. DeKruyff perceived as insubordinate.

After the meeting on November 14, 2005, Ms. DeKruyff gave Plaintiff a written coaching note addressing her unprofessional behavior at the management team meeting and Plaintiff's lack of judgment in calling an unauthorized meeting of the management team while excluding Mrs. Stinson, and discussing Mrs. Stinson and her position with the agency. *See* Ex. G. After Ms. DeKruyff's warning, Plaintiff e-mailed a response and asserted that allowing Ms. Stinson to remain employed somehow violated the Civil Rights Acts and offended Lighthouse policy. *See* Ex. E. Since Title VII had no application to the situation and because no such Lighthouse policy existed, Ms. DeKruyff summarily dismissed Plaintiff's allegations. In fact, the comparison between Ms. Stinson and Ms. Hibbler was never made by Plaintiff before her termination, and was first made known to Ms. DeKruyff in Plaintiff's EEOC Charge. However, even if Ms. DeKruyff had known that Plaintiff was relying on Ms. Hibbler as a comparator for Ms. Stinson, she would not have taken this as serious opposition to non-existent discrimination, and it would have not been the reason for her discharge. In short, Plaintiff's *post hoc* assertion that maintaining Ms. Stinson as Business Manager would violate Ms. Hibbler's civil rights was preposterous.

Additionally, Plaintiff's claim of disparate treatment cannot be given credence when Plaintiff herself admits that she would have allowed Ms. Stinson to continue her employment if she had been responsible for the decision. Specifically, Plaintiff's own

testimony clearly shows that her opposition to Ms. Stinson's continued employment had

nothing to do with race discrimination, but rather was due to her resentment of the fact

that Ms. Stinson did not seek Plaintiff's permission concerning her resignation:

> She never came to me and said this as her supervisor, which was a
> large part of the problem, you know. You bring me your
> resignation, but you don't come to me and tell me, listen, things
> are not, you know, working out the way I thought they were and I
> want to rescind or whatever. It didn't come to me [Owens I, p. 76,
> l. 6-12].

Thereafter, in her deposition, the Plaintiff was given eight chances to say that she

would not have agreed to the rescission of the resignation [Owens I, p. 76-80] and never

did so.  Rather, Plaintiff admitted that she would have agreed to Ms. Stinson's rescission

of her resignation if that had in fact occurred:

> Well, given every opportunity and every effort that I made with
> Carianne is no reason for me to think in my mind that I wouldn't
> have [agreed to the recission] because I had bent over backwards
> to try to work with her. I was happy for her in her move or
> whatever.  It was not that big of a deal.  [Owens I, p.78, l. 17-23].

With that admission, Plaintiff shows that her "opposition" was not based on Title VII

issues, and that she did not view Ms. Stinson's situation as discriminatory.  Rather, her

opposition was based on Ms. Stinson's perceived failure to discuss her resignation with

Plaintiff.

Finally, faced with a Deputy Director who was insubordinate and uncooperative,

the Executive Director recommended Plaintiff's discharge to the Board, and Lighthouse's

Board of Directors readily agreed.  On November 18, 2005, Ms. DeKruyff terminated

Plaintiff's employment in the presence of the Board Chairman, Mr. David Belser, and

another board member, Mr. Robert Sells.  At that time, Ms. DeKruyff informed Plaintiff

that it had become very apparent that their management styles were very different and

that this had created some confusion among the management and staff of the agency. Ms. DeKruyff told Plaintiff that she was not a good fit for Lighthouse at that time.

In sum, there is no evidence that Lighthouse retaliated against Plaintiff because of her opposition to discriminatory treatment of Ms. Hibbler. The situation involving Ms. Stinson and Ms. Hibbler's resignations had nothing to do with discrimination, and Plaintiff's "opposition" thereto was not objectively reasonable or based on Title VII issues.

**B.    IN THE UNLIKELY EVENT THAT THE COURT FINDS THAT PLAINTIFF HAS MADE OUT A *PRIMA FACIE* CASE OF DISCRIMINATION OR RETALIATION, LIGHTHOUSE IS STILL ENTITLED TO SUMMARY JUDGMENT BECAUSE ITS REASON FOR DISCHARGING OWENS WAS LEGITIMATE AND NOT A PRETEXT FOR DISCRIMINATION.**

Pursuant to the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-804 (1973), a plaintiff initially bears the burden of establishing a *prima facie* case of discrimination. *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252-53, 254 (1981). The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action. *Burdine,* 450 U.S. at 253. If the defendant articulates a legitimate, nondiscriminatory reason, the plaintiff can avoid summary judgment by producing sufficient evidence for a reasonable fact finder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual. *Chapman v. AI Transport,* 229 F.3d 1012, 1037 (11th Cir. 2000) (citing *Combs v. Plantation Patterns,* 106 F .3d 1519, 1543 (11th Cir. 1997).

Thus, only if the Court finds that Plaintiff has established a *prima facie* case of discrimination does the burden then shift to Lighthouse to articulate a legitimate, nondiscriminatory reason for its actions. *Burdine,* 450 U.S. at 253. Since Lighthouse can

articulate legitimate, nondiscriminatory reasons, Plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of Lighthouse's proffered nondiscriminatory reasons is pretextual to avoid summary judgment. *Combs v. Plantation Patterns,* 106 F .3d 1519, 1543 (11th Cir. 1997). Plaintiff may establish pretext by undermining the credibility of Lighthouse's proffered explanations. *See Combs,* 106 F.3d at 1538; *Burdine* 450 U.S. at 256 (plaintiff can establish that she was the victim of intentional discrimination by "showing that the employer's proffered explanation is unworthy of credence."). Plaintiff cannot rely on conclusory allegations of discrimination, but must come forward with evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence." *Combs,* 106 F.3d at 1538.

Lighthouse's reasons for terminating Owens were legitimate and not a pretext for discrimination. Plaintiff was employed at Lighthouse as the Deputy Director from September 12, 2005 to November 18, 2005. The operations chart for Lighthouse put all of the executive staff under the Executive Director and Deputy Director and showed a direct reporting line from the department heads to both the Deputy Director and Executive Director. *See* Ex. D. The long-time practice at Lighthouse had been for the Executive Director and Deputy Director to work as a team with the department heads, but immediately after her arrival, Plaintiff began to assert her position and cause problems whenever a department head did not go through her to present anything to the Executive Director. The Business Manager, Ms. Stinson, was one of these department heads. She had always worked closely with the Executive Director, but Plaintiff began to express

28

disapproval anytime she did so.  Ex. A at ¶ 5.  Gradually, the Executive Director began to detect that Plaintiff was destroying the harmony that had existed in the executive group. Plaintiff appeared to be pitting one employee against another and trying to create a clique of employees loyal to Plaintiff who would be allied against employees who preferred the Executive Director.  This problem became acute when the issue of whether Ms. Stinson was going to be allowed to work from home all but about one day a week.  In short, Plaintiff's uncongenial style of management led to her discharge.

Plaintiff had other performance problems as well.  Because Plaintiff's tenure with Lighthouse was only two months, she did not receive any performance evaluations, but problems in addition to her divisive attitude were apparent upon Ms. DeKruyff's return from maternity leave.  Plaintiff was under Ms. DeKruyff's remote supervision until Ms. DeKruyff's return from maternity leave.  Gradually, it became clearer and clearer that Plaintiff refused to accept her supervisor's authority.  Within five days of Ms. DeKruyff's return, Ms. DeKruyff terminated Plaintiff's employment because Plaintiff's work product was substandard and because Plaintiff's conduct was unprofessional, insubordinate, and uncooperative.

Additionally, Plaintiff's work product was unacceptable in quality, which led Ms. DeKruyff to conclude that Plaintiff had seriously exaggerated her grant writing abilities. However, the performance was also symptomatic of Plaintiff's larger problem, her inability or unwillingness to accept the Executive Director's authority.  Plaintiff attempted to write two grant proposals during her employment.  Ms. DeKruyff made numerous corrections to Plaintiff's first proposal, only to find that the Plaintiff had turned in the proposal prior to receiving the corrections.  In the second proposal, Plaintiff failed

to incorporate any of the corrections that Ms. DeKruyff made to the first proposal, even though Ms. DeKruyff specifically instructed Plaintiff by e-mail that she needed to approve the proposal before submission.  Lighthouse's procedures also provided for the Executive Director to sign the proposal as the agency's authorized official.  Nevertheless, Plaintiff signed the proposal herself, made none of the corrections, and submitted it without Ms. DeKruyff's approval.  This was typical of Plaintiff's refusal to accept supervision.  In short, Plaintiff was terminated because her work product was poor and because she was insubordinate and uncooperative, these latter traits being key reasons why her performance was poor.

Lighthouse also questioned the necessity of some of Plaintiff's travel, such as an unauthorized trip to the Center for Disease Control  ("CDC") in Atlanta, her long time home before moving to Montgomery.  On November 11, 2005, shortly before Ms. DeKruyff's return from maternity leave, Plaintiff announced that she was going to the CDC to pursue a grant.  Ms. DeKruyff did not make an issue of the trip since it already appeared that Plaintiff was not going to work out.  However, she questioned its legitimacy.  When asked in her deposition about this trip, Plaintiff said that she had arranged to meet a fellow student from a graduate program she attended who worked for the CDC [Owens I, p. 223, l. 3-4]; that she called her to see if she was familiar with the grant in question [Owens I, p. 224, l. 3-4]; that the fellow student offered to give Plaintiff tips on writing the grant, but could only meet on Friday [Owens I, p. 224, l. 21-22].  Plaintiff said that she met with this graduate friend for a couple of hours [Owens I, p. 226, l. 9].  Despite the fact that her graduate class contained only 30-40 people [Owens I, p. 229, l. 8], Plaintiff could not identify this friend with whom she allegedly met for

several hours.  [Owens II, p.9, l. 17-21].  When Plaintiff was asked: "If it were of extreme importance to you to know who your classmate [who was] at the CDC was, how would you go about finding that person?"  Plaintiff replied that it was not extremely important to her, and that she could not "remember anything."  [Owens II, p.11, l. 8-11].

In sum, Lighthouse had legitimate and non-discriminatory reasons for discharging Plaintiff.  Plaintiff's discharge was not a pretext for race discrimination, and Lighthouse should be awarded summary judgment on Plaintiff's Title VII claims.

   1.    **LIGHTHOUSE IS ENTITLED TO A "SAME ACTOR" PERMISSIBLE INTERFERENCE THAT MS. DEKRUYFF DID NOT ACT WITH A DISCRIMINATORY MOTIVE SINCE MS. DEKRUYFF BOTH HIRED AND DISCHARGED PLAINTIFF WITH FULL KNOWLEDGE OF HER RACE.**

In the Eleventh Circuit, an inference of non-discriminatory motive arises when the individual responsible for hiring or promoting an employee also participated in or made the ultimate decision to fire that employee.  *Williams v. Vitro Services Corp.*, 144 F.3d 1438, 1442-43 (11th Cir. 1998).  Other circuit courts have applied varying weights to the strength or value of the inference when the hirer and firer are the same actor.  *See, e.g., Bradley v. Harcourt, Brace and Co.,* 104 F.3d 267, 270-71 (9th Cir. 1996) ("[W]here the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive."); *Brown v. CSC Logic, Inc.,* 82 F.3d 651, 658 (5th Cir. 1996) ( "This 'same actor' inference has been accepted by several other circuit courts, and we now express our approval."); *Evans v. Technologies Applications & Service Co.,* 80 F.3d 954, 959 (4th Cir. 1996) ("[B]ecause Houseman is the same person who hired Evans, there is a powerful inference that the failure to promote her was not motivated by discriminatory animus."); *E.E.O.C. v. Our Lady of Resurrection Med. Ctr.,* 77 F.3d 145,

152 (7th Cir. 1996) ("If Boettcher wished to discriminate against Braddy because of her race, she could have refused to hire her in the first place, or she could have discharged her because of her deficient qualifications. Boettcher did neither.... The same hirer/firer inference has strong presumptive value.").

Plaintiff's allegations center around the alleged discriminatory conduct of Lighthouse Executive Director, Ms. DeKruyff, the same person who hired her only two months before her termination over two equally-qualified white candidates.  When, as here, an employer knows the employee's race when she is hired, and when, as here, the employer makes an extraordinary effort to hire that employee, it is simply not credible that the employee's race influenced the discharge two months later.  If Ms. DeKruyff did not want an African-American in the position of Deputy Director, she would have hired one of the two equally-qualified white applicants instead of the Plaintiff.  Thus, Lighthouse is entitled to the inference that Ms. DeKruyff did not act with discriminatory animus when she terminated Plaintiff's employment.

