IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DISTRICT

RECEIVED

2008 APR 30 P 12: 16

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

DR. CECELIA OWENS,            )
                             )
        Plantiff, Pro Se     )
                             )
vs.                          )
                             )    CASE NO.: 2:06CV999-ID
LIGHTHOUSE COUNSELING        )
CENTER, INC.,                )
                             )
        Defendant            )
                             )

**PLANTIFF DR. CECELIA OWENS RESPONSE TO DEFENDANT
LIGHTHOUSE COUNSELING CENTER'S MOTION FOR SUMMARY
JUDGEMENT**

**COMES NOW,** the Plantiff, Dr. Cecelia Owens, (hereinafter Plantiff) and pursuant
to Rule 56 of the Federal Rules of Procedure, respectfully moves this court to deny the
Defendant's motion for summary judgment. Plantiff is not a lawyer and therefore relies
heavily upon the courts to apply the law in this case. Plantiff uses the same cases
Defendant but in the opposing position. In support of this Response, the Plantiff files an
accompanying Statement of Facts and evidence, and states as follows:

1. Dr. Cecelia Owens is an African American female with over 15 years of non-
   profit experience which includes senior management, fiscal operations, grant
   writing and resource development, supervisory, community development and
   board development. Plantiff has worked and advocated on behalf of
   disenfranchised populations for over 20 years through legislation in Florida,
   Georgia and Washington, DC, has provided community-based training classes,

and received a two-year appointment to a state mental health board overseeing the services to and a budget of millions allocated for mental health clients in several counties in Georgia. In addition, plantiff holds a B.S. degree in Business Administration, two graduate degrees: an MBA, and a Masters in Theology, an advanced graduate degree: Education Specialist (Ed.S.) and a terminal degree: Doctorate in Education with a research emphasis on special-needs populations.

2. After two interviews and a six-week wait period, the Plaintiff was hired as the Deputy Director of Lighthouse, **Not** for Executive Director, Candace Dekruyff because she does not own the organization. Plantiff was informed by Candace Dekruyff that the Board of Directors required a waiver for unmet qualifications in order for Plantiff to be hired.  Plantiff is the only African American to ever be hired in executive management at the Lighthouse and the only executive required to have a waiver for employment. Plantiff was employed at Lighthouse from September 12, 2005 to November 18, 2005. During Plantiff's entire employment Candace DeKryuff was on maternity leave and not present in the Lighthouse. Plantiff raised the issue of discrimination and disparate treatment in a phone conversation to Candace DeKruff on November 9, 2005 relative to an African American employee LaShae Hibbler and a white female, Carianne Stinson both of who resigned their positions and both desired to withdraw their resignation. The issue of discrimination was raised after DeKryuff informed Plantiff that she was considering allowing Carianne Stinson to withdraw her resignation and stay on with the Lighthouse. DeKryuff wanted to know if Plantiff would support her in that position. On November 10, 2005 Plantiff received a **first and only** verbal

2

warning from Candace DeKryuff for speaking of discrimination. Immediately after management team meeting On November 14, 2005, Candace DeKryuff gave Plantiff a written disciplinary reprimand in retaliation for not agreeing with her in a management meeting concerning the issue of discrimination and disparate treatment of employees. After Plantiff would not withdraw the concerns about discriminatory practices of employees and support DeKryuff in her acts, in four days on Friday, November 18, 2008 Candace DeKryuff terminated the Plantiff. Plantiff was terminated in the presence of board chair, David Belser and board member Robert Selles and told by DeKryuff that the leadership styles of Plantiff and DeKryuff were too different, and not a good fit for the organization. DeKruff never stated anything about Plantiff's work product being sub-standard, in fact DeKruff repeatedly wrote her praises concerning Plantiff's work.

3. In short, Defendant's reason for terminating the Plantiff were in retaliation for raising the issue of racial discrimination and disparate treatment of an African-American employee which is a direct violation of Plantiff's civil rights. Plantiff's work product was excellent in every sense and Defendant's own Executive Director, Candace DeKruff and Plantiff's supervisor, has noted this verbally and in writing several times including in her monthly report to the Board of Directors dated November 15, 2005. Defendant's unlawful termination of the Plantiff was not legitimate and is in fact a pretext for discrimination and retaliation.