**C.    PLAINTIFF DOES NOT MAKE OUT A *PRIMA FACIE* CASE FOR TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP.**

    **1.    PLAINTIFF'S ALLEGATION IN HER COMPLAINT CONCERNING "POTENTIAL" NEW EMPLOYERS IS UNSUPPORTED AND DOES NOT GIVE RISE TO A CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP.**

The tort of intentional interference with a business relationship has five elements. A plaintiff alleging intentional interference with a business relationship is required to prove:

    1. The existence of a contract or a business relation;

    2. The defendant's knowledge of the contract or business relation;

3. Intentional interference by the defendant with the contract or business relation;

4. The absence of justification for the defendant's interference; and

5. Damage to the plaintiff as a result of the defendant's interference.

*Waddell & Reed,* 875 So.2d at 1153 (citing *Parsons v. Aaron,* 849 So.2d 932, 946 (Ala. 2002)); *Morrow v. Auburn University at Montgomery*, 973 F. Supp. 1392 (M.D. Ala. 1997); *Hickman v. Winston County Hosp. Bd.,* 508 So.2d 237, 239 (Ala. 1987). It is fundamental that in order to establish a claim of tortious interference with a contractual or business relationship, the plaintiff must first demonstrate the existence of a contract or a business relationship between the plaintiff and a third party. *Waddell & Reed*, 875 So.2d at 1153. If a plaintiff fails to satisfy any of the elements, summary judgment in favor of the defendant is appropriate. *See Hanson v. New Technology, Inc.,* 594 So.2d 96 (Ala. 1992). *See also Beechcroft & Holland v. City of Alabaster*, 901 So.2d 703, 707-08 (Ala. 2004) (affirming summary judgment in favor of defendant because plaintiff could not prove a business relationship between it and a third party).

Plaintiff cannot make out a *prima facie* case for the tort of intentional interference with a business relationship because there is no factual dispute that there cannot be a contractual or business relationship with a "potential" employer. Plaintiff's allegations in her Complaint concern "Defendant's tortuous [sic] interference with Plaintiff's ***potential*** business relationship with a new employer." Complaint at ¶32 (emphasis added). Thus, Plaintiff's own allegation reveals that she did not have a business relationship with any "new employer" so Plaintiff's claim for tortious or intentional interference with respect to a potential business relationship fails as a matter of law.

**2.    PLAINTIFF'S ALLEGATIONS CONCERNING LIGHTHOUSE'S ALLEGED TORTIOUS INTERFERENCE WITH PLAINTIFF'S EMPLOYMENT AT COSA ARE COMPLETELY UNFOUNDED.**

At Plaintiff's deposition, she also alleges that Lighthouse interfered with her employment at the Council on Substance Abuse (hereinafter "COSA") in several respects. Plaintiff was employed by COSA immediately after she left Lighthouse and was discharged approximately twelve weeks later. Plaintiff alleges that Ms. DeKruyff somehow contributed to her discharge by attending a meeting with COSA, and by having a telephone conversation with Alice Murphy, the President and C.E.O. of COSA, with regard to some papers that she left at the meeting. [Owens I, pp. 206-207]. Additionally, Plaintiff alleges that Lighthouse somehow interfered with her employment relationship with COSA when Ms. DeKruyff and Mr. Belser attended her trial against COSA and tape-recorded the proceedings. *Id.* However, the uncontroverted evidence shows that Lighthouse did not influence COSA's decision to terminate Plaintiff, but that Plaintiff was terminated by COSA because her performance and conduct were similar to that at Lighthouse.

Specifically, Alice Murphy, President and C.E.O. of COSA, has provided an affidavit with the following testimony. Plaintiff was employed by COSA on November 28, 2005, after she was terminated by Lighthouse, though she concealed the fact of her termination from COSA. Affidavit of Alice Murphy at ¶ 2, attached hereto as Ex. H (hereinafter "Ex. H"). Plaintiff told Ms. Murphy during her interview that she had quit Lighthouse because she was "not a good fit" there because she was more interested in being involved in COSA's mission, prevention of substance abuse, than in Lighthouse's mission, treatment of substance abuse. Plaintiff also misrepresented what she had been

paid by Lighthouse, telling Ms. Murphy that she was taking a salary cut in accepting COSA's offer of $55,000.00 per year, when Plaintiff had actually been making only $47,500.00 per year at Lighthouse.   Ex. A at ¶ 8.   This misrepresentation took on additional importance when Plaintiff later demanded even more pay from COSA and falsely contended that Ms. Murphy had promised to pay her more than the salary they had agreed upon.   In fact, Plaintiff sued COSA after her termination claiming, among other things, that she had been promised this extra pay, but her suit was unsuccessful.   [Owens I, p. 44, l. 23- p. 45, l. 21].   In that suit, Plaintiff testified that COSA had "lured" her away from Lighthouse.[7]   Ex. H at ¶ 2.

Ms. Murphy's sworn testimony further states that Plaintiff's claims that Lighthouse personnel caused her to be fired by COSA are untrue.   *Id.* at ¶ 3.   Ms. Murphy, the ultimate decision-maker in Plaintiff's termination, states that no one from Lighthouse had anything to do with Plaintiff's discharge from COSA.   In fact, the first time Ms. Murphy spoke to anyone connected with Lighthouse about Plaintiff was after her discharge from COSA.   Ms. Murphy testifies that Plaintiff was fired from her position at the COSA because she was "not a good fit" for that agency, either.   COSA was dissatisfied with Plaintiff's performance and her attitude.   She made unjustified salary demands, caused morale problems, attempted to get another employee fired, and performed her tasks in a mediocre fashion (all the same issues that led to her discharge from Lighthouse).   She especially appeared to have exaggerated her experience in the area of grants to COSA, as well as to Lighthouse.   Neither Ms. DeKruyff nor anyone

---

[7]   Plaintiff's testimony provides an understandable basis for her actions at Lighthouse before she was terminated.   If she was being "lured" by the prospect of a higher-paying job at COSA, she could feel safe in demanding that the Lighthouse accede to her demands.

acting on behalf of Lighthouse did anything that contributed to Ms. Murphy's decision regarding Plaintiff's discharge. Ex. C at ¶ 22. In short, no one from Lighthouse asked that Plaintiff be fired, suggested that she be fired or, in any way, caused Ms. Murphy to fire Plaintiff. Ex. H at ¶ 3. [8]

Thus, Plaintiff's claim of intentional interference with her employment at COSA is unsubstantiated and should be dismissed as a matter of law. Plaintiff's unfounded and unsupported belief that Lighthouse influenced Ms. Murphy's decision to terminate Plaintiff's employment does not create an issue of fact for purposes of summary judgment. [Owens I, p. 208, l. 16 – p. 209, l. 6]. Lighthouse is entitled to summary judgment on the tortious interference claim.

**D.    IN THE ALTERNATIVE AND ONLY IF THE COURT RULES AGAINST LIGHTHOUSE ON THE MOTION FOR SUMMARY JUDGMENT, LIGHTHOUSE MOVES FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S DAMAGES.**

**1.    PLAINTIFF'S MONETARY DAMAGES ARE NON-EXISTENT BECAUSE SHE STARTED WORKING FOR COSA AT A HIGHER SALARY IMMEDIATELY AFTER LIGHTHOUSE DISCHARGED HER.**

Lighthouse terminated Plaintiff's employment on November 18, 2005. When Lighthouse discharged Plaintiff, her annual salary was $47,500.00. Lighthouse also paid Plaintiff an additional two weeks severance, so Plaintiff received compensation through December 2, 2005. Plaintiff's employment with COSA began approximately one week after her termination from Lighthouse on November 28, 2005, at an annual salary of

---

[8]  Finally, Plaintiff's allegations concerning Ms. DeKruyff and Mr. Belser's presence at the trial of Plaintiff's suit against COSA are irrelevant to the issue of intentional interference with a business relationship. Ms. Murphy saw Ms. DeKruyff and Mr. Belser in the audience, saw Mr. Belser approach the bench and ask the judge to be allowed to tape record the proceedings, and saw him place his recorder in plain view. Ms. Murphy further states that neither Plaintiff nor her attorney objected to the tape recorder Murphy Aff. at ¶ 4. Plaintiff acknowledged that she saw the tape recorder and would have stopped speaking into it if it had bothered her. [Owens I, p. 211, l. 11-13]. Further, these observations took place after Plaintiff's termination and could not have affected Ms. Murphy's decision to discharge Plaintiff and thus, cannot support a claim of tortious interference and have no relevance to the present lawsuit.

$55,000.00. Therefore, Plaintiff is entitled to no monetary damages for lost wages (back pay or front pay). Securing higher-paying employment mitigated any pay loss damages she might have had. *See Kendrick v. Jefferson Co. Bd. Of Ed.*, 13 F.3d 1510 (11th Cir. 1994) (citing *Darnell v. City of Jasper*, 730 F.2d 654 (11th Cir. 1984). The fact that she was discharged from this employment due to her own actions is not attributable to Lighthouse.[9]

### 2.     IN THE ALTERNATIVE, PLAINTIFF'S DAMAGES SHOULD BE CUT OFF WHEN LIGHTHOUSE DISCOVERED EVIDENCE THAT PLAINTIFF WAS CONVICTED OF A CRIME WHILE WORKING FOR LIGHTHOUSE.

During discovery, Lighthouse learned that on October 20, 2005, while the Plaintiff was employed as Deputy Director of Lighthouse, she was arrested for shoplifting at Maxwell Air Force Base and charged with Theft of Government Property under 18 U.S.C. §641. *See* Ex. B. Plaintiff never reported her arrest to her employer. [Owens I, p. 16, l. 17-21].

In *McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352 (1995), a case involving an alleged violation of the ADEA, the Supreme Court held that after-acquired evidence of wrongful conduct during employment that would have resulted in

---

[9]   Courts typically reduce or offset back pay awards beyond the date of the aggrieved employee's involuntary termination from a new job. *See Ford Motor Co. v. EEOC*, 458 U.S. 219, 232 (1982) (the duty to mitigate damages includes the obligation to make reasonable and good faith efforts to maintain that job once accepted; if not, a claimant should be said to have voluntarily removed himself from the job market or the work place and forfeited his right to back pay); *Richardson v. Tricom Pictures & Productions, Inc.*, 334 F. Supp. 2d 1303, 1310-11 (S.D. Fla. 2004) (an employee's discharge for cause from subsequent employment will toll back pay damages); *Brady v. Thurston Motor Lines, Inc.,* 753 F.2d 1269, 1277-79 (4th Cir. 1985) (the rationale that supports the tolling of the back pay period following a voluntary quit should also apply to those terminations which result from a violation of an employer's rules); *Patterson v. P.H.P. Healthcare Corp.,* 90 F.3d 927, 936-37 (5th Cir. 1996) (vacating district court's back pay award to a plaintiff with respect to the period after his involuntary termination from a new job because of excessive absences, excessive use of the company phone for personal phone calls and for his conflicts with another staff member); *Johnson v. Spencer Press of Maine, Inc.,* 249 F. Supp. 2d 5, 7 (D. Maine 2003) (employee failed to exercise reasonable diligence in mitigating damages where he was fired from new job for violating company work rules by consuming food products on the job without paying for them, and employer was entitled to an ongoing offset against a back pay award beyond the date of employee's dismissal from his new job).

termination "bears on the specific remedy to be ordered." *Id.* The Court determined that in cases in which an employee commits an act during employment that would lead to termination and the employer finds out about the act during the course of litigation, "neither reinstatement nor front pay is an appropriate remedy." *Id.* at 361. The Court then discussed backpay, holding that it should be calculated "from the date of the unlawful discharge to the date the new information was discovered," with the court "taking into further account extraordinary equitable circumstances that affect the legitimate interests of either party." *Id.* at 361-62. The after-acquired evidence rule announced in *McKennon* provides that the misconduct revealed by the discovery be serious enough that the plaintiff's immediate discharge would have followed its disclosure in any event. 513 U.S. at 356. Additionally, the Supreme Court states that the two dates that are relevant for the purpose of calculating backpay are the date of termination and the date that the employer discovered the fraud. *Id*. at 362.

In the present case, Plaintiff's misconduct indisputably rises to a serious level. Lighthouse is a federally- and state-funded not-for-profit organization that provides services to ill, underprivileged individuals with chemical dependency problems. The Lighthouse policy manual provides in Paragraph 3. a., Behaviors Warranting discipline, for discipline, including termination, for: (3) Dishonesty and (12) Theft, and provides in Paragraph H. 1., Gross Misconduct, the following:

> The Executive Director or the Board of Directors will have the option of effecting immediate termination of any employee adjudged to be guilty of gross misconduct. Gross misconduct may include… behaviors that… significantly damage the center's public image….
> [Note: This excerpt is from the policies and procedures manual revised August 2006 because no copy of the unrevised manual has been found. Lighthouse affirms that

the quoted sections were not among the provisions that were changed in that revision and were the policies in effect during the Plaintiff's employment.].  Ex. C at ¶ 23.

Thus, Lighthouse hired Plaintiff on September 12, 2005, and Plaintiff was arrested for the crime of theft of government property shortly thereafter on October 20, 2005.  She pled guilty on November 13, 2006.  *See* Ex. B.  It is undisputed that Lighthouse would have terminated Plaintiff's employment upon learning of a conviction revealing Plaintiff's immoral character.  Ex. C at ¶ 20.  Additionally, Mr. David Belser, Chairman of Lighthouse's Board of Directors during Plaintiff's employment, testifies that he would have been in favor of terminating Plaintiff's employment had he known of the crime she committed and the fact that she concealed it from the Lighthouse.  Ex. F at ¶ 9.

Therefore, in the unlikely event that this Court finds in favor of Plaintiff on her claims, Lighthouse requests that her damages be limited to backpay from the date of Plaintiff's termination to the date of Lighthouse's discovery on February 7, 2007.  Additionally, reinstatement and front pay are not available remedies for Plaintiff.  For these reasons, Lighthouse is entitled to partial summary judgment limiting Plaintiff's damages as stated above.