4. Defendant unlawfully terminated Plantiff's employment in violation of Title VII and did tortuously interfere in her business relationship with another employer

causing her termination from that employer. Plantiff's complaint addresses several areas:

1). DeKryuff was more like to authorize the expenditures of white clients and employees as opposed to blacks. Plantiff did verbally voice and wrote her concerns to DeKryuff in several emails (Plantiff's exhibit 6) referencing specifics of each situation.

2). DeKryuff did handle the resignation of African American employee, Hibbler very differently than she handled the resignation of white employee, Stinson. Defendant allowed Stinson (white) to rescind her resignation and denied Hibbler (African American) that same right. Plaintiff did voice concerns about the discriminatory action of Defendant and was disciplined and subsequently terminated in retaliation.

3).Plantiff did send an email to DeKryuff with written concerns of discrimination that had been previously discussed before the email. DeKryuff did verbally lash out at Plantiff for raising the issue of discrimination in an earlier phone conversation.

5. Under Rule 56c of the Federal Rules of Civil Procedure, summary judgment should be denied "if the pleadings, depositions, answers to interrogatories, admissions on file, together with affidavits, if any, show that there is a genuine issue  to many material facts, therefore the moving party is not entitled to a judgment as a matter of law". (Plaintiff offers the same cases as the Defendant subject to Judge's interpretation of the rule and these cases in this matter).

4

6. The Plantiff cites the same cases as Defendant in support that the Plantiff does meet the burden of elements that establishes a *prima facie*. 1) Plantiff engaged in a statutorily protected expression of protest of Defendant's conduct of unlawful employment practices; 2) Plantiff did suffer an adverse employment action of termination as a result of that protest, and 3) there is a causal connection between the two events (citing same cases as Defendant for interpretation by the Judge). The burden is on the Defendant to produce legitimate, non-retaliatory reasons for the adverse employment action. If the Defendant cannot meet the burden of production, this motion should be denied.

7. The opposition clause under Title VII protects an employee who has opposed any practice made an unlawful employment practice under Title VII 42 U.S.C. 2000e-3(a). Plantiff did engage in a statutorily protected activity when she protested the Defendant's unlawful conduct and did so in good faith with a reasonable and substantiated belief that Defendant engaged in unlawful employment practices. Plantiff's opposition to the practice was in fact honest, bona fide, and more than objectively reasonable as it relates to this case. (Plantiff cites same cases as Defendant for Judge's interpretation).

8. In was revealed through discovery that the Defendant did in fact discriminate against Plantiff even in the hiring process, and other African American employees through disciplinary actions and terminations. These reasons and situations will be closely examined in the Statement of Facts and evidence that will accompany this Response. There is, in fact, a *prima facie* case of discrimination and retaliation by Defendant against Plantiff and other African-American employees

5

which will be presented in the evidence. Plantiff's opposition to racially discriminatory practices was more than objectively reasonable. Plantiff engaged in a statutorily protected opposition under Title VII and was directly and immediately reprimanded for it in retaliation and subsequently terminated all in a period of 7 working days. There is a clear causal connection and the documented timeline and events will demonstrate that connection.

9. Plantiff's claim of intentional interference with her employment COSA is highly substantiated by several facts already in evidence and should not be dimissed as a matter or law. Lighthouse is not entitled a summary judgment on this claim because they cannot demonstrate that the Plantiff's belief is neither unfounded or unsupported as will also be demonstrated throughout this response.


**PLANTIFF'S RESPONSE TO DEFENDANT'S REQUEST FOR PARTIAL SUMMARY JUDGEMENT**

10.    Defendant is not entitled to a partial summary judgment for Plantiff's damages for several reasons. Plantiff subsequent employment does not remove the Defendant's unlawful acts of discriminatory practices and retaliation based on race. Plantiff has suffered and is suffering great economic loss and emotionally from Defendant's termination, and business interference. Plantiff would have remained employed had not Defendant interfered in that employment relation because evidence produced by COSA is inaccurate and untrue. Due to Defendant's interference, Plantiff lost her employment forcing a relocation back to Georgia resulting in lack of appropriate care for her sick father which expedited