## IV.    CONCLUSION

In conclusion, Plaintiff has not produced any evidence that Lighthouse discharged her because of her race.  Additionally, Lighthouse terminated Owens's employment for reasons that are objectively legitimate, nondiscriminatory and non-pretextual.  Owens's performance was not acceptable the entire time she was an employee at Lighthouse, and she was not treated any differently than any other similarly-situated employee.  For the foregoing reasons, Lighthouse submits that this Court should enter summary judgment in

its favor as to all counts against it contained in Owens's Complaint, dismiss the Complaint and all claims in this lawsuit against Lighthouse with prejudice, and tax costs against Plaintiff.

Dated: March 7, 2008

Respectfully submitted,

**s/Bruce J. Downey, III**
**BRUCE J. DOWNEY, III**
**ASB-9205-W86B**

**Attorney for Defendant**
**Lighthouse Counseling Center,**
**Inc.**

**OF COUNSEL:**
CAPELL & HOWARD, P.C.
150 South Perry Street (36104)
Post Office Box 2069
Montgomery, Alabama 36102-2069
Telephone:     (334) 241-8000
Facsimile:      (334) 323-8888

## CERTIFICATE OF SERVICE

I hereby certify that on this the 7th day of March, 2008, I have electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Cecelia Owens
6245 Hillcrest Drive
Morrow, Georgia 30260
Via Facsimile at: 770-991-1505 and 770-991-2334
Via Email at: owensacademy@comcast.net and ceceliaowens@comcast.net

**s/Bruce J. Downey, III**
OF COUNSEL

# Exhibit A

03/05/2008   20:17   2055884355                 FEDEX KINKO'S - 1530                 PAGE  01

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| CECELIA OWENS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | )    **CASE NO.: 2:06CV999-ID** |
| LIGHTHOUSE COUNSELING | )    **(Filed per Order of the Court)** |
| CENTER, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

### AFFIDAVIT OF CARIANNE STINSON

| | |
|---|---|
| STATE OF ALABAMA | ) |
| MONTGOMERY COUNTY | ) |

Carianne Stinson, being first duly sworn, deposes and says:

1.    I am Carianne Stinson, Business Manager of the Defendant, Lighthouse Counseling Center, LLC [hereinafter "Lighthouse"]. I give this affidavit on behalf of the Defendant in the above-styled action,

2.    Lighthouse is a not-for-profit organization that provides chemical dependency services on an intensive outpatient basis for the general population and for several specific population groups (the dually-diagnosed, women who are pregnant and/or have dependent children, and those incarcerated in the Montgomery County Detention Facility). Additionally, Lighthouse provides supportive housing for homeless persons with a substance abuse disorder and another qualifying condition (HIV or AIDS, women who are pregnant and/or have dependent children and have a chronic health condition or a co-occurring mental illness). Lighthouse also provides sexual assault forensic evidence exams, counseling, and prevention education for HIV and substance abuse problems.

Stinson Aff 3-6-08 (2)

3. Lighthouse does not keep records of the racial breakdown of its client base, though a majority are African American.  The only prerequisite for Lighthouse's assistance is the need of the client and their suitability to Lighthouse treatment programs.  Any clients who would not benefit from treatment at Lighthouse are referred to another treatment facility that would better suit their specific diagnosis and needs.

4. Lighthouse's staff is two-thirds African American (currently, 20 African American employees and 10 Caucasian employees). The counselors and case managers make funding requests to the various Program Directors who will either approve the request, or pass the request along to the Deputy or Executive Director for approval when over the $250.00 authorizing limit approved for Program Directors.

5.    When the Plaintiff, Ms. Owens, was hired as Deputy Director, I welcomed her and made every effort to work co-operatively with her. As Business Manager, I was one of the Lighthouse department heads.  I had always worked closely with the Executive Director, but Plaintiff began to express disapproval anytime I did so.

6.    My relationship with the Plaintiff seemed reasonably harmonious until I failed to introduce her at the start of a staff meeting. I believed that everyone at the meeting had already met her, so it did not occur to me. However, she seemed very upset at my failure and was very cold and critical of me from that point on. After I announced that I would be resigning to join my husband in moving to Birmingham and the Board suggested that I might work from home, our relationship really worsened and I felt great hostility from her.  I gave my formal resignation to the Plaintiff on October 25, 2005 and announced my decision at a Board meeting that same day. During and following that Board meeting, several Board members expressed how sorry they were that I was leaving and asked the Executive Director, Ms. DeKruyff to discuss with me the

possibility of my remaining employed and working primarily from my new home in Birmingham.

7.    Ms. DeKruyff asked me to consider what would be required for me to do that and to give her a report on those requirements. I discussed this possibility with my husband, particularly the necessity for frequent trips to Montgomery, and we agreed that it was possible. I drew up a list of equipment I would need and gave that to Ms. DeKruyff. This is when I began to sense great hostility from the Plaintiff. She became highly critical of my work and appeared to be trying to enlist other staff members to oppose my remaining employed at Lighthouse.

8.    The Plaintiff's salary while employed by the lighthouse was $47,500.00 per year.

**Carianne Stinson**

Sworn to and subscribed before me on this the _6th_ day of March, 2008.

(SEAL)

NOTARY PUBLIC
My Commission Expires: _11-07-11_

Stinson Aff 3-6-08 (2)

# Exhibit B

## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 2:05-cr-310 |
| | ) | |
| CECILIA W. OWENS | ) | |

## PLEA AGREEMENT

DEFENSE COUNSEL:                          Jennifer Hart

SPECIAL ASSISTANT U.S. ATTORNEY:          Neal Frazier

## COUNT AND STATUTES CHARGED

Count: 18 U.S.C. § 641 (Theft of Government Property)

## STATUTORY MAXIMUM PENALTIES

Sentence: a term of imprisonment of not more than one year and a fine of not more than $100,000, or both; a term of supervised release of not more than twelve months; an assessment fee of $25; and an order of restitution.

## ELEMENTS OF THE OFFENSE

1.    The Defendant voluntarily, intentionally and knowingly embezzled, stole, or converted money or things of value to her own use.

2.    The money or things belonged to the United States and had a value.

3.    The Defendant did so with intent to deprive the owner of the use or benefit of the money or thing of value so taken.

**********************************************************************************

Neal Frazier, Special Assistant United States Attorney and Jennifer Hart, attorney for the Defendant, pursuant to Rule 11(c)(1)(C), Federal Rules of Criminal Procedure, as Amended, have, with the authorization of the undersigned Defendant, heretofore entered into discussions with a view towards reaching a pretrial conclusion of the charges pending in the Information and a Plea

Agreement has been reached by said parties. The plea is being submitted to the Court pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), and the parties understand that, if the terms of the Plea Agreement are not accepted by the Court, the Defendant will be allowed to withdraw the Defendant's plea of guilty and will proceed to trial.

## GOVERNMENT'S PROVISIONS

1.  The United States will stand silent at sentencing.

2.  The United States reserves the right to inform the Court and the Probation Department of all facts pertinent to the sentencing process, including all relevant information concerning the offense and the Defendant's background.

## DEFENDANT'S PROVISIONS

1.  The Defendant agrees to plead guilty to the Count of the Information.

## FACTUAL BASIS

The Defendant admits the allegations charged in the Count of the Information and understands that the nature of the charge to which the plea is offered involves proof as to the Count as follows:

1.  On or about 20 October, 2005, at the Army Air Force Exchange on Maxwell Air Force Base, Alabama, in the Middle District of Alabama, Cecelia Owens did steal property of the United States not exceeding $1,000.00, in violation of Title 18, Section 641, United States Code.

## DEFENDANT'S UNDERSTANDING AND ACKNOWLEDGMENT

1.  The Defendant, before entering a plea of guilty to the Count of the Information as provided for herein by said Plea Agreement, advises the Court that:

–2–

a.    The discussions between the attorney for the Government and the attorney for the Defendant towards reaching an agreed plea in this case have taken place with the Defendant's authorization and consent.

b.    The Defendant further understands that, pursuant to Title 18, United States Code, Section 3013, the $25.00 assessment fee is to be paid by the Defendant on the date of sentencing. The Defendant further understands that by completing and submitting to the court or the Government any financial statements, the Defendant is representing that the statement is true and accurate to the best of the Defendant's information, knowledge, and belief.

c.    The Defendant understands that the Defendant has a right to be represented by an attorney at every stage of the proceedings against the Defendant herein and is represented by the Defendant's undersigned attorney.

d.    The Defendant understands that the Defendant has the right to plead not guilty and has the right to be tried by a jury and, at a trial thereof, has the right to the assistance of counsel, the right to confront and cross-examine witnesses against the Defendant, the right to call witnesses in the Defendant's own behalf, and the right not to be compelled to incriminate the Defendant, and that if the Defendant enters a plea of guilty herein, there will not be a further trial of any kind and that by the entry of such a plea, the Defendant waives the right to a trial by jury or to a trial before the Court.

e.    The Defendant further understands that in entering a plea of guilty herein, the Court may ask questions about the offense to which the plea is entered and further understands that if the Defendant answers these questions under oath, on the record, and in the presence of counsel, which questions and answers would be recorded, that the answers may later be used against the Defendant in a prosecution for perjury or false statement if the answers are not truthful.

-3-

f. The Defendant further understands and advises the Court that the Plea Agreement as set forth herein and the plea to be entered by the Defendant as a result thereof is voluntary on the Defendant's part and is not the result of any force or threats or of any promises apart from the aforesaid Plea Agreement. The Defendant further advises the Court that the Plea Agreement set forth herein is the result of prior discussions between the attorney for the Government, and the attorney for the Defendant, all conducted with the Defendant's authorization, knowledge, and consent.

g. The Defendant further advises the Court that the Defendant's understanding of this Plea Agreement is as set forth in this document.

h. The Defendant further advises the Court that it is understood that the Government can only make a recommendation which is not binding on the respective Court.

i. The Defendant further advises the Court that the Defendant understands and has been advised that evidence of a plea of guilty, later withdrawn or an offer to plead guilty to the Count in the Information, or of statements made in connection with and relevant to said plea or offer to plead, shall not be admissible in any civil or criminal proceedings against the Defendant. However, the Defendant does understand that evidence of a statement made in connection with and relevant to a plea of guilty, later withdrawn, or an offer to plead guilty to the Count in the Information herein, is admissible in a criminal proceeding for perjury or false statement when the statement was made by the Defendant under oath, on the court record, and in the presence of counsel.

j. The Defendant is satisfied that defense counsel has been competent and effective in representing Defendant.

-4-

2.     The undersigned attorney for the Government and for the Defendant represent to the Court that the foregoing Plea Agreement is the agreement of the parties that has been reached pursuant to the Plea Agreement procedure provided for in Rule 11, Federal Rules of Criminal Procedure, as Amended. The attorney for the Defendant further advises the Court that the Defendant has been advised of the nature of the charge to which the foregoing described plea is to be offered, and that the Defendant has been advised of the Defendant's right to plead not guilty and to be tried by a jury on all issues herein; of the maximum possible penalty provided by law; that by the entering of a plea of guilty as aforesaid, the Defendant waives the right to be tried by a jury or by the Court, waives the right to confront and cross-examine witnesses against the Defendant and the right not to be compelled to incriminate the Defendant; and that if the Defendant pleads guilty, there will not be a further trial of any kind. Further, the Defendant has been advised that if the Defendant pleads guilty, the Court may ask questions about the offense to which the Defendant has pleaded and that if the plea is rejected or later withdrawn, that the answers to such questions may not be used against the Defendant in a civil or criminal proceeding, but that the Defendant's answers may later be used against the Defendant in a prosecution for perjury or false statement if the answers are not truthful.

3.     The Defendant understands that the United States Probation Office will prepare a presentence investigation report for the Court. The Probation Officer will consider the Defendant's conduct related to the offense to which the plea is offered, as well as the Defendant's criminal history. The offense level or criminal history category, as calculated by the Probation Officer and determined by the Court, may differ from that projected by Defendant's counsel or the Special Assistant United States Attorney.

This ___ day of November, 2006.

-5-

Respectfully submitted,

LEURA CANARY
United States Attorney

Neal B. Frazier
Special Assistant United States Attorney

     I have read the foregoing Plea Agreement, understand the same, and the matters and facts set forth therein accurately and correctly state the representations that have been made to me and accurately set forth the conditions of the Plea Agreement that has been reached.

     IN ADDITION TO THE FOREGOING PROVISIONS TO WHICH I AGREE, I SWEAR UNDER PENALTY OF PERJURY THAT THE FACTS IN THE "FACTUAL BASIS" PARAGRAPH ABOVE ARE TRUE AND CORRECT AND THAT I AM SATISFIED THAT I HAVE RECEIVED COMPETENT ADVICE AND REPRESENTATION FROM MY DEFENSE COUNSEL.