his death. Plantiff has been denied due process by Defendant in submitting an affidavit from COSA's Alice Murphy into their motion. Plantiff was not allowed the opportunity to question this witness during a legal deposition as to the contents of her testimony/affidavit. Further, Defendant has entered non-verified transcripts of testimonies of Alice Murphy and Plantiff that has not been authenticated as having taken place under the authority of an authorized court reporter and also without the Plantiff's consent. This information has been entered into this motion as authentic. Plantiff was not given the opportunity to examine this or question Alice Murphy. This so-called evidence should be thrown out because it was submitted in violation of the rules of civil procedure and due process for Plaintiff. The facts of this situation will be closely examined in this response. Plantiff's misdeamor offense was unknown to Defendant and cannot be used as an excuse for trying to justify unlawful employment practices expo facto. Plantiff will demonstrate in this response by deposition testimony and other evidence that DeKryuff herself and Stinson, both white females in management committed equally and worst acts during their employment, and it continues presently and were not terminated.

11.    In conclusion, Defendant has not produced any evidence that Plantiff was not discharged and retaliated against because she engaged in the protected activity of opposing racially and discriminatory acts of employment practices under Title VII. Defendants reasons for Plantiff's termination are not legitimate, were discriminatory and pretextual. There is substantial evidence supporting tortuous interference with a business relationship even the submission of an affidavit that

7

violated the Plantiff's right to due process and the rules of civil procedure because Plantiff was not given the opportunity to examine the testimony of Alice Murphy, COSA and has no authentic verification that the transcripts presented in this matter were obtained, transcribed and developed legally, and are accurate.

12.    There are several serious issues of genuine fact pursuant to Rule 56 of the Federal rules of Civil Procedure and those that will be contained in the attached Statement of Facts. The Plaintiff respectfully moves this Court to deny a favorable summary judgment for the Defendant and rule in favor of summary judgment for the Plaintiff on all claims contained in her Complaint. Plantiff seeks all appropriate back and front pay, compensatory pay for emotional pain and suffering, tortuous interference compensation, in addition to all legal fee costs and attorney fees against the Defendant.

Dated: April 29, 2008

Respectfully submitted,

*Cecelia Owens Ed.D*

Dr. Cecelia Owens, Pro Se

Plantiff ProSe:
Dr. Cecelia Owens
6245 Hillcrest Dr.
Morrow, GA  30260
770-991-2334 work
770-991-1505 fax
Email: ceceliaowens@comcast.net

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of April 2008, I have mailed the foregoing to the Clerk of the Court in the Middle District of Alabama at P.O. Box 158, Montgomery, AL 36101-0158 and to Counsel for Defendant at the following address:

Bruce Downey
Capell and Howard. PC
150 South Perry Street
Montgomery, AL 36102-2069

*Cecelia Owens Ed.D*

Dr. Cecelia Owens, Pro Se

9

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DISTRICT

DR. CECELIA OWENS,                )
                                  )
        Plantiff, Pro Se          )
                                  )
vs.                               )
                                  )     CASE NO.: 2:06CV999-ID
LIGHTHOUSE COUNSELING             )
CENTER, INC.,                     )
                                  )
        Defendant                 )
                                  )

RECEIVED

2008 APR 30 P 12: 16

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

## AFFADAVIT OF DR. CECELIA OWENS

STATE OF GEORGIA          )
CLAYTON COUNTY            )


Dr. Cecelia Owens being first duly sworn, deposes and says:

1.  I am Dr. Cecelia Owens, former Deputy Director of the Lighthouse Counseling
    Center, Defendant [hereinafter, "Defendant"], and I am the Plantiff in this case,
    [hereinafter "Plantiff"]. I give this affidavit on behalf of myself in the above-
    styled action.

2.  I was hired by the Defendant on September 12, 2005. I don't know who else was
    interviewed, their qualifications, or their gender or race. I was told by Candace
    Dekryuff, the Executive Director that I did not meet all of the written
    qualifications and that she would have to seek criterion waiver for those un-met
    qualifications. Dekryuff was on maternity leave the entire time of Plantiff's
    employment until November 14, 2005.