Cecelia W. Owens
Defendant

Date: 11/13/06

Jennifer A. Hart
Attorney for the Defendant

Date: 11/13/06

# Exhibit C

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **CECELIA OWENS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **CASE NO.:  2:06CV999-ID** |
| **LIGHTHOUSE COUNSELING** | ) | **(Filed per Order of the Court)** |
| **CENTER, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## AFFIDAVIT OF CANDYCE DEKRUYFF

**STATE OF ALABAMA**              )
**MONTGOMERY COUNTY**              )

Candyce DeKruyff, being first duly sworn, deposes and says:

1.      I am Candyce DeKruyff, former Executive Director of the Lighthouse Counseling Center, Inc. [hereinafter "Lighthouse"].  I give this affidavit on behalf of the Defendant in the above-styled action, Lighthouse.

2.      As the Executive Director of Lighthouse, I hired Plaintiff as my Deputy Director on September 12, 2005. I interviewed three candidates for the position as my deputy and selected Plaintiff over two equally-qualified white candidates.   In fact, Plaintiff did not meet all the written qualifications that had been set for the position, so I went to Lighthouse's Board of Directors and obtained a waiver for those un-met qualifications.   Shortly after interviewing Plaintiff, I took a maternity leave of absence and returned to work on or approximately November 14, 2005.  Before November 14, 2005, I was available from home but relied on  staff, including Plaintiff, to handle the day-to-day operations.

1

3. Plaintiff was employed at Lighthouse as the Deputy Director from September 12, 2005 to November 18, 2005.  The operations chart for Lighthouse [Ex. D to this brief] put all of the executive staff under the Executive Director and Deputy Director and showed a direct reporting line from the department heads to both the Deputy Director and Executive Director.  The established practice at Lighthouse had been for the Executive Director and Deputy Director to work as a team with the department heads, but immediately after her arrival, Plaintiff began to assert her position and cause problems whenever a department head did not go through her to present anything to me, as Executive Director.  The Business Manager, Ms. Carianne Stinson, was one of these department heads.  She had always worked closely with me as Executive Director, but Plaintiff began to express disapproval anytime she did so. Gradually, I began to detect that Plaintiff was destroying the harmony that had existed in the executive group.  Plaintiff appeared to be pitting one employee against another and trying to create a clique of employees loyal to her who would be allied against employees who preferred me as Executive Director. This problem became acute when the issue of whether Ms. Stinson was going to be allowed to work from home all but about one day a week arose.  This is an example of how Plaintiff's uncongenial style of management led to her discharge.

4.     Plaintiff had other performance problems as well.  Because Plaintiff's tenure with Lighthouse was only two months, she did not receive any performance evaluations, but problems in addition to her divisive attitude were apparent upon my return from maternity leave.  Plaintiff was under my remote supervision until I returned from maternity leave.  Gradually, it became clearer and clearer that Plaintiff refused to accept my authority.  Within five days of my return, I terminated Plaintiff's employment because her work product was substandard and because Plaintiff's conduct was unprofessional, insubordinate, and uncooperative.

5.     Plaintiff's work product was unacceptable in quality, which led me to conclude that Plaintiff had seriously exaggerated her grant writing abilities.  However, her performance was also symptomatic of Plaintiff's larger problem, her inability or unwillingness to accept my authority.  Plaintiff attempted to write two grant proposals during her employment.  I made numerous corrections to Plaintiff's first proposal, only to find that the Plaintiff had turned in the proposal prior to receiving the corrections.  In the second proposal, Plaintiff failed to incorporate any of the corrections that I made to the first proposal, even though I specifically instructed Plaintiff by e-mail that I needed to approve the proposal before submission.  Lighthouse's procedures also provided for the Executive Director to sign the proposal as the agency's authorized official.  Nevertheless, Plaintiff signed the proposal herself, made none of the corrections, and attempted to submit it without my approval.  This was typical of Plaintiff's refusal to accept supervision.  In short, Plaintiff was terminated because her work product was poor and because she was insubordinate and uncooperative, these latter traits being key reasons why her performance was poor.

6.     I questioned the necessity of some of Plaintiff's travel, such as an unauthorized trip to the Center for Disease Control  ("CDC") in Atlanta, her long-time home before moving to Montgomery.  On November 11, 2005, shortly before my return from maternity leave, Plaintiff announced that she was going to the CDC to pursue a grant.  I did not make an issue of the trip since it already appeared that Plaintiff was not going to work out.  However, I questioned its legitimacy.

7.     Exhibit D to this brief is a true and correct copy of the Lighthouse organizational chart as it existed during the Plaintiff's employment.

8.     Exhibit E to this brief is a true and correct copy of an email message sent to me by the Plaintiff after I had strongly verbally counseled her.

9.     There are few, if any, expenditure requests that I, as Lighthouse's Executive Director, deny unless they do not qualify as program expenditures or unless the money is not available to provide for the request.  Importantly, most expenditure requests are made for items or programs and are not made for particular clients.  Thus, it would be impossible for me to make expenditure authorization decisions based on the race of the client.  I am not aware of the race of the clients when budget decisions are made, so budget requests necessarily cannot be racially discriminatory.

10.     During Plaintiff's employment, there was one expenditure request that I can recall that was denied, a request for an additional van driver for Lighthouse's New Beginnings treatment program, which is open to persons of all races.  The request was denied because there were no additional funds in the New Beginnings program grant budget for additional personnel. Additionally, the New Beginnings program directors asked for several positions at that time – counselor, van driver, and an additional case manager.  I asked the New Beginnings directors to prioritize their requests since all three could not be granted due to the lack of grant funds.  The directors reported that the counselor was the most important request, so I asked the Board to approve that request, despite the absence of grant funds.

11. The Board of Directors' Notes attached as Exhibit I to the defendant's brief is a true and correct copy of the Board of Directors' Notes for the meeting held that date. In that meeting members of the Board did exactly what those notes reflect which was to instruct me to investigate the option of allowing Ms. Stinson to work remotely and come into the office one to two days a week.

12.     While proceeding to recruit applicants for the position of Business Manager, I also negotiated with Ms. Stinson over the particulars of the Board's suggestion.  I noticed that Plaintiff resented the fact that I conducted these negotiations directly with Ms. Stinson rather than involving the Plaintiff. The Plaintiff began to obstruct my efforts with Ms. Stinson.  With the Board's approval, I ultimately asked Ms. Stinson to continue her employment, and she agreed, working remotely in Birmingham and coming to Montgomery one or two days a week.

13.     I informed Plaintiff on November 9, 2005 that I had discussed with Ms. Stinson the possibility of her continuing her employment with Lighthouse and working remotely from Birmingham.   Therefore, Mrs. Stinson would not be resigning as initially thought.   This discussion and decision was made under the direction of the Board of Directors.   Ms. Stinson continued to be a full-time employee. The Board of Directors unanimously decided to allow Mrs. Stinson to work primarily from Birmingham because of the excellence of her work, because of her years of experience with the agency in the crucial financial capacity, and because she could not easily be replaced.

14.     Ms. Hibbler's situation was not remotely similar to that of Ms. Stinson.  Ms. Hibbler was a substandard, entry-level employee who resigned of her own volition during an extended probationary period.  In fact, I am not aware of any attempt by Ms. Hibbler to actually withdraw her resignation.   At the most, Ms. Hibbler stated in an exit interview that she had thought about rescinding, but decided not to do so.  If Ms. Hibbler attempted to rescind her resignation, she did not bring it to my attention which is one of the reasons she would not have come to mind when the Plaintiff began her non-specific last minutes allegations of racism.

15.     Ms. Hibbler was not similarly-situated to Ms. Stinson, the Business Manager of the organization, with respect to her job performance or qualifications either.  Ms. Hibbler began

her employment on February 23, 2005 as a case manager in the Center's HUD Housing for clients with substance abuse and HIV diagnoses.  In her first six months in the position, Ms. Hibbler received two coaching notes for poor performance: one dated July 25, 2005 and one dated August 15, 2005.  As a result of her poor performance, Ms. Hibbler was not taken off of her probationary status on September 2, 2005 at the end of her six-month probationary period.  Instead, she was given explicit direction regarding the required improvements that would have to occur in order to have her probationary status removed after another 90 days.  Ms. Hibbler acknowledged this memorandum on September 6, 2005.  Less than 30 days later, on October 3, 2005, Ms. Hibbler was given a third coaching note regarding Leave Procedures.  On October 6, 2005 Ms. Hibbler turned in her resignation while I was on maternity leave, and it was accepted *by Plaintiff* the same day.

16.    On November 9, 2005, Plaintiff called an unauthorized meeting of the managing staff, excluding Ms. Stinson and without notifying me.  On the morning of November 10, 2005, I called Plaintiff after discovering her unauthorized meeting of the management team on November 9, 2005.  I gave her a strong verbal warning regarding her actions.  When counseled about the unauthorized meeting, Plaintiff was unapologetic, uncooperative and belligerent toward me. This was all before the Plaintiff ever mentioned the word "discrimination" to me. The Plaintiff's position was that the members of the management team were below her, and she should be able to call a meeting of them, excluding whomever she wished, without my approval.

17.    On November 14, 2005, I conducted a regularly-scheduled Management Team Meeting, which were held every Monday and included all members of the management – Executive Director, Deputy Director, Business Manager and the four Program Directors.  I reminded the team that at the previous Board Meeting, I was given a directive by the Board to

explore the option of Mrs. Stinson working remotely from Birmingham and coming into the Montgomery office one or two days a week. Mrs. Stinson and I discussed the issue with the Board as well, and the consensus was to pursue this arrangement with a three-month trial and then reevaluate the situation. At that point, I asked the other members of the team if they had any concerns. Plaintiff responded that she had already expressed her concerns, and made several statements that I perceived as disingenuous, bizarre, and insubordinate.

18.     After the meeting on November 14, 2005, I gave Plaintiff a written coaching note addressing her unprofessional behavior at the management team meeting and her lack of judgment in calling an unauthorized meeting of the management team while excluding Mrs. Stinson, and discussing Mrs. Stinson and her position with the agency. *See* 11/10/05 Coaching Note, attached to the Defendant's brief as Ex. G.   After my warning, Plaintiff e-mailed a response and asserted that allowing Ms. Stinson to remain employed somehow violated the Civil Rights Acts and offended Lighthouse policy.  Ex. E.[1]  Since race discrimination laws had no application to the situation and because no such Lighthouse policy existed, I summarily dismissed Plaintiff's allegations.  The comparison between Ms. Stinson and Ms. Hibbler was never made by Plaintiff before her termination, and was first made known to me in Plaintiff's EEOC Charge.  However, even if I had known that Plaintiff was relying on Ms. Hibbler as a comparator for Ms. Stinson, I would not have taken this as legitimate opposition to what was non-existent discrimination, and it would have not been the reason for her discharge.

---

[1]   Plaintiff's e-mail also reveals that Plaintiff was unapologetic for the matters about which she had received the verbal warning and that Plaintiff remained adamant that I should not follow the Board's instruction and secure Ms. Stinson's continued employment.  In hindsight, it appears that Plaintiff was not concerned about retaining her employment at Lighthouse because she was already pursuing a new, higher-paying job with COSA.

19.     Plaintiff reacted to these events in a belligerent manner by giving Ms. Stinson a harsh coaching note.  Additionally, Plaintiff exceeded her authority by attempting to order an audit of Lighthouse's finances despite the fact that a thorough audit had just been made.  I perceived Plaintiff's actions as an ultimatum that it was going to be "her way or the highway." Faced with a Deputy Director who was insubordinate and uncooperative, I recommended Plaintiff's discharge to the Board, and Lighthouse's Board of Directors readily agreed.   On November 18, 2005, I terminated Plaintiff's employment in the presence of the Board Chairman, Mr. David Belser, and another board member, Mr. Robert Sells.   At that time, I informed Plaintiff that it had become very apparent that our management styles were very different and that this had created some confusion among the management and staff of the agency. I told Plaintiff that she was not a good fit for Lighthouse at that time.

20.  After the Plaintiff's termination, on or about November 9, 2007, I discovered that, while employed by the Lighthouse, the Plaintiff had stolen government property from Maxwell Air Force Base and concealed her arrest from the Lighthouse. Had I known those facts at the time, I would have considered that to have been gross misconduct and have strongly favored her discharge.

21.  At no time did the plaintiff ever complain to me that any of my funding decisions were racially discriminatory.

22. At no time during the Plaintiff's employment with the Council on Substance Abuse [COSA] did I ever do anything to cause or attempt to cause her to be terminated by them, nor am I aware of any other representative of the Lighthouse doing so. In fact, Ms. Murphy of COSA and I did not discuss Ms. Owens in any manner until after she was fired by COSA.

23.     The Lighthouse policy manual provides in Paragraph 3. a., Behaviors Warranting

Discipline, for discipline, including termination, for: (3) Dishonesty and  (12) Theft, and

provides in Paragraph H. 1., Gross Misconduct, the following:

> The Executive Director or the Board of Directors will have the
> option of effecting immediate termination of any employee
> adjudged to be guilty of gross misconduct. Gross misconduct may
> include... behaviors that... significantly damage the center's
> public image....

This excerpt is from the policies and procedures manual revised August 2006

because no copy of the unrevised manual has been found.  I affirm that the quoted

sections were not among the provisions that were changed in that revision and

were the policies in effect during the Plaintiff's employment. I know this to be

true because I made the 2006 revisions.


_____
**Candyee DeKruyff**

Sworn to and subscribed before me on this the 6th day of March, 2008.