1

3.  Plantiff was employed at the Lighthouse as the Deputy Director from September
    12,2005 to November 18, 2005.The operating chart [Ex. 5 to this brief] outlines
    the reporting procedures of all employees including the executive staff. Executive
    staff reported to both the Deputy Director and the Executive Director.My job
    description outlined my responsibilities in the absence of the Executive Director
    which were to manage the day to day operations of the organization. I was not
    aware when I was hired that the Business Manager, Carianne Stinson had been
    unofficially acting in the role of the Deputy Director for months. Stinson was not
    qualified for the position, so therefore she could not be hired officially in the
    position. From day one of my employment, Stinson resented my presence,
    rejected my authority, and refused to be supervised by me. Stinson was highly
    insubordinate in constantly by-passing the me on all decisions, organizational
    issues, budget issues, client and employee issues by reporting only to DeKryuff
    even though she was on leave at home. Stinson made it very clear by her
    insubordinate actions that she was not going to communicate with me about
    anything and that she was not going to even acknowledge my presence in the
    organization, let alone my role. I brought these issues to DeKryuff on several
    occasions, but to no avail. Other executive employees as well as lower level
    employees complained to me about Stinson all of the time. Stinson was
    condescending, disrespectful, highly authoritarian, and right-winged in her
    interactions with everyone in the organization except DeKryuff who was not
    present. Stinson did not like the fact that employees finally had me to voice their
    concerns and issues to. Stinson and DeKryuff management styles were highly

2

punitive in nature. Employees knew and understood the consequences of voicing their concerns, and their fears were many times realized by disciplinary actions and threats. Stinson did not like the fact that I had gained respect from employees and had established a great rapore in a very short time. Stinson was loosing control and she did not like it at all. DeKryuff promised to deal with the issues when she returned from maternity leave.

4. I had absolutely no performance problems in any area of my job responsibilities. My experience and background in the management of non-profits is very broad and spans many years. There was not one task or assignment that I did not proficiently complete and in a timely manner. DeKryuff began giving me huge projects and assignments my first week of employment when I had not even been acclimated to the environment. I completed every assignment and worked 10 to 12 hour days much of the time. Many of these assignments required highly technical skills and managerial ability, along with public speaking and representing the organization. I received only thanks and praises from DeKryuff, management team, lower level employees and even the clients. Stinson did not like this at all. The very unusual relationship between DeKryuff and Stinson began to manifest itself. Stinson was the stronger of the personalities and DeKryuff as totally co-dependent upon her. This was not my focus, but everyone, including me was aware of it. I was never insubordinate to DeKryuff but got along well with her, until I raised the issue of discrimination on 11/9/05. I welcomed DeKryuff's input, her insight and really enjoyed working with her. I

looked forward to her return from maternity leave so that I could spend more time caring for my very sick father.

5. I was hired because of my grant writing capabilities and non-profit background. DeKryuff needed someone to handle the development of the organization DeKryuff told me that this was why she chose me for the position. In only 9 weeks I wrote two grants which is unprecedented and one of them was funded for the Defendant. DeKryuff never made any corrections to any of my work even though I sent it to her email. DeKryuff was busy at home enjoying her new baby and barely returned any of my emails or phone calls. Unknown to me, DeKryuff had a reputation for desiring to put her signature to the grants that others wrote, even her predecessor, Junior Durnham. DeKryuff never so much as even spoke to me concerning any deficiencies in my work, she only praised me. Once after a meeting that she came into the office for while on maternity leave, she asked me to pray with her. I asked her what was her prayer request and she told me that she really desired not to be jealous of me because of all my wonderful gifts, and that she wanted the devil to stop putting thoughts in her head to envy me. I prayed with her and told her not to give in to the thoughts because I was there to assist her in her leadership role in the organization. She seemed relieved. Later, I realized that this was all coming from Stinson who was very upset because she was no longer running the organization in DeKryuff's absence. I was not terminated because of poor work product. On 11/18/05, I was told by DeKryuff that I was not a fit for the organization and that our leadership styles were "too" different. I believe that I was unlawfully terminated because I raised the issue of

4

discrimination to DeKryuff concerning unlawful employment practices by the organization.

6. I was never questioned concerning any travel. It was standard practice and procedure of the organization for all management team members to share their schedules and any travel plans during our weekly meeting. We all knew what was on the schedule for weeks and sometimes month ahead. DeKryuff was informed by me and the team members by email and in phone conversations daily, and even several times day if there were changes. DeKryuff was delighted to see me pursuing the CDC, HIV grant and gave me her complete support in preparation to write it. This included my trip to Atlanta to the meet with the CDC representative. My mileage was paid for and never questioned until I filed this lawsuit. The trip was legitimate because of my job responsibilities.

7. Plantiff's Exhibit 5 is a true and correct copy of the organizational that existed during my employment.

8. Defendant's Exhibit E is a copy of the email I sent to DeKryuff after earlier discussing my concerns about discrimination where she verbally counseled me.