(SEAL)    _____
NOTARY PUBLIC
My Commission Expires: _____9-19-2011_____

# Exhibit D



Lighthouse Counseling Center, Inc.
Organizational Chart

June 21, 2005
DMH Standard 3107

# Exhibit E



Candyce,

I have received your email where the tone is much different from your phone conversation today. Why can't we just follow policies and procedures as written without disparate treatment of employees which puts the Lighthouse in violation of the Civil Rights Act of 1964, our regulatory bodies, certifying entities and our funding authorities.

Candyce, are you retaliating against me for raising the issue of disparate treatment/possible discrimination of employees or for requesting to follow company policy? This issue of resignation retraction and working in another city is unprecedented, and is a federal Civil Rights case in the making. Remember there are other employees who have desired to retract their resignation whose only difference is the color of their skin. We are an organization that receives federal funding, the implications here are quite serious.

Do you really want to communicate to this organization that policies and procedures are only for some employees and not others? Do you want to disregard the hard work, opinions and expertise of members of mgmt team members who assist you in operating this organization?

According to the Personnel Policy and Procedure Manual, page 7, letter G, Item 1, the Board of Directors, personnel committee should be informed that there are discrepancies in the policy application with all employees. Has the Board been informed of the entire issues here?

For clarity, the mgmt team members decided that we needed a meeting with you concerning your proposal on the business manager position. You informed me and you did not direct me not to discuss this with them. They have been a part of the decision making process all along so it is not unusual or uncommon that they would be informed as it was with the Deputy Director position. I have kept you abreast of every step in this process by phone and by email. You have never objected to them participating before, but rather directed and encouraged it. We are all a part of the decision making process of this organization. This is what you informed me of during my interview and on many occasions since I have been in this position.

Carianne was not invited or a part of this meeting because Carianne has not communicated with me as her supervisor any of these issues at hand for obvious reasons. She continues to be insubordinate in every way as it relates to me as her supervisor. The recent Mike King situation that cost the organization over $600 was a clear oversight on Carianne's part. She was informed of the sensitive nature of the situation with this landlord last month, and she did not seek my counsel or direction in the handling of his rent checks. Given the situation, I have done nothing unprofessional in my position as Deputy. I am doing the job I was hired to do under your directives.

Carianne submitted her resignation of her own free will and decided on her own departure date. She made her own decisions, announced this to mgmt team, the board and put it in writing. She could have easily waited until she had a position, but chose to prematurely do this. By policy, the business manager position was advertised, top candidates were interviewed,

and we have two viable candidates. The mgmt team has worked very diligently to fill this position. We also have a vital plan of transition. The day

before the offer is to be made to the candidate, and with no prior warning or consultation, you state to me that you are the Executive Director and that you are considering the option of Carianne remaining in the position to work in B'ham one day a week.

Of course, I informed the team who have worked with me through this in your absence. The request to rescind the resignation if any, should have come to me as her supervisor. On last week, I requested your assistance and support in supervising Carianne. You pledged that to me, but when given the opportunity to exercise the option with this situation, you chose not to do so by failing to re-direct Carianne in the appropriate manner to me as her supervisor.  This was your choice, not mine. By your own actions, you have chosen to remove the decision making power of the Deputy Director when it relates to the Business Manager position present and future.  This is fine with me. I have accepted this as being consistent of your leadership/management as it relates to the Business Manager but with no other mgmt team member. I will continue to carry out the responsibilities in my job description unless you provide other directives.

I will keep you informed concerning my leave time as soon as I get confirmation from my husband's doctors.  I'm not sure about Monday and Tuesday yet, I will let you know.

See you next week.

Cecelia

# Exhibit F

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **CECELIA OWENS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **CASE NO.: 2:06CV999-ID** |
| **LIGHTHOUSE COUNSELING** | ) | |
| **CENTER, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## AFFIDAVIT OF DAVID E. BELSER

| | |
|---|---|
| **STATE OF ALABAMA** | ) |
| **MONTGOMERY COUNTY** | ) |

David E. Belser, being first duly sworn, deposes and says:

1. I am David E. Belser, of Montgomery, Alabama. I am a practicing attorney admitted to practice before this Court. I give this affidavit on behalf of the Defendant in the above-styled action, Lighthouse Counseling Center, LLC [hereinafter "Lighthouse"].

2. I am a member of the Lighthouse's Board of Directors. Like all of its board members, I serve without pay or compensation on a voluntary basis because of my belief in the Lighthouse's mission.

3. At the time the Plaintiff, Ms. Cecelia Owens, was employed by Lighthouse, I was President of the Lighthouse Board.

4. The Board approved the Executive Director's, Ms. DeKruyff's, request that a requirement for the position of Deputy Director be waived so that the Plaintiff could be hired as her deputy. All during the time of the Plaintiff's employment, and before and since, the board has placed great emphasis on the opinion of the Executive Director as to

hiring and firing decisions since the Executive Director has knowledge of the needs of the Lighthouse and the performance of employees that the board members cannot have. I cannot recall a single time in which the recommendation of the Executive Director as to an issue of hiring or firing has not been approved or ratified. In fact, Board approval is not actually required for any of these decisions unless there is some requirement to be waived or the proposed salary is outside the approved range. Normally, however, the Executive Director advises the board of decisions about the top executive positions, such as the Deputy Director position.

5. I was board chairman and present at the board meeting on October 25, 2005 when the Lighthouse Business Manager, Carianne Stinson, announced that she was resigning because she was moving to Birmingham. Many members of the board, me included, were very disappointed to hear that the Lighthouse would be losing an excellent employee who we felt was very important to the Lighthouse's success. That feeling was expressed during the board meeting.

6. During the board meeting, or immediately thereafter, some members of the board, me included, instructed Ms. DeKruyff to see if something could be worked out so that Ms. Stinson would remain in her position, working remotely from Birmingham and coming to Montgomery weekly and when the need arose. Ms. DeKruyff agreed to do that, and Ms. Stinson agreed to consider the possibility.

7. Ms. DeKruyff later reported to the board that it could be done if the board approved a modest amount of electronic equipment for Ms. Stinson's home office, a telephone and internet connection for that office and travel expenses for the trips to Montgomery. The

board considered the proposal to be reasonable and, with some limits on the travel expense, approved it so that Ms. Stinson could remain employed.

8.  I was President of the Board when Ms. DeKruyff decided to terminate the Plaintiff's employment. Ms. DeKruyff explained that the Plaintiff was not working harmoniously with her and was refusing to accept her supervision. That was sufficient for me to concur in the Plaintiff's termination.

9.  Since the Plaintiff's termination, I have learned that, while employed as the second highest Lighthouse executive, Ms. Owens stole government property from the Base Exchange at Maxwell Air Force Base and that she concealed that from the Lighthouse. If I had discovered those facts during her employment, I would have been in favor of terminating Ms. Owens's employment. If Ms. DeKruyff had recommended that action, as I believe she would had she been aware of the facts, there is no question in my mind that Ms. Owens would have been terminated forthwith.

**David E. Belser**

Sworn to and subscribed before me on this the _6ᵗʰ_ day of March, 2008.

(SEAL)

NOTARY PUBLIC
My Commission Expires: _12-25-09_

# Exhibit G

LHCC Coaching Note Form, 5/98

## Lighthouse Counseling Center
# COACHING NOTE

| Employee Name | Position/Status | Date |
|---|---|---|
| Cecelia Owens | Deputy Director | November 10, 2005 |

Frequency of Coaching:

_____ Daily          _____ Weekly          _____ Monthly          X  One Time Only

Type of Note:
_____ Recognition of a job well done!          _____ Review of policy and procedures.
_____ Clarification of duties.          X  Review of job expectations and/or attitude check.
_____ Review of previous coaching note.          _____ Other. Explain _____

Explanation of Note:

Cecelia ~ As per our conversation earlier today, I am very disturbed that you would either call or participate in a management team meeting to discuss the business manager position/Carianne (as stated in your e-mail) without Carianne present. It is completely inappropriate and unprofessional to discuss these issues with Carianne's peers prior to discussing any concerns that you may have with me as your supervisor. I also feel that your decision to do so shows very poor judgment and I have to say that I expect both a higher degree of professionalism and much more maturity in judgment from someone in the Deputy Director position.

Your participation in a meeting of this nature is a divisive action and does not work towards the goal of teamwork that you say that you have.

It is my expectation that both your judgment and your level of professionalism will increase and that a situation of this nature will not occur again in the future.

Employee Response:

There has been no unprofessionalism on my part as I stated in my email dated 11/10/05. Any inappropriateness in this business manager position has been by Carianne and yourself. The mgmt team has been a part of this process all along at your direction. Further you did not instruct me not to share your proposal. The divisiveness in this situation is from you and Carianne. This coaching note is retaliation for my bringing to your attention that your proposal *

| | |
|---|---|
| [signature]  11-14-05 | Cecelia Owens  11-14-05 |
| Supervisor's Signature & Date | Employee Signature & Date |

- Acknowledge Receipt * is disparate and discriminatory against other employees in the same situation based ming, Hoffman Green Campbell, PC.          upon their race and violates their

# Exhibit H

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **CECELIA OWENS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **CASE NO.:  2:06CV999-ID** |
| **LIGHTHOUSE COUNSELING** | ) | **(Filed per Order of the Court)** |
| **CENTER, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**AFFIDAVIT OF ALICE MURPHY**

**STATE OF ALABAMA**              )
**MONTGOMERY COUNTY**        )

      Alice Murphy, being first duly sworn, deposes and says:

      1.     I am Alice Murphy, President and C.E.O. of the Council on Substance Abuse-NCADD [hereinafter "COSA"].   Our offices are located at 828 Forest Avenue, Montgomery, Alabama.  I give this affidavit on behalf of the Defendant in the above-styled action, Lighthouse Counseling Center, LLC [hereinafter "The Lighthouse"].

      2.     The Plaintiff in this action, Ms. Cecelia Owens, was employed by COSA on November 28, 2005 after she was terminated by the Lighthouse, though she concealed that fact from us.  She told us during her interview that she had quit The Lighthouse because it was "not a good fit" for her  because she was more interested in being involved in our mission, prevention of substance abuse, than in The Lighthouse's mission, treatment of substance abuse. She also misrepresented what she had been paid by The Lighthouse, telling me that she was taking a salary cut in accepting my offer of $55,000.00 per year, when I was informed  that she actually had been making only $47,500.00 per year at The Lighthouse. This misrepresentation took on additional importance when Ms. Owens later demanded even more pay from COSA and falsely contended that I had promised to pay her more than the salary we agreed upon. In fact, Ms. Owens sued COSA after her termination claiming, among other things, that she had been

promised this extra pay, but her suit was unsuccessful. In her testimony in that suit, Ms. Owens testified that COSA had "lured" her away from The Lighthouse. That testimony was obviously untrue because she was terminated by The Lighthouse.

      3.     I understand that Ms. Owens claims that The Lighthouse personnel caused her to be fired by COSA. That claim is not true. No one from The Lighthouse had anything to do with her discharge from COSA on February 6, 2006. The first time I spoke to anyone connected with The Lighthouse about Ms. Owens was after her discharge from COSA. Other members of my staff were in agreement, but I made the ultimate decision to terminate Ms. Owens. Therefore, I know why I made the decision and, thus, why she was fired. Ms. Owens was fired from her position at the COSA because she was "not a good fit" for this agency, either. We were dissatisfied with her performance and her attitude. She made unjustified salary demands, caused morale problems, attempted to get another employee fired, and performed her tasks in a mediocre fashion.  She especially appeared to have exaggerated her experience in the area of grants. Neither Candyce DeKruyff nor anyone acting on behalf of The Lighthouse did anything that contributed to my decision regarding her discharge. No one from the Lighthouse asked that she be fired, suggested that she be fired or, in any way, caused me to fire Ms. Owens.

      4.     I was present during the trial of Ms. Owens' suit against COSA.  I observed Ms. DeKruyff and Mr. David Belser in the audience.  I saw Mr. Belser approach the bench and ask the judge to be allowed to tape record the proceedings and saw him place his recorder in plain view.  Neither she nor her attorney objected.

 

Alice Murphy

Sworn to and subscribed before me on this the 6th day of ~~February~~ March, 2008.

      (SEAL)

Patricia Adams Mills

NOTARY PUBLIC

My Commission Expires: 9-19-2011

Owens final

# Exhibit I

## Lighthouse Counseling Center, Inc.
### Board of Directors' Meeting Notes
### October 25, 2005

**Attendees:** David Belser, Robert Sells, Ramona Blankenship, Blanchie Powell, Ceil Champion, Jane Nichols, Randy Tatum, James Carmichael, Grace Bishop, Sheddred Johnson,

**Unexcused Absence:** Mollie Isaacson

**Staff:** Candyce DeKruyff, Regina Berry, Lisa Carroll, Rick Baity, Cecelia Owens, Carianne Stinson

Mr. David Belser called the meeting to order at 12:15pm.

A Quorum was determined and Ms. Ceil Champion made a motion to accept the agenda. Ms. Grace Bishop seconded the motion and it was approved unanimously.

Mr. James Carmichael made a motion to accept the minutes of the July meeting. Ms. Ramona Blankenship seconded the motion and it was approved unanimously.