9. DeKryuff is aware of all expenditure requests of clients and staff. Stinson made sure of this. DeKryuff and Stinson both knew the clients, their races, their diagnosis and all other pertinent information. These things were discussed weekly in team meetings, by email and phone, and through weekly and monthly reporting. It was not only possible for her to make expenditure decisions based on race and preference, she actually did it several times.

5

10. There were many expenditure requests to assist clients that were denied by Stinson and supported by DeKryuff. New mattresses and furniture requests were denied several times to HIV clients. Overtime was denied to staff who were caring for clients and may have worked over by 15 minutes or so. Stinson and Dekryuff would pitch a fit and recommend disciplinary actions no matter what the situation was.

11. Stinson prepared all the Board of Director's minutes and freely had the option to put whatever she desired in the minutes, fact and non-fact. Dekryuff supported this because her co-dependency on Stinson and friendship meant everything to her. Whatever Stinson wanted, Stinson got it from DeKryuff. The board minutes of 10/25/05 do not accurately reflect what was said in the board meeting.

12. Dekryuff directed Stinson to advertise her position and for me and the team to interview candidates and give her our recommendation. We did so with the entire team participating in the interview process. We all, including Stinson, selected the top two candidates. I never resented the fact of Stinson negotiating to try to remain in her position. I was accustomed to Stinson and Dekryuff's interactions, without me being included. This was the norm. What I resented was the treatment of African-American employee, LaShae Hibbler who desired to remain in her position after giving her resignation. Hibbler was denied the opportunity extended to Stinson.

13. On the morning of 11/9/05, DeKryuff did inform me concerning her proposal for Stinson to remain in her position. Stinson had already resigned, and wanted a

rescission. I inquired about the details of the arrangement when DeKryuff insisted on making the issue a decision of the Board which I knew was not totally truthful. In our discussion, I compared Stinson's request to that of Hibbler's several weeks earlier to remain in her position. I raised the issue of the disparate treatment and discrimination because so many African-American employees had complained to me about Stinson and DeKryuff in racial tones. This was when DeKryuff got upset and verbally counseled me in an effort to convince me that the issues of Stinson and Hibbler were not the same. I told her the only difference was the color of their skin. There was no unanimous decision from the Board at this time, it was only Stinson's and DeKryuff's proposal. The board did not vote on the issue until the 11/22/05 board meeting. DeKryuff did not want Stinson replaced because of her co-dependency upon her and the secrets that they shared concerning the organizational financials.

14. Hibbler's and Stinson's situations were exactly the same. They were both employees who resigned and desired to withdraw their resignations. Dekryuff strictly directed me not to allow Hibbler to rescind because she wanted Hibbler gone. DeKryuff was not present at the exit interview of Hibbler where she made her request to me and I told her no which was what I had been directed to do by DeKryuff. DeKryuff and Hibbler had a known, bad history and many verbal confrontations in the presence of other employees.

15. On 11/9/05 when Plantiff informed me of her proposal to allow Stinson to remain in her position, I informed the team members. We were about to extend an offer to the second highest candidate who was African- American, because the highest

7

candidate had refused the offer one day earlier. Team members were waiting to move forward. When I informed them, they all wanted to talk about the issue which was our normal routine. We met daily, sometimes several times a day. Team members requested to meet. It was lunch time, so we decided to have lunch together which was also not out of the ordinary. I had the authority to meet with team members and did not need permission from DeKryuff. This was something that happened all of the time and even more so, because we were all trying to fill Stinson's position as directed by Dekryuff. Stinson had not talked to me as her supervisor or any other team member about her situation, so she was not present at the meeting. Stinson had been directing all of her communication directly to Dekryuff by-passing me again, which was common.

16. There was a management team meeting on 11/14/05 where DeKryuff asked for everyone's opinion about the Stinson proposal to remain in her position. DeKryuff tried desperately to help us all remember the fictitious board directive. We all had a hard time, but listened. She wanted everyone's opinion. I was quiet, and then she basically ordered me to speak. I replied to her that she knew how I felt and what I would say. I saw no need in rehashing the issue. After the meeting, DeKryuff marched in my office and handed me a disciplinary action accusing me of unprofessional behavior and insubordination. She told me that I should not have met with my team members who I met with regularly every day. She also told me that I should have supported her in front of the team and that I was insubordinate in not doing so. I responded to the disciplinary action that had actually been written with a date of 11/10/05, three days earlier, but was given to

me on 11/14/05. I realized that the action had nothing to do with the 11/14/05 meeting, but had been planned since 11/10/05 in retaliation for my raising the issue of discrimination on 11/9/05.