### Board Committee Reports

**Personnel Committee -** The personnel committee made the motion not to raise the family health coverage deduction for employees who elect to have family health coverage. The employees portion will stay at $162/mth, with an annual cap of $16,000.00/year. All board members were in favor and it was approved unanimously.

**Executive Director's Report -** Candyce informed the board that the Christmas luncheon will be held at the Arrowhead Country Club on December 20, 2005 at noon. That will be the December Board meeting date.

### New Business

Robert Sells motioned that the board approve individual raises up to the maximum of 5% for employees that have been with the agency a minimum of 6 months and who have completed their probationary period. Performance raise amounts will be determined by staff supervisors and approved by the Executive Director and would be effective January 1, 2006. Ceil Champion seconded the motion and it was approved unanimously.

Ceil Champion informed the board of a fund raiser in response to an SOS for STAR. It will be Thanksgiving weekend, Saturday November 26th at Down the Street Cafe. Boston butts will be $25.00 a piece and Spaghetti Plates for $5.00 a piece.

The board asked Candyce DeKruyff to investigate the option of the Business Manager, Carianne Stinson, working remotely and coming into the office 1-2 times a week. Candyce and Carianne agreed to research that option.

There being no further business, the meeting was adjourned at 1:00pm.

The next meeting will be on Tuesday November 22nd, 2005 at noon at the Lighthouse.

Respectfully submitted,

Carianne Stinson

I

# Exhibit J

COPY    1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                  NORTHERN DIVISION

4

5     CECELIA OWENS,

6          Plaintiff,

7     Vs.                              CIVIL ACTION NO.
                                        2:06CV999-ID
8     LIGHTHOUSE COUNSELING
      CENTER, INC.,

9
           Defendant.
10

11              * * * * * * * * * * * *

12                    VOLUME I

13              * * * * * * * * * * * *

14

15          VIDEOTAPED DEPOSITION OF CECELIA OWENS, taken

16    pursuant to stipulation and agreement before Lisa J.

17    Green, CCR, ACCR # 334, Registered Professional

18    Reporter and Commissioner for the State of Alabama at

19    Large, in the Law Offices of Capell & Howard, 150

20    South Perry Street, Montgomery, Alabama on Wednesday,

21    December 26, 2007, commencing at approximately

22    9:55 a.m.

23

237

        I, Cecelia Owens, hereby certify that I have

read the foregoing transcript of my deposition given

on Wednesday, December 26, 2007, and it is a true and

correct transcript of the testimony given by me at the

time and place stated with the corrections, if any,

and the reasons therefor noted on a separate sheet of

paper and attached hereto.




                              _____
                              Cecelia Owens




        SWORN TO AND SUBSCRIBED before me this

_____ day of _____, 20___.




                              _____
                              NOTARY PUBLIC

1      them were African-American.

2   Q.   The majority, African-American.  So you would

3        therefor expect the majority of any comments

4        about any person to relate -- would involve

5        somebody who was African-American if the

6        clientele was predominantly African-American?

7   A.   Well, I would expect that if comments are made

8        about people or a population, that it's in

9        reference to that population that's being

10        talked about, which were the clients.

11   Q.   And those people might be predominantly male.

12        Does that lead you to believe that the

13        comments are related to their gender just

14        because they're predominantly male?

15   A.   Well, the comments were made specifically

16        concerning a population -- it had -- whether

17        they were male or female.

18   Q.   Did you understand Ms. Nicholas -- and I

19        believe I said Nichols before, and I

20        apologize.

21            Do you understand that she claims that

22        Ms. Stinson or anyone else at Lighthouse made

23        derogatory references to people and indicated

44

1  A.   Yes, I certainly was.

2  Q.   And that was before you had this outbreak of

3       shingles?

4  A.   I had the outbreak of shingles right after I

5       had a court case with the previous employer,

6       and I got the outbreak of shingles right after

7       that.

8  Q.   So do you attribute that to the stress of the

9       court case with the Council on Substance

10      Abuse?

11 A.   I attribute it to the entire stress, not only

12      the court case, but also what happened during

13      the court case, the Lighthouse showing up and

14      all these different things and then not

15      properly being defended, the entire situation

16      of my personal belongings being taken from me,

17      things that I cherish, the interference of the

18      Lighthouse.  I attribute it to all of it.

19 Q.   Okay.  In terms of Lighthouse's actions -- not

20      the Council on Substance Abuse.  You're not

21      suing them any longer, right?

22 A.   No, I'm not.

23 Q.   You lost that suit, didn't you?

45

1   A.   Well, you should know.  You were there.

2   Q.   No, I wasn't there.

3   A.   Well, I wouldn't say I lost it.  I'd just say

4        that I was placed at a very -- a real

5        disadvantage.

6   Q.   Well, what was the judgment?  Was it in your

7        favor or against you?

8   A.   I don't know what judgment was.  Simply, the

9        case was one where my personal belongings were

10       taken, and I wasn't reimbursed for things that

11       were very cherished by me that my husband and

12       I had collected from years of our lives.  And

13       I went to court to try to get those things

14       back and to get reimbursement for those

15       things.  And basically, I believe the judge's

16       ruling was that I had not proven my case

17       because I didn't bring the broken items and

18       things into court or whatever.  I don't really

19       recall.

20  Q.   You got no recovery in that case, did you?

21  A.   No, I did not.

22  Q.   All right.  The Lighthouse had nothing to do

23       with the taking of your property that you're

58

1      have to get those from the institution.

2  Q.   And I say:  With sole exception of any

3      correspondence solely between the plaintiff

4      and her attorneys, documents and other

5      evidence that were returned to her from her

6      attorney before or after his withdrawal from

7      this case.  Do you have anything you haven't

8      given to me that was returned to you by your

9      attorney?

10 A.   No, I don't.

11 Q.   Plaintiff is also required to bring all

12     records in her possession or control that

13     relate to her criminal history, including

14     arrests, plea, and conviction records and any

15     probation and parole records.  Did you bring

16     those?

17 A.   I don't have anything.

18 Q.   You haven't saved anything in connection with

19     what the court gave you in terms of your most

20     recent conviction?

21 A.   No, I sure don't.  I'm sorry.  I've moved.

22     I've moved twice since then.

23 Q.   Are you still on probation?

76

1    in Birmingham comparable to what she had at

2    the Lighthouse and she wanted to stay, which

3    really, you know, to me wouldn't have been

4    that big of a deal.  It was just the way it

5    all happened, you know.

6         Really, to me -- She never came to me and

7    said this as her supervisor, which was a large

8    part of the problem, you know.  You bring me

9    your resignation, but you don't come to me and

10    tell me, listen, things are not, you know,

11    working out the way I thought they were and I

12    want to rescind or whatever.  It didn't come

13    to me.

14  Q.   And if it had, you say it wouldn't have been

15     that big of a problem?

16  A.   If it had come to me, then we could have

17     addressed it in a manner that I feel would

18     have been appropriate because it would have

19     been done appropriately.  Nothing was done

20     appropriately.  It was done -- And it was

21     clear that race was an issue.

22  Q.   How would you have -- Let's assume she had

23     come to you and said, Ms. Owens, you know, for

1    various reasons, I really would like to

2    withdraw my resignation, I wish you would help

3    me with this and help me figure a way that I

4    can continue to work for the Lighthouse and

5    she had come to you and approached you in the

6    right way, how would you have been able to

7    help her?

8    A.    Well, first of all, that was a hypothetical,

9    and it didn't happen.  But as a person in the

10   deputy director position, I probably would

11   have called Candyce and we would have talked

12   about it.  Then it would have went to the

13   management team and we would have all talked

14   about it the way we had done everything else.

15        This is the way things were done.  I did

16   not set the management style of that

17   organization.  It existed when I got there.

18   It was a process that -- it was the way things

19   were done.  Nothing was made by one person.

20   Of course, Candyce had the ultimate decision,

21   but nothing was made by one person.  It was a

22   team effort.

23   Q.    All right.  And if the team had said, well,

78

1  you know, if she would come down here and

2  spend a sufficient amount of time down here

3  and be available by computer the rest of the

4  time, that could probably work, would you have

5  gone along with the team recommendation?

6 A. I can't answer hypotheticals because that did

7  not happen.  That did not happen.

8 Q. When you can't answer a hypothetical, that

9  means you can't say, no, you wouldn't have

10  gone along with it, correct?

11 A. I don't know what would have happened because,

12  like I said, there were things that were not

13  done and I wasn't given that opportunity to

14  respond.  I wasn't given that opportunity.

15 Q. So you don't know whether you would have gone

16  along or not?

17 A. I can't -- well -- Well, given every

18  opportunity and every effort that I had made

19  with Carianne is no reason for me to think in

20  my mind that I wouldn't have because I had

21  bent over backwards to try to work with her.

22  I was happy for her in her move or whatever.

23  It was not that big of a deal.

1              It was just when all this masterminding

2        and all this conniving and all this stuff of

3        going around her supervisor which had been a

4        problem from day one, you know, never, ever

5        communicating with me, you know, even to

6        signing her own expense statements when I'm

7        her supervisor right across the hall, you

8        know, all these things were already going on,

9        so there were a lot of issues.

10             And, yes, I would have expressed the way

11       I would have felt.  I would have wanted to

12       know how things were going to handle -- be

13       handled, just like the management team wanted

14       to know how things were going to be handled.

15       They wanted to know these things as well.

16   Q.  And assuming that she had agreed to spend

17       sufficient time in Montgomery to satisfy the

18       management team, you would have been

19       cooperative?

20   A.  I make no assumptions.

21   Q.  Which means you don't assume that you would

22       have been uncooperative?

23   A.  I make no assumptions because these are all

80

1    hypotheticals and they did not happen.  And

2    had it happened, I would have been given that

3    opportunity and I could be sitting here now

4    telling you what I did.

5  Q.  Well, it's helpful just to know you don't know

6    what you would have done in those

7    circumstances.

8  A.  Well, I wasn't given that opportunity, so I

9    certainly couldn't answer.

10 Q.  Okay.  Plaintiff is also required to bring all

11    records in her possession and control that

12    relate to her criminal history, including

13    arrest, plea, conviction records and any

14    probation and parole records.  And you say you

15    have absolutely none of those?

16 A.  No, I don't.

17 Q.  All right.  Let me ask you about your criminal

18    history.  And, Ms. Owens, in fairness, I need

19    to say to you, remember you're talking to the

20    judge and the jury and that if you're not

21    candid and fully honest in your answers to

22    these questions, the judge or the jury could

23    conclude that they should not believe you as

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

1          to other things.  Do you understand that?

2     A.   Well, I appreciate your advice, but I

3          understand that.

4     Q.   All right.  In that regard, I would like to

5          know about your entire criminal history.  I

6          would like for you to tell me every time

7          you've been arrested.

8     A.   I don't remember every time I've been

9          arrested.  I have had problems over the years

10         stemming back from college.  In college, I was

11         on marijuana.  I had a failed first marriage

12         that resulted in a lot of incidences.  So I've

13         had some issues that I've had to deal with,

14         and I'm dealing with them.

15    Q.   All right.  I'm really not talking about

16         issues.  I'm talking about matters with the

17         police and courts.

18              You said you were on marijuana in

19         college.  Were you arrested for marijuana

20         possession or use of --

21    A.   I don't -- I don't -- I don't know if I was

22         arrested for marijuana.  I know I was

23         arrested.  And, actually, I really don't even

82

1       remember.

2   Q.   Where was that arrest?

3   A.   Probably Montgomery.  I was in college here.

4   Q.   Do you remember appearing in court?

5   A.   Yeah, I think that would be the legal thing.

6       I'm pretty sure I went to court.

7   Q.   And do you recall where that was?

8   A.   Here in Montgomery somewhere.

9   Q.   When were you in college?

10   A.   Alabama State University.

11   Q.   When?

12   A.   1977 till something, '81 or '82.

13   Q.   All right.  This arrest, would you say that

14       was the first time you were ever arrested?

15   A.   Yes.

16   Q.   You were never arrested when you were in

17       Greenville?

18   A.   No, I wasn't.

19   Q.   And did that arrest have anything to do with

20       theft?

21   A.   I'm not sure.  I really don't remember, but

22       I'm pretty sure you can get the records and

23       they would say.

83

```
1   Q.   But you were a college student at the time?
2   A.   Yeah, I was.  I was a college student, very
3        disturbed and on -- smoking marijuana.
4   Q.   And did you have -- Did you serve any time in
5        jail or --
6   A.   Not to my knowledge.  I don't -- I don't
7        remember serving any time in jail.
8   Q.   You don't remember spending nights in the jail
9        facility?
10  A.   No.  I remember being arrested, but I don't
11       know -- I don't know if I ...
12  Q.   Do you remember where you were arrested?
13  A.   In Montgomery.
14  Q.   I mean, where in Montgomery?
15  A.   I don't know where.  I really don't.
16  Q.   Were you at a party or were you at a mall?
17  A.   I don't know exactly where I was, because it
18       was over 20 something, 30 years ago.  I
19       don't -- I don't really remember.
20  Q.   What's the next arrest that you recall?
21  A.   I'm not sure.  I've been arrested several
22       times, so I really don't --
23  Q.   Well, I really want to know them all, so --
```

84

1   A.   But I really -- I honestly cannot remember,

2         but if you have something, you know, I'll

3         definitely stipulate to it.

4   Q.   Have you been arrested since you were arrested

5         in -- at the Post Exchange?