17. After Stinson's actions in continually being insubordinate to me, her supervisor, in this matter and every other matter since I had been employed, I reinstated the disciplinary action given to her several weeks earlier. I had promised Stinson if we could work together, improve communications, and she demonstrated that she is not insubordinate towards me that I would remove the disciplinary action as a reward for her efforts. Stinson had made it clear that she would never be supervised by me and that she would continue to go straight to Dekryuff which was where she could get whatever she wanted. At his point, the entire team including myself still was not clear that a final decision had been made on Stinson. Inspite of the fact that DeKryuff had written Stinson a letter offering rescission, neither I nor team members knew this. I continued on with my duties, thinking that Stinson was still leaving. Due to the hostile environment, I requested an exit-audit which is a common practice for non-profits who have the person handling the financials to leave the position. I wanted to be sure that everything was accounted for prior to Stinson's leaving for her credibility as well as the organizations. Stinson and DeKryuff both went wild with anger at the thought of me or anyone looking into the books. It was absolutely something I felt would have been welcomed.

18. I was unlawfully terminated on 11/18/05 by DeKryuff in the presence of board chair, David Belser and board member Robert Selles. I was told by DeKryuff that

9

I was not a good fit for the organization and that my leadership style was "too" different.

19. After my termination, I found out that DeKryuff admitted to having charged the Lighthouse credit card for 3-bedroom condos for her family and friends on an Alabama beach without prior approval by the board yearly. This act violated Lighthouse policy that states using personal property without proper of the company without proper authorization is a violation and disciplinary actions including termination is warranted. I also was made aware that under DeKryuff's leadership and Stinson's management, employee Eliza Byrd had been counseling clients of the Lighthouse for almost two years without the proper education, training or experience. Clients had been put in harms way because Stinson had not verified Byrd's transcript upon hiring. Dekryuff did not inform the clients that they had been clinically treated by a quack, and tried to cover up the situation by stating that no client was harmed. DeKryuff did not terminate Stinson although she violated five critical areas requiring discipline and termination to include incompetency, inefficiency and neglect of duty for failing to perform job functions accurately and in a timely manner, professional mis-conduct, endangering the health and safety of others, and behavior that clearly violates the rights and privileges of others. This is the best example of DeKryuff's co-dependency on Stinson and the lengths that she would go to for her, even discrimination.

20. I raised my concerns to Dekryuff many times about policies, practices, both written and unwritten trying to get clarity. Policy administration changed with the

wind. One day things went this way, the next day things went that way. All of this was on the pulse of Stinson mainly. There was no consistency on anything.

21. I left the Lighthouse on 11/18/05 after being unlawfully terminated and retaliated against. I dropped my resume off on my way home to Alice Murphy of COSA who had been pursuing me to work for her my entire time at the Lighthouse. I was hired. On January 25, 2006, I conducted a meeting with community partners at COSA. DeKryuff came to that meeting representing the Lighthouse. I observed her speaking to Murphy in an intense manner. After the meeting, Murphy began acting strangely. I was terminated about a week later. I believe that DeKryuff slandered me and my work history at Lighthouse to Murphy. DeKryuff and Belser also showed up at a hearing between Murphy and myself to get my personal belongings back. DeKryuff and Belser were well informed of what was going on and made their presence known by showing up in court with a tape recorder. They taped my hearing without my consent and continued interfering in my business relationship with another employer. Other potential employers have inquired about my work at Lighthouse and received slander from DeKryuff thereby hindering my job prospects.

22. DeKryuff unlawfully terminated by employment at the Lighthouse for me raising my concerns about discrimination and retaliation of an African- American employee. She has attempted to ruin my reputation by slandering my actual job performance and work history, and interfering in my business relationship.

11

_Cecelia Owens_
Dr. Cecelia Owens

Sworn to and subscribed before me on this ___25th___ day of April, 2008

(SEAL)

_Tommy A. Boggs_
NOTARY PUBLIC
My Commission Epires ___12|08|11___

12