6   A.   No.

7   Q.   Do you want to change your tape?

8   A.   Yeah.  You can go ahead.

9   Q.   What's the other arrest you recall between

10        your arrest at the Post Exchange and your

11        arrest for the marijuana?

12   A.   I don't -- I don't recall.  I just know it was

13        a period in my life when I was going through

14        things, and some of it is vague to me or

15        whatever.  But I don't deny my criminal

16        history.  I don't deny any mistakes I've

17        made.  I really don't.  I've learned from

18        them, and I'm moving forward.  It's in my

19        past, and that's where, you know, it's going

20        to stay.

21   Q.   You want the judge and the jury to believe

22        that you don't recall the times you were

23        arrested?

1   Q.   Ms. Owens, please get my question straight.  I

2        am not asking you for specifics beyond what

3        you recall, but I do want to know about when

4        to the degree you recall when, where to the

5        degree you recall where, for what to the

6        degree you recall for what.  And I'm asking

7        you, do you expect the judge and jury to

8        believe that you don't recall the times you've

9        been arrested?

10  A.   I recall the times I've been arrested.  But

11       like I said, if you have something specific

12       that you want to ask me, you know -- you know,

13       go for it.

14  Q.   I want to know everything you recall about

15       those arrests.

16  A.   I don't recall anything about them.  I really

17       don't.

18  Q.   Do you know if you've ever been arrested in

19       Georgia?

20  A.   Yes, I've been arrested in Georgia.

21  Q.   For what do you recall about being arrested in

22       Georgia?

23  A.   I'm not sure what they call it.  It was a

87

1      misdemeanor, some situation concerning my

2      daughter and myself relative to paying for an

3      item and the price wasn't right or something.

4  Q.  Changing the price -- You were accused of

5      changing the price on an item that you tried

6      to purchase?

7  A.  Well, that was the charge, I believe.

8  Q.  Do you know whether you pled guilty?

9  A.  Yes, I pled guilty.

10 Q.  So you, in fact, did change the price?

11 A.  No, I didn't change the price.  I pled guilty.

12 Q.  Any other arrests that you recall in Georgia?

13 A.  Not to my knowledge.

14 Q.  Did you ever take a computer from work, report

15     it stolen, and then try to pawn it?

16 A.  No, I didn't take a computer from work.  I

17     took my computer from work.

18 Q.  Did you report it stolen?

19 A.  Yes, because it was stolen.

20 Q.  Did you try -- subsequently try to pawn it?

21 A.  No, I didn't try to pawn it.  I pawned it

22     because it was mine after it was returned to

23     me and after I had paid for it.

88

1    Q.    And did you -- But did you make a report to
2          the insurer that your computer had been
3          stolen?
4    A.    The employer made a report to the insurer,
5          collected my money and the insurance money as
6          well, and the judge saw it -- saw through it
7          and dealt with that as well.
8    Q.    All right.  Were you convicted of any
9          violation in connection with that incident?
10   A.    No, I was not.  It was all -- it was all a
11         part of an employer -- legal situation that
12         was dealt with by the judge.
13   Q.    How did you get the computer back if it had
14         been stolen?
15   A.    I don't remember the details, but it was
16         labeled.  It was labeled with my information
17         on it.  And it was returned to me, like,
18         several months later if I remember correctly.
19   Q.    By whom?
20   A.    By somebody.  I don't know who.  I don't
21         really remember who --
22   Q.    By somebody from work?
23   A.    No, it wasn't anybody from work because that's

1     had been using my office or whatever and left

2     the doors open.  But there had been break-ins

3     all along.

4          And they contacted me a couple of days

5     later about the computer if I remember

6     correctly, and I told them -- actually, I was

7     coming back to pick it up because it was on my

8     desk, but at that time it couldn't be

9     located.  But I told them don't worry about it

10    because it had labels and everything on it;

11    maybe if somebody got it, they would return it

12    or whatever.  But it was five or six months

13    later.

14  Q.   Did you make any kind of claim for

15    reimbursement either from an insurer or from

16    the employer for the loss of that computer?

17  A.   I didn't make any claim to the insurer because

18    it was insured, I think, through the

19    employer.  But what the employer did was took

20    it out of my pay.  They made me pay for it

21    five -- five months previous.  They made me

22    pay for it.  They took the money out of my

23    check or something.

1    Q.    Have you ever been arrested in Florida?

2    A.    I think so.  I don't know.  Maybe back in the

3          early eighties with my older daughter's

4          father, my first marriage, I think there was

5          an incident there or something.

6    Q.    Was this a physical violence incident?

7    A.    Well, I don't remember.  I don't know what it

8          was.

9    Q.    Were you convicted of some violation in

10         Florida?

11   A.    I don't think I was.  I just know that he

12         was -- he was in a lot of trouble, and he had

13         a really, really bad drug problem.  And there

14         was always situations.  I don't even

15         remember.  It's just a part of my past that I

16         just ...

17   Q.    Where in Florida was this?

18   A.    Pensacola.

19   Q.    Did you ever live anywhere other than

20         Pensacola in Florida?

21   A.    No.

22   Q.    Do you recall any other arrests in Florida?

23   A.    No.

93

1    Q.    Any other arrests in Alabama other than the
2          most recent one at the Post Exchange?
3    A.    No.
4    Q.    Did you tell the people at the Lighthouse when
5          you were interviewing there about any of your
6          criminal history?
7    A.    No.  The people at the Lighthouse, I gave them
8          permission to run my history, just as was the
9          policy with everybody else.  I signed the
10         paper.
11   Q.    Did you tell them when you were arrested at
12         the Maxwell Air Force Base?
13   A.    No, I didn't.
14   Q.    If you had reported that you had been arrested
15         at Maxwell Air Force Base for shoplifting,
16         would you have expected that to affect your
17         employment at the Lighthouse?
18   A.    I really probably didn't think about that at
19         the time because I wasn't at the Lighthouse at
20         the time and ...
21   Q.    You weren't at the Lighthouse when you were
22         arrested?
23   A.    I wasn't working.  I think that -- that -- It

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

94

1    was evening or night or something.  That's

2    what I'm saying.

3  Q.  You were employed --

4  A.  I wasn't physically there.

5  Q.  You were employed --

6  A.  Yeah, I was employed there.

7  Q.  Tell me about the circumstances of this.

8  A.  Well, there's nothing to tell.  There's

9    nothing to tell.  It was a misdemeanor.  And I

10    don't even think there's anything in the

11    Lighthouse policy that prohibits you from

12    being employed with a misdemeanor, you know,

13    according to the employee policy, so it -- I

14    don't know.

15      But the way the things are treated at the

16    Lighthouse are different with certain people,

17    because the policy, if I remember correctly,

18    it said something about -- I don't know.  I

19    don't know certain -- I don't know exactly

20    what it reads, but it's in there.  And I think

21    I read it or whatever, but I -- no, I did not.

22  Q.  No, you did not report it?

23  A.  Exactly.

1    Q.    Is that what you're saying?

2          I beg your pardon, but there are

3    specifics about it.  What did you do?  You

4    took some stuff and put it in your purse?

5    A.    No, I didn't.

6    Q.    What did you do?

7    A.    I really didn't do anything.

8    Q.    You really are innocent?

9    A.    Well, I mean, that's for a judge to decide or

10   whatever.

11   Q.    The judge decided you were guilty based on

12   your guilty plea, correct?

13   A.    Well, yes, that's true.

14   Q.    And you were given probation?

15   A.    That's correct.

16   Q.    But you didn't report any of this to the

17   Lighthouse?

18   A.    No, I didn't.

19   Q.    Now, you understood, didn't you, that the

20   Lighthouse dealt with people with multiple

21   problems?  Sometimes they had problems with --

22   mental health problems and physical -- you

23   know, physical problems, like drug addiction

1    Q.    You were searching for employment during that

2          time?

3    A.    Yes, I was.

4    Q.    How about -- You obviously had no employment

5          between Lighthouse and Council on Substance --

6    A.    (Shakes head from side to side.)

7    Q.    What was your employment immediately preceding

8          Lighthouse?

9    A.    I worked for Keeping Our Village Alive.

10   Q.    And is that an entity you formed?

11   A.    Uh-huh.  (Positive response.)  Formed with

12         some other people.

13   Q.    And was it a not-for-profit?

14   A.    Not-for-profit.

15   Q.    And what were you paid to run that?

16   A.    It varied from year to year, depending on what

17         the funds were.  Sometimes in the thirties,

18         sometimes in the forties.  It just varied.

19         Sometimes -- Initially nothing.

20   Q.    How many years did you work for KOVA?

21   A.    The last seven -- six, seven years.

22   Q.    And you say the most you made during any year

23         would have been in the forties?

1                    of tape four.

2    Q.    Ms. Owens, help me get this straight.    I'm

3          talking about during the year in which you

4          worked for Lighthouse and --

5    A.    During the year that I worked for Lighthouse,

6          I worked at KOVA for three months.

7    Q.    Three months at KOVA, and that would have been

8          January, February, March?

9    A.    About three months before I moved down here.

10   Q.    Do you recall when you moved to Montgomery?

11   A.    I don't know.  I was backwards and forth down

12         here because of my dad.  And my daughter was

13         already living here, so I was already kind of

14         here during that entire year.  But I think

15         I -- I don't know when I got my own place.  It

16         might have been June, but I was always

17         backwards and forth because my dad was gravely

18         ill.

19   Q.    All right.  Did your husband live here in

20         Montgomery with you during any of that time?

21   A.    My husband still lived in Georgia, and we were

22         backwards and forth.

23   Q.    All right.  And where did you live when you

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

1   A.   I have never, ever seen it.  I would like to

2        know -- I would like for you to please

3        disclose that information.  I need to know who

4        that is.

5   Q.   I don't have the information as to who the

6        psychologist is.  I just have the notes from

7        the court file.

8   A.   That is -- That is not accurate, and I have

9        never, ever seen that or heard it, and that's

10       what's amazing to me.  I would love -- which

11       is going to make me ...

12  Q.   Ms. Owens, you said you'd only sued this

13       council and this COSA and Lighthouse, but

14       didn't you also sue Community Schools --

15       didn't you also sue Cuff and Dean, Georgia

16       Medical Institute?

17  A.   You asked me about the ones that I've sued,

18       and I've told you the ones that I've sued.  I

19       had a complaint against Georgia Medical

20       Institute, yes, I did.

21  Q.   All right.  And what was the nature of that

22       complaint?

23  A.   Actually, it's ironic that all of these cases

1    are pretty much the same where organizations

2    want to hire me in as the African-American

3    token, and then when I won't do their

4    discriminatory practices, then they get angry

5    and upset with me.

6        So it was the same situation basically as

7    the Lighthouse and Communities and Schools of

8    Georgia and Alice, same situation.

9  Q.   All the same situation?

10 A.   Same situation.

11 Q.   That you had no trouble getting hired, but

12    that the way you did your job made them want

13    to fire you?

14 A.   No, it wasn't the way I did my job.  It was

15    when I would not do the things that I knew

16    were wrong in my job.  It was no problem with

17    the way -- I don't even have a write-up in

18    none of my employee files.  None of them.  You

19    will not find one write-up on anything.

20        And when it gets to these decisions where

21    there is a clear racist line to do something

22    that I know that I'm not going to do, then

23    that's when I, so to speak, become the

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

```
 1              Could you read the statement before that

 2        or -- and the statement -- and the one behind

 3        it so I can --

 4   Q.   Are you talking about in your complaint?

 5   A.   Yes.  I'm not sure if I have it.

 6   Q.   I'll let you look at your complaint.  We're

 7        looking at the complaint, page seven, count

 8        three, tortious interference in business

 9        relationships.  You reallege and reincorporate

10        by reference all you've said before.

11   A.   What this has to do with is the Lighthouse

12        interfering with my employment with the

13        Council on Substance Abuse.

14   Q.   All right.  And tell me what the Lighthouse

15        did that interfered with that employment.

16   A.   I feel like the Lighthouse either made

17        derogatory statements through communications

18        with Alice Murphy, because it was directly

19        after January 25th, a meeting when Candyce

20        DeKruyff came to COSA and physically saw me

21        there -- I was in charge of that meeting --

22        that my employment was terminated.

23              And then, again, when the Lighthouse
```

1    showed up at this court proceeding between

2    myself and Alice Murphy -- the Lighthouse was

3    there.   There was a tape recording put up.   I

4    didn't even know what was going on.   Just all

5    kinds of attempts to intimidate me during that

6    proceeding.   I was never told by the judge or

7    COSA's attorney that, okay -- I just saw David

8    Belser come up to the podium and place a tape

9    recorder during my proceeding with another

10    employer.

11        All this was going on, so I feel like

12    they interfered with a matter, really, that

13    had nothing to do with them.

14    Q.   All right.   I want to separate that into two

15         things.   One is -- You said I feel like and I

16         believe that Candyce DeKruyff persuaded in

17         some way Alice Murphy to terminate you.   Is

18         that --

19    A.   I feel like she interfered.

20    Q.   All right.   Feeling like is, I respectfully

21         suggest, not enough to sue somebody.   What

22         evidence do you have that Candyce DeKruyff

23         actually in that meeting said anything to

208

1          Alice Murphy that interfered with your

2          business relationship?

3    A.    Well, for one thing, it wasn't until that

4          meeting, January 25th, at the Council on

5          Substance Abuse that everything started

6          happening.  So, you know, the timing is

7          impeccable.

8    Q.    All right.

9    A.    And then --

10   Q.    Is there anything --

11   A.    -- validated by their presence.  How did the

12         Lighthouse get to my hearing between me and

13         Alice over my personal belongings?

14   Q.    Well, we'll do them one at the time.

15   A.    Okay.

16   Q.    But the first one, the issue of the -- the

17         issue of Candyce DeKruyff interfering in your

18         relationship with COSA by a conversation with

19         Alice Murphy, and that is a conversation you

20         are assuming occurred.  You don't have any

21         proof that it occurred.

22   A.    Well, I believe it occurred.

23   Q.    All right.  But there's no facts or proof or

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

209

1    tape recordings or anything beyond what you're

2    saying is your belief that the court needs to

3    know about, right?

4    A.   Other than her -- their presence at the trial.

5    Q.   You draw a conclusion based on that as well?

6    A.   That as well.

7    Q.   Let's take that separately.  At the time you

8         had a trial on your dispute with COSA, you had

9         left the Lighthouse, filed a charge against

10        them in which you would be seeking lost wages

11        and gotten a job in which you were making more

12        than you made at the Lighthouse, correct?

13   A.   That's correct.

14   Q.   So it was actually in that you were more than

15        replacing the salary you had lost at the

16        Lighthouse.  It was very much in the

17        Lighthouse's interest for you to stay employed

18        at COSA, wasn't it?

19   A.   I don't think so.

20   Q.   Well, financially, you would acknowledge that

21        it was in the Lighthouse's interest for you to

22        stay employed at COSA because you're making --

23        you have no claim against the Lighthouse.

1          it?

2     A.   No.  I find it wrong -- it wasn't -- it wasn't

3          a problem with him tape recording it.  He

4          actually tape recorded it.  But I do find that

5          it was in -- in the same pattern of the way

6          that they treat, just to come in and place a

7          tape recorder when it's not even your case and

8          not even say to my lawyer who's standing

9          there, well, you know, we're doing this or

10         whatever.

11              If I had a problem speaking into the tape

12         recorder, then, you know, I would have just

13         stopped it.  But all of these are just things

14         that are patterns of behavior that -- that the

15         Lighthouse displays constantly with no regard

16         for -- not even civil proceedings.

17    Q.   The facts you have told me about your business

18         interference claim are that Candyce DeKruyff

19         attended a meeting -- a seminar that you put

20         on at COSA and you believe she had

21         conversations with Alice Murphy about you, and

22         David Belser and Candyce Murphy -- DeKruyff

23         attended your -- the suit, the trial of your

222

1       this list?

2   A.  I don't -- STAR, I'm not sure.  Last month,

3       STAR.

4   Q.  All right.  There's Lighthouse, STAR miles, it

5       says 12.

6   A.  No, that's local.

7   Q.  All right.

8   A.  STAR had a meeting in Atlanta -- I mean in

9       Auburn.

10  Q.  All right.

11  A.  And myself and five other members of the

12      Lighthouse staff on the STAR program went to

13      that meeting in Auburn.

14  Q.  Okay.

15  A.  We were all there together, like six or seven

16      of us.

17  Q.  Okay.  Let's go to the meeting on 11-11,

18      Lighthouse, Atlanta CDC.

19  A.  Okay.

20  Q.  All right.  What caused you to go to that

21      meeting?

22  A.  Well, when I went through the qualifications

23      of the grant, I saw that the CDC were the ones

1        that were going to be doing the rating.  The

2        grant was going to the CDC, and I had a

3        member -- I believe a graduate student in my

4        program that worked for the CDC at the time.

5   Q.   And who was that?

6   A.   I don't know her name.  I don't just keep up

7        with people's names.  It was just a student.

8        This was like back in 2005.

9   Q.   A student from what program?

10  A.   The doctorate of education program, and she

11       worked for the CDC.  I remember her telling me

12       that --

13  Q.   Let me back up.  Doctorate of education,

14       didn't you get that from -- correspondence out

15       of New Orleans?

16  A.   No.  I got that from Argosy University out of

17       Atlanta.

18  Q.   Oh, you're talking -- but you hadn't gotten it

19       at this time?

20  A.   No, but she was in my program.

21  Q.   Okay.

22  A.   I was in school.

23  Q.   All right.

224

1    A.    I started school in 2004.

2    Q.    And you called her?

3    A.    I called her to ask her was she familiar with

4          this grant and that we were trying to seek

5          partners.  And she told me that, yes, she was

6          very familiar with the grant and that she

7          would be happy to talk to me about some things

8          that we needed to make sure we included in the

9          grant, that she was actually one of the people

10         that were not working on the rating, but she

11         actually was one of the -- one of the

12         programmatic people and she was responsible

13         for doing a lot of the grant writing tips and

14         things like that.

15              And I asked her did she mind sharing with

16         me because we were planning on writing for it,

17         and she said, yeah.  So I told her, I said,

18         well, I'm working in Montgomery and I don't

19         have class this weekend, so is there any way I

20         can meet with you.  And she said, well,

21         that -- I think that was on a Friday.  She

22         told me that was the only day she had.

23              And I said, well, it wasn't my intent to

225

1    come to Atlanta this weekend because my

2    husband was gone to see about his mother.  And

3    she said, well, today is the only day I have.

4    And we were getting tight for the deadline, so

5    I asked Candyce about it, told her what was

6    going on and told her that I was going to

7    drive up to meet with this lady, and that's

8    what I did.  I drove up to Atlanta to meet

9    with this lady.

10   Q.   And you drove to the CDC offices?

11   A.   Yes, I drove to Emory University.

12   Q.   Emory University, is that where you went?

13   A.   Yes, it's listed right here.

14   Q.   All right.  And who did you see there other

15        than this lady?  Anyone else?

16   A.   I was meeting with her.  We met, like, in the

17        student -- I don't know, like the student

18        center or whatever, and we went through the

19        grant.  We talked about it.

20        I brought all the information back to the

21        Lighthouse, still trying to find a partner.

22        Paulette Nicholas was constantly still feeding

23        me partners that -- we still was trying to

226

1    find somebody to go in with us because we

2    could not do it alone.  Even she had suggested

3    it to me, you know, you're not going to get

4    it.  They're looking for consortiums.  They

5    want people working -- communities working

6    together.  That's what that meeting was about.

7  Q.  All right.  How long did that meeting last?

8  A.  I don't know.  Maybe -- We ate while we were

9    talking.  Maybe a couple of hours.

10 Q.  And you took notes from the meeting?

11 A.  Yeah, I was writing on the grant.

12 Q.  And would those notes be at the Lighthouse?

13 A.  Well, I left the entire grant folder there,

14   so ...

15 Q.  Would those notes include the name of this

16   woman?

17 A.  I don't know what's in the notes.  I just took

18   notes.

19 Q.  If you later wanted to call her and ask her

20   another question about the grant, how would

21   you have reached her again?

22 A.  Well, first of all, I would have had no need

23   to call her because when my employment was

228

1      Lighthouse.  I wouldn't have needed to

2      contact --

3   Q.  Have you got her -- Have you got her name in

4      any address book, Rolodex --

5   A.  No, I do not.

6   Q.  -- anything like that?

7   A.  No, I do not.

8   Q.  You don't even feel that you would have

9      written her name and phone number on the grant

10     itself, that file?

11  A.  First of all, the grant itself is not

12     something that I took there.  I wrote notes --

13     other than to read -- I didn't write on the

14     grant.  The grant was public information.

15     Anybody could get the grant.  All you had to

16     do was go on the computer.  She knew the grant

17     because it came out of the CDC.

18  Q.  Well, your notes and all that, they should be

19     in the file --

20  A.  I left the entire grant file that I had to my

21     knowledge there because I would have had no

22     need to have it.  The grant writing was a

23     function of what my responsibilities were at

1        the Lighthouse, so I would have had no reason

2        to take any grant.  I would have had no reason

3        to take any numbers or anything else.

4  Q.   Ms. Owens, how big was your doctoral class

5        over there that this woman was a member of?

6  A.   Very large.

7  Q.   Like how many?

8  A.   I don't know.  30, 40 people in one class.

9  Q.   Did you have any relationships with other

10       students over there?

11  A.   No, I didn't have relationships with her.  I

12       just knew she was in my class because we all

13       had to introduce ourselves and we --

14  Q.   How did you know she was with the CDC?

15  A.   Because when we stand and introduce ourselves

16       at the beginning of class, they tell what they

17       do.  If they teach, if they work somewhere,

18       they stand and say that.  We all do.

19  Q.   So to reach her the first time, you called the

20       CDC and gave them her name and asked for her

21       phone number?

22  A.   No.  No, that wasn't what happened.  To reach

23       her the first time, I saw her in class.

COPY

1

1       IN THE UNITED STATES DISTRICT COURT

2       FOR THE MIDDLE DISTRICT OF ALABAMA

3               NORTHERN DIVISION

4

5   CECELIA OWENS,

6           Plaintiff,

7   Vs.                          CIVIL ACTION NO.
                                    2:06CV999-ID

8   LIGHTHOUSE COUNSELING
    CENTER, INC.,

9

10          Defendant.

11

12          * * * * * * * * * * * *

13               VOLUME II

14          * * * * * * * * * * * *

15

16      **VIDEOTAPED DEPOSITION OF CECELIA OWENS**, taken

17  pursuant to stipulation and agreement before Pamela A.

18  Wilbanks, Certified Court Reporter, ACCR# 391,

19  Registered Professional Reporter and Commissioner for

20  the State of Alabama at Large, in the Law Offices Capell

21  & Howard, 150 South Perry Street, Montgomery, Alabama,

22  on Monday, January 21, 2008, commencing at approximately

23  4:30 p.m.

COPY                119

1              In The U.S. District Court

2              For the Middle District of Alabama

3              Northern Division

4              2:06CV999-ID

5    on Monday, January 21, 2008.

6              The foregoing 118 computer printed pages

7    contain a true and correct transcript of the

8    examination of said witness by counsel for the parties

9    set out herein.   The reading and signing of same is

10   hereby not waived.

11             I further certify that I am neither of kin nor

12   of counsel to the parties to said cause nor in any

13   manner interested in the results thereof.

14             This 28th day of January 2008.

15

16

17

18

19   _____

20   Pamela A. Wilbanks ACCR #391
     Expiration Date:  9-30-2008
21   Registered Professional Reporter
     and Commissioner for the State
22   of Alabama at Large

23

9

1    because I was the one that wrote it.  And I said

2    sure.

3  Q.    This also makes reference to $200,000 in funds

4    available through the Center For Disease Control

5    to provide HIV prevention services.

6        Do you know whether that grant was approved?

7  A.    That grant was never written because that's what

8    I was in the process of doing was getting

9    partners.  You had to have partners to go in on

10   that grant.  That was why I met at Tuskegee.

11   That was why I met with the lady from the CDC,

12   and I had a meeting scheduled the following

13   Monday with a group out of Phenix City,

14   Alabama.  That's what I was in the process of

15   doing was trying to get a collaboration to write

16   that grant.

17  Q.   Ms. Owens, I want to go back to your meetings at

18   Tuskegee and your meetings with the CDC.  And

19   you weren't able to tell me with whom you met on

20   either of those occasions; isn't that correct?

21  A.   That's correct.

22  Q.   If it were important to you to determine who the

23   woman who was a fellow doctoral candidate with

1       about whether there is such a woman over there.

2   A.  Well, that's your pleasure.  That's your

3       pleasure.

4   Q.  And I'm asking you to tell the jury that if it

5       were of extreme importance to you to know who

6       your classmate at the CDC was, how you would go

7       about finding that person.

8   A.  Well, first of all, at this point I would not

9       have that as an extreme importance because

10      that's in the past, and I can't remember

11      anything.  I don't know any more than what I've

12      told you.  I'll tell you and I'll tell the jury

13      and whoever else needs to know.  I have given

14      you all the information that I can give you just

15      like I can't tell you who the people, like I

16      said, that I was scheduled to meet with on that

17      Monday and even next week.  I had several

18      meetings set up with people.

19  Q.  Let me specify that I'm not interested in --

20  A.  Well, these were all of the same thing.  Why

21      aren't you not interested in those?

22  Q.  Because you did not actually meet with them.

23  A.  Well, they were scheduled to be met with, that

98

1    I think we talked later in the week or

2    whatever.  And I think I started, like, the next

3    week or whatever.

4    Q.    So you were out of work for like a week?

5    A.    Probably.

6    Q.    Did she have to terminate the person that she

7          had hired in order to hire you?

8    A.    I don't know anything about that situation.  She

9          just told me she had hired somebody and it

10         wasn't working out.  That had nothing to do with

11         me.  I don't know.  I don't know what the whole

12         situation was around that.

13   Q.    Did she ask you what you had been making at the

14         Lighthouse?

15   A.    She had been asking me that question way, way

16         back.  The first meeting she asked me that

17         question.

18   Q.    And did you tell her?

19   A.    No.  I did not tell her because it wasn't her

20         business.

21   Q.    At any point did you tell her what you --

22   A.    No.  I didn't tell her because it wasn't her

23         business.