IN THE UNITED STATES DISTRICT COURT RECEIVED
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DISTRICT

2008 APR 30 P 12: 16

DR. CECELIA OWENS,                          )
                                            )       DEBRA P. HACKETT, CLK
        Plantiff, Pro Se                    )        U.S. DISTRICT COURT
                                            )       MIDDLE DISTRICT ALA
vs.                                         )
                                            )       CASE NO.: 2:06CV999-ID
LIGHTHOUSE COUNSELING                       )
CENTER, INC.,                               )
                                            )
        Defendant                           )
                                            )

## PLANTIFF, DR. CECELIA OWENS STATEMENT OF FACTS IN SUPPORT OF SUMMARY JUDGEMENT FOR PLANTIFF

**COMES NOW,** the Plantiff, Dr. Cecelia Owens (hereinafter "Plantiff") and pursuant to Rule 56 of the Federal Rules of Civil Procedure, respectfully submits the following facts, and evidence, in support of Plantiff's Response for a favorable Summary Judgment filed contemporaneously herewith. The Plantiff is *pro se* and therefore depends greatly on the courts understanding as she attempts to write and state as clearly as possible the facts and evidence in this case in layman's language. Where Defendant has presented case law, Plantiff will attempt to address these arguments just as is understood in layman's language, as best she can, and takes the opposing position of the Defendant.

# I.    **STATEMENT OF FACTS**

## A. PLANTIFF'S BACKGROUND.

The Plantiff, Dr. Cecelia Owens is a dedicated, committed, and highly proficient professional in the executive management and the operations of non-profit organizations. The Plantiff was well qualified, and over qualified for the position of Deputy Director which she was hired for with Defendant as noted in her impressive resume, distinctive credentials, and professional experience. The Defendant states that "Plantiff is highly-aggrieved" and that somehow this inaccurate representation is attributed to Plantiff choosing to exercise her constitutional and civil rights through a court of law.  Plantiff has engaged in two previous civil matters regarding her civil rights being violated. The first was over 12 years ago, and the second just over 8 years ago. Both of these cases were settled out of court and Plantiff was paid for loss wages and compensatory damages by both defendants. The third civil matter between Plantiff and COSA in 2006, dealt with a breach of contract and theft of Plantiff's highly valuable collectables from all over the world, stolen by Alice Murphy of COSA. After intentional and tortuous interference from the Defendant, Plantiff was terminated and Plantiff was not allowed to get her personal belongs on that day. Plantiff returned to COSA on the very next day with a police escort only to find her personal belongings rummaged through, and packed in boxes with valuables missing that had been collected over 28 years of military service and travels to other countries. Plantiff had every right to seek assistance in a court of law to try to get a lifetime of memories and family heirlooms returned to her in addition to the salary promised to Plantiff. Had Plantiff been given the opportunity to be present at the deposition and sworn statement of Alice Murphy, COSA, these facts would have been

documented by that testimony.  Defendant is highly-aggrieved in their reasoning that somehow it is wrong for Plantiff to exercise her legal rights, but not lawfully wrong for employers to continually violate those very same civil and legal rights. It is Plantiff's choice, and careful judgment in this matter to pursue legal matters in a court of law, and not take matters into her own hands. Plantiff believes in the justice system and uses it only when necessary. As a citizen if these United States, this is Plantiff's guaranteed right under the Constitution.

Plantiff was employed by an organization she helped to form, Keeping Our Village Alive Inc. for over 6 years. Plantiff's salary did varied because the organization had to be built from the ground up and Plantiff volunteered a lot of time without pay. Plantiff's highest professional salary was $65,000.00 yearly with a previous employer of over 12 years ago, Communities in Schools of Georgia. Plantiff's current earnings are documented by tax returns and have been provided to Defendant for 2006 and 2007 tax years. Plantiff had no income except that from COSA in 2006 from January to February 6, 2006 at $55,000.00 yearly. Plantiff's income for 2007 was $9,600 as noted on her tax returns and the attached 1099 IRS form. Plantiff is currently employed as a part-time administrator for a private, special needs school with minimal earnings of $1500 monthly that actually started in December 2007, and will end in May of 2008. Plantiff is registered with a state employment office, careerbuilder.com and continually seeks full-time positions that match her experience and qualifications.  Plantiff moved to Montgomery to take care of her very sick father during his time of need.

Plantiff does not deny having some previous troubles with the law. Defendant's characterization of "extensive" can be interpreted as aggressive, reaching on their part,

and attempting to distract from the real issue of violation of Plaintiff's civil rights under Title VII. Plantiff willingly submitted to a background check by her signature upon accepting the Defendant's employment offer. It was the Defendant's responsibility to handle this function of human resources. Plantiff did what was required of her in the employment process. Plantiff does not have any records of the offenses because it is not something that Plantiff desired to hold on to because it is part of her past. Plantiff was reimbursed for the stolen computer charge as a part of her settlement in the case of Communities in Schools of Georgia. Plantiff did receive a charge in 2005 in Montgomery while employed at the Lighthouse and does not excuse this off-hours behavior which was not known to Defendant during the time of their unlawful employment acts. Plantiff does not profess to be perfect, only violated by Defendant. Plaintiff has done what was required by the courts and the law. Now it's time for the Defendant to own up to their pattern of unlawful, discriminatory and retaliatory violation of Plaintiff's civil rights under Title VII.

## B. LIGHTHOUSE BACKGROUND.

Lighthouse is a non-profit organization on paper and uses their 501c3 IRS standing to solicit charitable contributions for its operations. Defendant solicits funds from the local, state and federal levels to service several populations but many times does not utilize the funding to meet the need of the clients whose demographics and mental health issues were used to obtain the funding. Much are the funds are used to pad the salaries and expenses of executive management and the business manager. The Defendant has a pattern and practice of decision-making that is not always beneficial to the employees and clients as mentioned in several emails from Plantiff to DeKryuff and

Stinson **(Plantiff's exhibit 6).** Defendant has three other EEOC charges of discrimination based on race and gender in the past two years since the Plantiff's termination (Mark Rollins, Timothy Kemp and Eugene Wolfork **(Plantiff's exhibit 11)).** Plaintiff has no relations with either of these employees. Clients do have advocates in the Alabama Department of Mental Health where they have repeatedly voiced and written their complaints to then Bob Wynn, Director. Defendant's pattern of disparate and discriminatory treatment can also be understood from 7 past employees prior to Plantiff's employment, and not connected to Plantiff in any way, who have repeatedly voiced many of Plantiff's same complaints to DeKryuff, Lighthouse Board and other regulatory bodies **(Plantiff's exhibit 10).** Defendant has gross disparity in salaries between the employees who actually perform the services to clients and those who are considered management. The disparaties in salaries and in raises are noted in the salary history provided to Plantiff during discovery **(Plantiff's exhibit 3).**

Defendant has a very high rate of employee turnover, particularly in management. It's only been 2 years since Plantiff's employment and all members of management including DeKryuff have resigned. Stinson is the very last management employee left of 7, and has given her resignation for a second time to the Defendant in the March 2008 Lighthouse Board meeting. Under non-profit law, all boards must have quorum represented to vote on decisions, all meetings must be published and opened, and accurate minutes must be kept. Defendant repeatedly violates this non-profit law and decisions are made without the proper representation of the board, non-published meetings are held, and minutes are prepared by the very person, Stinson who has everything to gain from what's in the board minutes.

## C. PLANTIFF'S WORK HISTORY AT LIGHTHOUSE.

Plantiff was hired as Deputy Director for the Defendant by DeKryuff, then Executive Director at a salary of $47,500 yearly. Plantiff was not hired as DeKryuff's Deputy Director but rather, for the Lighthouse organization. Dekryuff does not own the organization. No evidence was produced during discovery that there were two equally-qualified white candidates. Defendant expects the courts to believe that there were two qualified white applicants and Defendant chose to hire an African-American who was not qualified. Defendant admits that a waiver of un-met qualifications, which have yet to be identified, was obtained from the Board of Directors. DeKryuff informed Plantiff the waiver had to do with the Defendant's Board concerns that the Plantiff could never run the organization due to not having a master's degree in counseling **(DeKryuff's deposition, page 21, lines 1-23, page 22, lines 1-23)**. Plantiff agreed to accept employment with the knowledge that she could never run the organization as Executive Director and was very satisfied with this due to having to take care of her sick father. Plantiff also did not want the full organizational responsibilities which would have interfered with her responsibilities to her father, and had just given up a Executive Director position with her previous employer. In the deposition testimony of David Belser, then Chair of the Board, he could not identify the un-met qualification that is referenced **(Belser's deposition 7, pages 25-28 and 8, pages 29-32)**. It is fact and also noted in Belser's sworn testimony, that the Defendant placed an unlawful criterion on the hiring of the Plantiff by use of an un-met qualification waiver that was not placed on Teresa Houser, Plantiff's white female Deputy Director successor who did not meet the

qualifications of the position and was hired in at a higher salary of $48,500. The job description for the Deputy Director states that the position title is Deputy Director of Development and that grant writing experience is necessary **(See Plaintiff's exhibit 2: job description of Deputy Director's position for Plantiff and also for Houser and resumes of both Plantiff and Houser direct and equal comparators).** Despite the fact that Houser's resume reveals no grant writing or fundraising experience, this white female was hired with no waiver for un-met qualifications, and at a higher salary than the Plantiff. Houser has no professional experience listed on her resume to meet the most important qualification of the Deputy Director position to write grants and to raise funds for the Defendant. Houser salary has been raised by almost $10,000 to over $57,500 in less than 2 years **(Stinson deposition, Volume II, page 37, lines 21-23, page 38, lines 1-8)** and she has not written the first grant or engaged in any favorable fund development for Defendant that has resulted in bringing funds into the organization. Houser's salary was turned over in discovery by Defendant as an estimated $57,800. During Plantiff's employment of 2 months, Plaintiff wrote two grants, one was funded for the sexual victim's crime week shortly after the Plantiff's termination as noted by the testimony of Stinson in her deposition **(Stinson deposition, Volume II, page 58, lines 3-20).** Belser stated in his sworn testimony that no waiver for unmet qualification was mandated or obtained for Houser, white female Deputy Director by the Defendant, and that he does not know whether she has ever written a grant in her two years of employment with the Defendant, which is a major function of her position. **(Belser deposition 19, pages 73-76).** Belser in his sworn deposition does acknowledge "Deputy Director of Development" as the title of Houser's position and could not identify from Houser's

resume any grant writing or fundraising experience **(Belser deposition 20, pages 77-80, 21 pages 81-84, 22, pages 85-88, and 23, pages 89-91).** In was also revealed in discovery that the very un-met qualification of not having a *"master's degree in a mental health field or counseling"* that was used for Plantiff, was actually changed in the job description of the new Deputy Director, Houser to read*" master's degree in an administrative or mental health related field"* **(Plantiff's exhibit 2, job descriptions of Plantiff and Houser under qualifications).** This very waiver that was put in place as a criterion for Plantiff was then used as a qualification for the position of Deputy Director. Plantiff did and does hold an MBA which is an administrative, business executive degree. Because of Plantiff's race, Defendant felt it necessary to impose this illegal criterion which was made a part of the qualifications just one year later and not used for any other management employee. Defendant's pattern of disparate treatment and discrimination based on race will be further explained as it relates to Candace KeKryuff and Carianne Stinson, both white female management employees.

Plantiff was the person in charge of the organization in the absence of the Executive Director, DeKryuff as noted by Plantiff's job description and also the Defendant's organization chart already presented in Defendants motion **(Defendant's Exhibit D).** Subordinate white employee and Business Manager, Carianne Stinson never accepted Plantiff as her supervisor or as the person in charge of the operations of the Defendant in the absence of the Executive Director, DeKryuff. From the first week of Plantiff's employment, Stinson was insubordinate to her and this continued throughout and leading up to Stinson's request to rescind her resignation not ever communicated to the Plantiff , Stinson's direct supervisor, but directly to DeKryuff **(Stinson deposition,**

**Volume I, page 82, lines 1-12).** This pattern of insubordination by Stinson towards Plantiff was on-going and highly supported by DeKryuff. Stinson and DeKryuff were best friends because DeKryuff got Stinson hired at the Lighthouse in 1992, despite the fact that Stinson did not meet the qualifications for the Business Manager position. Defendant did not require a waiver for the un-met qualifications of Stinson for not having a degree in accounting or being CPA eligible **(Plantiff exhibit 13, Business Manager Job Description and Stinson's resume).** Stinson was accustomed to acting in the role of the Deputy Director under DeKryuff even though she was not in that position and was not qualified to be. Plantiff discussed her concerns about Stinson's insubordination to Dekryuff on several occasions and by email **(Plantiff's exhibit 6, email from Plantiff to DeKryuff dated 10/31/05 subject "Issues" paragraph 3-7).**

Plantiff's concerns about Stinson's ineffective communication skills were clearly documented in a disciplinary action, coaching note given to Stinson on 10/18/05 **(Plantiff's exhibit 7).** Although the Plantiff made every attempt to provide direction and support to Stinson, it was to no avail due to the lack of support from DeKryuff in redirecting Stinson and encouraging her to follow the chain of command. In spite of these situations with Stinson, Plantiff and DeKryuff continued to work very well together. Plantiff had five direct reports including Stinson, four white managers and one other African-American manager. There were no issues with any of the other management team members who all supported, respected and was supervised by the Plantiff. Stinson was the only department head that did not follow the chain of command and who refused to work with and be supervised by the Plantiff. All other management team members worked quite well with employees. It is clear in all correspondences to DeKruyff from

Plaintiff regarding Stinson that Plantiff's desire was to be included in the process and not constantly the recipient of Stinson's insubordination by her own admission **(Plantiff's exhibit 13, Stinson's email to Plaintiff dated 10/3/05 subject:Peachtree ).** Plantiff accepted the Deputy Director position not aware of the friendship and unusual work relationship between DeKryuff and Stinson. There were absolutely no cliques between Plantiff and other employees. Plantiff was employed by Defendant only 9 weeks did not know any employee prior to working for Defendant. Defendant has fabricated this unfounded notion with facts that never took place. With the exception of Stinson, the majority of the Defendant's employees displayed tremendous respect for Plaintiff because of her true compassion and concern for them as human beings. Plaintiff empowered employees in very visible ways. Employees were accustomed to be treated dogmatically and punitively by Stinson, which DeKryuff allowed and engaged in herself. Plaintiff just simply treated employees and clients with the dignity they deserved, had earned, and needed. Employees and clients alike, did sense a very positive change due to Plantiff's interaction with them, her ability to try to get their issues resolved, and her genuine concern for them. Plantiff's leadership was to support DeKryuff in every way and was delighted for DeKryuff to return from maternity leave to resume her duties so that Plaintiff could focus on her sick father.

When Stinson realized that she could not control Plantiff, was not in charge anymore, she marched into Plantiff's office and voluntarily handed her a letter of resignation stating that she and her husband would be relocating to Birmingham. Plaintiff was directed by DeKryuff to accept the resignation just as had been done with all other employees who resigned by signing and dating it and placing it in Stinson's employee file

**(Plantiff's exhibit 8).** Plantiff agrees that the problem with Stinson became acute when DeKryuff and Stinson plotted to pass off Stinson's desire to rescind her resignation as a directive given by the Lighthouse Board in the 10/25/05 meeting. Stinson had decided that she wanted to remain in her position and did not inform Plantiff, her supervisor **(Stinson deposition Volume I, page 81, lines 9-13, page 82, lines 1-12).** For two weeks, Stinson had advertised her own business manager position, participated in six interviews of candidates along with the management team as a whole selected two top candidates, Claude Hurtt (white male, top choice) and Rochelle Baker (African-American female, 2nd choice). DeKryuff, Stinson, and all other management team members were in agreement to offer the position to Hurtt first because he was the top candidate being a CPA. On 11/08/05 in a phone conversation and update from Owens concerning the position, DeKryuff gave the final authorization for Plantiff to offer the business manager position to Hurtt. On 11/09/05 at 9:00am before Plantiff could phone Hurtt, he phoned Plantiff. Plantiff offered Hurtt the position at the salary approved by DeKryuff but Hurtt informed Plantiff that he was withdrawing his name from the candidates list due to the low salary and that he needed a salary in the 50k-60k. Plantiff informed Stinson in email on 11/9/05 at 9:22am #7 copying DeKryuff

**(Plantiff's exhibit 6).** All other members of the management team were informed of Hurtt's withdrawal and the team discussed the option of offering the position to the second highest candidate Rochelle Baker. **(Plantiff's exhibit 6, Owens email to Dekryuff 11/09/05 at 10:05am subject:No Claude).** Later on the morning of 11/09/05, Plantiff spoke with DeKryuff by phone immediately after the email to Stinson, and was informed that Stinson wanted to rescind her resignation because she could not find a

comparable position in Birmingham and wanted to stay with the Lighthouse. When Plantiff raised concerns about how Stinson could rescind her resignation and a previous employee, LaShae Hibbler (African American) who had resigned 3 weeks earlier and desired to rescind her resignation, could not at KeKryuffs directive, DeKryuff got upset. Plantiff also expressed concerns about what this decision favorable for Stinson and against Hibbler, would communicate to employees in reference to the different standards being applied in the two situations where the only difference was their race.

Plantiff had no performance problems or challenges other than dealing with the constant insubordination of Stinson. Plantiff did not receive a formal performance evaluation but DeKryuff praised Plantiff's work several times even as late as 11/15/05 in her Executive Directors report to the Lighthouse Board **(DeKryuff reports 10/17/05 #6, and 11/15/05 #6).** DeKryuff continually praised Plantiff's work and demonstrated tremendous confidence in Plantiff's abilities to get the job done by requesting her to perform many task without direction or supervision **(Plantiff's exhibit 6, DeKryuff's emails to Plantiff dated 9/26/05 2:52pm, 9/26/05  11:28am, 10/20/05 2:34pm, and 10/20/05 3:55pm).** Each of these referenced emails from DeKryuff to Plantiff are requesting for Plantiff to perform major organizational work requiring proficient knowledge of the task and on behalf of the Defendant. Plantiff had only been employed for a couple of weeks when given these major tasks. Plantiff completed the tasks in an exemplary manner. During Plantiff's nine week employment with Defendant, Plantiff never received any complaints, reprimands written or verbal from DeKryuff concerning her performance until 11/10/05 one day after Plantiff raised the issue of discrimination. From that 11/10/05 date, Plantiff's was immediately and intentionally retaliated against in

12

a continual process and ultimately terminated by DeKryuff on 11/18/05. Plantiff had absolutely no problems with Dekryuff's authority or supervision over her. Plantiff kept Dekryuff informed regularly of the daily operational, management, clinical, regulatory, and employee/client issues at the Lighthouse and intentionally solicited her input in all matters. **(Plaintiff's exhibit 6, Owens emails to DeKryuff 9/23, 10/26/05 6:29pm subject: policies/procedures/practices, 10/27/05 8:41am subject: Cecelia's responses and updates, 10/31/05 1:51pm subject: issues, 11/08/05 3:07pm subject: greetings, 11/09/05 10:05 subject: no Claude).**

DeKryuff never complained, but praised Plantiff's work. Plantiff possesses excellent grant writing skills that spans over 15 years of securing grants for millions in previous organizations. In only 9 weeks of employment with Defendant, Plantiff wrote two grants at DeKryuff's request and later learned that the first grant, CDBG did not stand a chance of being funded due to Lighthouse' unfavorable reputation and history at that agency. The second grant that Plantiff wrote was due on 11/18/05. Plantiff wrote this grant and had it prepared to be submitted on the due date. On the morning of 11/18/05, Plantiff was terminated, but DeKryuff took the time to ask Plantiff for the grant. DeKryuff submitted it under her name and took the credit for writing it. Defendant received the funding due to the Plantiff's work, not DeKryuff's. DeKryuff was still on maternity leave when the second grant was written. **(Stinson's deposition, Volume II verification of grant funds received page 58, lines 3-23).**

Dekruff was always fully informed of Plantiff's projects, work schedule, and travel as noted by each of Plantiff's emails already presented. Plantiff's trip to Atlanta to meet with a CDC representative concerning an HIV grant proposal was necessary due to

the requirements of trying to obtain the grant, and by virtue of Plantiff's job description. Plantiff informed Dekryuff on 11/09/05, **not on** 11/11/05 as Defendant alleges, in the same manner as always by emails and weekly updates. Defendant's normal practice of employees conducting travel in place prior to and during Plantiff's employment was that management team members did not have to get approval to carry out the functions of their positions, they only needed to inform their supervisors. Supervisors would then provide any objections or directives to the team member. Management team met every Monday, where projects and schedules were discussed by each member. Each member was always updated on the projects of other team members. The HIV grant had been discussed in every management team meeting since mid-October 2005, due to trying to obtain collaborative partners. Dekryuff was well aware of this and Plantiff's trip to the CDC ( **Plantiff's exhibit 6, email from Owens to DeKryuff 10/27/05 8:41am 3rd paragraph, and Plantiff's email to Stinson with a CC to Dekryuff on 11/09/05 9:22am and Owens email to Dekryuff again on 11/09/05 at 10:05am subject: no Claude, 2nd paragraph, 1st line).** DeKruff was thoroughly informed several times of Plantiff's planned travel to the CDC in Atlanta. Plantiff did commute to Atlanta on some weekends due to her doctorial studies, however Plantiff was not scheduled to be in Atlanta the weekend of 11/11/05 but only went due to the scheduled meeting with the grant rater from the CDC who agreed to assist Plantiff and to provide clarity in the grant writing requirements in the program area. Plantiff only charged mileage for the trip and chose to sleep at her second home. Plantiff could have stayed in a hotel during the trip and be legitimately reimbursed for hotel expense, but opted to be inconvenienced and travel several miles out of her way to sleep at home to save money for the Defendant. The

meeting location, Emory University in north Atlanta, was a significant distance from where Plantiff lived in south Atlanta. During the planning phases which were necessary prior to writing the CDC grant, partners needed to be obtained. Plantiff had several meetings with potential partners, UAB, Tuskegee Institute and a planned meeting on 11/21/05 in Phoenix City, AL that did not happen because Plantiff was terminated on 11/18/05.  Plantiff does not recall the names of any of these individual contacts from either of these potential partners with whom she had one meeting each. There was a lot going on during this times particularly the Stinson situation. Plantiff left all grant files in her old office upon being terminated.

## C.    FACTS SURROUNDING PLANTIFF'S CLAIMS.

### a).    FACTS CONCERNING DISPARATE TREATMENT OF AFRICAN-AMERICAN CLIENTS

Lighthouse is a not-for-profit organization that is funded to provide services to clients who are chemically dependent, homeless, and HIV positive with substance abuse disorders. During the Plantiff's employment, she witnessed the constant request of case managers and sometimes supervisors being denied by Dekryuff and Stinson. Stinson felt that she had to make the final decision on any and all expenditures. When furniture items or mattresses were requested for the HIV clientele who needed clean and new mattresses to complete their move into apartments, Stinson and DeKryuff both felt that the HIV clientele could sleep on the same, possibly infected mattresses of the previous client. The expense was denied, although allocated in the budget. The majority of the HIV clientele was African American. Stinson whose job it was only to manage the budget, abused her power by denying purchase items, harassing employees and encouraging disciplinary

15

actions for clients and employees who did not obey her. One client slept on a broken bed and furnishings for almost four months because Stinson would not allow the case manager to purchase new furniture which was allocated in the budget. DeKryuff upheld Stinson in these decision and threatened disciplinary actions to case managers who made the request. Stinson knew every client and many times would deal with the clients without the case manager's involvement. DeKryuff allowed this. Stinson had complete control over the Lighthouse operations in every way. Anyone who threatened her position of power would be fired and she made this very clear to employees and clients. Stinson wrote an email to Lisa Carroll, Clinical Director on 9/26/05 stating that fear needed to put in client Victor Leornard **(Plantiff's exhibit 13, Stinson to Carroll 9/26/08 paragraph #1).** This was Stinson's modus operandi of dealing with clients and employees. Plantiff received many complaints concerning Stinson condescending communication to employees and clients in the organization. This is one of the reason's Plantiff developed and required weekly leadership training for Stinson. Stinson greatly disapproved of attending the weekly training with Plantiff. Stinson and DeKryuff were very much aware of who the clients were for each program, including their race, because managers did written reports regularly, and it was how the Defendant was paid on superbills (drawing down of funds).

At the recommendation of Stinson, DeKryuff many times would write disciplinary actions to employees who worked 5 minutes of overtime to care for the needs of a client. Stinson wanted these employees written up no matter what the circumstances. Stinson did not want to pay the medical bills of a client in the Kaliedescope program who was pregnant and bleeding and had to go to the emergency room over the weekend.

Stinson also did not want to pay for the overtime of the case manager who had to take the client to the hospital and stay with her. The Plantiff approved this expenditure due to the nature of the situation, life and death **(Plaintiff exhibit 13, Owens email to DeKryuff 10/31/05 1:51pm subject: Issues).**

### a.  FACTS CONCERNING THE DISPARATE TREATMENT OF LASHAE HIBBLER

The true facts surrounding Hibbler's and Stinson's resignations are summarized as follows. Plaintiff had oversight and management of this entire situation following the direction of DeKryuff. DeKryuff was on maternity leave and away from the Lighthouse this entire time. Hibbler turned in her resignation to Plantiff several weeks prior to Stinson's resignation of 10/25/05. Plantiff accepted the resignation by her signature as directed by DeKryuff who stated that she was so glad to see Hibbler go. DeKryuff stated that she had experienced so many problems with Hibbler, and that she was a cancer in the organization. DeKryuff stated that Hibbler could never work for the organization again, and that she needed to hurry and go. DeKryuff also informed Plantiff that Hibbler would not be allowed to change her mind about the resignation and that she was gals to be rid of her. Plantiff had no history or background of the tumultuous relationship between DeKryuff and Hibbler that had existed prior to Plantiff's employment. It was very clear to Plantiff that really bad blood existed between DeKryuff and Hibbler. During the exit interview of Hibbler, she requested to rescind her resignation to Plantiff and was denied at the direction of DeKryuff.

Several weeks later on 10/25/05, Stinson submitted her resignation to Plantiff and it was accepted by her signature as was the Defendant's practice. Later that morning,

Stinson informed the Board members during the 10/25/08 board meeting. There was no directive given to DeKryuff during that meeting to have Stinson remain in her position. Stinson was responsible for preparing the board minutes and freely wrote her desires in the minutes. The board minutes of 10/25/05 were written by Stinson and the decision for Stinson to remain was not approved by the board until the November 2005 board meeting after the Plantiff's termination on 11/18/05. There was no vote, nor was there any outside discussion after the board meeting. Management team members and board members all left the meeting simultaneously on 10/25/08. Immediately after the board meeting of 10/25/05, Stinson placed an advertisement in the non-profit resource network announcing her position. If in fact the board had given the directive alleged, there would not have been any reason for Stinson to advertise her own position. Six candidates had interviews with the entire management team. There was a consensus of two top candidates by all, and the recommendations given to DeKryuff who gave her approval to Plantiff to hire. This is when Stinson decided that she wanted to keep her position without notifying Plantiff, her immediate supervisor as she continued in her previous pattern of insubordination. Without Plantiff's knowledge of Stinson's change of mind and with no word from Stinson or DeKryuff, Plantiff proceeded with the entire management team including Stinson, to fill the position as had been directed by DeKryuff **(Plantiff's exhibit 6, Owens email to DeKryuff on 11/08/05 3:07 subject:greetings, #1)** DeKryuff in the meantime had authorized Plantiff to offer the position to the top candidate Claude Hurtt, white male **(Plantiff's exhibit 6, email from Owens to DeKryuff on 11/09/05 10:05am, subject: No Claude).** When Hurtt would not take the position due to the low salary, Plantiff was proceeding to offer the position to the second top choice by the

management team Rochelle Baker, African-American female at the previous direction of DeKryuff from the day before. Even though Stinson advertised her position, was a part of the team that interviewed and selected the candidates, she suddenly did not want Rochelle Baker to have the position. Stinson never came to Plantiff, her immediate supervisor to inform her desire to rescind her resignation. Instead, Stinson and Dekryuff began to secretly plan for Stinson to remain in the position without a word or conversation to the Plantiff and with an intentional attempt to keep Plantiff out of the process for reasons unknown to the Plantiff. Plantiff was blindly carrying out the task of trying to fill Stinson's position without any knowledge from DeKryuff or Stinson as to what was going on. Plantiff even emailed Stinson requesting a training schedule for the new person when the position was filled (**Plantiff's exhibit 6, email from Owens to Stinson 11/9/05 at 9:22am #3).** Stinson even responded to Plantiff's email and stated that she would have a training schedule ready for the new person by the following Monday, 11/14/05. Even at this time Stinson nor DeKryuff still had not informed Plantiff of Stinson's desire to rescind her resignation (**Plantiff's exhibit 6, email from Stinson to Owens 11/9/05 at 9:51am #3).**

There was absolutely no resentment from Plantiff concerning Stinson's desire to rescind her resignation once Plantiff was told about it on the morning of 11/9/08 by DeKryuff in a phone conversation. DeKruyff also told Plantiff that Stinson could not find a job in Birmingham and wanted to remain in her position. DeKryuff and Stinson interacted without any respect for the Plantiff as Stinson's supervisor all the time. This type behavior from Stinson had been the insubordination that Plantiff had experienced since her first day of employment. DeKryuff's behavior was also consistent in that she

allowed the insubordination due to her desperate co-dependency on Stinson. As Plantiff stated in her deposition, it was not that big of a deal the "change of mind itself". The significant issue was the lack of application of fair and consistent employment practices for all employees without regard to their race or gender. Plantiff spoke with DeKryuff about the similarities in Stinson's situation and that of Hibbler several weeks earlier. DeKryuff asked Plantiff, what did she think about the possibility of Stinson rescinding her resignation. Plantiff discussed with DeKryuff her concerns that to treat employees differently in an exact, comparable situation could raise issues of discrimination when the only distinct difference is the color of their skin. DeKryuff got angry, authoritarian and dictatorial in her tone to Plantiff over the phone, and gave her a verbal lashing for mentioning discrimination. Plantiff realized that Hibbler was in fact being treated disparately and being discriminated against in the situation.

Plantiff continued in her duties and informed the management team members of Dekryuff's proposal for Stinson. Management team members were confused and needed clarity concerning the situation because they each had worked so hard in trying to fill Stinson's position. It was a normal practice for the Plantiff to regularly meet with management team members several times a week and most times daily for the carrying out of the operations of the Lighthouse business. Meeting with the management team was not something that had to be authorized or approved, it was a responsibility of Plantiff's position as the person in charge of running the organization in the absence of DeKryuff. It was also DeKryuff's expectation as stated in her deposition for Plantiff and management staff to work together as stated in Defendants motion several times and in DeKryuff's sworn affadavit. DeKryuff had never given a directive not to meet with

20

management on any issue because to meet regularly with the team was in the normal course of daily operations at the Lighthouse, and happened all the time. The management team was a part of the entire process of trying to fill Stinson's position and they requested a meeting **(Plantiff's exhibit 6 email from Carroll to DeKryuff 11/10/05 at 11:55am and email from Baity to Dekryuff 11/10/05 at 1:22pm).**

Stinson was not at the management team meeting on 11/09/05 because she had made it perfectly clear by her continued insubordination towards Plantiff that she was bypassing Plantiff with her request to rescind her resignation. Stinson still at this point had not even informed Plantiff, who was her supervisor of her decision. Management team members had great concerns about loosing the viable candidates already selected for the position. Management team members were seeking clarity concerning what was going on, because nobody knew about this so-called fabricated board directive, and we were all present at the 10/25/05 board meeting. DeKruff did not give Plantiff counseling about the management team meeting but about raising the issue of discrimination against Hibbler in an earlier conversation on 11/09/05. DeKruff thought that Plantiff had shared with management her concerns about discrimination issues, when in fact, Plantiff had just informed the management team of DeKryuff's proposal for to allow Stinson to rescind her resignation. By this time DeKruff was already engaged in her intentional retaliation for the Plantiff raising the issue of discrimination. Later  on the evening of 11/9/05, Dekryuff in retaliation for Plantiff raising concerns of discrimination, sent and email removing the Plantiff as Stinson's supervisor **(Plantiff's exhibit 6, email from DeKryuff to Owens, 11/10/05 at 6:43 pm).** The contents of these email made matters

worst and again undermined the Plantiff's position thereby reducing Plantiff to same level as Stinson, her subordinate.

During the regular, Monday morning management team meeting on 11/14/05. DeKryuff requested that all management team members express their concerns about Stinson remaining in her position and working from home in Birmingham. DeKryuff stated that she and Stinson had a meeting with the board whom they say made the decision for Stinson to rescind her resignation and work only one or two days a week from Birmingham. Defendant produced no minutes of such meeting as required by board by-laws and non-profit law. In an attempt to legitimize the so-called board's directive for Stinson to remain in her position, DeKryuff back-dated a letter offering Stinson the opportunity to rescind her resignation and Stinson accepted by her signature and date. When DeKryuff dicussed this option with Plantiff on November 8 and 9th, it was still in the proposal stage because DeKryuff wanted to hear from other members of management on the issue during the next team meeting  on Monday, 11/14/05.  According to this letter, that Plantiff knew nothing of, and was not copied on the letter **(Plantiff's exhibit 13, DeKryuff to Stinson letter 11/9/05),** Stinson and Dekryuff had closed the issue of Stinson's resignation rescission while leading Plantiff and the entire management team on a pretentious mission of wanting to hear opinions on the matter in the team meeting on 11/14/05. This letter demonstrates the lengths that DeKryuff would go to for Stinson even deception to the entire management team including Plantiff, Stinson's supervisor. Further DeKryuff admits in her deposition page 131, lines 11-15 that no decision had been made concerning Stinson, but she had already given Stinson rescission letter on 11/9/05 and prior the meeting and discussion with management on 11/14/05. Each member of

22

management did speak about the issue and their concerns and when Plantiff would not speak, DeKryuff insisted that Plantiff speak. Plantiff replied to DeKryuff that she already knew how she felt and what she would say because Plantiff had discussed it with Dekryuff on 11/09/05 and again on 11/10/05 by phone and in an email. Defendant's distorted statement of the facts of the 11/14/05 meeting allegedly made by the Plantiff in subscript at the bottom of page 12 of their Memorandum of Law, is absolutely not true and totally fabricated. Plantiff was not pursuing any job with COSA during this time, although COSA had been pursing Plantiff for two months. COSA never received Plantiff's resume until after Plantiff's termination on 11/18/05 even though COSA had been pursuing Plantiff.

Immediately following the management team meeting of 11/14/08, Dekryuff continued retaliation  by marching into Plantiff's office and announced" this is your written disciplinary action". Plantiff inquired as to what it was for. DeKruyff told Plantiff to read it. Plantiff complied and noticed the date on the action was actually 11/10/05 but it was given to Plantiff on 11/14/05 noted by Plantiff's signature on the action **(Defendant's exhibit G, 11/10/05 coaching note from Dekryuff to Plantiff).** DeKryuff was clearly upset so Plantiff responded to the disciplinary action later that day in writing and gave it back to DeKryuff who filed it in Plantiff's employee file.  Plantiff continued with her responsibilities despite the hostile environment that had been created by DeKryuff and Stinson still not knowing that DeKryuff and Stinson had actually sealed the decision for Stinson to rescind her resignation. It was painfully clear to Plantiff at this point that all the leadership/communication training that had been going on for weeks between she and Stinson was all pretense from Stinson with no intentions of ever

23

allowing Plantiff to supervise her. Plantiff had already given Stinson a disciplinary action in early October 2005 but had agreed if Stinson completed the leadership/communication training and stop the insubordination that Plantiff would remove the action from Stinson's file. Because Stinson refused to follow the agreement and continued in a more aggressive pattern of insubordination towards the Plantiff, the Plantiff made the decision to allow the earlier disciplinary action to remain in Stinson's file. This angered both DeKryuff and Stinson, even though they both knew that Stinson had engaged in gross insubordination by not communicating her desires to her immediate supervisor, by-passing Plantiff in the entire process as she admits in her deposition **(Stinson deposition, page 81 line 23, page 82, lines 1-23, page 83, lines 1-23).** DeKryuff and Stinson were the two people that were not only unprofessional, but obsessed with Stinson being allowed to continue to do as she pleased even to the extent of violating the civil rights of others. Stinson had a pattern of this type behavior and everyone in the organization knew it. At this point DeKryuff or Stinson still had not made a definitive decision on the resignation rescission. Plantiff continued in her duties still not knowing what decisions would be made. Plantiff requested a separation audit for Stinson because she was at that point still leaving her position. Plantiff still did not know of DeKryuff's letter dated 11/9/05 to Stinson. The audit request was perfectly legitimate due to her position as business manager and the person who handled all the finances. As her supervisor, and to protect the organization and Stinson, the Plantiff desired to ensure that the financial books were in order and accounted for prior to Stinson leaving.  This was a normal practice for non-profits who have the financial person to leave. DeKryuff and Stinson did not like this at all because Stinson and Dekryuff have for years maintained a secretive

account of the organization's finances, giving themselves 5, 10 and even 15 thousand dollar raises and spending on lavish vacations as they please **(DeKryuff deposition page 154 lines 1-23, page 155 lines 1-23, page 156 lines 1-23)**. They simply did not want Plantiff going through the books with a team of qualified financial people. Plantiff did not want to be held accountable for any discrepancies if and when Stinson did leave. Three days later, DeKryuff terminated Plantiff.  In 7 working days from the date Plantiff raised the issue of discrimination on 11/9/05, Plantiff was immediately retaliated against by being given a verbal warning on 11/9/05 and again on 11/10/05 by DeKryuff. DeKryuff removed Plantiff as Stinson's supervisor also on 11/10/05. Plantiff received a written disciplinary action given on 11/14/05 but written by DeKryuff on 11/10/05. Plantiff was terminated on 11/18/05 and told that she was not a fit for the Defendant by Dekryuff in the presence of board chair, David Belser and board member, Robert Selles. Plantiff had no verbal or written disciplinary actions prior to 11/09/05. Before Plantiff left the building, DeKryuff asked Plantiff for the grant that she had written. Plantiff gave it to her and that grant was funded for the Defendant as verified in Stinson's deposition **(Stinson's deposition, Volume II, page 58 lines 1-15)**.

For the reasons that follow, the Court should grant summary judgment in favor of the Plantiff on all claims. Plantiff has more than sufficient enough evidence to support the facts in this case and has already made a *prima facie* case of discrimination, retaliation and tortious interference of Plantiff's business relationship.

### c).   STATEMENT OF FACTS CONCERNING TORTUOUS INTERFERENCE WITH  A BUSINESS RELATIONSHIP

Plantiff states the Executive Director, Candace DeKryuff attended a collaborative meeting at COSA on January 25, 2006. During that meeting which Plantiff was

facilitating, DeKryuff interacted more with Alice Murphy than any other partner at that meeting. DeKryuff communicated with Alice Murphy in an intense manner and told Murphy that she would be calling her. During the Plantiff's entire employment with COSA, from November 28, 2005 up to the meeting, Murphy had never spoken or had contact with DeKryuff. As soon as DeKryuff saw the Plantiff during the COSA meeting, DeKryuff began her interference. It was three days later that Murphy began to act very strangely towards Plantiff, she was agitated and responding in with juvenile behavior of throwing temper tantrums. Murphy had not acted in this manner before towards Plantiff. COSA also has a 90% employee turnover rate and several complaints against them at the Alabama Department of Community Affairs, Substance Abuse prevention office from prior employees. In exactly eight days after DeKryuff's visit to COSA, with no verbal warning or prior disciplinary actions, Murphy terminated Plantiff's employment. Murphy stated that Plantiff was "not a good fit", the exact words used by DeKryuff when she terminated Plantiff. Murphy had aggressively pursued Plantiff to work for her for 2 months while Plantiff was employed with the Defendant, and made many promises. Murphy approached Plantiff in a meeting in September 2005, and wanted to know Plantiff's salary and if Plantiff was interested in working for COSA. Even though Plantiff told her no, Murphy was persistent in requesting Plantiff's resume but Plantiff did not give it to her until after her termination from Defendant on November 18, 2005. Plantiff did tell Murphy that she would not take another pay cut as she had when working for Defendant. Murphy assumed that Plantiff meant a paycut from the Lighthouse, but Plantiff's reference to paycut was from her salary history where the highest salary was $65,000 yearly. Murphy was so delighted to finally get Plantiff to accept employment

26

with COSA after pursuing her for 2 months that she never inquired of the circumstances by which Plantiff no longer worked for Lighthouse. Murphy asked Plantiff was she still employed by the Defendant. The Plantiff answered Murphy truthfully when she stated no. Murphy admits in her illegally recorded testimony of April 2006 that she approached Plantiff about working for her. The funding allocated for the position in which the Plantiff was hired by COSA was a total of $65,000 which Plantiff did not learn until she reviewed the grant budgets after accepting employment with COSA. Murphy only offered Plantiff $55,000 and lied about that amount being all that was available in the grant. Murphy promised to give the Plantiff a raise of $10,000 when she received other grants. Murphy stated what Plantiff wanted to hear to get her to accept the position only to turn on Plantiff after her meeting eith DeKryuff on 1/25/06. Problems with Murphy were further exascerbated by the fact that Murphy is an in-the-closet lesbian who had secret desires for the Plantiff of a sexual manner. Murphy made several un-welcomed sexual gestures toward Plantiff which were ignored. When DeKryuff gave Murphy the unfounded and untruthful details of Plantiff's work history at the Lighthouse, Murphy terminated the Plantiff. Further interference came when the Defendant miraculously showed up at the hearing when Plantiff was trying to get back her personal belongings from Murphy. Defendant has not revealed how they knew where to be and why they were there. It was clear that the Defendant and COSA had been in communication concerning the Plantiff. It was also painfully obvious at that time as well that DeKryuff and Murphy had been in communication and were working together against the Plantiff. Defendant had no reason at all to be at that hearing. It was not a claim of discrimination and had nothing to do with Defendant. A tape recorder was placed upon the witness stand and

27

without the consent of the Plantiff to try to intimidate the Plantiff. Also, this unverified, unathenticated transcript has been submitted as evidence along with an affidavit of Alice Murphy's testimony violating Plantiff's right to due process because **Plantiff was not given notification or the opportunity to question Alice Murphy. This intentional act of denying Plantiff's right to due process is a direct violation pursuant to rule 56 of civil procedures which makes provision for Plantiff and Defendant to examine all witnesses who are deposed.** The proof of these facts, are in the very interaction, presence, and timing of Plantiff's termination from COSA. Murphy pursued Plantiff and never voiced or wrote any disciplinary dissatisfaction with Plantiff's work. It was only after Dekryuff interfered in that business relationship that Plantiff was terminated. Defendant continued to interfere for months later.

**C.    PLANTIFF'S RESPONSE ON PARTIAL SUMMARY JUDGEMENT FOR DEFENDANT**

The Defendant is not entitled to summary judgment of dismissal of Plantiff's three claims or for partial summary judgment for the two reasons stated. Defendant states that Plantiff suffered no economic loss from termination by Defendant. Plantiff has suffered great economic loss, as well as tremendous emotional pain and suffering. Defendants discriminatory and retaliatory acts are so embedded in their culture and has existed for so long, that they actually believe that their violation of Plantiff's civil rights "is right". Due to Defendant's interference in Plantiff's business relationship, Plantiff has not been employed full-time for over two and a half years. Due to Defendant's interference and causing the termination from COSA, Plantiff had to relocate back to Georgia and leave her very sick father which expedited his death.

Defendant argues that Plantiff's off- hours conduct of a misdemeanor would have caused termination. There is no way that defendant can support this position for several reasons. First, Defendant had no knowledge of this offense when Plantiff's civil rights were violated. Defendant's argument is a fabricated hypothetical that could not be acted upon because it was not known. Second, Plantiff had not been convicted of anything during this time. Defendant could not have terminated Plantiff in what was a charge, not a conviction at that time. Third, Defendant has excused the behavior of DeKryuff and Stinson which has placed the organization in far more serious danger that Plantiff ever has. Dekryuff admits in her deposition that she knowingly used the Lighthouse credit card for her own purpose…to entertain her friends and extended family by renting a three bedroom condo on an Alabama beach when she only needed one bedroom. DeKryuff states that she rented the three bedroom condo for family and friends to join her. She could produce no proof of repayment during deposition and admits that she did not get prior approval for this expenditure from the board of directors **(DeKryuff's deposition, page 156, lines 1-23).**

Using and abusing the organization's credit card without authorization is serious and other employees have been reprimanded for it with termination threatened. What DeKryuff did is a direct violation of Policy #3a 15, from the Defendants Policy & Procedures Manual. DeKryuff admits in her deposition page 156, lines 19-23 that she did not get permission from the board to charge the expenditure to the Defendant's credit card. Stinson's lack of competent performance of her job responsibilities placed the Lighthouse in serious jeopardy many times during Plantiff's employment and afterwards. On several occasions, Stinson, caused the organization to have to pay funds that would

not have had to be paid if she had done her job properly, particularly the case o McGhee Park Apartments **(See Plantiff's exhibit 6, email from Owens to Dekryuff 11/8/05 3:07pm #2).** The worst gross managerial incompetence and mis-management of responsibilities by Stinson was in the case of Eliza Byrd, a counselor for the Defendant who was hired at the graduate degree level in January of 2005. It was Stinson's responsibility to verify all aspects of employee files including employee transcripts upon hire. Plantiff requested completion of this process during an email to Stinson dated 11/9/05. **(Plantiff's exhibit 6, Owens to Stinson 11/9/05 9:22am #1).** Due to Stinson's lack of effective performance of her responsibilities, Byrd remained in a counselor position without the proper education level for almost 2 years. Stinson did not do her job and Byrd counseled clients with serious mental health and substance abuse problems without the proper educational training. The number of clients Byrd served cannot adequately be counted over a two year period while her transcript had not been verified by Stinson. Defendant was paid for the counseling services and has not reimbursed the funding source for this gross mismanagement. The worst part is that the client's lives were put in danger and many have relapsed. DeKryuff tried to minimize the situation in a memo for Byrd's personnel file dated 6/5/05 as she falsifies information in the memo stating that Byrd was supervised by a master's level counselor while counseling clients. This is not true because Plantiff was the supervisor of the Byrd's supervisor and at no time does supervisors sit in with counselors when they are with the clients **(Plantiff's exhibit 13, memo from DeKryuff 6/5/05).** Stinson put the Defendant in very serious jeopardy of having their license pulled, loosing funding, and client lawsuits. Further, Defendant has not to this date notified clients of this gross-misconduct. What Stinson did

is listed in the Lighthouse employee handbook as reason for immediate termination for gross–misconduct and four other areas of violation. **(Defendant's exhibit C, paragraph 3, H and I).** Stinson's action placed the Lighthouse in great jeopardy and if the truth had been made known or to the funders, regulatories bodies, and especially the clients this could have meant a closing of the organization. Dekryuff was forced to resign behind this situation because she was in charge of the organization and this gross-managerial incompetence on hers and Stinson's part. Stinson remained and only received a very unclear written coaching on the wrist **(Plantiff's exhibit 13, from DeKryuff to Stinson 6/5/06).** Again the Defendant demonstrates disparate treatment in the application of policies and along racial lines of employees. Plantiff's arrest was not a conviction and cannot be used as an argument of what the Defendant would have done after the fact. The facts are that the Defendant has and does excuse gross-misconduct from Stinson and DeKryuff on a frequent basis. To state that Plantiff would have been terminated due to bad conduct not known to Defendant just further supports Plantiff's argument of Defendant's pattern of discriminatory and retaliatory acts against her and other African-American employees. Belser's testimony of what he would have done if he had known of Plantiff's arrest is fabricated and only serves to distract from the real reason Plantiff was terminated which was retaliation. The fact is that neither Belser, nor any other board member has done anything to this date concerning Stinson's gross misconduct and managerial incompetence in the Byrd situation except increase her salary from $40,000 to over $49,000 in raises. DeKryuff is still being rewarded after her resignation by being given a $10,800, 12 month contract in 2006 to duplicate the duties of the current Deputy Director, Teresa Houser and renewed again in 2007 **(Plantiff's exhibit 1)** . After

DeKryuff's resignation in 2006, DeKryuff received these two contracts from the Defendant with the direct responsibilities of the current Deputy Houser. Despite the fact that DeKryuff has not delivered one new grant, her contract has been renewed for another year. When comparing the job description of current Deputy Houser who is paid to be the grant writer, to DeKryuff's grant writer contract, it is clear that funding is being abused through duplication of responsibilities. The Defendant mis-uses and steals its own funds while neglecting the needs of the clients. Houser is being paid over $56,800 yearly and is responsible for development including grant writing as stated in her job description but does no grant writing and has not brought in one dime to the organization during her entire 2 years of employment ( **Plantiff's exhibit 2, Deputy Director job description)**. Defendant should be arrested for misrepresenting their mission and gross mis-management of government and private funds.

It is arrogantly presumptuous for the Defendant to presume that it is unlikely for the court to find in favor of the Plantiff on all claims. Lighthouse is not entitled to partial summary judgment because of their own failures in not providing the necessary disciplinary actions to other employees that committed gross-misconduct in addition to managerial incompetence that would have demonstrated their clear position and record that they would have terminated the Plantiff.

## II.    SUMMARY JUDGEMENT STANDARD

Plantiff is not a lawyer by profession and would not attempt to interpret the law but only to state the following. The pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits demonstrate that there is a genuine issue to many material facts. The Defendant is not entitled to summary judgment as a matter of

law. The Defendant cannot and has not successfully demonstrated anything that proves the absence of a genuine issue of many material facts. The evidence submitted by the Plantiff which clearly tells the facts of the events that took place during Plantiff's employment are all there for the courts review along with the depositions, pleadings, and false affidavits that does not match what's documented in Plantiff's records/emails or what actually happened. The Defendant did in fact base their employment decision to hire Plaintiff on an illegal criterion not used for Stinson or Houser who were not qualified for their positions according to their job descriptions, resumes and Stinson's transcript. Defendant imposed a criterion on Plaintiff never used before on any other management employee. Defendant is the only African-American that has ever been Deputy Director but was hired with a waiver not used for her white counter-parts and direct comparable, current Deputy Director Houser. Defendant also based its decision to terminated Plantiff on the fact that Plantiff complained about discrimination. With no prior disciplinary actions of any kind, Defendant terminated Planted with 7 days of her sharing her concerns about discrimination.

Plaintiff has offered the courts more than sufficient evidence to establish an element essential to all of her claims and can bear the burden of proof at trial. There are no deficiencies, only verifications of the facts of this case. Therefore Lighthouse is not entitled to summary judgment but Plantiff is entitled to summary judgment.

## III.    ARGUMENT

### A. PLANTIFF HAS MADE A PRIMA FACIE CASE FOR DISCRIMINATION AND CERTAINLY RETALIATION UNDER TITLE VII.

33

The Plantiff belongs to a protected class (minority and female), was more than qualified to do her job according to the job description and her resume, and did suffer the adverse employment actions of an illegal-imposed, discriminatory criterion in the form of a waiver, retaliation and termination based on her race. Defendant has treated similarly situated employees outside of Plantiff's class more favorably. Plantiff did suffer from differential application of work and disciplinary rules in that Stinson was not required to have a waiver when employed by the Defendant in 2002. Although Stinson did not meet the qualifications of her position that required a major in accounting or CPA, she was hired without a waiver thus applying a criterion to Plantiff that was not required for a comparable, white counterpart. The Defendant further continued in this same illegal employment practice when hiring the new Deputy Director, Teresa Houser in 2006, an exact comparator of Plantiff, who is not qualified for her position because she has no grant writing or fundraising experience which is required in the job description for the Deputy Director of Development. Further, Defendant has failed to follow their own disciplinary policies in the serious, gross-misconduct of Dekryuff and Stinson as it relates to the Eliza Byrd transcript verification situation which placed the Lighthouse in serious jeopardy, and if known to funders and clients would have seriously damaged the Lighthouse image and could have closed Defendant's doors **(Plantiff's exhibit 13 Dekryuff's memo to Byrd's employee file dated 6/5/06)**. DeKryuff wrote this memo to cover hers and Stinson's gross-management, incompetence and overall poor performance. DeKryuff states in her letter, that no client was harmed, neglected or abused by being clinically counseled by Eliza Byrd who did not have the proper education, training or experience. Byrd was employed at the Lighthouse for almost two years and

34

counseled numerous clients during this entire period. For DeKryuff to state that no client was harmed, abused or neglected is an understatement and demonstrates how she felt about clients in allowing them to be clinically and psychologically treated by a quack. The harm that was done is irreparable. To make matters worst, clients still have not been told the truth about their mal-practiced treatment, and neither have funders been informed or reimbursed.

### 1. PLAINTIFF'S EVIDENCE OF PARTICIPATION IN A STATUTORILY PROTECTED OPPOSITION UNDER TITLE VII BECAUSE PLAINTIFF'S STATEMENT OF FACTS ARE REASONABLY OBJECTIVE

The Plaintiff did engage in a statutorily protected expression when she made her concerns about discriminatory practices known to DeKryuff on 11/8/05 and 11/09/05. Plaintiff did suffer an adverse employment action of retaliation and termination. The protected expression of concerns about discriminatory practices and the adverse employment actions of retaliation and termination are causally connected. The retaliation and the termination are a direct result of the Plaintiff's expressions of concern over discriminatory practices. Plaintiff was highly proficient in her job performance as noted repeatedly by DeKryuff, and had received no prior disciplinary actions of any kind before she raised her concerns about discriminatory practices to DeKryuff. Plaintiff did protest Defendant's unlawful and discriminatory employment practices. The Plaintiff did observe and believe in good faith that Defendant was engaging in unlawful employment practice in light of the facts surrounding the resignations and rescind request of both Hibbler and Stinson. The entire record of facts does not only indicate, but also demonstrates that

35

Plantiff's belief was objectively reasonably and not mistaken at all. Plantiff was directed to interview candidates for the Stinson's position, and interviewed candidates along with the management team. DeKryuff and Stinson agreed to the hiring of white male, Claude Hurt for the position, and he turned the position down. When the second best candidate was to be hired who was African-American female, Rochelle Baker, DeKryuff and Stinson shifted gears to stop Rochelle Baker's employment by initiating another discriminatory practice. That disparate practice was to allow the resignation rescission of Stinson (white female) and not allow Hibbler (African-American).

Defendant has produced no evidence that proves the existence of the so-called, two white and qualified candidates for the Deputy Director position for which the Plantiff was hired with an illegal, criterion waiver. Plantiff does demonstrate a prima facie case in that Stinson, who was not qualified for her position when hired in 2002 according to the written qualifications of needing to have an accounting degree or being a CPA. Plantiff and Stinson were similarly situated because both were members of management. Defendant continued in this unlawful practice in the hiring of new Deputy Director, Houser, a direct and exact white comparator to the Plantiff, who does not meet the qualifications for the position, and a waiver was not imposed.

### a) PLANTIFF'S ARGUMENT AND STATEMENT OF FACTS CONCERNING DISPARATE TREATMENT OF AFRICAN-AMERICAN CLIENTS

The facts surrounding the Defendant's treatment of clients who were African-American are clearly documented throughout this response and supported by the evidence in emails from Owens to DeKryuff, **(Plantiff's exhibit 6).** Further documentations are outline in the complaint letter of 7 other past employees in **(Plantiff's**

**exhibit 7, 32 pages).** The courts can clearly and reasonable see how clientele were treated and the issued surrounding that treatment. Further evidence is documented in the EEOC complaints of Rollins, Kemp and Wolfork **(Plantiff's exhibit 11).** The documented facts of Defendant's treatment of African-American clientele, is not only important and objectively reasonable, but it demonstrates a mindset and a culture that has been harvested and illegally practiced for years at the Lighthouse.

b) **PLANTIFF'S AGUMENT AND STATEMENT OF FACTS CONCERNING DISCRIMINATION AND DISPARATE TREATMENT OF LASHAE HIBBLER AND THE RETALIATION IMPOSED ON PLANTIFF FOR HER OPPOSITION**

Plantiff informed DeKryuff on 11/09/05 that to consider allowing Stinson to rescind her resignation was possibly discrimination against Hibbler because Hibbler desired to rescind her resignation as well just several weeks before. Plantiff did not mention Hibblers name in the email to DeKryuff on 11/10/05 because she had already discussed the entire situation with DeKryuff by phone. The email was just merely an attempt on the Plantiff's part to get DeKryuff to understand the issues that management was facing given the two situations. DeKryuff began her retaliation at that moment after that phone conversation and email by a verbal warning to Plantiff, and later that day on 11/10/05 removing the supervision of Stinson from Plantiff. After management team meeting on 11/14/05, Defendant gave Plantiff a written reprimand for what she called unprofessional behavior for meeting with team members that she met with regularly everyday. Four days later, DeKryuff terminated the Platiff's employment.

Hibbler requested to Plantiff to rescind her resignation. DeKryuff had already given the directive that this could not happen due to the bad history between DeKryuff and Hibbler.  DeKryuff wanted Hibbler out of the organization which Plantiff had no issues with either way. However, when Stinson made the same request in secret to DeKryuff, the unethical and unprofessional way the request was treated was when the Plantiff voiced her concerns to DeKryuff about discrimination. When Plantiff would not totally agree with DeKryuff concerning Stinson's proposed new work arrangement, DeKryff retaliated against Plantiff for raising the issue of discrimination and disparate treatment.  The fact that Stinson and DeKryuff kept this proposal hidden from Plantiff and all other members of management raised many concerns from all **(Stinson's deposition Volume I, page 84 lines 1-23)**.

Stinson did not attempt to turn in her resignation, but actually turned in her resignation to Plantiff on 10/25/05 as offered in evidence in EEOC complaint. It is also noted in DeKryuff's letter to Stinson dated 11/09/05 at the bottom where Stinson rescinds her resignation by her own signature. For Counsel to state that there was no resignation is highly inaccurate according to facts and evidence. Plantiff accepted Stinson's resignation noted by her signature as had been the practice of Defendant before Plantiff's employment. Stinson did notify the board in a meeting later that morning of 10/25/05. There was no clear directive given to DeKryuff or Stinson for her to remain and work from home in Birmingham.  If there was conversation on this matter from board members, it was not official board business and therefore illegal. There was no vote. In fact, the board only approved Stinson's resignation withdrawal in the November 22, 2005 board meeting after the Plantiff had been terminated on 11/18/05. The Defendant's facts

are just not true and have been fabricated to cover up what actually happened. Stinson left that board meeting and advertised her own position. If in fact, she was told she could remain in her position, why would she advertise her own position and interview 6 candidates, and continue to offer training for the new person. Stinson could absolutely be replaced and so could any other employee. Stinson was going to be replaced by candidates with more qualifications and experience than what Stinson held, even a CPA **(Plantiff's exhibit 6, resumes of candidates).**

The argument by Defendant that Hibbler deserved to be treated disparately and discriminated against because of her work history is ludicrous. Defendant still does not understand that there are laws that govern employers engaging in the type of unlawful employment practices that is their long-standing history. It was not that Stinson remaining employed violated Hibbler's civil rights, but that the disparate treatment of Hibbler in the two situations with regard to race violated Hibblers's civil rights and the Plantiffs' civil rights for raising her concerns about discrimination. Plantiff was unlawfully retaliated against and terminated for addressing the issue of discrimination and disparate treatment against Hibbler but for Stinson. Defendant argues that Hibbler and Stinson are not direct comparators; however lawful employment practices are for all employees without regard to their race.

Plaintiff held no resentment towards Stinson remaining in her position, but against the disparate treatment and discrimination of Hibbler. Plaintiff did not admit agreement with Stinson decision to remain in her position because that hypothetical did not happen. The facts are that Plaintiff was never notified of Stinson's decision or given input in the situation as Stinson's supervisor which was clear insubordination on Stinson's part. The

rescission decision in favor of Stinson had already been made according to DeKryuff's letter to Stinson of 11/09/05 **(Plantiff's exhibit 13)**.

There is insurmountable evidence of the true facts in this case as it relates to the resignation rescissions request of Hibbler and Stinson. However Hibbler was treated disparately and discriminated against given the same situation. Hibbler did nothing that warranted termination but rather submitted her resignation just as Stinson did several weeks later. Both Hibbler and Stinson requested to rescind their resignations and were treated very differently in the same situation where the only difference was the color of their skin. Plantiff's opposition to this unlawful employment practice was and is highly objective and reasonable based on Title VII issues.

## B. PLANTIFF'S ARGUMENT THAT HER TERMINATION BY DEFENDANT WAS FOR RETALIATION AND IS A PRETEXT FOR DISCRIMINATION AND NOT LEGITIMATE

The Defendant proffered non-discriminatory reasons for terminating the Plantiff are pretextual and non-credible. Defendant offers several contradictions, inconsistencies and an undisputed timeline of events that not only support the facts of the termination but renders their reason unworthy of credence.

Plantiff asserted the authority of her position as Deputy Director because it was her responsibility to do so. Plantiff was in charge of running the day to day operations of the Lighthouse in the absence of DeKryuff and by her job description. Plantiff never had any problems with any department head but Stinson. Stinson was the only management employee who refused to be supervised by the Plantiff and was insubordinate from day one of Plantiff's employment. Prior to Plantiff's hiring, Stinson was accustomed to acting in the unofficial role of Deputy Director and did not want to stop even after the Plantiff

came on board as the new Deputy Director. Plantiff had an excellent working relationship with all other managers including her supervisor DeKryuff. All members of management team respected Plantiff in her position by reporting to her and keeping her in the chain of command except Stinson. It was not an issue for Stinson to report to DeKryuff, but Stinson never reported to Plantiff, her immediate supervisor, on anything as noted in her emails where Stinson apologized to Plantiff for constantly bypassing her **(Plantiff's exhibit 13, Stinson email to Owens on 10/03/05 2nd paragraph)**. Stinson by-passed the Plantiff, her immediate supervisor, on everything. Even though Plantiff's and Stinson's offices were less that 10 feet across the hall from each other, Stinson refused to consult with Plantiff on anything but would email or call DeKryuff who was at home on maternity leave **(Plantiff's exhibit 6, Owens email to DeKryuff 10/31/05 1:51 subject:issues paragraphs 3-8)**.

Plantiff never destroyed harmony within the management team, DeKryuff and Stinson accomplished this all by themselves by their secret coo to exclude team members from the decision making process regarding Stinsons resignation rescission **(Plantiff's exhibit 6, Emails to DeKryuff from Carroll 11/10/05 and Baity to DeKryuff on 11/10/05).** DeKryuff and Stinson were deceiving members of management by pretending that there would be a discussion of Stinson's request in the 11/14/05 team meeting. When in reality, DeKryuff had already given Stinson a letter offering rescission and Stinson signed it on 11/9/05 rescinding her resignation and remaining in the position **(Plantiff's exhibit 13, DeKryuff letter to Stinson on 11/09/05).**

Plantiff had absolutely no performance problems and was not terminated for poor performance. Plantiff welcomed and solicited DeKryuff's input, directives and counsel

41

daily. Plantiff emailed DeKryuff regularly and spoke with her by phone daily when DeKryuff would answer **(Plantiff's exhibit 6, emails from Owens to DeKryuff and Dekryuff to Owens)**. Plantiff always requested DeKryuff's input and her advice in every email.

Plantiff's grant writing capabilities were never exaggerated. Plantiff wrote a 1.5 million dollar grant for a previous employer, a million dollar grant for a previous employer, a 3 million grant for a previous employer, and several hundreds of thousand dollar grants for clients of Keeping Our Village Alive, her previous organization. Client also wrote a grant for the Defendant, in DeKryuff's absence which got funded after Plantiff was terminated. DeKryuff tried to take the credit for the grant but was away on maternity leave when it was written by the Plantiff. There were no changes made to the grant as argued by Defendant because the grant was due on the very day Plantiff was terminated, 11/18/05. Plantiff had the grant prepared and ready to be mailed that day when DeKryuff asked for it after terminating Plantiff. Plantiff complied by giving it to DeKryuff who submitted the grant and it was in fact funded to the Defendant. The first grant written by the Plantiff had the information in it that was available to the Plantiff in the absence of DeKryuff who went on her vacation and never replied to Plantiff with any corrections. Because of the past bad relations of the Defendant with the funding agency, the grant did not stand a chance of being funded in the area that DeKryuff had advised the Plantiff to write for. However, Plantiff wrote the grant and met the deadline as directed by DeKryuff.  There is no email stating DeKryuff needed to approve the grant, this had already been done. DeKryuff was out of town when the first grant was submitted and it required no signature. Plantiff was never told that her termination was for poor

performance only that she was not a fit for the organization because of a different leadership style. See Depositions of Belser and DeKryuff with regard to these very statements.

Defendant never questioned any of the Plantiff's travel while employed because all travel plans to handle Defendant's business were made known by each member of management during the weekly meeting. Every team member knew the schedule of the team for weeks and even months ahead. This was a normal practice in place prior to Plantiff's employment and which every team member followed. As a courtesy, and out of respect for DeKryuff, Plantiff always followed up with emails on her schedule and did seek any response from DeKryuff **(Plantiff exhibit 6, all emails Owens to DeKryuff on 9/23/05 paragraph #3,  10/31/05 paragraph 2, 11/9/05  paragraph # 2 (CDC).** Each of these detailed emails and others, demonstrates the frequency with which the Plantiff communicated all issues including her schedule to DeKryuff. The only travel Plantiff engaged in was in line of her job responsibilities and for the Defendant. Plantiff met with several potential partners, UAB, Tuskegee Institute, and the CDC who was the grant provider. A later meeting was scheduled for Monday, 11/21/05 with another group out of Phoenix City, AL, to try to obtain a partner for the CDC grant but Plantiff was terminated abruptly on 11/18/05. Plantiff never stated that she met with a "graduate friend" actually this was a person who was in one of Plantiff's graduate classes who happened to work for the CDC grants department. Plantiff had no association with this person except to gain clarity on the grant requirements as a part of the planning process to write the grant.

The Defendant had absolutely no reason to unlawfully terminate the Plantiff. Plantiff's job performance was excellent and was never mentioned as a reason for

unlawfully teminating Plantiff. Plantiff was unlawfully discharged in retaliation for raising the issue of disparate treatment and discrimination. Plantiff was immediately and verbally reprimanded after mentioning discrimination to DeKryuff on 11/9/05. The supervisory responsibilities for Stinson were removed from Plantiff the next day on 11/10/05. Plantiff was written-up on 11/10/05 but not given the disciplinary action until 11/14/05 as noted on the written action. Plantiff was unlawfully terminated on 11/18/05, 7 working days after expressing concerns about the unlawful disparate and discriminatory treatment of African-American employee, Hibbler. Plantiff's unlawful discharge was a pretext for race discrimination, and Plantiff should be awarded summary judgment thereby denying summary judgment in favor of the Defendant.

1. **PLANTIFF'S ARGUMENT THAT DEFENDANT IS NOT ENTITLED TO A "SAME ACTOR" PERMISSABLE INTERFERENCE THAT DEKRYUFF DID NOT ACT WITH A DISCRIMINATORY MOTIVE BECAUSE SHE BOTH HIRED AND TERMINATED PLANTIFF WITH FULLKNOWLEGE OF HER RACE.**

Plantiff was hired by the Defendant as the only African-American executive member of management that has ever had an illegally-imposed criterion for hiring. DeKryuff did choose to hire Plantiff and knew that she was African-American, however DeKryuff and the board imposed a criterion not used for any other white management employees prior to Plantiff, nor after Plantiff. Despite the fact that neither Stinson (white) before Plantiff's hire, did not meet the qualifications for her position, or Houser (white) who filled Plantiff's position, there was no waiver imposed by DeKryuff or the board. Defendant cannot successfully argue that because DeKryuff hired and terminated Plantiff that her unlawful actions were not discriminatory.

44

DeKryuff made the effort to hire Plantiff because of her distinguished qualifications and how they could benefit the Defendant, but tainted that very decision by imposing an illegal criterion not imposed for Plantiff's white counterparts. There is no proof or evidence to support the existence of two-equally qualified white candidates who DeKryuff supposedly did not hire. In Defendant's response to Plantiff's EEOC Charge, Defendant states on page 1 that Plantiff was hire *"over two qualified white applicants"***(Plantiff's exhibit 4, Defedant's Response to EEOC Charge, page 1 in italics).** This is another fabrication by the Defendant which is why the language has been changed in this motion to read" two-equally qualified white candidates. It is not reasonable and is unlawful to choose an unqualified candidate over two qualified applicants???? Lighthouse is not at all entitled to any inference that DeKryuff did not act with discriminatory animus when she unlawfully terminated Plantiff's employment. It is fact, that DeKryuff did act with discriminatory animus in the hiring and unlawful termination of the Plantiff. DeKryuff further discriminated against Plantiff by placing a letter in the employee file of Stinson in an attempt to refute and remove the disciplinary action that Plantiff had legitimately given Stinson in October 2005. The supervisory and direct reporting responsibility for Stinson was a function of Plantiff's position as Deputy Director. Plantiff was well within her authority to discipline Stinson for repeated insubordination which was well documented even by Stinson herself. **(Plantiffs exhibit 7, Owens to Stinson disciplinary action for insubordination and Plantiff's exhibit 13 DeKryuff Memo to Stinson's personnel file dated 6/7/06).** This memo from DeKryuff to Stinson's personnel file was as written exactly two days after DeKryuff's memo of 6/5/06 to Eliza Byrd's file. The significance of both of these documents again

demonstrates the lengths, even discrimination, that DeKryuff would go to for Stinson to be satisfied and how co-dependent DeKryuff was on Stinson. Stinson had just put the Defendant in the most serious jeopardy in their public image of any employee by not verifying the transcript of Eliza Byrd who clinically counseled numerous clients without the proper training and education for almost two years. It was Stinson's responsibility to verify transcript at the time of hire and because she did not do that, clients were put in harm's way, services were billed and funders paid for these services, and clients were never informed of the situation. Stinson didn't even get a slap on the wrist for violating at least 5 areas in the Defendant's handbook, under behaviors warranting discipline and/or termination: incompetence, inefficiency/neglect of duty, endangering the health and safety of the clients, professional misconduct, and behavior that clearly violated the rights and privileges of clients **(Plantiff's exhibit 13, Lighthouse Policy & Procedures Manual, page 15, #3a 1-21).**

### C. PLANTIFF'S ARGUMENT FOR MAKING A *PRIMA FACIE* CASE FOR TORTUOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP

Plantiff simply states that Defendant has done everything within their power to interfere in Plantiff's employment relations. Potential employers have informed Plantiff that when they have phoned Defendant to verify employment information on the Plantiff, that they have received negative and slanderous feedback. DeKryuff even wrote slanderous, unsubstantiated facts about Plantiff in a letter to Stinson's employee file that clearly demonstrates and records her discriminatory opinion after Plantiff's unlawful termination **(Plantiff's exhibit 13, DeKryuff Memo to Stinson on 6/7/06)**.

### 1. PLANTIFF'S ARGUMENT CONCERNING DEFENDANT'S TORTUOUS INTERFERENCE WITH HER EMPLOYMENT AT COSA

Plantiff emphatically objects to any testimony offered by Alice Murphy of COSA because Plantiff has been denied her right to due process and Defendant has failed to follow Rule 56 of civil procedure. Plantiff was not given the opportunity to cross-examine or question Alice Murphy concerning her allegations against Plantiff in her deposition/affidavit. Any evidence submitted referencing Alice Murphy or by Alice Murphy is highly controversial, unsubstantiated, illegal, and non-authentic because it was obtained without providing due process to the Plantiff. Defendant should have followed due process in this submission. Plantiff was not informed or notified that Alice Murphy was being deposed, giving a sworn statement or the like. This evidence is unconstitutional and grounds for appeal in the event of a favorable ruling of summary judgment for the Defendant on this issue of claim. The evidence from Alice Murphy of COSA shows nothing but the same fabricated story of the Defendant. The similarities are more than just words. Murphy's testimony has been scripted which demonstrates that many conversations between the Defendant and Murphy have taken place and they were all premeditated against the Plantiff.

However, Plantiff's argument is the same as stated in the facts. Plantiff states the Executive Director, Candace DeKryuff attended a collaborative meeting at COSA on January 25, 2006. During that meeting which Plantiff was facilitating, DeKryuff interacted more with Alice Murphy than any other partner at that meeting. DeKryuff communicated with Alice Murphy in an intense manner and told Murphy that she would

be calling her. During the Plantiff's entire employment with COSA, from November 28, 2005 up to the meeting, Murphy had never spoken or had contact with DeKryuff. As soon as DeKryuff saw the Plantiff during the COSA meeting, DeKryuff began her interference. It was three days later that Murphy began to act very strangely towards Plantiff, she was agitated and responding in with juvenile behavior of throwing temper tantrums. Murphy had not acted in this manner before towards Plantiff. COSA also has a 90% employee turnover rate and several complaints against them at the Alabama Department of Community Affairs, Substance Abuse prevention office from prior employees. In exactly eight days after DeKryuff's visit to COSA, with no verbal warning or prior disciplinary actions, Murphy terminated Plantiff's employment. Murphy stated that Plantiff was "not a good fit", the exact words used by DeKryuff when she terminated Plantiff. Murphy had aggressively pursued Plantiff to work for her for 2 months while Plantiff was employed with the Defendant, and made many promises. Murphy approached Plantiff in a meeting in September 2005, and wanted to know Plantiff's salary and if Plantiff was interested in working for COSA. Even though Plantiff told her no, Murphy was persistent in requesting Plantiff's resume but Plantiff did not give it to her until after her termination from Defendant on November 18, 2005. Plantiff did tell Murphy that she would not take another pay cut as she had when working for Defendant. Murphy assumed that Plantiff meant a paycut from the Lighthouse, but Plantiff's reference to paycut was from her salary history where the highest salary was $65,000 yearly. Murphy was so delighted to finally get Plantiff to accept employment with COSA after pursuing her for 2 months that she never inquired of the circumstances by which Plantiff no longer worked for Lighthouse. Murphy asked Plantiff was she still employed

48

by the Defendant. The Plantiff answered Murphy truthfully when she stated no. Murphy admits in her illegally recorded testimony of April 2006 that she approached Plantiff about working for her. The funding allocated for the position in which the Plantiff was hired by COSA was a total of $65,000 which Plantiff did not learn until she reviewed the grant budgets after accepting employment with COSA. Murphy only offered Plantiff $55,000 and lied about that amount being all that was available in the grant. Murphy promised to give the Plantiff a raise of $10,000 when she received other grants. Murphy stated what Plantiff wanted to hear to get her to accept the position only to turn on Plantiff after her meeting eith DeKryuff on 1/25/06. Problems with Murphy were further exacerbated by the fact that Murphy is an in-the-closet lesbian who had secret desires for the Plantiff of a sexual manner. Murphy made several un-welcomed gestures toward Plantiff which were ignored. When DeKryuff gave Murphy the unfounded and untruthful details of Plantiff's work history at the Lighthouse, Murphy terminated the Plantiff. Further interference came when the Defendant miraculously showed up at the hearing when Plantiff was trying to get back her personal belongings from Murphy. Defendant has not revealed how they knew where to be (in court) and why they were there (in court). It was clear that the Defendant and COSA had been in communication concerning the Plantiff. It was also painfully obvious at that time as well that DeKryuff and Murphy had been in communication and were working together against the Plantiff. Defendant had no reason at all to be at that hearing, it was not a claim of discrimination and had nothing to do with Defendant. A tape recorder was placed upon the witness stand and without the consent of the Plantiff to try to intimidate the Plantiff. Also, this unverified, unathenticated transcript has been submitted as evidence along with an affidavit of Alice

49

Murphy's testimony violating Plantiff's right to due process because **Plantiff was not given notification or the opportunity to question Alice Murphy. This intentional act of denying Plantiff's right to due process is a direct violation pursuant to rule 56 of civil procedures which makes provision for Plantiff and Defendant to examine all witnesses who are deposed.** The proof of these facts are in the very interaction, presence, and timing of Plantiff's termination from COSA. Murphy pursued Plantiff and never voiced or wrote any disciplinary dissatisfaction with Plantiff's work. It was only after Dekryuff interfered in that business relationship that Plantiff was terminated. Defendant continued to interfere for months later and even showed up in court with tape recorder in hand. Defendant cannot explain how they knew where to be, what time, and why they came so prepared with a tape recorder to interfere in a legal matter of Plantiff that had nothing to do with them.

Referencing Defendant's footnote on page 35 of their motion, Plantiff's testimony does provide an understandable basis for her actions before she was terminated, but not for the reasons stated. Plantiff's actions were perfectly in line with the responsibilities of her position which Plantiff was carrying out. Plantiff was being pursued by Murphy for months, but never responded until after Plantiff was terminated from Defendant. Further, Plantiff had no demands of Defendant except that employees and clients be treated fairly without regard to their race or condition, and that policies and practices be administered without disparity. This kind of request was consistent of Plantiff's leadership and is documented all through her emails. This was something that should have been admired and respected, however Defendant does not embrace equality for all as evident by their history of unlawful employment practices.

50

D. **PLANTIFF'S ARGUMENT AGAINST DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLANTIFF'S DAMAGES**

Plaintiff did work for COSA at a higher salary for 9 weeks, and would have remained employed if it had not been for the interference of the Defendant in that business relationship. Defendant was so certain that they could destroy Plaintiff when they engaged in this interference, that they did not think beyond to the consequences of their action by: 1) Defendant choosing to show up at the hearing between COSA and Plaintiff with a tape recorder in hand, it was a direct admission of their intent. This personal property/employment issue had nothing to do with Defendant, and 2) The intentional letter by DeKryuff to Stinson using unsubstantiated facts and slander from Murphy as justification to remove a disciplinary action written on Stinson for insubordination, and 3) Defendant's submission of testimony from Murphy without notifying the Plaintiff denying her right to due process and violation the rules of civil procedure.

Defendant is responsible because of they interfered in Plantiff's business relationship, and should not be awarded partial summary judgment on Plantiff's damages.

2. **PLANTIFF'S ARGUMENT THAT THERE WAS <u>NO CONVICTION</u> OF ANY CRIME WHILE EMPLOYED AT THE LIGHTHOUSE**

Defendant has again stated that Plaintiff was convicted of a crime while employed for the Defendant. When the evidence submitted is carefully reviewed, Plaintiff is confident that the courts will see another attempt to slander and make false statements against the Plaintiff. Plaintiff was arrested, but not convicted while employed for the Defendant. Plaintiff argues that the Defendant represent themselves as having a mission of healing and restoration for clients and employees. Defendant has also demonstrated and it

is factual, that two white management employees who engaged in gross-misconduct and managerial incompetence that jeopardized their image were not disciplined or terminated. As revealed in discovery, the Eliza Byrd employee false transcript incident that lasted for almost two years, put hundreds of clients in danger, no reimbursement to funders and medicade, and if revealed could have destroyed not only the Defendants' image but the entire organization but yielded no terminations. DeKryuff and Stinson were directly responsible of this situation. Defendants themselves should be arrested for fraud, government waste, as well as endangering clients and their families. DeKryuff's whiting out of Byrd's name from files is illegal and a cover-up as well. Defendant has also excused the unauthorized credit card charges of the top executive, DeKryuff who rented a 3 bedroom condo to entertain family and friends yearly by her own admission, which is theft, was not disciplined or terminated. These patterns of misconduct and gross managerial incompetence indisputably rises to the most serious level because Defendant is a federally and state-funded, not-for-profit organization that provides services to the ill, underprivileged individuals with chemical dependency problems.

Plantiff agrees that the Defendant's policy manual provides for behaviors warranting discipline and including termination. Policies must be administered consistently because they are written for all employees not just African-American ones. Listed in those same categories are the offenses that both DeKryuff and Stinson have committed and continue to commit. After Dekryuff's resignation in 10/06, she was given an $11000 grant-writing contract for job responsibilities that are already a part of a full-time salaried Deputy Director, Houser. Because Houser was hired without grant writing experience and not capable of writing a grant, Defendant is engaging in fraud and waste

52

by paying Dekryuff for the same duties even though she has not produced one grant in two years of the contract either.

Defendant would be believable in their allegations against the Plantiff if their disciplinary actions in situations of gross-misconduct and managerial incompetence that could significantly damage the centers image were followed and applied equally. This is not the case. Defendant has a history of not following their own policies and practices as noted in Plantiff's email to DeKryuff on several occasions (Plantiff's exhibit 6). To state that Plantiff would have been fired is a hypothetical and does not follow the pattern, practices, or policy administration history of the Defendant. What Defendant did not do in DeKryuff's and Stinson's situation in Byrd's incident takes away the credibility of their argument that Plantiff would have been fired. It is an *expo facto* statement to distract from the real reason for unlawfully terminating the Plantiff.

Therefore, Defendant is not entitled to impose any limits on a favorable ruling of backpay for the Plantiff. Defendant cannot determine what are available remedies for Plantiff, this is up the courts. Plantiff is seeking reinstatement and front pay. Defendant is not entitled to partial summary judgment that would limit Plantiff's damages.

## IV. <u>CONCLUSION</u>

Plantiff has produced insurmountable evidence that the Lighthouse discharged her because of raising the issue of discrimination and disparate treatment of employees based on race. The reasons provided by Lighthouse for their unlawful discharge are all un-substantiated and without evidence. Defendant's reasons for unlawfully terminated the Plantiff are not objectively legitimate, were discriminatory, and pre-textual. Defendant

argues that Plantiff's performance was not acceptable the entire time of her employment. The Executive Director herself, and Plantiff's supervisor constantly praised Plantiff work even as late as in her November 15, 2005 report to the board. Further, Plantiff had no disciplinary actions, verbal or otherwise, the entire time of her employment until she raised the issue of discrimination and disparate treatment. Plantiff was treated very differently that other similarly situated employees, namely Stinson a white comparator, and Houser a direct, white comparator. Plantiff had an illegally imposed criterion placed upon her during the hiring process for an un-met qualification. Stinson did not meet the qualifications for her position, but no waiver was imposed. Houser, who filled the position left vacant by the Plantiff did not and does not meet the qualifications of her position, but no waiver was imposed.

The court should enter summary judgment in favor of the Plantiff on all claims contained in her Complaint and all claims in the Lawsuit with prejudice, tax cost, emotional pain and suffering, and legal fees against the Defendant.

Dated: April 29, 2008

Respectfully submitted,

*Cecelia Owens Ed.D.*

Dr. Cecelia Owens, Pro Se

Plantiff ProSe:
Dr. Cecelia Owens
6245 Hillcrest Dr.
Morrow, GA 30260
770-991-2334 work
770-991-1505 fax
Email: ceceliaowens@comcast.net

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of April 2008, I have mailed the foregoing to the Clerk of the Court in the Middle District of Alabama at P.O. Box 158, Montgomery, AL 36101-0158 and to Counsel for Defendant at the following address:

Bruce Downey
Capell and Howard. PC
150 South Perry Street
Montgomery, AL 36102-2069

*Cecelia Owens Ed.D.*

Dr. Cecelia Owens, Pro Se

# PLANTIFF'S EXHIBIT 1

OEKryuff's
Contracts
for 2007
And 2008
Total pages 10



Total pages
10

# CONTRACT
## BY AND BETWEEN
## LIGHTHOUSE COUNSELING CENTER, INC.
### AND
### CANDYCE DEKRUYFF

The purpose of this contract is for Lighthouse Counseling Center, Inc., hereafter referred to as "Lighthouse", to purchase from Candyce DeKruyff, hereafter referred to as DeKruyff, certain consulting services as outlined in Exhibit 1.

WHEREAS, DeKruyff has the capabilities to provide the needed services, and

WHEREAS, Lighthouse wishes to purchase such services, and

WHEREAS, Lighthouse is authorized, to contract for specific services for its clients,

## I. SERVICES TO BE PROVIDED

A. DeKruyff will provide certain consulting services as specified in Exhibit 1, attached hereto, and will provide adequate documentation of those services.

## II. FINANCIAL ARRANGEMENTS

A. Both parties hereto agree that their responsibilities to one another are contingent upon the availability of state and/or federal funds and that such responsibilities shall terminate if said funds cease to be available.

B. DeKruyff shall document each time period in hours for each project or grant in which she works. This documentation shall be in permanent form and provided to Lighthouse on a monthly basis. Once this documentation is provided, Lighthouse will issue a check for reimbursement of services.

C. DeKruyff hereby agrees to be responsible for providing the above delineated services in a timely and professional manner, and to be responsible for any/all taxes (i.e., sales/use, FICA, income, Federal, State, Local, etc.) or related items which may become die as a result of any payment made under this Agreement. It is expressly understood and agreed that DeKruyff is a bona fide independent entity and as such, there is no employer-employee relationship whatsoever between Lighthouse and DeKruyff, and that DeKruyff is not entitled to any payroll services or other benefits, prerequisites, and privileges granted by Lighthouse to its employees.

D. Reimbursement for specific services will be at the rate(s) established in Exhibit 1, attached hereto.

## III. PERIOD OF CONTRACT

A. This contract shall begin January 1, 2008 and shall continue through December 31, 2008 unless terminated by either party upon thirty (30) calendar

**LIGHTHOUSE01110**

days written notice to the other party.

B. This contract is subject to immediate termination by either party for noncompliance with it terms and conditions.

## IV. OTHER PROVISIONS

A. In the performance of this contract, there shall be no discrimination against any applicant or recipient of aid, benefits, or services, or any employee, or any other person on the basis of race, color, religion, sex, or national origin including but not limited to discriminating prohibited by Title VI of the Civil Rights Acts of 1964, as amended, and any applicable Department of Health and Human Services Regulations.

B. In the performances of this contact, there shall be no discrimination against any otherwise qualified handicapped applicant or recipient of aid, benefits or services, or any employee or person on the basis of physical or mental handicap, in accordance with the Rehabilitation Act of 1973, the Americans with Disabilities Act of 1990, and any applicable Department of Health and Human Services regulations.

C. DeKruyff understands and agrees that it will at all times during the existence of this contract indemnify and save harmless Lighthouse and  Department of Health and Human Services of all and any and all liability, loss damages, cost or expenses which Lighthouse and/or Department of Health and Human Services may hereinafter sustain, incur, order, require or ordered pay as a result of any actions or inactions of the employees, agents, servants, or volunteers of DeKruyff.

D. Both parties understand and agree that they will operate in accordance with applicable federal, state, municipal and local laws, ordinances and codes, including but not limited to State Medicaid Agency Plan and the Medicaid Administrative Code.

E. The parties hereto understand and agree that all client information, including, but not limited to name, location, characteristics, health, and treatment shall be treated as confidential, except between the parties hereto, so as to comply with all applicable state and federal laws and regulations regarding the confidentiality of client information, including medical records.

In this regard, the parties hereto also understand and agree that said information may be shared for treatment, payment and healthcare operations as authorized by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and related regulations.  Each party agrees that they will comply with HIPAA and are responsible for their own data.  When one party shares data with the other, the other party will: (1) use it only for the intended purpose(s), (2) ensure that only those having need or right will have access to it (3) destroy or return such data to the other if and when necessary, (4) promptly report any breeches to the other party, and (5) cure such breaches within ten working days and advise the other party.

LIGHTHOUSE01111

The parties hereto agree that failure to comply with these requirements may require sanction, up to and including termination of this contract.

F. Both parties understand that, in accordance with Executive Order 12549, Department and Suspension, 45 CFR Part 76, Section 510, Participants, responsibilities, DMH/MR cannot make any sub grants or permit any contract or subcontract at any tier to any party which is debarred or suspended or otherwise excluded from or ineligible for participation in any Federal assistance program in accordance with the Department of Health and Human Services regulation at 45 CFR Part 76. AS Such:

> 1. Both parties certify, by signing this contact that neither they nor their principles are presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participation in this transaction by any Federal department or agency.

> 2. If either party to this contract is unable to certify the above statement (1), such prospective participant shall attach an explanation to this contract.

G. Under no circumstances shall the commitments by either party contained herein constitute a debt to the State of Alabama as prohibited by Section 213 of the Alabama Constitution of 1901, as amended by Amendment 26.

H. It is understood and agreed that each party will provide its own insurance coverage and will determine its own limits of liability. Neither party shall be responsible for the actions or lack of actions by the employees, agents, staff members, or representatives of the other.

I. By executing this agreement, DeKruyff understands and agrees that Lighthouse will not be responsible for any accidents or injuries of DeKruyff or any of DeKruyff's employees, agents, servants, or volunteers, which may occur while performing the duties or services provided by the Agreement.

J. This Agreement shall be governed by the laws of the State of Alabama as to interpretation, construction, and performance.

## V. ENTIRE AGREEMENT

The parties hereto understand and agree that this contract and embody the entire agreement by and between the parties. This contract may be modified only by mutual consent of the parties by written amendment.

IN WITNESS WHEREOF, the parties hereto have caused by this contract to be executed by their duly authorized representatives.

LIGHTHOUSE01112

Candyce DeKruyff

By: _Candyce DeKruyff_
    (Type or Printed Name)

By: _[signature]_
    (Signature)

As Its: _Self_

WITNESS: _[signature]_

DATE: _12-26-07_

Tax No. (SS#): ██████████

Lighthouse Counseling Center, Inc.

By: _Douglas E. Lindley_
    (Type or Printed Name)

By: _[signature]_
    (Signature)

As Its: _Executive Director_

WITNESS: _[signature]_

DATE: _12-20-07_

Tax (FEIN/SS#): 23-7126914

LIGHTHOUSE01113

**EXHIBIT 1**

**I. SERVICES TO BE PROVIDED:**

1. DeKruyff will draft, edit and prepare all necessary narrative responses to RFP's, budgets, attachments and exhibits for renewal applications for the following:

   - SAMHSA New Beginning Continuation
   - VOCA Renewal (STAR Program)
   - VAWA Renewal (STAR Program)
   - DPH Block Grant (STAR Program)
   - DPH Prevention Grant (STAR Program)
   - HUD I (12 HIV Housing Units)
   - HUD II (10 Women & Dependant Children Units)
   - HUD III (27 Dual Housing Units)

2. DeKruyff will draft, edit and prepare all necessary narrative responses to RFP's, budgets, attachments and exhibits for new grant/funding applications for Greil Foundation, Junior League, Central Alabama Community Foundation, and Community Development Block Grants.

3. DeKruyff will draft, edit and prepare all necessary narrative, budgets, attachments and exhibits regarding the United Way proposal, annual reports, newsletters (2-4 annually) and any necessary updating of brochures or printed materials.

4. All services to be provided under this Paragraph I, will be coordinated via direct meeting, telephone, facsimile or email prior to beginning each project, with designated Lighthouse management; throughout the project as necessary; and a final review by Lighthouse management prior to submitting completed application.

**II. FINANCIAL ARRANGMENTS**

1. Lighthouse will reimburse DeKruyff, monthly, on a flat fee basis for all services included in Paragraph I at the rate of $900.00 per month, for a total not to exceed $10,800.00 during the 12 months of the contract.

2. Lighthouse will negotiate any other irregular expenses like out of town travel, etc., as needed. Contractor will be responsible for all local travel, at her own expense.

**III. OTHER PROVISIONS**

1. Any other grants, proposals or other projects not covered in Paragraph I, which Lighthouse requests DeKruyff to research and pursue, will be negotiated separately under a mutually agreed upon flat fee or hourly rate.

2. Lighthouse in its sole discretion has the right to accept, rewrite, or reject any application submitted by DeKruyff.

**LIGHTHOUSE01114**

CONTRACT
BY AND BETWEEN
LIGHTHOUSE COUNSELING CENTER, INC.
AND
CANDYCE DEKRUYFF

The purpose of this contract is for Lighthouse Counseling Center, Inc., hereafter referred to as "Lighthouse", to purchase from Candyce DeKruyff, hereafter referred to as DeKruyff, certain consulting services as outlined in Exhibit 1.

WHEREAS, DeKruyff has the capabilities to provide the needed services, and

WHEREAS, Lighthouse wishes to purchase such services, and

WHEREAS, Lighthouse is authorized, to contract for specific services for its clients,

## I. SERVICES TO BE PROVIDED

A. DeKruyff will provide certain consulting services as specified in Exhibit 1, attached hereto, and will provide adequate documentation of those services.

## II. FINANCIAL ARRANGEMENTS

A. Both parties hereto agree that their responsibilities to one another are contingent upon the availability of state and/or federal funds and that such responsibilities shall terminate if said funds cease to be available.

B. DeKruyff shall document each time period in hours for each project or grant in which she works. This documentation shall be in permanent form and provided to Lighthouse on a monthly basis. Once this documentation is provided, Lighthouse will issue a check for reimbursement of services.

C. DeKruyff hereby agrees to be responsible for providing the above delineated services in a timely and professional manner, and to be responsible for any/all taxes (i.e., sales/use, FICA, income, Federal, State, Local, etc.) or related items which may become due as a result of any payment made under this Agreement. It is expressly understood and agreed that DeKruyff is a bona fide independent entity and as such, there is no employer-employee relationship whatsoever between Lighthouse and DeKruyff, and that DeKruyff is not entitled to any payroll services or other benefits, prerequisites, and privileges granted by Lighthouse to its employees.

D. Reimbursement for specific services will be at the rate(s) established in Exhibit 1, attached hereto.

## III. PERIOD OF CONTRACT

A. This contract shall begin January 1, 2007 and shall continue through December 31, 2007 unless terminated by either party upon thirty (30) calendar

**LIGHTHOUSE01115**

days written notice to the other party.

B. This contract is subject to immediate termination by either party for noncompliance with it terms and conditions.

## IV. OTHER PROVISIONS

A. In the performance of this contract, there shall be no discrimination against any applicant or recipient of aid, benefits, or services, or any employee, or any other person on the basis of race, color, religion, sex, or national origin including but not limited to discriminating prohibited by Title VI of the Civil Rights Acts of 1964, as amended, and any applicable Department of Health and Human Services Regulations.

B. In the performances of this contact, there shall be no discrimination against any otherwise qualified handicapped applicant or recipient of aid, benefits or services, or any employee or person on the basis of physical or mental handicap, in accordance with the Rehabilitation Act of 1973, the Americans with Disabilities Act of 1990, and any applicable Department of Health and Human Services regulations.

C. DeKruyff understands and agrees that it will at all times during the existence of this contract indemnify and save harmless Lighthouse and Department of Health and Human Services of all and any and all liability, loss damages, cost or expenses which Lighthouse and/or Department of Health and Human Services may hereinafter sustain, incur, order, require or ordered pay as a result of any actions or inactions of the employees, agents, servants, or volunteers of DeKruyff.

D. Both parties understand and agree that they will operate in accordance with applicable federal, state, municipal and local laws, ordinances and codes, including but not limited to State Medicaid Agency Plan and the Medicaid Administrative Code.

E. The parties hereto understand and agree that all client information, including, but not limited to name, location, characteristics, health, and treatment shall be treated as confidential, except between the parties hereto, so as to comply with all applicable state and federal laws and regulations regarding the confidentiality of client information, including medical records.

In this regard, the parties hereto also understand and agree that said information may be shared for treatment, payment and healthcare operations as authorized by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and related regulations. Each party agrees that they will comply with HIPAA and are responsible for their own data. When one party shares data with the other, the other party will: (1) use it only for the intended purpose(s), (2) ensure that only those having need or right will have access to it (3) destroy or return such data to the other if and when necessary, (4) promptly report any breeches to the other party, and (5) cure such breaches within ten working days and advise the other party.

LIGHTHOUSE01116

The parties hereto agree that failure to comply with these requirements may require sanction, up to and including termination of this contract.

F. Both parties understand that, in accordance with Executive Order 12549, Department and Suspension, 45 CFR Part 76, Section 510, Participants, responsibilities, DMH/MR cannot make any sub grants or permit any contract or subcontract at any tier to any party which is debarred or suspended or otherwise excluded from or ineligible for participation in any Federal assistance program in accordance with the Department of Health and Human Services regulation at 45 CFR Part 76. AS Such:

> 1. Both parties certify, by signing this contact that neither they nor their principles are presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participation in this transaction by any Federal department or agency.

> 2. If either party to this contract is unable to certify the above statement (1), such prospective participant shall attach an explanation to this contract.

G. Under no circumstances shall the commitments by either party contained herein constitute a debt to the State of Alabama as prohibited by Section 213 of the Alabama Constitution of 1901, as amended by Amendment 26.

H. It is understood and agreed that each party will provide its own insurance coverage and will determine its own limits of liability. Neither party shall be responsible for the actions or lack of actions by the employees, agents, staff members, or representatives of the other.

I. By executing this agreement, DeKruyff understands and agrees that Lighthouse will not be responsible for any accidents or injuries of DeKruyff or any of DeKruyff's employees, agents, servants, or volunteers, which may occur while performing the duties or services provided by the Agreement.

J. This Agreement shall be governed by the laws of the State of Alabama as to interpretation, construction, and performance.

## V. ENTIRE AGREEMENT

The parties hereto understand and agree that this contract and embody the entire agreement by and between the parties. This contract may be modified only by mutual consent of the parties by written amendment.

IN WITNESS WHEREOF, the parties hereto have caused by this contract to be executed by their duly authorized representatives.

LIGHTHOUSE01117

Candyce DeKruyff

By: _Candyce DeKruyff_
    (Type or Printed Name)

By: _____
    (Signature)

As Its: _Self_

WITNESS _____

DATE: _12·27·06_

Tax No. (SS#): ████████

Lighthouse Counseling Center, Inc.

By: _Douglas E. Lindley_
    (Type or Printed Name)

By: _Douglas E. Lindley_
    (Signature)

As Its: _Executive Director_

WITNESS: _____

DATE: _12-21-06_

Tax (FEIN/SS#): 23-7126914

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Sept 00, 0000
BONDED THRU NOTARY PUBLIC UNDERWRITERS

Sworn and Scribed before me on this
the 21st day of December, 2006

LIGHTHOUSE01118

**EXHIBIT 1**

I. SERVICES TO BE PROVIDED:

    1. DeKruyff will draft, edit and prepare all necessary narrative responses to RFP's, budgets, attachments and exhibits for renewal applications for the following:

- SAMHSA New Beginning Continuation
- VOCA Renewal (STAR Program)
- VAWA Renewal (STAR Program)
- DPH Block Grant (STAR Program)
- DPH Prevention Grant (STAR Program)
- HUD I (12 HIV Housing Units)
- HUD II (10 Women & Dependant Children Units)
- HUD III (27 Dual Housing Units)

    2. DeKruyff will draft, edit and prepare all necessary narrative responses to RFP's, budgets, attachments and exhibits for new grant/funding applications for Greil Foundation, Junior League, Central Alabama Community Foundation, and Community Development Block Grants.

    3. DeKruyff will draft, edit and prepare all necessary narrative, budgets, attachments and exhibits regarding the United Way proposal, annual reports, newsletters (2-4 annually) and any necessary updating of brochures or printed materials.

    4. All services to be provided under this Paragraph I, will be coordinated via direct meeting, telephone, facsimile or email prior to beginning each project, with designated Lighthouse management; throughout the project as necessary; and a final review by Lighthouse management prior to submitting completed application.

II. FINANCIAL ARRANGMENTS

    1. Lighthouse will reimburse DeKruyff, monthly, on a flat fee basis for all services included in Paragraph I at the rate of $900.00 per month, for a total not to exceed $10,800.00 during the 12 months of the contract.

    2. Lighthouse will negotiate any other irregular expenses like out of town travel, etc., as needed. Contractor will be responsible for all local travel, at her own expense.

III. OTHER PROVISIONS

    1. Any other grants, proposals or other projects not covered in Paragraph I, which Lighthouse requests DeKruyff to research and pursue, will be negotiated separately under a mutually agreed upon flat fee or hourly rate.

    2. Lighthouse in its sole discretion has the right to accept, rewrite, or reject any application submitted by DeKruyff.

LIGHTHOUSE01119

# PLANTIFF'S EXHIBIT 2

① Houser's job description
   And resume

② Owens job description
   And Resume
   Total pages 7



*Houser's description*

# LIGHTHOUSE COUNSELING CENTER, INC.
## DEPUTY/DEVELOPMENT DIRECTOR

**Definition:**

*TOTAL PAGES 7*

*Plaintiff's current OD job description*

The Deputy/Development Director is responsible for overseeing the various services of the Lighthouse Counseling Center, which include: Chemical Dependency & Recovery, Prevention Programs, Housing Programs, and the Standing Together Against Rape. The Deputy/Development Director is also responsible for representing the agency at various community functions and events to enhance the referral process and provide community education. The Deputy/Development Director will also perform various administrative duties including grant writing, continuation applications, grantee reports, and other required granting documentation, supervision, public relations, and outreach activities. The Deputy/Development Director also oversees, coordinates and promotes all aspects of the various fundraising activities of the Lighthouse.

*Starting salary o 48,500*

**Description of Duties:**

Coordinates and supervises staff in the absence of the Executive Director, and acts as the liaison between staff and the Executive Director. Coordinates public relations via press releases, media interviews, public speaking, community activities, exhibits, etc. Attends all related staffings, staff meetings and other pertinent meetings as scheduled. Performs other administrative functions and related work as assigned by the Executive Director. This is an exempt employment position.

**Requirements:**

Knowledge of individual, family and group behavior. Flexible and able to adjust to frequent changes. Strong leadership, administrative and organizational skills. Good relationship building skills. Knowledge of principals of counseling. Knowledge of community and ability to network, establish and maintain rapport with community agencies. Ability to make clear and pertinent statements orally and in writing. Grant writing experience is necessary.

**Supervisor:**

Executive Director

*change from plaintiff's description*

**Qualifications:**

A master's degree from an accredited college or university in an administrative or mental health related field, and at least three years of progressive managerial experience.

_____          _____
Incumbent's Signature                 Date

*white female TERESA Houser current OD job description See resume attached*

LIGHTHOUSE00290

**Teresa Houser, M.A.**
188 F Hambleton Road
Montgomery, AL 36117
334-224-9853
trhjac@yahoo.com

## EMPLOYMENT GOAL:

To work with an organization to leverage my management skills, clinical experience, and track record of success to acquire a position in which I can make an effective difference for the consumers and the employer.

## EDUCATION:

Bachelor of Science, Marriage and Family Counseling, University of Montevallo, Montevallo, Alabama 1989.

Master of Arts, in Marriage and Family Counseling, Southwestern Theological Seminary, Fort Worth, Texas 1993.

Master of Arts, in Religious Education, Southwestern Theological Seminary, Fort Worth, Texas 1993.

## RELATED WORK EXPERIENCE:

**Deputy Director of Development**        **April 2006 - presently**
**Lighthouse Counseling Center (non-profit)**
**Montgomery, Alabama**

Responsibilities include:
- Represent the agency at various community functions and events to enhance the referral process and provide community education
- Write State, Federal, and Foundational grants and grantee reports
- Supervise, evaluate, and coordinate schedules for 5 Program Directors within the agency
- Market and promotes all aspects of fundraising activities
- Supervise all staff (34) in absence of Executive Director
- Write and update policy and procedures as needed

**Mental Health Counselor III**        **Nov. 2005 – March 2006**
**Valdosta State Prison**
**Valdosta, Georgia (temporary/transitional job)**

Responsibilities included:
- Managing a case load of 45 to 52 inmates who were classified as medium to high security with moderate to sever diagnosis of mental illness
- Provided group counseling and education to inmates
- Worked closely with the department director to facilitate positive working relationships within the correctional system
- Updated treatment plans, made appropriate referrals as needed,
- Provided brief initial assessments for inmate placement within dormitories

LIGHTHOUSE01120

Teresa Houser

**Regional Director of Operations**                    **April 2002 – July 2005**
**Colonial Management Group, LP**
**Orlando, Florida**

Responsibilities include:
- Assuring full compliance with all local, state, federal and company rules, regulations and policies;
- Directing and monitoring all efforts to maintain national CARF accreditation in six outpatient drug treatment clinics;
- Developed alliances with physicians, social service agencies, and other strategic relationships consistent with CMG's strategy to market methadone treatment
- Structured and negotiated treatment contracts with various health care providers
- Developed and maintain regional patient/customer census of 1,226
- Coordination, approval, and management of all personnel actions including hiring and termination of staff and oversight of clinical supervision program;
- Performed quarterly compliance/quality assurance audits of all clinical and administrative systems and directed corrective actions as needed;
- Structure and supervise 24 hours of training annually to all staff;
- Initiate special studies, coordinate end of year data collection efforts and prepare statistical reports to improve regional performance of all clinics;
- Annually coordinate the revision and implementation of the company's Policy and Procedures Manual; and
- Establish and manage program objectives and performance goals for each clinic in support of corporate objectives and the highest quality patient care.

**Program Director**                    **May 1999 to April 2002**
**Huntsville Metro Treatment Center**
**Huntsville Alabama**
(Owned and operated by Colonial Management Group, LP)
Responsibilities included:
- Planned, developed, implemented and coordinated the Huntsville Metro's substance abuse program in accordance with both State and Federal regulations
- *Created a physician/healthcare referral base for marketing and outreach*
- Hiring, training, and supervision of 4 medical staff and 8 clinical staff,
- *Increased patient census from 192 patients to 400 patients within two years*
- Provided strategic, marketing, and outreach plans to the RDO for analysis and planning
- Initiated and took ownership of various projects locally and within the company
- Advocated program initiatives by offering information and guidance to local affiliates and business.
- Supervised all clinical activities, managed payroll, local marketing, and developed strategies to increase patient satisfaction and retention.

LIGHTHOUSE01121

**CAREER RELATED EXPERIENCE CONTINUED**:

**Adjunct Professor**, Calhoun Community College. Classes taught: Sociology, Developmental Psychology **- Fall 2000 to Winter 2000**

**Children's Therapist**, North Alabama Mental Health Center, Decatur, Alabama.
**August 1996 to January 1998**

**Independent Practice,** Marriage and Family Counselor, Grace Counseling Center, Iola Kansas –
**January 1994 to August 1996.**

**Adjunct Professor**, Allen County Community College, Iola, Kansas. Classes taught: Psychology and Abnormal Psychology
**Summers of 1994 and 1995 and Spring of 1995.**


**References are available upon request.**

LIGHTHOUSE01122

Owen's description

Exhibit 2

Plaintiff's Job Description
See resume Attached
Starting salary
$47,500.

# LIGHTHOUSE COUNSELING CENTER, INC.
## DEPUTY/DEVELOPMENT DIRECTOR

**Definition:**

The Deputy/Development Director is responsible for overseeing the various services of the Lighthouse Counseling Center, which include: Chemical Dependency & Recovery, Prevention Programs, Housing Programs, and the Standing Together Against Rape. The Deputy/Development Director is also responsible for representing the agency at various community functions and events to enhance the referral process and provide community education. The Deputy/Development Director will also perform various administrative duties including grant writing, continuation applications, grantee reports, and other required granting documentation, supervision, public relations, and outreach activities. The Deputy/Development Director also oversees, coordinates and promotes all aspects of the various fundraising activities of the Lighthouse.

**Description of Duties:**

Coordinates and supervises staff in the absence of the Executive Director, and acts as the liaison between staff and the Executive Director. Coordinates public relations via press releases, media interviews, public speaking, community activities, exhibits, etc. Attends all related staffings, staff meetings and other pertinent meetings as scheduled. Performs other administrative functions and related work as assigned by the Executive Director.

**Requirements:**

Knowledge of individual, family and group behavior. Flexible and able to adjust to frequent changes. Strong leadership, administrative and organizational skills. Good relationship building skills. Knowledge of principals of counseling. Knowledge of community and ability to network, establish and maintain rapport with community agencies. Ability to make clear and pertinent statements orally and in writing. Grant writing experience is necessary.

**Supervisor:**

Executive Director

**Qualifications:**

A master's degree from an accredited college or university with a behavioral science or counseling major, and at least three years of progressive managerial experience.

## Curriculum Vitae and Resume

**Cecelia W. Owens**
**2600 Vaughn Lakes Blvd. #524**          **Home 334-270-0810**
**Montgomery, AL 36117**                 **Cell 404-849-8300**

**EDUCATION:**
- ✓ B.S. (Bachelor of Science) in Computer Science 1982
- ✓ M.B.A. (Master Business Administration) in Organizational Development 1990
- ✓ 18 Graduate Hours in Counseling Psychology 1999
  - @A School of Prof. Psych.

**RELATIVE PROFESSIONAL EXPERIENCE:**
**Keeping Our Village Alive Inc.**
**Position:** Executive Director                    1999 to 2005
Riverdale, GA

Founded and pioneered this non-profit organization which serves low-income youth and families by providing community-based educational services to include after-school programs, college/career counseling, programs, family and marriage counseling, adult education programs, and mentoring services. Provide on-going career counseling for youth and adults. Supervised a management team of consultants, trainers, grant writers, and volunteers. Responsible for resource development to include foundations, corporations, annual giving, direct mail and capital campaigns, fiscal and financial management, budget preparation, and community relationship building. Taught community-based business development courses, seminars and workshops to other non-profits and adults. Travel the nation assisting non-profits with faith-based and other grant research, writing and funding opportunities through training and seminars.

**Communities In Schools of Georgia**
**Position:** Director of Operations                 1997-1999
Atlanta, GA

Was responsible for the day-to-day operations of this educational, non-profit organization which provided grants and technical, education support to local, state and national sites which served at-risk youth. Completed the organization's first strategic plan. Supervised all management level employees, resource development, grant writing, fiscal management to include the 2 million budget, expenditure approval, public relations, policy administration, lobbying for state and private funding. Organized and implemented grant distribution process to 25 counties in Georgia. Spoke before legislators and represented the organization at local, state and national forums. Partnership and relationship building, board development, and staff training/development.

LIGHTHOUSE 00011

**Georgia Department Juvenile Justice**
**Position:** Education Consultant                         1996-1998
Atlanta, GA

Wrote and managed 2.5 million Title I federal grant. Distributed education funds to 32 juvenile detention centers in the state of Georgia. Assisted in rebuilding classrooms to enhance learning and represented the department at the National Title I Conference where I did a lecture and PowerPoint presentation on: " The use of technology as a tool to enhance learning strategies for at-risk youth". Taught student violence prevention classes. Was responsible for staff development of teachers and principals who received the funds. Had to oversee the use of funds and assist local sites with their budgets and spending.

**Georgia Medical Institute**
**Position:** Dean of Education                         1994-1996
Atlanta, GA

Was responsible for the curriculum, education programs and training, maintaining regulatory and accreditation standards, staff management and training, and all audits. Overseer of every aspect of student life on three campuses. Maintained budget and quality assurance of programs while increasing student admissions by 30% during my tenure. Taught adult business courses in finance and technology.

**Pensacola Junior/Community College**
**Position:** Program Manager/Instructor                         1991-1994
Pensacola, FL

Responsibilities were to develop, coordinate and manage 1.5 million community reach-out program/grant which provided educational remedial services, and academic career counseling to at-risk middle and high school students. Other responsibilities included supervising employees, public speaking in the community, meeting with local educators and legislators, partnership building, fiscal management, federal and state guideline interpretation. Taught adult business courses in finance, office skills and computer technology.

**COMMUNITY AFFILIATIONS:**
- ✓ **Chair Political Committee, Georgia Mental Health and Substance Abuse Board, led initiative which restored 23 million medicaid dollars. (Appointed)**
- ✓ Member of the Southern Institute for Business & Professional Ethics
- ✓ Member Delta Sigma Theta Sorority, Inc.

LIGHTHOUSE 00012

# PLANTIFF'S EXHIBIT 3

*1 page*

PLAINTIFF'S
EXHIBIT
3

PENGAD 800-631-6989

## Bruce J. Downey, III

**From:**  Teresa Houser [thouser@lighthousehelp.com]
**Sent:**  Monday, November 19, 2007 5:15 PM
**To:**  Bruce J. Downey, III
**Cc:**  dlindley@lighthousehelp.com; 'carianne'
**Subject:** Salary for Candyce, Carianne, Doug and Teresa

### Candyce DeKruyff

| | |
|---|---|
| 1/1/02 | 42,000 |
| 1/1/03 | 44,100 |
| 1/1/04 | 51,500 |
| 1/1/05 | 57,783 |
| 1/1/06 | 60,000 |
| 10/31/06 | Resigned |

*Current salary  49,300.00*

### Carianne Stinson

| | |
|---|---|
| 9/5/02 | 30,000 |
| 10/1/03 | 35,000 |
| 1/1/04 | 36,050 |
| 1/1/05 | 40,448 |
| 1/1/06 | 42,000 |
| 11/1/06 | 44,100 |
| 1/1/07 | 45,555 |

*Current salary $49,300.00    1/1/38    1/08 -*

*- Excellent rating %
5% incentive raise*

### Teresa Houser

| | |
|---|---|
| 04/2/06 | 48,500 |
| 1/1/07 | 52,355 |
| 10/1/07 | 54,973 |

*Current salary $57,800.00 per Stinson on 2/27/08
At deposition*

### Doug Lindley

| | |
|---|---|
| 10/24/06 | 60,000 |
| 1/1/07 | 61,980 |

Teresa Houser, M.A.

Deputy Director

334-286-5980 ext. 223

thouser@lighthousehelp.com

**Note:** This electronic mail transmission may contain legally privileged and/or confidential information. This message and/or any files transmitted with it are intended solely for the use of the addressee. This communication is to be treated as confidential and the information in it
may not be used or disclosed except for the purpose for which it was sent. If you have reason to believe you are

LIGHTHOUSE00020

11/19/2007

DefendAnts
Response to
EEOC ChARge
20 pAges

# PLANTIFF'S EXHIBIT 4

**BEFORE THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**BIRMINGHAM DISTRICT**

CECELIA OWENS,                          )
                                        )
    Charging Party,                 )
                                        )
vs.                                     )
                                        )    EEOC NO.:  130-2006-01265
LIGHTHOUSE COUNSELING                   )
CENTER, INC.,                           )
                                        )
    Respondent,                     )
                                        )

PLAINTIFF'S
EXHIBIT
4

20 pages

## RESPONSE TO CHARGE

COMES NOW the Respondent, Lighthouse Counseling Center, Inc. ["Lighthouse"], and in response to Charging Party's complaint, states as follows:

## I.    GENERAL RESPONSE.

The Charging Party's allegation that her termination was caused by racial discrimination is absurd. The person she now accuses of discriminating against her, the Lighthouse Executive Director, Candyce DeKruyff, is the same person who hired her only two months before her termination. Since Ms. DeKruyff was aware of the Charging Party's race at the time she hired her, the Respondent is entitled to the "Same Actor" presumption that the termination was not based on race. However, the actual facts are stronger than that. Ms. DeKruyff interviewed three candidates for the position as her deputy and selected the Charging Party *over two qualified white candidates*. Indeed, the grounds for the presumption against a racial motive are still stronger. The Charging Party did not meet all the qualifications that had been set for the position, so Ms. DeKruyff went to the Board of the Lighthouse and obtained a waiver of those un-met qualifications. If Ms. DeKruyff had possessed any racial motivations, she could easily have rejected the Charging Party's application because of her failure to meet the qualifications. Instead, she bent over backwards to hire her, much to her later regret [see below]. The suggestion that Ms. DeKruyff went from a person who would risk a charge

EEOC Response FINAL 1-23-06

1



of reverse discrimination in order to hire the Charging Party to a racist in two months is not worthy of the Commission's time.

The Charging Party's contention that she was the victim of illegal retaliation is equally without merit. She does not come close to meeting the requirements for retaliation under the law. What she calls "retaliation" is nothing more than a reasonable and to-be-expected response to her own actions. It is a word she threw out to try to make herself immune from supervision. She got herself fired by her supervisor when it became apparent that the Charging Party was refusing to cooperate and to act as her deputy. She was fired when her supervisor learned that she had hired a deputy who was unwilling or unable to be supervised, who was abusive and insubordinate, who demanded that everything be done "her way" and who constantly attempted to undermine her. Rarely has an employee better deserved discharge. It was as if the Charging Party set out to be discharged, piling bad conduct on top of bad conduct until Ms. DeKruyff had only two choices: surrender the reins of the organization to the Charging Party or fire her.

Not only was the discharge for good cause and exceptionally well-deserved, it could not have been retaliatory as that term is defined under Title VII of the Civil Rights Act of 1964. The Charging Party never opposed discrimination and never participated in any proceeding under Title VII. The Respondent's Business Manager resigned to follow her husband to Birmingham. The Respondent's Board of Directors considered the Business Manager to be an extremely valuable employee and did not accept her resignation. It asked her to continue her employment, working in Birmingham and coming to Montgomery one or two days a week. The Charging Party did not like this. She had other people in mind for the Business Manager's position. Even though she was only Deputy Director and had only been employed two months, she thought that she knew more than the Executive Director and the Board. She asserted that she had not let a poorly-performing probationary employee retract her resignation, so the Executive Director and the Board could not let the Business Manager retract hers. [In fact, the probationary employee never actually retracted her resignation and the Business Manager's resignation was simply not accepted.] At first, she just talked about consistency in applying the rules. [There is no rule about rescinding resignations and the Charging Party had acted without consulting the Executive Director in dealing with the

LIGHTHOUSE00271

probationary employee.] She was totally unwilling or incapable of seeing the difference in the two situations and she did everything she could to undermine the Board and the Executive Director. Finally, she called an unauthorized meeting of the managing staff without notifying the Executive Director to try to form dissent. When counseled about this, she was totally uncooperative and belligerent to the Executive Director. She basically refused to accept her supervision. Her position was that the members of the management team were below her and she could call a meeting of them with or without the Executive Director's approval. Faced with a deputy who was totally uncooperative, the Executive Director did the only thing she could and recommended her discharge to the Board. The Board agreed. The deputy director had to be someone who would work with the Director. At no time was she trying to protect anyone's civil rights. She was not trying to get the probationary employee rehired. Finally, she began to say that the action was racially discriminatory, but that was just a device to try to force the Respondent to fire the Business Manager. Then, after she had gone behind the Executive Director's back and tried to undermine her, she waved the word "retaliation" around to try to make herself discipline-proof. She did not "oppose" any racial discrimination and did not "participate" in any Title VII proceeding. She has no retaliation claim.

## II.    SPECIFIC RESPONSE.

**Charge:** "I began work with Respondent on September 12, 2005 as the Deputy Director."

**Response:** True.

**Charge:** "As Deputy Director I had five director reports, including the business manager, who was in charge of finances of Respondent."

**Response:** The Deputy Director position was responsible for overseeing the various services of the agency and for supervising various program directors of the agency. However, prior to The Charging Party's arrival, the Deputy and Executive Directors worked as a team and supervised the various staff together. Officially, the organization of the Lighthouse was set up so that the business manager and other program directors did report to the Deputy Director (for purposes of supervision,

3

LIGHTHOUSE00272

signature approval on leave slips, etc). However, it was not the practice and it was never intended that Deputy Director would become an impenetrable barrier between the Executive Director and the Program Directors. They may report to the Deputy Director on specific matters assigned by the Executive Director but they normally report directly to the Director. The Deputy Director is only to act as a "liaison" between the Directors and the Executive Director. *[See Deputy Director job description, **Exhibit 1**.]*

**Charge:** "During the course of my employment I performed my job duties in at least a competent manner."

**Response:** The Charging Party began her employment with Lighthouse while her supervisor was on maternity leave. She really had no one supervising her until Ms. DeKruyff's return. No doubt, she enjoyed being free from supervision and "running the show." Apparently, she enjoyed it so much that she refused to accept her returning supervisor's authority. It took only five days after the Executive Director's return for the situation to reach the breaking point. Charging Party never received any evaluations due to her short tenure, but based on getting herself fired immediately, the Respondent cannot agree that she was competent. The Respondent also has some serious, but unanswered, questions about the necessity of some of her travel, such as an unauthorized and inexplicable trip to the Center for Disease Control in Atlanta. The Charging Party did attempt to write two grant proposals during her employment. The Executive Director made numerous corrections to her first proposal only to find that she had turned in the proposal prior to receiving the corrections. In the second proposal, she failed to incorporate any of the corrections that had been made for the first. And, even though the Executive Director had informed the Charging Party by e-mail that the Executive Director would need to see that proposal before submission, and that the proposal would need to be signed by the Executive Director as the agency's authorized official, the Charging Party signed the application herself and made none of the corrections. This was typical of the Charging Party's refusal to accept supervision and does not constitute "competent performance" of the job for which she was hired.

**Charge:** "My primary job was to act as liaison between the staff and the Executive Director, Candyce DeKruyff (W)."

LIGHTHOUSE00273

**Response:** This was listed as a part of the description of duties for the position the Charging Party held, but it was misinterpreted by the Charging Party. "Liaison" means "a connection," not "a barrier." The Lighthouse is a relatively-informal social work organization, not the military.

**Charge:** "I also was grant writer."

**Response:** The official position is called deputy/development director, which includes grant writing, fundraising and other development activities in addition to the deputy role. See the above response regarding the problems with her "grant writing."

**Charge:** "Respondent receives funding from state and federal sources, together with private funding."

**Response:** This is true. The Lighthouse receives funding from 2 federal sources – SAMHSA (a division of Health & Human Services) and HUD; state funding through the Department of Mental Health & Mental Retardation, the Department of Public Health and the Department of Economic & Community Affairs. In addition, it receives funding from Montgomery County, the City of Montgomery, the River Region United Way, and various private donors.

**Charge:** "It provides counseling and housing for clientele that [sic] suffer from a number of unfortunate situations, health and mental related problems and the like."

**Response:** The Lighthouse is officially responsible for providing chemical dependency services on an intensive outpatient basis for the general population and for several specific population groups (the dually-diagnosed, adolescents, women who are pregnant and/or have dependent children, and those incarcerated in the Montgomery County Detention Facility); for providing permanent supportive housing for homeless persons with a substance abuse disorder and another qualifying condition (HIV or AIDS, women who are pregnant and/or have dependent children and have a chronic health condition or a re-occurring mental illness); for providing sexual assault forensic evidence exams, counseling, advocacy & prevention; and for providing prevention education for HIV and for substance abuse.

LIGHTHOUSE00274

**Charge:** "The clientele of Respondent is at least 80% black."

**Response:** Lighthouse Counseling does not keep records of the racial breakdown of its client base, though many are African American. The only prerequisite for its help is the need of the client and their suitability to Lighthouse treatment programs. Any clients who would not benefit from treatment at the Lighthouse are referred to another treatment facility that would better suit their specific diagnosis and needs. Respondent suggests that this allegation is indicative of an unhealthy preoccupation with race on the Charging Party's part. What possible difference would it make in anything, if the Lighthouse clients were of a greater or lesser percentage of any race?

**Charge:** "Shortly after I began work with Respondent I noticed that when our clientele had needs that were covered within our program mandates and were within budget that DeKruyff was often reluctant to authorize the expenditure."

**Response:** This is totally false and reflects the Charging Party's attitude that after a few weeks' employment she, not her supervisor, knew what the Lighthouse priorities should be. The Lighthouse does not have unlimited funds so judgments have to be made. As far as the notion that Ms. DeKruyff showed reluctance in authorizing expenditures, that was her job. The Respondent is not aware of any specific circumstances that are being alleged by The Charging Party.

**Charge:** "She would more quickly authorize the expenditure of white clientele than for the black clientele."

**Response:** Respondent does not understand what "the expenditure of... clientele" means. If the Charging Party means that the expenditure of funds was more quickly authorized on the basis of race, that is totally denied. The staff of Lighthouse Counseling is more than fifty percent African American (17 African American employees, 15 Caucasian employees). The counselors and case managers make funding requests to the various Program Directors who will either approve the request as able, or pass the request along to the Deputy or Executive Director for approval when over the $250.00 authorizing limit approved for Program Directors. The Charging Party was able to

LIGHTHOUSE00275

authorize expenditures during the Executive Director's leave and did so between September 12 and November 12, 2005. She was only employed for five days following the Executive Director's return, hardly time to discern any racial pattern in expenditure approval for any reasonable person. Of course, the Charging Party is not a reasonable person. She is the kind of person who can detect a racial "trend" in a single action (See her racial allegation below about a single decision to allow a party to work from Birmingham). There are few, if any, requests that the Executive Director denies unless it does not qualify as a grant program expenditure or if the money is not available to provide for the request. Further, requests are made for items and are not made for a particular client. Thus, it would be impossible, except in the Charging Party's fertile imagination, to make authorization decisions based on the race of the client. Finally, the Executive Director does not often even know the race of the clients since she does not have regular direct interaction with them. The Commission should use this allegation as a guide to the credibility of the Charging Party's other allegations. Anyone who would accuse another of an improper motivation on an issue like this, where improper motivation cannot have been involved, is not a credible witness as to anything.

During the Charging Party's employment, there was only one expenditure request which the Executive Director can recall was denied. It was a request for an additional van driver for the Respondent's New Beginnings treatment program. The request was denied because there were no additional funds in the New Beginnings program grant budget for additional personnel. Additionally, the Program Directors were asking for several positions at the time – counselor, van driver, and an additional case manager. The Executive Director asked the Directors to prioritize their requests since all three could not be granted The Directors reported that the counselor was the most important request, so the Executive Director asked the Board to approve that request-- despite the absence of grant funds. The Board will consider the Executive Director's request at its January meeting. The New Beginnings program is open to persons of all races.

**Charge:**    "I had a subordinate, LaShae Hibbler (B), who turned in her resignation."

LIGHTHOUSE00276

**Response:** Ms. LaSha Hibbler was not the Charging Party's subordinate but, rather, the subordinate of one of the Program Directors – Ms. Lisa Carroll. Ms. Hibbler began her employment on February 23, 2005 as a case manager in the Center's HUD Housing for clients with substance abuse and HIV diagnoses. In her first six months in the position, Ms. Hibbler received two coaching notes for poor performance: one dated July 25, 2005 and one dated August 15, 2005. Due to these two written coaching notes, Ms. Hibbler was not recommended to be taken off of her probationary status on September 2, 2005 at her six-month's evaluation. Instead, she was given explicit information regarding the required improvements that would have to occur in order to have her probationary status removed in another 90 days. Ms. Hibbler acknowledged this memorandum on September 6, 2005. Less than 30 days later, on October 3, 2005, Ms. Hibbler was given a third coaching note regarding Leave Procedures. On October 6, 2005 Ms. Hibbler turned in her resignation, and it was accepted *by the Charging Party* the same day. According to Ms. Hibbler's resignation letter, her intention was to work out her two-week notice.

**Charge:** "She changed her mind and sought to withdraw the resignation."

**Response:** Ms. Hibbler turned in her resignation while the Executive Director was on maternity leave (August 21 through November 14, 2005). She was only informed of this after the resignation had been accepted. The first time that the Executive Director heard that Ms. Hibbler had considered or mentioned rescinding her resignation was following her exit interview with Ms. Stinson (the business manager) and the Charging Party. Ms. Stinson informed the Executive Director that Ms. Hibbler had stated that she had *considered* rescinding her resignation, but she realized that she and her supervisor did work well together *so she would not ask to rescind*.

**Charge:** "DeKruyff told me that the policy of the Respondent was that once a resignation was submitted that it could not be rescinded and the person would have to go ahead and end their employment."

**Response:** The Lighthouse has no such policy and the Charging Party was not told that. It does have the practice of promptly accepting an employee's resignation so

LIGHTHOUSE00277



that the employee will not waiver and continuously change his or her mind to resign or not resign. The reason for this practice is to keep fully staffed by promptly hiring replacements for resigning employees. [The Charging Party's designation of the Executive Director as "DeKruyff" is typical of the lack of respect she showed her while employed.]

**Charge:** "She was not even allowed to work out her two weeks."

**Response:** If this is true, it is because the Charging Party did not allow her to do so. The Respondent allows an employee to work out his or her notice unless the employee was asked to resign. In that case, the employee is asked to leave but is paid for their two week time in severance pay. In the case of Ms. Hibbler, the Executive Director was on maternity leave at the time of the incident in question and the Charging Party was handling day-to-day affairs in her absence. The Charging Party was the person who denied Ms. Hibbler the opportunity to work out her notice. In fact, the Charging Party called the Executive Director and told her that she had done this and that she knew she was within her rights to do so. Since the action had already been taken, the Executive Director did not change it.

**Charge:** "Shortly after this occurred with Hibbler, the Business Manager, Carianne Stinson (W) turned in her resignation."

**Response:** True. Mrs. Stinson turned in her resignation on October 25, 2005. Mrs. Stinson informed the Board during its meeting on that date that she and her husband were moving to Birmingham so she would have to resign. The Board considered the Business Manager to be a very valuable employee and did not want to lose her expertise and experience. Therefore, it instructed the Executive Director to investigate the possibility of allowing Mrs. Stinson work remotely in Birmingham and just come into the office 1-2 days per week (see exhibit 2).

**Charge:** "She indicated that she would be moving to Birmingham from Montgomery."

LIGHTHOUSE00278



**Response:** True. Mrs. Stinson's husband received a job offer in Birmingham and his new employer required that he relocate to Birmingham. Mrs. Stinson would be moving to Birmingham with her husband.

**Charge:** "Shortly after Stinson turned in her resignation, I was told by DeKruyff on November 9, 2005 that Stinson wanted to withdraw the resignation because she had been unable to find a job in Birmingham making as much money."

**Response:** Entirely untrue. The Executive Director did inform the Charging Party on November 9, 2005 that she had discussed with Ms. Stinson the possibility of her continuing her employment with the Lighthouse and working remotely from Birmingham. Therefore, Mrs. Stinson would not be resigning as initially thought. This discussion and decision was made under the direction of the Board of Directors. While it is totally irrelevant, the Respondent believes that Ms. Stinson had received several offers in Birmingham that were at least as good as the Lighthouse offered. Mrs. Stinson is a very loyal employee and has a love and a dedication to the Respondent's mission. For that reason, she chose to stay with the Lighthouse despite the considerable inconvenience *Compromise where is the inconvenience* involved in doing so.

**Charge:** "DeKruyff told me that she had decided to allow Stinson to continue to do her job from Birmingham, only working one day a week without a reduction in pay."

**Response:** This allegation is entirely incorrect. Ms. Stinson will continue to be a full time employee. The Board of Directors unanimously decided to allow Mrs. Stinson to work primarily from Birmingham because of the excellence of her work, because of her years of experience with the agency in the crucial financial capacity, and because she *Viable candidates* could not easily be replaced. Mrs. Stinson will be coming to the agency only one or two days each week, but that does not mean that she will only be working "one or two days." She will work the remaining hours from her home office in Birmingham. That the Charging Party would compare Mrs. Stinson to Ms. Hibbler is further evidence of the Charging Party's inability to see anything other than the color of a client or an employees' skin. The evaluations of these two employees are attached as Exhibit 3 and Exhibit 4. They show that Ms. Hibbler was in an entry-level position and had a record of

LIGHTHOUSE00279



unsatisfactory performance. Ms. Hibbler was hired as a case manager in Respondent's HIV housing department and was refusing to complete her job duties regarding education on HIV prevention [See Attachment 1 to Exhibit 3, a coaching note given her by her African American HIV prevention supervisor – Ms. Regina Berry]. Ms. Hibbler was only willing to complete the areas of her job description that suited her. On the other hand, Mrs. Stinson has had a solid work performance record with consistently excellent performance ratings. The only negative coaching note in Mrs. Stinson's personnel file comes from the Charging Party.

**Charge:** "I told DeKruyff that the job of business manager was too important and too time intensive for that to work."

**Response:** This allegation is not recalled by Respondent's Executive Director. However, it is the key to why the Charging Party did not succeed in her job. A decision had been made by the Charging Party's Executive Director *at the Board of Directors' instruction* about a key executive employee, but the Charging Party ( the Deputy director who had only be employed two months) refused to accept it. Apparently, the Charging Party wanted to place someone she favored in the position, so she sought a way to prevent the Board and the Executive Director from exercising their authority. The Charging Party said that Mrs. Stinson had officially resigned and that she was aware of three viable candidates for the position. Therefore, she did not believe Mrs. Stinson should be able to rescind her resignation. That the Board and her supervisor felt differently meant nothing to her. She made no reference to any concern of racial discrimination but stated that she had some strong concerns regarding this situation. She said that she would put those concerns in writing to the Executive Director by the end of the day (November 9, 2005). However, instead of continuing to work with her supervisor,  the Charging Party held an unauthorized management team meeting [from which she excluded the Executive Director and Business Manager]. The object of this meeting was to undermine the Executive Director with the management team and seek support in overriding the Board's decision. The Executive Director was shocked at the Charging Party's actions and attempted to counsel her on its inappropriateness. The Charging Party was totally unrepentant and refused to accept that she had erred. She was curt and rude

LIGHTHOUSE00280



and made it clear that she had no intention of cooperating with her supervisor. Therefore, the Executive Director was left with no option but to recommend her dismissal. To have done anything else would have been to surrender control of the agency to her subordinate (see Exhibit 5)..

**Charge:** "I pointed out to DeKruyff that this action was racially discriminatory to allow Stinson to rescind her resignation, while not allowing Hibbler to do the same."

**Response:** The Charging Party did accuse the Executive Director of racially-discriminatory treatment. However, she did not mention Ms. Hibbler at this time. At the time of this accusation, the Executive Director was unaware that Ms. Hibbler had even considered rescinding her resignation. She was aware that four employees had resigned their positions since the Charging Party was appointed Deputy Director. These employees all resigned before the Executive Director returned from maternity leave. Three of these employees were African American and one was Caucasian. Initially, based upon the circumstances surrounding the departures of these four staff members, it was the Executive Director's assumption that the only employee whose resignation was "rescinded" was Ms. Stinson and that resignation was rescinded at the express request of a unanimous Board of Directors. It would actually be more accurate to say that Ms. Stinson's resignation was *not accepted.* ~~was accepted on 10/25/05 in writing~~

**Charge:** "I told her Respondent should apply its policy consistently."

**Response:** True. Charging Party did state this in an e-mail dated November 10, 2005. However, there was no policy that was not applied consistently. The Lighthouse has no policy regarding the rescinding of a resignation. The same persons did not handle the two resignations (the Board and Executive Director in the case of the Business Manager and the Charging Party, herself, in the case of the probationary employee). There was actually no other resignation that was rescinded (the probationary employee considered but decided not to rescind), and the probationary employee with the poor performance record was not "similarly situated" to the Business Manager who was asked to stay on.

LIGHTHOUSE00281

**Charge:** "On the morning of November 10, 2005 I had a phone call with DeKruyff and raised the issue of discrimination.".

**Response:** On the morning of November 10, 2005 the Executive Director called the Charging Party after discovering her unauthorized meeting of the management team on November 9, 2005. The Executive Director gave her a verbal warning regarding her actions (see exhibit 6). The Executive Director does not recall if the Charging Party mentioned "discrimination" at the time of the telephone conference. However, even if she did, that had nothing to do with her termination which was brought about because of the Charging Party's refusal to accept counseling about her actions.

**Charge:** "Later that day, on November 10, 2005 I sent a long email to DeKruyff."

**Response:** This is true. See exhibit 7.

**Charge:** "I pointed out that it was race discrimination not to apply the policy equally between Hibbler and Stinson."

**Response:** The email is attached as Exhibit 8. It mentions discrimination and retaliation but it comes after all of the actions that led to her termination were taken except the email, itself. What is important about the email is that it exhibits absolutely no contrition for her insubordinate actions and no willingness to cooperate in the future. It shows no understanding that for discrimination to occur the persons must be similarly-situated. The suggestion of discrimination is not made to benefit Ms. Hibbler. The Charging Party was perfectly satisfied that Ms. Hibbler's resignation was not rescinded. It was only made to try to force the Respondent to terminate the Business Manager. It was not made to protect anyone's civil rights. It was a crude playing of the "race card" to try to get her way. The mention of retaliation was made for a similar reason. The Charging Party conducted herself in an entirely inappropriate manner and, then, said "retaliation" to try to make herself immune to discipline for her actions.

**Charge:** "I asked if she was aware of the 1964 Civil Rights Act."

LIGHTHOUSE00282

**Response:** The Charging Party simply stated in her e-mail that she felt there was a violation of the Civil Rights Act of 1964. The suggestion that there had been was absurd.

**Charge:** "I also asked her if she was retaliating against me based on her phone call of the day before."

**Response:** Not true. First, the phone call was the morning of the long e-mail (November 10, 2005). Second, she asks in the e-mail if the Executive Director is retaliating for "raising the issue of disparate treatment/possible discrimination of employees or for requesting to follow company policy." The question was frivolous. The Respondent does not believe that anyone asked to rescind his or her resignation. The Executive Director certainly did not know of anyone, and the phone call had been about holding unauthorized meetings to undermine her supervisor, not about letting Ms. Hibbler rescind her resignation.

**Charge:** "That evening by email, DeKruyff took away all of my responsibilities over the Business Manager."

**Response:** This is true. The Charging Party sent Mrs. Stinson an e-mail late in the afternoon of November 10, 2005 and copied the Executive Director on the e-mail (see Exhibit 8). In this e-mail, the Charging Party requested a separation audit for Mrs. Stinson and by doing so, completely ignored the fact that the Executive Director had told her that Mrs. Stinson was not going to be leaving the agency ( because of the Board's request) and was implying some type of fraud or funds mismanagement by Mrs. Stinson. The Charging Party was so obviously "gunning" for the Business Manager and seeking to have her removed from her job that she could not possibly supervise her. In addition, if the Charging Party was truly aware of company policies – especially regarding the allocation of funds, she would have been aware that she did not have the authority to request such an audit nor to allocate the funds that would have been required for an audit of that nature. It was the Executive Director' opinion that the Charging Party was again attempting to undermine the Executive Director's authority and the Executive Director

LIGHTHOUSE00283



feared that the Charging Party might go so far as to terminate Mrs. Stinson prior to the Executive Director's return to the office from maternity leave on November 14, 2005.

**Charge:** "On November 11, 2005 I had a meeting with my subordinates."

**Response:** The Executive Director does not know if this is true, however, the Executive Director finds that it is highly unlikely as the Charging Party claimed mileage to Atlanta, GA for November 11, 2005 stating that she would be meeting with a colleague at the CDC regarding a possible grant proposal (see Exhibit 9). The Executive Director does know that there was a meeting held of the Charging Party and her subordinates (with the exception of Mrs. Stinson) on November 9, 2005. (See Exhibit 5)

**Charge:** "The subject regarding how Stinson would be allowed to work one day a week came up at that time."

**Response:** The Executive Director does not know what came up at that meeting as the Executive Director was not notified of it or present. However, the Charging Party informed the Executive Director by e-mail (Exhibit 5) that the Charging Party had informed the team of the decision to have Mrs. Stinson remain employed as the Lighthouse's Business Manager.

**Charge:** "Right after the meeting, DeKruyff called me and told me that speaking to the management team about her proposal was unprofessional."

**Response:** The Executive Director received the Charging Party's e-mail at approximately 5 pm on November 9th and chose to not respond until November 10th. On November 10th, the Executive Director called the Charging Party with a response (exhibit 6) to her e-mail (exhibit 5). What the Executive Director said was that calling a meeting of her subordinates, with the exclusion of Mrs. Stinson, to discuss Mrs. Stinson's position and her continued employment, without notifying the Executive Director was unprofessional, lacked proper judgment and was not behavior fitting her position with the agency.

*Considering not have* [handwritten margin note]

EEOC Response FINAL 1-23-06

LIGHTHOUSE00284

**Charge:** "On November 14, 2005 DeKruyff called a staff meeting of my subordinates with her."

**Response:** First, as Executive Director of the agency, all the employees of the Lighthouse Counseling Center, Inc. ultimately report to the Executive Director, who has the authority to meet with any of them at any time. Second, this was not a specially "called meeting" as the Charging Party suggests, but rather, the regularly-scheduled Management Team Meeting held every Monday at 9:00 am to include all members of the management – executive director, deputy director, business manager and the four program directors. Third, the Charging Party was a part of this meeting and was present in the meeting.

Not true

**Charge:** "She told them of her decision to allow Stinson to continue her duties from Birmingham and asked what they thought."

**Response:** This is correct. More accurately, the Executive Director reminded the team that at the previous Board Meeting that the Executive Director was given a directive by the Board to explore the option of Mrs. Stinson working remotely from Birmingham and just coming into the office one or two days a week. Mrs. Stinson and the Executive Director had talked about the issue and the Executive Director had talked about the issue with the Board as well, and the consensus was to pursue this with a three-month trial and then a re-evaluation of the situation. At that point, the Executive Director stated that it was the Executive Director's understanding that the team may have some concerns and the Executive Director asked them if they were willing to discuss those at this time.

**Charge:** "I did not say anything."

**Response:** This is true.

**Charge:** "DeKruyff asked me to comment."

**Response:** The Executive Director did ask the Charging Party to express her concerns, as the Executive Director had asked each of the other team members to do so.

**Charge:** "I then told her, 'you know what I will say,' referring to the race discrimination that I had already mentioned to her."

LIGHTHOUSE00285



**Response:** The Executive Director's recollection is that the Charging Party stated that she had already expressed her concerns to the Executive Director previously. She made no reference to race, express or implied.

**Charge:** "She told me to go ahead."

**Response:** This is true. The Executive Director did want the Charging Party to state her concerns publicly so that the Executive Director might address these concerns with the group as a whole and so that words could not be twisted later on.

**Charge:** "I mentioned that to the group and stated that I thought we needed to apply our policies equally."

**Response:** The Executive Director does not recollect this.

**Charge:** "After I got out of the meeting, DeKruyff called me and told me I was being derisive [sic] and should not have spoken to the staff as I did."

**Response:** This is not true. The Charging Party had been completely insubordinate in the meeting while expressing her concerns, stating "that when she came to the agency she believed that this would be a team effort but that the Executive Director had made it very clear that the Executive Director was the E.D. and would make whatever decision that the Executive Director chose and that she would either have to live with it or leave". While the Executive Director did ask her to express her opinions, she did not have to become insubordinate in doing so. However, the Executive Director did not address her outright insubordination, in the meeting or afterward. The Executive Director did, however, give the Charging Party her coaching note (see Exhibit 10) that the Executive Director had informed her in the phone call of November 10, 2005 (see Exhibit 6) that the Executive Director would be doing.

**Charge:** "I never raised my voice and was never derisive, other than to accuse DeKruyff of racial discrimination."

**Response:** It is true that the Charging Party never raised her voice, but her insubordination (as stated above) was extremely divisive. In addition, the Charging Party

LIGHTHOUSE00286

did state that "she had consulted lawyers over the weekend regarding her belief that discrimination is occurring over the rescinding of resignations". She also mentioned that her husband had a high level national security clearance with the military and that the JAG office needed to be informed of anything that might compromise his security clearance. What this meant, the Executive Director was left to wonder. It was impossible to imagine any issues at the Lighthouse that would be large enough or far-reaching enough to compromise a national security clearance with the United States Military.

**Charge:** "Shortly after the meeting on November 14, 2005 I received a written disciplinary action for answering DeKruyff's question regarding my view on her proposal for Stinson."

**Response:** This is not true. The Executive Director did address the Charging Party in writing through a coaching note form as stated above (Exhibit 10) that was in response to her unprofessional behavior and lack of judgment in calling a meeting of the management team while excluding Mrs. Stinson, to discuss Mrs. Stinson and her position with the agency.

**Charge:** "On November 18, 2005 I was terminated by DeKruyff in the presence of the Board Chairman, Belser, and another board member, Robert Sells."

**Response:** This is true. The Board Chairman's name is Mr. David Belser.

**Charge:** "DeKruyff told me that 'our leadership styles were too different' and therefore, I was being terminated."

**Response:** This is true. The Executive Director informed the Charging Party that it had become very apparent that their management styles were very different and that this had created some confusion among the management and staff of the agency. This had led the Executive Director to conclude that the Charging Party was not a good fit for the Lighthouse at this time.

**Charge:** "I believe that I was terminated because of my race, African American, and in retaliation for my questioning DeKruyff regarding her racial discrimination of

LIGHTHOUSE00287



clients and of the disparate treatment between Hibbler and Stinson in violation of Title Vii of the Civil Rights Act of 1964."

**Response:** This is completely false. The Charging Party was terminated because it was determined that she was not a good fit for the Lighthouse at this time. This was shown through the Charging Party's continual attempts to undermine the Executive Director's leadership at the agency and to be the director herself, which she was not. In addition, the Charging Party had a desire to filter through the information of the agency and only give to the Executive Director the information that she deemed important or that the Executive Director needed. This is not how the agency should be run. The Charging Party was hired by the Executive Director and the Executive Director was fully aware that the Charging Party' was African American at the time of her hiring. In addition, the Charging Party did not originally qualify for the position as she did not possess a Master's Degree in Counseling or in another behavioral science related field, and the Executive Director chose to broaden the required degrees to include administrative degrees so that the Charging Party would qualify for the position. Furthermore, the Executive Director spent several weeks in communications with the Board of Directors personnel committee working to gain their agreement so that the Executive Director could hire the Charging Party. Additionally, there were two other qualified candidates for the position of Deputy Director. The Executive Director selected her over two Caucasian candidates.

The Charging Party never questioned any racial discrimination against clients at the agency, nor is there any. The Executive Director can not retaliate against something that the Executive Director has not been accused of. Furthermore, the Executive Director has been with the Lighthouse Counseling Center, Inc. for 9+ years and in various capacities – from counselor, to program director, to deputy director, to executive director. The Executive Director has never previously been accused of any sort of racial discrimination in any of the capacities in which the Executive Director has served whether it was working directly with clients or in supervising staff or in overseeing program development or the entire agency. In the Executive Director's capacity as counselor the Executive Director served over 400 victims of sexual assault directly regardless of the color of their skin. In various management positions, the Executive

EEOC Response FINAL 1-23-06

19

LIGHTHOUSE00288

Director has only been responsible for, or a part of, the termination of four employees and the Charging Party is the only one of these four that is African American. The Executive Director has never terminated an employee because of his or her race nor for disagreeing with her. The Executive Director does have to have a deputy who will help and support her and who will not try to undermine her.

The Executive Director also has not retaliated against the Charging Party for bringing up any issues of disparate treatment between Ms. Hibbler and Mrs. Stinson as there was no disparate treatment shown. Ms. Hibbler was an entry-level case manager with the Lighthouse who was with the agency less than 7 months. At the time that Ms. Hibbler resigned her position with the agency, the Executive Director was on maternity leave and was informed by the Charging Party after the fact that Ms. Hibbler had resigned and that the Charging Party had asked her to leave immediately and not work out her two week notice. Ms. Hibbler had several documented coaching issues in her file during this short 7 month time frame. In contrast, Mrs. Stinson is a veteran 3 year employee with the agency and has an integral role in the agency as the chief financial agent. Mrs. Stinson has had an excellent documented work history with the agency and has an excellent rapport with their auditors over this same time period. Mrs. Stinson is trusted by both the Board and the management of the agency and it was in the best interest of the agency to work with Mrs. Stinson to have her stay in her current position even if that means in a different working arrangement.

Dated: _January 23, 2006_

_Bruce J. Downey_
**BRUCE J. DOWNEY, III**

**Attorney for Lighthouse**
**Counseling Center, Inc.**

**OF COUNSEL:**
CAPELL & HOWARD, P.C.
150 South Perry Street (36104)
Post Office Box 2069
Montgomery, Alabama 36102-2069
Telephone:    (334) 241-8000
Facsimile:    (334) 323-8888

EEOC Response FINAL 1-23-06                    20

LIGHTHOUSE00289

# PLANTIFF'S EXHIBIT 5



PLAINTIFF'S EXHIBIT 5
PENGAD 800-631-69

# Lighthouse Counseling Center, Inc.
# Organizational Chart

June 21, 2005
DMH Standard 3107

# PLANTIFF'S EXHIBIT 6

All documents
in date order

emails, etc.

39 pages
in date order

**Cecelia Owens**

| | |
|---|---|
| **From:** | cdekruyff-lhh@greenlynk.com |
| **Sent:** | Sunday, September 18, 2005 5:43 PM |
| **To:** | cowens@lighthousehelp.com |
| **Subject:** | Re: Cecelia's Week 1 |

Cecelia --

I sure appreciate your enthusiasm and your willingness to jump in at an awkward time for
me (in that I'm not at the Lighthouse!). You are appreciated and please, DO NOT HESITATE
to call and ask questions, give me info, or just to chat about what you are
seeing/feeling/perceiving at the agency.

As I said last week, I want to let you formulate your own ideas & opinions on the agency,
the programs, our operating procedures and the people, BEFORE I give you my take on it
all...but, I will do that soon.

Thanks!

Candyce

On 15 Sep 2005 18:45 CDT you wrote:

> Dear Fellow Team Members:
>
>
>
> This week is almost over and most of you will begin your weekend on
> tomorrow.  I just wanted to let you to know this week has been great for me.
> I'm getting to know each of you as I learn new things.  It's
> wonderful.  I am also keenly aware of some of the challenges that we
> face as an organization.  Don't worry, I'm not running yet.
>
>
>
> You each have done a great job in making me feel a part of this team.
> The sharing of information is good.  I want to encourage you to
> continue.  I need to listen and to learn.  Candyce is available to all
> of us and we are all must communicate with her openly and regularly as
> our leader.  I'm sure you already know that she is available to us and
> for us.  In your schedules next week, if you have something going on
> that you feel I could learn from, please don't hesitate to invite me
> into your work world.  This would help me to get more acclimated.  Thank you.
>
>
>
>
>
> Be safe and enjoy life.
>
>
>
>
>
> Blessings Cecelia
>

PLAINTIFF'S
EXHIBIT
6
PENGAD 800-631-6989

DEFENDANT'S
EXHIBIT
3
PENGAD 800-631-6989

1

*1/23*

*by email*

Candyce,

Henry Stough and the other agencies informed me that that they were not experiencing this type of housing situation with their clients. They all advised that we speak with a lawyer given that we are in both the lessee and lessor position.

For me communication with employees is flowing smoothly. I am gently assisting with employee to employee communication. We are definitely problem-solving regularly.

Carianne got a very positive response from SAMSA concerning our unspent funds. We will get some/most of it back. She was really concerned---I'm glad things are working out. I certainly encouraged her in this situation as I'm sure you have already.

On Monday, September 26th I will attend Council on Substance Abuse with Regina from 8:00-12:00noon. Later that day at 3:00pm I will be going over check verifications with Carianne and anything else she shares.

I would like to suggest consideration for "Team Building" as an employee training topic for a staff meeting sometime in the future. I can conduct this training for us, if feasible.

Lisa is overwhelmed but balancing out. I encouraged her to take a deep breath this afternoon, Friday and catch up with herself. I am guiding and supporting her with effective time management.

I will attend the administrative feedback meeting for New Beginnings on Wednesday, 9/28 to listen and to learn (Karen from Auburn facilitating).

I have informed Carianne that I will be facilitating both the mgmt team and staff meetings in your absence. However, I am depending on her and the mgmt team to carry on as usual to ensure a smooth transition. I will check with you timely and prior for any input.

I will be meeting with Regina as she engages in a conversation with Shirley concerning disciplinary issues and trying to resolve things. Please advise if you have input concerning this situation. Should Debbie be present due to the shared supervisory responsibility.

As always, I am open to you Candyce for any feedback or comments. HARMONY is important for you and I. It is the highest priority for me. I will lead with your empowerment, guidance, and support. We are in this together. I will always respect your position and your authority in your absence and in your presence.

Blessings Cecelia

*CARIANNE did not LIKE this. My first week of work And my first staff meeting, CARIANNE facilitated And did not INTRODUCE ME - the ONE IN charge*

*I saw the need to get things in order MORE updates on my work to Candyce.*

**Cecelia Owens**

| | |
|---|---|
| **From:** | cdekruyff-lhh@greenlynk.com |
| **Sent:** | Monday, September 26, 2005 2:52 PM |
| **To:** | cowens@lighthousehelp.com |
| **Cc:** | lcarroll@lighthousehelp.com; rbaity@lighthousehelp.com; cstinson@lighthousehelp.com |
| **Subject:** | Fwd: URGENT-MANDATORY GRANTEE HURRICANE DISATER SURVEY |

msg480.txt (36 KB) mentalhealth_subst ancepolicy (...

                         Cecelia --

This is supposed to be completed & faxed back today (& seeing as I don't have a fax
machine at the house, I am asking you to complete this (with Lisa, Rick's & Carianne's
help)

Thanks

CD

------------ Forwarded Message ------------
Date: 26 Sep 2005 13:17 CDT
From: Dilcia Morris <dmorris@iqsolutions.com>
Subject: URGENT-MANDATORY GRANTEE HURRICANE DISATER SURVEY

*WAS asked constantly to complete task and responsibilities of Candyee by her I did them

CARIANNE took care of

1

**ALABAMA BOARD OF NURSING**
**CHEMICAL DEPENDENCY TREATMENT PROVIDER CONTACT**
**INFORMATION**

NAME OF FACILITY/ORGANIZATION: _Lighthouse Counseling Center_

MAILING ADDRESS: _1415 East South Blvd. Montgomery, AL 36116_

PHYSICAL ADDRESS (IF DIFFERENT): _____

TELEPHONE NUMBERS:

_334-286-5980_ FOR BOARD STAFF TO CONTACT YOU: _Candyce DeKeuyff_
_X222_

     REFERRALS FOR TREATMENT: _Lisa Carroll 334-286-5980 x245_

FAX NUMBER: _334-286-5993_

NAME OF CONTACT:

_334-286-5980_ FOR BOARD STAFF TO CONTACT YOU: _Cecelia Owens_
_X223_

     REFERRALS FOR TREATMENT: _Lisa Carroll_

DAYS AND HOURS AVAILABLE FOR INTAKE: _M-F   8:00-5:00_

WEB SITE AND EMAIL ADDRESS: _cdekeuyff@lighthousehelp.com_

    _website: www.lighthousehelp.com_

PLEASE COMPLETE AND RETURN, AT YOUR EARLIEST CONVENIENCE,
TO:

N. GENELL LEE, MSN, RN, JD
EXECUTIVE OFFICER
ALABAMA BOARD OF NURSING
P.O. BOX 303900
MONTGOMERY, AL 36130-3900

1-800-656-5318
334-242-4184
FAX: 334-242-4360
E-MAIL: glee@abn.state.al.us

**Cecelia Owens**

| | |
|---|---|
| **From:** | cdekruyff-lhh@greenlynk.com |
| **Sent:** | Monday, September 26, 2005 11:28 AM |
| **To:** | cowens@lighthousehelp.com |
| **Subject:** | Fwd: Request for articles for the MACH News |

*8:1*

message.txt (202 B)    message.html (637 B)

```
            Cecelia --

Would you please put something together on any or all of our housing programs for the MACH
newsletter?  A success story would be great!
Thanks!
```

*By October 5th*

```
Candyce
```

*Paulette LaShare*

```
-------------- Forwarded Message --------------
Date: 25 Sep 2005 21:07 CDT
From: HKStough@aol.com
Subject: Request for articles for the MACH News

Please submit any articles or a paragraph on your organization for the MACH News by
October 5, 2005. Thanks.
```

*SEE documentation
Attached
never A task not
completed*

1

**The Lighthouse Counseling Center** hosted "HIV Testing Day" on June 27, 2005. This was an outreach effort for the community at large under the leadership of Prevention Coordinator, Regina Berry. HIV testing was made available to the general public, clients and their families. On this day, many of the staff were also tested. The day was well spent with a total focus on HIV Prevention. The event was well received and quite successful. It was a day of education and awareness. The fellowship of community and delicious food were added benefits. There were 107 people tested on this day and there were NO positives. These encouraging results are indicators that HIV Prevention and Awareness really works. Some of the clients attended the African American HIV Education Instructor training class and assisted in facilitating groups and testing sessions.

This day was highlighted by the contributions made from members of the County jail HIV prevention class. Regina Berry, instructed the group to devise a prevention plan of their own assuming that they had the necessary resources. One group member came up with a slogan and a picture to be used as a bill board. The inscription of the slogan read,

*"Sex last a moment, but HIV last a lifetime"*
**Practice safe sex. Protect yourself and others.**

This slogan was screen printed on the T-shirts worn that day. In demonstration of our commitment, the Lighthouse Counseling Center continues to offer the best in HIV Prevention services through education, awareness and testing.

Candyce Dekryuff,
Executive Director

**Cecelia Owens**

**From:**     Regina Berry [berrreg@lighthousehelp.com]
**Sent:**     Thursday, September 29, 2005 9:37 AM
**To:**       cowens@lighthousehelp.com
**Subject:**  National AIDS Testing Day-

Cecelia, here is some information regarding our HIV Testing Day Event which was June 27th. Let me know if you need additional information....

The design for the T-shirt came as the result of one of my classes at the County Jail. I asked each group to devise a prevention plan of their own assuming they had all of the resources available to them. As a result he came up with a slogan and a picture to be used as a billboard. I told him that he may see that design again because it was very "catchy". I talked with a graphic artists and she put it into print for me.

The event was very successful; we had hotdogs, hamburgers and sides; along with HIV Testing and HIV Education all day(including the evening group). We didn't have groups that day and focused on HIV Prevention; we tested 107 people that day and had no positives. The tests were available to the general public, clients and their families. Many of the staff were tested also that day. Some of our clients attended the African American HIV Education Instructor training class and helped to facilitate groups and testing sessions.

We had a successful day!

Regina N. Berry, MPH
Prevention Services Coordinator
www.lighthousehelp.com

" Sex last

9/29/2005

**Cecelia Owens**

**From:**   Candyce DeKruyff [cdekruyff@lighthousehelp.com]
**Sent:**   Thursday, October 20, 2005 2:34 PM
**To:**   Cecelia Owens; Lisa Carroll
**Subject:** Tx for Homeless Grant

Just an FYI -- Jan. 23-26 is a TA workshop in Baltimore.  Cecelia -- I would like you to plan to attend this year with Lisa if at all possible.  We should be getting more info shortly.

Thanks

Candyce DeKruyff
Executive Director
Lighthouse Counseling Center, Inc.

*She requested for me to attend this most important meeting with the funders and to represent the organization*

10/20/2005

**Cecelia Owens**

**From:**   Candyce DeKruyff [cdekruyff@lighthousehelp.com]
**Sent:**   Thursday, October 20, 2005 3:55 PM
**To:**   Cecelia Owens
**Subject:** Your Calander

Cecelia --

Please plan to attend a reception with me on Thursday, November 17th from 5:30pm-7:30pm.  The reception will be at Gallery One and is presented in part by the Women's Philanthropy (Auburn University's College of Human Sciences).

This will be a place for us to rub shoulders with some wealthy individuals for future funding of Lighthouse programs and events, as well as to meet some potential Board Members.  The Gallery director is a friend of mine and has invited us and if we give her some names of some people that we are interested in for Board Membership, she will help to contact and recruit them for us!

Thanks!

Candyce DeKruyff
Executive Director
Lighthouse Counseling Center, Inc.

*Candyce had much confidence in my abilities to represent the organization*

10/20/2005

Subj:       **Policies/Procedures/Practices**
Date:       10/26/2005 6:29:32 PM Eastern Standard Time
From:       cowens@lighthousehelp.com
To:         cdekruyff@lighthousehelp.com

Candyce,

I was reviewing the check reimbursements to locate Rick's check for medicine he paid for and also reviewing the overall process of accounts payable when I came across your reimbursement check for cell phone and internet charges. It was my understanding from the inquiry to you that all staff received the same $15.00 cell phone reimbursement. Was the cell phone bill of the Deputy Director paid for in the past?

Candyce, in light of the most recent audit, the SAMSA review, and the job responsibilities that I am held accountable for, I am asking you for clear written policies. I am seeing discrepancies in the application of policies and procedures that are of some concern. As I search for understanding, I am not able to find appropriate paper trails for critical decisions and how they were made. This makes it very difficult to carry out the DD job responsibilities efficiently.

I am requesting to sit down and talk with you about policies, procedures and practices both written and unwritten to assist me in carrying out the responsibilities of the DD position. I will provide you with the areas that I need clarification in.

Let me know if you want this conversation to wait until your return or some other time convenient for both of us.


Thank you very much


Cecelia

*Constant disparaties.*
*My constant seeking*
*of her help in*
*these issues.*

Sunday, November 06, 2005 America Online: Apostleowens

**Cecelia Owens**

| | |
|---|---|
| **From:** | cdekruyff-lhh@greenlynk.com |
| **Sent:** | Wednesday, October 26, 2005 9:10 PM |
| **To:** | cowens@lighthousehelp.com |
| **Subject:** | Re: Policies/Procedures/Practices |

Cecelia --

I'm glad that you keep coming up with these items that have "no paper trails" because after being with the LH for the past 9 years, I've just come to know and accept how some of these things operate and you are opening my eyes by seeing things from an new-comer's point of view who needs to learn and understand what is going on.

I would love to sit and talk with you about these areas where you have questions, and yes, let's please try to do that after I return to work (however, if there's some items that can't wait that long, then by all means, please call me or e-mail me about those items as needed). -- My next 2.5 weeks are very busy (with being out of state for 6 of those days) and I also have the fun day and AL Council Meetings as well.  Please send me your list of items when ever you can so that I can begin to look into those things and come up with the fullest answers possible for you.

I will tell you that with regards to cell phones -- the practice (not a written operational policy though it needs to be) is that staff members that require a cell phone for job related duties -- DD, program directors, case managers, STAR staff for on-call purposes are reimbursed $15/month.  The ED has a separate agreement with the Board as a part of the job package that is agreed upon when hired.  The previous director's phone was purchased by the agency and the monthly bill was approximately $150/month.  I had a cell phone and did not want to change but my bill is covered by the agency as a part of my employment agreement.  Also, I am charging 2 months of internet access to the agency during my maternity leave so that I can be accessible to staff and the board during this time -- it was not practical for me to continue to use my dial-up connection during this time when downloading the large documents, etc., that I am reviewing while on leave.

I hope that this begins to answer some of your questions and let's keep this dialogue going as it will help us to get some things on paper that haven't been before.

Candyce


On 26 Oct 2005 18:29 CDT you wrote:

> Candyce,
>
>
>
> I was reviewing the check reimbursements to locate Rick's check for
> medicine he paid for and also reviewing the overall process of
> accounts payable when I came across your reimbursement check for cell phone and internet charges.
> It was my understanding from the inquiry to you that all staff
> received the same $15.00 cell phone reimbursement.  Was the cell phone
> bill of the Deputy Director paid for in the past?
>
>
>
> Candyce, in light of the most recent audit, the SAMSA review, and the
> job responsibilities that I am held accountable for, I am asking you
> for clear written policies.  I am seeing discrepancies in the
> application of policies and procedures that are of some concern. As I
> search for understanding, I am not able to find appropriate paper

1

Subj:    **Cecelia's response and updates**
Date:    10/27/2005 8:41:53 AM Eastern Standard Time
From:    cowens@lighthousehelp.com
To:    cdekruyff-lhh@greenlynk.com

Candyce,

Thanks for your response. I am really trying to understand how things
operate here as it relates to the DD position. I will admit that things are
somewhat different than my past experiences in non-profit organizations. I
was required and am accustomed to decisions being documented as was required
by board/organization policies. So I could always look there to find
answers or get clarification. However, I am realizing that this is not the
case at Lighthouse, so I will flow with what is here but with the
understanding that I cannot be held accountable for what I do not know
about. Further, it hinders me in trying to build a supportive, effective,
professional working relationship with you. I believe in effective
communication. There is nobody else for me to inquire to as you are my
supervisor.

I will list the areas that I need clarification in and we can meet when you
return.

I am getting my arms around the CDC grant, it is due 12/05. I have put a
call in to them to be sure I understand the parameters.

I have spoken with Hyundai HR and have some inside scoop about what the
really looking for. I also have news that Hyundai is going to give away 30
crash cars (those with minor imperfectness). My question to you is do we
have the capacity to receive maybe 10 or all of these cars? I am thinking
they could be used for as self-sufficiency loaners to clients who have jobs
for a period of 90 days and turned back in to us to be reassigned to other
clients. The Lighthouse would be the owner. Do we have funds for insurance?
Where could we park them? Tell me what you think. Should this be pursued?
Time is of the essence.

I would have to draft a letter immediately requesting for the cars to come
to us.

Later today, I will let you know if there's anything else I need. Regina
has picked up the items from Sams. I got the gift certificates from Ruby
Tuesdays, they only had $10 or $25, so I chose $10. I will pick up
Starbucks' over the weekend.

Thanks again, and I will email later today on other updates.

Cecelia

-----Original Message-----
From: cdekruyff-lhh@greenlynk.com [mailto:cdekruyff-lhh@greenlynk.com]
Sent: Wednesday, October 26, 2005 9:10 PM
To: cowens@lighthousehelp.com
Subject: Re: Policies/Procedures/Practices

Cecelia --

I'm glad that you keep coming up with these items that have "no paper
trails" because after being with the LH for the past 9 years, I've just come
to know and accept how some of these things operate and you are opening my
eyes by seeing things from an new-comer's point of view who needs to learn

*[handwritten note, right margin:]* This email highlights both my concerns and my work. I communicated with Candyce at home by email, most times 3days week. And I spoke to her by phone daily.

*[handwritten note, lower right:]* Candyce Response please read second page

Exhibit 6

# Cecelia Owens

**From:** Cecelia Owens [cowens@lighthousehelp.com]

**Sent:** Monday, October 31, 2005 1:51 PM

**To:** 'Candyce DeKruyff'

**Subject:** Issues

Candyce,

Mgmt team went well this morning (Lisa. Debby, Carianne, Regina, and I). We are all prepared for Fun Day. Rick has an emergency with his wife on tomorrow and may not be attending due to a urgent doctor's appointment. I will probably get Debby
to facilitate his group. Also it is supposed to rain tomorrow (40% chance), Regina is checking to see if the indoor space is available if it does rain. Regina has just informed me that he lady at Lagoon Park wants us to pay for the indoor space whether we use it or not in order to hold it for tomorrow. Also, we do not have the phones covered yet. The intern will be here at 2:00pm, but she does not need to be alone although locked in. Please advise on what needs to happen.

Our UAB meeting on the CDC grant is rescheduled due to two UAB depts planning to go for the grant. They need to talk first as each dept did not know the other was planning to apply. When they decide what they are going to do on Wednesday of this week, then we will talk.

Candyce, I have your email concerning the overtime situation. Again, I am faced with the issue of Carianne coming to you and not talking with me about this. It is clear given Carianne's actions that the plan I put in place is not working. She chooses not to effectively communicate with me and continues to come to you, while simultaneously ccing me in emails. This is not working, nor does it follow the plan proposed or the chain of command. The relationship/environment that exists between the two of you has made it impossible for me or anyone to supervise/manage Carianne while here. The situation seems to be polarized in that neither of you can see the supervisory challenges for me with Carianne. It also wreaks havoc on everybody else, and cultivates an environment non-conducive to teamwork.

Had Carianne come to me she would have learned that I approved the overtime. The circumstances were extenuating in both cases. I made the determination and approved the overtime. It is impossible to operate a post-pardum program for women who are pregnant and deny them emergency medical care. Further, you wanted the records cleaned up and it took a little time to do that. The liability is far greater than 4.25 hours of overtime for two employees. Some support for hard-working employees is warranted.

On several occasions, I requested your support in redirecting Carianne properly. This is not happening. I am your only direct report, not Carianne. Carianne and I are not on the same level. I am operating this organization in your absence by virtue of my job description. I am her supervisor. I am requesting that you either support me as Cariannes' supervisor or that you completely relieve me and you continue supervising her for the balance of her time here.

Support for me means directing her back to me when she steps over me, encouraging her to communicate with me constantly and demonstrating your support for me from a supervisory perspective with her. I have been more than fair about my expectations. I have gone the extra mile in trying to work with Carianne to assist her in working out her issues. I have spent way too much time dealing with this. I am not getting effective results.

The business office is across the hall from me. It would take all of two seconds to get clarity/direction on any matter that Carianne needs. She constantly chooses to email and call you on everything. This is fine. I did not create this situation. I have made every effort to work with it, but now I need you to fix it.

It is my determination that nobody will receive a coaching note or reprimand. However, all employees are encouraged to follow directives and seek approval for restrictions prior to any violations. Approval was given by me under the circumstances.
My commitment and action in resolving this overtime issue has been demonstrated. I have put the on-call system in place, although the feasibility story is yet to be told on the average dollar figure in expenses (counselors)

10/31/2005

versus average overtime hours (case managers).

I will await your response.  I need clarity on Carianne's supervision.

Thank you,


Cecelia

10/31/2005

# Cecelia Owens

**From:** Cecelia Owens [cowens@lighthousehelp.com]
**Sent:** Tuesday, November 08, 2005 3:07 PM
**To:** 'Candyce DeKruyff'
**Subject:** Greetings

Candyce,

Pray that you and your family had a wonderful trip.  There is some issues I need to inform you of:

1.  The mgmt team had three final candidates for the business position.  Our concensus is Claude Hurtt whose resume I'm attaching.  He is very qualified and willing to work for a salary range of $35-40K. Everyone really likes him and he is so gentle, humble and full of wisdom.  He is a great fit for us.  My concerns have been addressed which dealt with supervisory issues.  He does not appear to have any biases that show and is willing to be a part of the team.  I have a great peace about him as the choice and the team feels the same.  I strongly feel that he can come and hit the ground running with little or no supervision but oversight.  Hope you like what you see. After I check all of his references, by Thursday I would like to make him an offer of  $39K and a start date of Wednesday, November 16, 2005.  This will give him six training days with Carianne.  I have directed her to outline a training plan for him for those days.

2.  Mr. King at McGhee Park did not receive his rent checks and they seem to have disappeared into thin air. Carianne says that she mailed them Thursday night , 11/3 along with all other rent checks.  All other landlords got theirs on Friday, but King called on Friday to inquired and to this date has not received the checks.  Yesterday, we stopped payment on the checks and issued him two more, but we have incurred an 8% late fee as a result of this of $548.00.  I thought we had gotten this clear last month as to the rent getting there on time.  He seems to think that Carianne has done this on purpose and is holding the checks.  I don't know, but it is very strange that everyone received their rent checks except McGhee Park and they were all mailed at the same time.  We have to get this straightened out.  I spoke with King today and he informed me that the checks still have not come.  I informed him when they do come that I want to pick them up along with the envelop they were mailed in.

3.  Spoke with Bob Wynn today to verify criteria for business manager.  In the conversation he informed me that he had several complaints against us from staff.  He was concerned about staff turnover.  I informed him that the last four employees that have left offered their resignation and we accepted. I also told him that you and I would be addressing many organizational issues when you return next week and that we welcomed his input anytime.


I will email you later with the rest, there is more.

Thanks Cecelia

11/18/2005

*Job Announcement posted by CARIANNE advertising her own job*

### Business Manager, Lighthouse Counseling Center, Inc.

*Job Category:* Financial and Accounting

*Job Location:* Southeast Region (Montgomery/Dothan)

*Job Status:* Full-time

*Job Description:*
This is a highly responsible work which includes coordinating the following financial areas: payroll, accounts payable/receivable, vouchers, insurance and budget preparation. Responsible for all accounting matters related to the agency and the timely and accurate production of financial statements in accordance with generally accepted accounting principals. Responsible for human resource duties.

**Qualifications:**
-4 year degree in either accounting or finance;
-Three years' hands-on accounting experience including payables, receivables, and payroll;
-Extensive computer skills and wide knowledge of a variety of computer systems and software;
-Ability to interact cooperatively with clients, employees, vendors and the general public;
-Excellent communication and organizational skills.

*Salary Information:* ~~$34,000 - $38,000~~  **34 - 38K**

*How to Apply:*
send by e-mail to: cowens@lighthousehelp.com or by fax to: (334) 286-5993 *(posted: 10/25/2005)*

### School-Based Mentoring Coordinator, Big Brothers Big Sisters of Greater Birmingham

*Job Category:* Program(s)

*Job Location:* Central Region (Birmingham)

*Job Status:* Full-time

*Job Description:*
Mentoring Coordinator needed for Big Brothers Big Sisters. This position will work closely with area schools to develop and manage a caseload of clients in need of mentoring services. A Bachelor's degree in Education or a social service field is required. Strong communication skills, both verbal and written, are required.

*Salary Information:* Salary commensurate with experience.

*How to Apply:*
Fax resume to:
Big Brothers Big Sisters of Greater Birmingham
Attn. Director of Programs
205-942-6557. *(posted: 10/24/2005)*

### Administrative Assistant, Big Brothers Big Sisters of Greater Birmingham

*Job Category:* Administrative

*Job Location:* Central Region (Birmingham)

*Job Status:* Full-time

*Job Description:*
Responsible for assisting in the support services of the organization including data entry, filing, answering multi line phone, reporting & tracking data. Strong orgainzational skills and computer experience in MS Word, Excel, Access, etc. are required.

This position is a 1-year funded grant position.

Did you kn

NRCA Members
unlimited FREE
postings on the
Job Page.

Nonmembers ca
a job notice on t
NRCA Job Page
days for $100. C
Erin Tumlin to t
advantage of th
option. Just call

## LIGHTHOUSE COUNSELING CENTER, INC.
## BUSINESS MANAGER

**Definition:**
This is a highly responsible work which includes coordinating the following financial areas: payroll, accounts payable/receivable, vouchers, insurance and budget preparation. Responsible for all accounting matters related to the agency and the timely and accurate production of financial statements in accordance with generally accepted accounting principals.

**Description of Duties:**
- Strictly monitors and controls the collection and disbursements of agency funds and the resultant cash balances to ensure a positive cash position to meet financial obligations at all times;
- Produces timely and accurate monthly and annual financial statements in accordance with generally accepted accounting principals;
- Reconciles all general ledger accounts to supporting detail information;
- Prepares employee payroll (both salaried and contract);
- Receives invoices for services or goods purchased, verifies accuracy and ensures timely payment of all periodic expenditures; reconciles vendor statements;
- Bills clients and third parties for services provided; follows up on delinquent accounts; collects fees;
- Prepares weekly, monthly, annual and other financial reports as requested by staff members;
- Works cooperatively with and assists staff members with proposals and contracts as needed;
- Coordinates agency insurance and other employee benefits;
- Maintains orderly financial and administrative files;
- Maintains computer programs to assure efficient agency operation;
- Files payroll tax deposits and quarterly payroll tax returns, year-end payroll tax returns, W-2's, 1099's and other reports as needed;
- Responsible for the interviewing, hiring, training, and supervision of Business Office personnel;
- Monthly reconciliation of all agency bank accounts; and
- Related duties as assigned by supervisor
- This is an exempt employment position

**Supervisor:**
Deputy Director

**Qualifications:**
Graduation from an accredited four-year institution of higher learning with a major in Accounting, CPA or eligible. Three years' hands-on accounting experience including payables, receivables, and payroll; extensive computer skills and wide knowledge of a variety of computer systems and software; ability to interact cooperatively with clients, employees, vendors and the general public; excellent communication and organizational skills.

_____          _____
Incumbent's Signature                                              Date

Thanks,

Carianne

---

**From:** Cecelia Owens [mailto:cowens@lighthousehelp.com]
**Sent:** Wednesday, November 09, 2005 9:22 AM
**To:** cstinson@lighthousehelp.com
**Cc:** 'Candyce DeKruyff'
**Subject:** Directives

Carianne,

Listed below are responsibilities/task/issue that you will need to ensure are completed and followed through on by the dates listed under each task:

1. I noticed the employee files are not complete, there is paper worked stacked to be filed. Please be sure that all filing is in appropriate places by Monday, November 21, 2005. There are also other invoices and accounts payables that are stacked. If this is the normal procedure that gets handle during the month, please inform me, otherwise the referenced date applies for all filling.

2. I have several complaints on Jeannie from counselors, mgmt and other staff concerning client files and unprofessional language and behavior in the work environment. I had a talk with Jeannie yesterday and offered her my support for her issues. I also informed her about the complaints. I have reviewed Jeannie personnel record and see where she is receiving outpatient counseling services. I spoke with Keith Johnson her counselor and have obtained a release of information from Jeannie to keep updated with the situation. I noticed a tumultuous work history with Jeannie prior to the time she lost her husband. Frankly, I am amazed that she has been able to remain in her position due to the absences and other issues before her husband deceased. You will need to address the complaints about the files and Jeannie's language.

3. Please be sure to outline a detailed 6 and ½ training schedule for the new Business Manager beginning Tuesday, November 15th through ½ day Wednesday, November 23, 2005. Please provide by Monday, November 14th during mgmt team meeting.

4. Please cut a late fee check for McGhee Park for 8% of the total rent, he still has not received the rent checks. The mystery of this situation continues to baffle me. It is my intent to get to the bottom of this somehow. This situation was and is quite sensitive. Given the history, this check situation should have never occurred under any circumstances and now the Lighthouse must suffer the consequences because he did not get the rent until 4:30pm on the 7th.

5. If you have any questions or need clarification concerning any of the above directives, please speak with me immediately.

6. We can meet about these directives sometime later today or tomorrow to allow you the opportunity to address some of this. Communicating about these issues will facilitate our exchange for this week. Let me know what is the best time for you. Remember I am out to the CDC meeting in Atlanta on Friday.

7. Claude Hurtt just called and is withdrawing his name for consideration due to the salary. He would like in the 50s or 60s. I told him I understand and thanked him for the courtesy phone call. He wanted me to express to everyone how he enjoyed meeting us. He thought the team was great. It is my intent to offer the position to Rochelle pending Candyce's feedback.

8. Please reflect upon any issues that I need to be informed about as it relates to the organization as a whole and/or the business manager position duties. Further, I continually willing to support you professionally in whatever your needs may be as it relates to your new transition to B'ham and the flexibility you may need with your schedule. Just let me know if I can assist you.

Thank you, Cecelia

11/9/2005

## Cecelia Owens

**From:**  Carianne Stinson [cstinson@lighthousehelp.com]
**Sent:**  Wednesday, November 09, 2005 9:51 AM
**To:**  cowens@lighthousehelp.com
**Subject:** RE: Directives

We can meet at your availability. I will be here all day today, and Thursday. I will also be here Friday, but I know you plan to be out.

Below are my responses to the issues, listed in order. I hope this helps, if more clarification is needed, I will be happy to do that. As you stated, we can also talk about these things when we meet.

1. The A/P invoices are all filed except for 10-20 that need folders made. (We had to clean out all of A/P for year end and start new folders for this fiscal year) This week Sabrina is working on getting BCBS billing and Medicaid billing completed. I asked her last week to complete the personnel files once her billing this week was finished. I will give her the date of Monday 21st and will help with that if necessary.

2. I will also speak with Jeannie. I have always tried to be the kind of supervisor that encourages staff, and tries to help them excel and jump and hurdles or challenges. Jeannie got off on a great start with us. Soon after she became somewhat unreliable. We found out that she had an alcohol problem (we became aware after her husband died). I sought advise from Candyce on the issue with Jeannie in June when all took place. Since it is in the policy to give our employees a one time chance to get rehab, we gave her that chance. Since she has been back, I have tried to be sensitive, without being "babying" (couldn't think of a better word) to the situation of her husband passing. I have tried to coach my other staff not to baby as well, when they bring issues to me. I am working with her on her performance, and her blaming issues. I have seen much potential in her, which is why she is still here. This is the first I have heard about unprofessional language. I am surprised, and will address that as well, and immediately.

3. I have been thinking about training schedule and will have you a written schedule by Monday.

4. I have always mailed Mr. Kings checks unless the checks were cut on the 4th or 5th. If that happened then I would hand deliver. I will make sure that his check is hand delivered every month and that we get a receipt from his secretary. As you, I am also baffled at the situation since he is the only one who has not gotten his checks. I am also and frustrated with him for wanting late fees since the checks were officially due on the 6th (Sunday) and he received them on Monday. I will cut that check today. I will make sure that it is hand delivered.

5. I understand

6. I am available all day today, until 5pm (I have a prior engagement tonight at 5:30)

7.  :(

8. I will be thinking about organizational things that you need to know. I think that I have informed you of most things, but I am sure I will think of something!  :)
I think I am done traveling to Birmingham during the week. I appreciate your willingness to allow me off the 2 1/2 days that I needed. You have been very helpful.

Thanks especially to the insight on Jeannie. I did speak with her last week about the issue Lisa brought up (Jeannie breaking down). Jeannie stated that she did cry, but that it was at lunch with Laura (she says they go way back). She said that they decided to go to lunch to "catch up". When they were catching up, she cried telling Laura about Frank. I did not really see at that point that it was any of my business what she does on her personal time, so I let it go. I have also been giving her deadlines since last week and plan to spend time with Jeannie.

Please let me know if you need more info, or more action from me on these items.

**11/9/2005**

GTI

**Inbox: cdekruyff-lhh@greenlynk.com**

Folders
· Inbox
· Sent Mail
· Trash
Find Mail
Compose
Address Book
Settings

Logout

---

**Dial-Up Internet Access**

---

| Inbox #37 | Reply | Reply All | Delete | Forward | Show Header |

**From**    Cecelia Owens <cowens@lighthousehelp.com>    <Save Address>
**To**    'Candyce DeKruyff' <cdekruyff@lighthousehelp.com>
**Date**    09 Nov 2005 10:05
**Subject**    No Claude

---

Claude Hurtt informed me this morning that he is withdrawing his name from
the candidate list due to salary. He desires 50s-60s, so do I (smile). Our
second choice and a great one is Rochelle Baker. She was our top candidate
prior to interviewing Claude and also a great fit for us. We were torn
between the two on yesterday. I would like to offer Rochelle the position
for 40K, she is retired maybe salary won't be primary to her.this is what
she told us anyway. I have spoken with 5 references (supervisors and
others). All say the same: she is a very hard worker, efficient, dependable,
level headed, well-respected, people person and team oriented. Her mgmt
style is participatory/inclusive/horizontal. Please give me you feedback.
I would like to complete this task while we still have this good candidate.
My plan is to make an offer immediately. Let me know what you think. There
is concensus among mgmt.


Nothing else urgent. I will be at the CDC in Atlanta on Friday to meet with
one of the grant evaluators who is also a colleague of mine to get the scoop
on what our real chances are of receiving 1 of the 4 200k grants. I don't
want to waste time writing if the odds are so against us. I met with
Tuskegee University on Monday for collaboration options, to no avail. They
basically want to be the big dog and need some little dogs to do the work.
NOT. During the HIV collaborative meeting yesterday, Paulette has some
smaller org. leads out of Selma that may be beneficial to partner with.
They are small and need stable organizational support. I will examine the
possibility of this union and inform you. I am going to assign Lisa to
watch over the Lighthouse in my absence on Friday, she is always here and
most of the things that might happen are under her duties anyway. She will
be directed to contact me for me or you (if desired) for any major
decisions. She will be keeping in contact with me regularly anyway. Regina
is on leave today through Friday. Carianne will probably need her
flexibility in scheduling due to her B'ham transition. I have encouraged her
to take advantage of the Friday afternoons to accomodate her plans.


We have a grant due by the 18 of November that I will be penning for STAR
for National Crime Victims' Rights Week. Will share on

On Monday or earlier if you like.I can forward by email. Don't want to
bombard you so heavily.

LIGHTHOUSE00230

LIGHTHOUSE 00013

All for now.... Everything will be okay Candyce. I am here to assist you and I do support you fully. I am committed to the Lighthouse. Just wanted you to know.

**Cecelia**

Print

» Message Body
» message.html / HTML Formatted Message - 6.3kB

Current # of users: 1

GTI

**Inbox:** cdekruyff-lhh@greenlynk.com

**Dial-Up Internet Access**

Folders
· Inbox
· Sent Mail
· Trash
Find Mail
Compose
Address Book
Settings

Logout

| Inbox #39 | Reply | Reply All | Delete | Forward | Show Header |
|---|---|---|---|---|---|

| | |
|---|---|
| **From** | Cecelia Owens <cowens@lighthousehelp.com>     <Save Address> |
| **To** | 'Candyce DeKruyff' <cdekruyff@lighthousehelp.com> |
| **Cc** | lcarroll@lighthousehelp.com |
| | 'Debby Headley' <dheadley@lighthousehelp.com> |
| | rbaity@lighthousehelp.com |
| | 'Regina Berry' <berrreg@lighthousehelp.com> |
| **Date** | 09 Nov 2005 16:49 |
| **Subject** | Emergency meeting |

Candyce,

The management team met after lunch today. I informed them of our conversation concerning the business manager's position/Carianne. It is the consensus of the team that we need a meeting with you on tomorrow so that everyone can speak for themselves.

We are requesting an emergency management team meeting with you on tomorrow to discuss this issue. We can either do it by phone or here at the office. Regina is out of town, but has given me her input and welcomes the opportunity to be reached by phone for any clarity.

Please respond immediately concerning the time of the meeting for tomorrow. This matter is urgent for us. Your prompt attention is greatly appreciated.

Thank you,

Cecelia, Lisa, Rick, Regina and Debby

Print

» Message Body
» message.html / HTML Formatted Message - 3.7kB

Current # of users: 1

LIGHTHOUSE 00015

**Cecelia Owens**

| | |
|---|---|
| **From:** | Lisa Carroll [lcarroll@lighthousehelp.com] |
| **Sent:** | Thursday, November 10, 2005 10:55 AM |
| **To:** | cdekruyff-lhh@greenlynk.com |
| **Cc:** | Rick Baity; dheadley@lighthousehelp.com; Cecelia Owens; Carianne Stinson; Regina Berry |
| **Subject:** | RE: "Emergency Meeting" |

Candyce,
I am somewhat confused about the business manager position. I was under the impression
that Cecelia was to hire someone before Carianne leaves in order to allow that new
candidate to acclimate to the position while Carianne is here so that she may help train
this person. I was instrumental in requesting this emergency meeting because we have 2
viable candidates for the position. Cecelia exhibited exemplary leadership skills by
allowing the management team to aid in interviewing the prospective candidates for the
position just as you did when you were recruiting her in the deputy position.
My concern is that those candidates will accept other positions and we my lose the
opportunity to hire them if you waiver on this much longer. I am, again, requesting that
we meet sooner than Monday as an entire team to discuss these concerns and get
clarification on your expectations.
Thank you for your prompt attention to this matter.
Lisa


-----Original Message-----
From: cdekruyff-lhh@greenlynk.com [mailto:cdekruyff-lhh@greenlynk.com]
Sent: Thursday, November 10, 2005 9:08 AM
To: berrreg@lighthousehelp.com; dheadley@lighthousehelp.com; cstinson@lighthousehelp.com;
lcarroll@lighthousehelp.com; rbaity@lighthousehelp.com; cowens@lighthousehelp.com
Subject: Re: "Emergency Meeting"


Management Team --

I understand that there are issues and concerns regarding the business manager position.
I do not feel that this is an emergency situation but that it can be dealt with on Monday
when I return, following our regular meeting with the entire team present.

If you would like to e-mail your concerns or issues in advance of the meeting, I will
entertain those and we can discuss them on Monday.

Thank you.

Candyce

**Cecelia Owens**

| | |
|---|---|
| **From:** | Cecelia Owens [cowens@lighthousehelp.com] |
| **Sent:** | Thursday, November 10, 2005 11:24 AM |
| **To:** | 'cdekruyff-lhh@greenlynk.com' |
| **Subject:** | Response to 11/10/05  Phone Verbal Warning" |

Candyce,

I have received your email where the tone is much different from your phone conversation today.  Why can't we just follow policies and procedures as written without disparate treatment of employees which puts the Lighthouse in violation of the Civil Rights Act of 1964, our regulatory bodies, certifying entities and our funding authorities.

Candyce, are you retaliating against me for raising the issue of disparate treatment/possible discrimination of employees or for requesting to follow company policy? This issue of resignation retraction and working in another city is unprecedented, and is a federal Civil Rights case in the making. Remember there are other employees who have desired to retract their resignation whose only difference is the color of their skin. We are an organization that receives federal funding, the implications here are quite serious.

Do you really want to communicate to this organization that policies and procedures are only for some employees and not others?  Do you want to disregard the hard work, opinions and expertise of members of mgmt team members who assist you in operating this organization?

According to the Personnel Policy and Procedure Manual, page 7,letter G, Item 1, the Board of Directors, personnel committee should be informed that there are discrepancies in the policy application with all employees.  Has the Board been informed of the entire issues here?

For clarity, the mgmt team members decided that we needed a meeting with you concerning your proposal on the business manager position.  You informed me and you did not direct me not to discuss this with them.  They have been a part of the decision making process all along so it is not unusual or uncommon that they would be informed as it was with the Deputy Director position.  I have kept you abreast of every step in this process by phone and by email.  You have never objected to them participating before, but rather directed and encouraged it.  We are all a part of the decision making process of this organization. This is what you informed me of during my interview and on many occasions since I have been in this position.

Carianne was not invited or a part of this meeting because Carianne has not communicated with me as her supervisor any of these issues at hand for obvious reasons. She continues to be insubordinate in every way as it relates to me as her supervisor. The recent Mike King situation that cost the organization over $600 was a clear oversight on Carianne's part.  She was informed of the sensitive nature of the situation with this landlord last month, and she did not seek my counsel or direction in the handling of his rent checks. Given the situation, I have done nothing unprofessional in my position as Deputy.  I am doing the job I was hired to do under your directives.

Carianne submitted her resignation of her own free will and decided on her own departure date.  She made her own decisions, announced this to mgmt team, the board and put it in writing.  She could have easily waited until she had a position, but chose to prematurely do this.  By policy, the business manager position was advertised, top candidates were interviewed,

and we have two viable candidates. The mgmt team has worked very diligently to fill this position.  We also have a vital plan of transition.  The day before the offer is to be

1

## Cecelia Owens

| | |
|---|---|
| **From:** | rbaity [rbaity@lighthousehelp.com] |
| **Sent:** | Thursday, November 10, 2005 1:22 PM |
| **To:** | Candyce DeKruyff |
| **Cc:** | cowens@lighthousehelp.com; Lisa Carroll; Carianne Stinson; dheadley@lighthousehelp.com; berrreg@lighthousehelp.com |

**Subject:** Emergency Meeting

Candyce:

Regarding the Emergency Meeting and Business Manager position. The consensus of the Management Team interview panel is that we have a very viable applicant we wanted to hire as soon as possible (ASAP). I say ASAP due to the possibility of losing
the applicant to another employer and due to the need to have the incumbent, Carianne train the applicant. Finally, I'm not sure
how working one day a week from Birmingham would be effective. Looking forward to discussing further on Monday.

11/10/2005

## Cecelia Owens

**From:**    Carianne Stinson [cstinson@lighthousehelp.com]
**Sent:**    Thursday, November 10, 2005 1:41 PM
**To:**    cowens@lighthousehelp.com
**Subject:** RE: Coaching Note October 18, 2005

Cecelia,

My response is one of shock. I have also worked diligently to improve communication efforts between us. I emailed you my schedule so that you could sit with me while doing my work, in order for you to get a working knowledge of what goes on in the Business Office. We have met twice so far and both times you expressed how through I had explained the work. I am very surprised by this sudden change.

I am responding to each issue in order:

1. I am not sure of what overtime issue that is reference here. I looked back and they both had overtime that week. I show that I emailed you, Lisa and Candyce to inform you of the overtime, as you had previously requested me to inform you of any overtime. I am not sure what I failed to follow through with here.

2. As stated in my email yesterday regarding McGehee Park, I always mail the rent checks, unless they are cut on the 4th or 5th, in which case we hand deliver. I have not been directed to otherwise. He is the only person who did not receive his rent on time, which concerns me as much as it does you. My plan of action is to have those checks hand delivered from now on. I do not see how I could have anticipated this, but we will make sure that it does not happen again.

3. At the last board meeting, the board asked me to consider working from home in Birmingham. Candyce said to me and the Board President that we would discuss the option and make a decision. I thought about it hard, I want what is best for Lighthouse as well as my family. I emailed Candyce a list of all the things that would need to happen to make it work. She called me once she returned from vacation to make sure that that was my desire before contacting the board. I stated that it was. I was only following the directive of the President of the Board.

4. I have received two recent complaints about Jeannie, outside of my current staff. Once last week, from Lisa, after she had come to you first with the complaint. The complaint was that Jeannie had a breakdown and that it was effecting Lisa's staff. I spoke with Jeannie about this and she stated that she did cry while at lunch with Laura. I did not feel it was my place to coach her about this on her personal time. I have worked with Jeannie over the last several months trying to help her jump the hurdle of grief from losing her husband. She has made great strides. As you and I discussed yesterday, she has a poor way of communicating and trying to make friends with coworkers. I hope to help her learn proper ways of doing this in an appropriate way. The only other complaint I have had regarding Jeannie recently is the email that you sent to me on Monday. We discussed this yesterday and you seemed to be very happy with the outcome. My frustration with the Jeannie issue is that the complaints are being brought directly to you and not to me as her direct supervisor. I cannot work on a problem if it does not come to my attention.

We were scheduled to meet regarding two of these issues yesterday at 3:00pm. You called to reschedule for 10:00am today. We still have not met, and this is also surprising to me since we had plan to discuss these issues and instead I received this email.

As I expressed before, I have respect for you and want communication with you to be better and for us to have a good working relationship. I feel that I have work hard to do that.

Carianne

**From:** Cecelia Owens [mailto:cowens@lighthousehelp.com]
**Sent:** Thursday, November 10, 2005 12:04 PM

LIGHTHOUSE00096

11/10/2005

LIGHTHOUSE 0131

**To:** cstinson@lighthousehelp.com
**Cc:** 'Candyce DeKruyff'
**Subject:** Coaching Note October 18, 2005


November 10, 2005

To: Carianne Stinson

Carianne,

Since October 18, 2005, I have worked diligently with you in an effort to improve communications between us. I outlined a plan that was researched-based and proven to be effective in many organizations across this nation. Initially, you started off great and I have noticed positive improvement in your day to day communications with me as your supervisor. Unfortunately, where it really matters, you continue to fail to communicate with me appropriately. I will admit that there was an organizational/environmental factor that I did not see as a threat to the success of the plan. However, the ultimate success was your responsibility to demonstrate to me that you are not insubordinate, or that you do not communicate in an unprofessional, rude or condescending manner to me or other employees. At this time, I am unable to continue considering removal of the coaching note from your employee file. The Coaching Note of October 18, 2005 will remain with this email as an addendum for the following additional reasons:

On at least three important organizational issues, you failed to communicate with me for counsel or direction

1.  Overtime issue for Zola Coates and Cynthia Wilson, week of October 31, 2005
2.  The problem-solving issue concerning McGhee Park rent checks which resulted in the organization having to pay late fees of over $600.00, week of November 1, 2005
3.  The most recent request to the Executive Director, not to me as your supervisor to rescind your resignation, which has caused great confusion and dissention among management. Your actions validate and demonstrate a critical need for continuing professional development in the workplace in the employee relations, diversity, sensitivity training and communication.
4.  Lack of proper supervision of Jeannie Bowen after staff continue to bring to your attention.


You may submit any response desired in writing to be attached with this addendum that will be placed in your employee file. Please submit your response by 5:00pm today by email.

Due to the sensitive nature of the current situation with the Business Manager position and until Candyce returns on Monday, 11/14/05, all communication to me should be in writing by email so that there are no misunderstandings about what is stated. I will email any directives I have for you. This is to protect both of us.

Thank you for your cooperation in this matter.



Cecelia Owens
Deputy Director

11/10/2005

LIGHTHOUSE00095

LIGHTHOUSE 0130

## Cecelia Owens

**From:** cdekruyff-lhh@greenlynk.com
**Sent:** Thursday, November 10, 2005 6:43 PM
**To:** cowens@lighthousehelp.com
**Subject:** Carianne's Supervision

Cecelia --

It is apparent to me that you and Carianne have not been able to resolve the issues between you as seen in the e-mail that you sent her earlier today (referencing the coaching note of October 18, 2005) and which you copied me on.

Therefore, I am removing you as Carianne's supervisor effective immediately, until such a time as I see fit to re-instate this supervisory relationship. I appreciate your cooperation with this directive and I will also inform Carianne that she is to now report directly to me.

Thank you.

Candyce

*Retaliation began this day with this email*

*RECEIVED*
*ON MONDAY 11/14/05*
*NOT 11/10/05*

LHCC Coaching Note Form, 5/98

## Lighthouse Counseling Center
# COACHING NOTE

| Employee Name | Position/Status | Date |
|---|---|---|
| Cecelia Owens | Deputy Director | November 10, 2005 |

Frequency of Coaching:

_____ Daily          _____ Weekly          _____ Monthly          X   One Time Only

Type of Note:
_____ Recognition of a job well done!          _____ Review of policy and procedures.
_____ Clarification of duties.          X   Review of job expectations and/or attitude check.
_____ Review of previous coaching note.          _____ Other. Explain _____

Explanation of Note:
Cecelia ~ As per our conversation earlier today, I am very disturbed that you would either call or participate in a management team meeting to discuss the business manager position/Carianne (as stated in your e-mail) without Carianne present. It is completely inappropriate and unprofessional to discuss these issues with Carianne's peers prior to discussing any concerns that you may have with me as your supervisor. I also feel that your decision to do so shows very poor judgment and I have to say that I expect both a higher degree of professionalism and much more maturity in judgment from someone in the Deputy Director position.

Your participation in a meeting of this nature is a divisive action and does not work towards the goal of teamwork that you say that you have.

It is my expectation that both your judgment and your level of professionalism will increase and that a situation of this nature will not occur again in the future.

Employee Response:

There has been no unprofessionalism on my part as I stated in my email dated 11/10/05. Any inappropriateness in this business manager position has been by Carianne and yourself. The mgmt team has been a part of this process all along at your direction. Further you did not instruct me not to share your proposal. The divisiveness in this situation is from ~~you~~ and Carianne. This coaching note is retaliation for my bringing to your attention that your proposal ✳

_[Supervisor signature]_    11·14·05          *Cecelia Owens*   11-14-05

Supervisor's Signature & Date          Employee Signature & Date

I Acknowledge Receipt ✳ is disparate and discriminatory against other employees in the same situation based upon their race and violates their civil rights and mine. (OVER)

∴ Deming, Hoffman Green & Campbell, PC.
Military Jag Office FT McPherson, GA

*INTERVIEW TUESDAY 11/8 11:00am*

# Claude D. Hurtt

417 Mountain Drive
Birmingham, Alabama 35206
(205) 836-5647
churtt@pobox.com

## SUMMARY

Experienced Accountant, Financial Analyst, Manager.
Strengths in analysis, solving problems, getting the work done, and management.

*- largest budget 6 or 7 million*
*- Federal grant*
*- no past race*

## WORK EXPERIENCE

**Controller/Business Manager, Paraguay office**
*International Mission Board, Southern Baptist Convention, 2004-2005*
- Management of all business, financial, legal affairs,
- Accounting and financial management: cash, banking, accounting, reporting
  **Implemented improved reporting, and instant service**
  **cost savings of 1% of total budget in cash movement process**
  **cost savings of 1/2% for clients in new cash system**
- Budgeting, forecasting & monitoring, financial analysis

- Marketing and product work during *2001/2003, Ecuador*
  **Field representative; very successful in developing new field**

**Treasurer/Administrator, Peru office**
*International Mission Board, Southern Baptist Convention, 1999-2001*
- Financial management of cash, accounting, banking, budgets
  **Overcame $70,000 budget shortfall**
  **Solved major accounting and computer problems**
- Supervision of accountants and other staff
  **Accounting project avoided shutdown by government**

*mgmt style*
*- encouragement*
*team*

**Office Manager and Interim Minister of Education**
*Ruhama Baptist Church, Birmingham, Alabama, 1997-1998*
- Management of office staff and activities
  **Improvements in work flow, productivity**
- Unique monitoring of trends, forecasting
- Management supervision, analysis of pre-school program
  **Problem solving for pricing system, and accounting !**

**Special Ministry**
*Jefferson County jail system, 1996-1997*

*30 days*
*technical parts of job*
*relationship*
*identify challenge*

**Insurance Agent,**
*Allstate Insurance Company, 1995*
  **Computerized marketing program and some client information**
  **Developed plan for new independent insurance agency**

*Employment plans*
*Employee benefits*
*payrolls*

**Claude D. Hurtt**, page two, continued:

**Financial Manager**
*Baptist Health System, Birmingham, Alabama, 1972-1995*
- Assistant Vice President, Finance 1972-1995
  - **$1.5 million savings per year through self-insurance program**
  - **Automated payroll accounting  for executive payroll**
  - **Managed FASB for legal liabilities**
- Internal Auditor, 1972
  - **revised internal controls**

**Staff Accountant**
*Alabama Power Company, Birmingham, Alabama 1971-1972*

**Instructor,  Accounting,** part time
*Indiana University, Bloomington, Indiana, 1969-1970*

## EDUCATION

**M.B.A.,  Finance,** *Indiana University,  1971,*

**B.S. in  Business  Administration,  Accounting,** *Samford University,  1969*

## COMMUNITY AND PROFESSIONAL ACTIVITIES

**Treasurer, Employee Benevolent Fund,** 1972-1995
  Baptist Health System, Birmingham, Alabama
**Healthcare Financial Management Association**, Advanced Member
  Alabama Chapter, and National; 1972-1995
**American  Society for Healthcare Risk Management**
  Alabama Chapter, and National; 1977-1995
**Risk and Insurance Management Society**, 1972-1995
  various offices: Alabama Chapter; member, National
**Birmingham Employee Benefits Forum**, 1976-1988
**YMBC Civic Forum, 1980-1999, President** 1993/1994
**United Way**
  **Loaned Executive, 1980**
  **Allocations Committee, and visiting allocation teams, 1981-1993**
**Treasurer, Birmingham Baptist Association,** 1980/1982;
  Assistant Treasurer, 1978-1980
**Olympic Hosting Program, Birmingham Baptist Association,** 1996
  Special volunteer, and Section Leader
**Judge, Birmingham Board of Education: Outstanding Teacher Program**, 1990-1998
**Jimmie Hale Mission,** 1993/1998, volunteer worker, volunteer Chaplain
**Chaplain (volunteer), Jefferson County Sheriff's Department**, 1998
**Trustee, Centro Medico Bautista, Asuncion, Paraguay,** 2004/2005
  (Baptist Medical Center in Asuncion, Paraguay)
**Mission Administrators Forum, Asuncion, Paraguay,** 2004/2005
  Founder, Chairman

**Cecelia Owens**

| | |
|---|---|
| **From:** | Claude and Cheryl Hurtt .. [churtt@pobox.com] |
| **Sent:** | Friday, November 04, 2005 1:56 PM |
| **To:** | cowens@lighthousehelp.com |
| **Subject:** | Claude Hurtt  --Business Manager |

Claude Hurtt
letter.doc (21 KB...

Claude Hurtt
resume.doc (29 ...

Hello,

Thank you for letting me send in this letter and resume for the Business Manager position.

I can do an excellent job working with you, really contributing to the organization.

A letter and resume are attached.

Thank you,

Claude Hurtt
(205) 836-5647
churtt@pobox.com

1

**Claude D. Hurtt**
417 Mountain Drive
Birmingham, Alabama 35206
(205) 836-5647
churtt@pobox.com

**References:**

Employment

> International Mission Board,
>  Southern Baptist Convention
>      Box 6767, Richmond, Virginia 23230
>
>     Telephone: 800-999-3113
>   note: supervisor is overseas, available by email


Ruhama Baptist Church

>     Mr. Homer Lloyd
>     508 Lance Road
>     Birmingham, Alabama 35206
>
>     telephone: (205) 836-1958


Allstate Insurance

>     Mr. Pete Russell
>     9729 Parkway East
>     Birmingham, Alabama 35215
>
>     telephone: (205) 853-7777

Baptist Health System

>     3201 Fourth Avenue South
>     Birmingham, Alabama 35222
>
>     telephone: (205) 715-5000
>
>     Supervisor: Robert Greene, Senior VP,Finance

CARIANNE
like both
both fit
more Accounting
both quality

↓

Claude

Rick
- Rochell vision
- IT
- Claude calm
-

↓

Claude

Regina
like both
Rochell&quality fit
Claude suitable

↓

Claude

Debby

↓

Claude

Cecelia

LISA
- Claude Calm
- good Knowledge
- unshakable Claude
- dispelled   concerns Claude
- Claude good team player

- good vision Rochelle

↓ Claude

Rochelle

LIGHTHOUSE COUNSELING   Fax:3342865593

**✳✳ Transmit Conf. Report ✳✳**

P.1                                                         Nov  8 2005   8:45

| Fax/Phone Number | Mode | Start | Time | Page | Result | Note |
|---|---|---|---|---|---|---|
| 2420759 | NORMAL | 8, 8:45 | 1'19" | 3 | ✳ O K | |

11 05 08:20a      USIS Investigations            334281031        p. 1

*Attn: Bob Wynn  page1*
*3 pages*            November 1, 2005        *Wednesday*
                                                  *8:30am*

Attn:  Human Resources
VIA FACSIMILE:  (334) 286-5993

    Please find my resume attached for the position of **Business Manager** as listed in the Sunday edition of the *Montgomery Advertiser*.

    I have over 15+ years experience working with state government in Alabama, and also for the past 5 years in the private sector with over 3 years working with the Alabama Community Healthcare Network, a federally funded non-profit, funded by the National Bureau of Primary Healthcare, an umbrella of the federal Department of Health and Human Services in Washington, DC.  I have also worked in the executive managerial area from strategic planning, business analysis, monitoring market patterns and trends, preparing monthly, quarterly and annual budgets, handling payroll, reconciliation of financial statements, AP/AR, and GL functions.  I also worked with business forecasting, defining functional requirements for IT systems, ROI, identifying best practices, evaluating business products, and vendor selection communicating with management, department users and vendors to ensure project's success, and managing client/vendor accounts.

    In addition, I have over 13 years each in accounting, (completing weekly, monthly and annual reports as well as year-end close out.  I also served human resources manager for over 13 years (employee benefits & compensation, performance appraisals, employment law and information technology.)  Using these combined skills, I am excellent at multitasking and my communication skills are excellent.  I am available for immediate employment. Thanks for your consideration.

Sincerely,

*Rochelle S. Baker*

Rochelle S. Baker

*Community Healthcare Network, Notary?*
*— Bondable,*

*Attn: Bob Wynn    page 2*

*Fax 242-0759*

Rochelle S. Baker
3408 Prairie Creek Trail   Montgomery, AL 36116
(334) 462-8092  Email:  Rrsbaker@aol.com

**Professional Profile:**
Strong entrepreneurial executive with more than 15 years of Information Technology experience managing operations, personnel and projects at the district, regional and corporate level for both start-up and established corporations by reducing costs, enhancing revenue and improving quality of services using "best practices" methodologies

*Management Skills:*

| | |
|---|---|
| **Strategic Planning** | **Business Analysis** |
| **Functional Requirements** | **Budget Forecasting** |
| **Cost Analysis** | **Process/Change Management** |
| **Establishing Project Teams** | **Proposal Development (RFI, RFP, RFQ)** |
| **Vendor Selection** | **Process/Change Management** |
| **Technical writing** | |

\*\*Currently hold Top Secret/SSBI/SCI Clearance granted May 2004\*\*

Professional Experience:
(Laid off State of AL federal govt. contract May 2003 due to state
financial crisis—since that time performed temporary work for local staffing companies)

*P.S.*
*Budget 45 million*
*Clinics 250 million statewide*

**May 2004-PRESENT**
**Special Investigator, USIS Investigations**
Conducts background security investigations for federal government agency
employees working for U.S. Office of personnel Management as Independent Contractor

**Sept. 2002–May 2003**
**Business Development Manager, Majestic Systems**
Alabama Account Executive for Company based in Nashville, TN
Liaison for contract employees and state government managers
ensuring deliverables were met
Developed strategy for recruitment of new IT professionals for contracts
and identified new business clients for company
Supervised a team of 21 working on State of Alabama's federal
DHR SACWIS Project using Oracle database with IBM3090 server
running Windows 2000 using PC Anywhere, SQL Server, Crystal Reports,
RUP, Rational Rose

**June 1999 –Sept. 2002, Executive Director/CIO**
**Alabama Community Healthcare Network, Inc.**
Managed day-to-day operations of organization reporting to 9-statewide member
Board of Directors and their 67-member healthcare clinics
Accounting and HR Manager
**IT Project Director/Functional Requirements Analyst for centralized, shared, integrated,**
**statewide healthcare MIS Software system, using AS400 platform,**
**running on Oracle database**

**Jan. 1997—March 1999**
**Assistant Director /Operations Specialist**
State of Alabama General Contractors Board
**IT Project Manager, Systems Administrator, Functional Requirements Analyst, Contract Manager**
**Accounting and HR Manager**

*ATN: BobWynn page 3*

**Rochelle Baker**
**Page 2**

**Feb. 1994—Jan. 1997**
**Executive Assistant**
State of Alabama - Governor's Office
Executive Asst to Governor's Press Officer
Developed requirements needs assessments for IT systems
Served as Legislative Liaison with legislators of Alabama
State Senate and House of Representatives.
Prepared governor's press releases and using HTML language via the Internet website
Prepared responses, both orally and in writing, to inquiries received for Governor's reply

**June 1990—Feb. 1994**
**HR Manager**
State of Alabama - Arts Council      *(non-profit)*
Served as Assistant to Executive Director, Deputy Director
and 15 statewide Board Members.
Served as IT Project Manager and Systems Administrator of Information Systems
for in-house system using Novell Netware Server

**May 1973—June 1990**          ← *Retired from*
**Criminal Intelligence Analyst**
State of Alabama, Dept. of Public Safety, Criminal Intelligence Unit
IT, HR and Accounting Managers for division
Project director for the statewide, centralized, shared, integrated MIS system
running on AS400 platform, migrating from UNIX-based system
Assisted in development of annual budget, strategic plan, and final work plan
Translated business requirements into functional and technical specifications
Provided business analysis expertise to management for leadership, organization
effectiveness, and processes to achieve business results
Create greater work efficiency by reducing costs using the economies of scale
Provided consultation to business customers to support their business plans

**Hands-On Network Systems Administrator Hardware/Software Skills:**
**Windows 2000, NT, 98, AS400, Novell, UNIX, SQL Server,**
**TCP/IP, JCL, LAN/WAN, VOIP, DSL, Ethernet, Broadband, ATM, Frame Relay**
**Microsoft Office 2000, Project, ME, Word, Excel, Visio, Access, PowerPoint, Outlook, Goldmine, WordPerfect,**
**Novell GroupWise, Lotus Notes, Lotus 1-2-3, QuickBooks, Peachtree Accounting, State and Federal**
**Government Accounting Software, RUP, Crystal Reports, SQL Server**

<u>Education:</u>
BS/CIS with concentration in HR Management        *Coursework – Acct I & II, Managerial, Cost, Finance*
Troy State University, 1993                                            *HR Mgmt –*

*Professional Development:*
Strategic Business Planning for Organizations      1990-2002
Executive Directors Training Institute                      1999-2002
IT Project Directors Management Training             1990-1999
<u>Professional Memberships:</u>
Member, State of Ala Personnel Officers' Council    1990-1999
Member, State of Ala Advisory IT Council               1990-1999

REFERENCES WILL BE FURNISHED UPON REQUEST

*Notate with Bob Wynn + Omit*

# REFERENCES

Mr. Al Head, Executive Director
Alabama State Council on the Arts
201 Monroe Street
Montgomery, AL 36130
(334) 242-4076

- very dependable
- Supervisor
- hard worker, efficient
  on 11/4/05
- high level administration
- indirect supervision

- co-worker 20 years
- Hardworker - dependable
- conscientious - level headed
- well respected

Ms. Dorothy G. James
Legal Opinion Clerk
Alabama Dept. of Public Safety
 Driver License Division
Montgomery, AL 36130
(334) 242-4253

she trained
co-worker 1997
on 11/4/05
- very hardworker
- people person
- dependable

Ms. Mary Reynolds
Administrative Support Asst.
State of Alabama
General Contractors Board
2525 Fairlane Drive
Montgomery, AL 36116
(334) 272-5030

2nd in command

Mr. Danny Culpepper Floyd
Diversified Computer Services
6013 E. Shirley Lane
 Montgomery, AL 36117
(334) 260-8453

- co-worker
on 11/4/05
- State Dept of Transportation
  IT
- Easy to work with
- good personality in
  dealing with people
- in meetings
  well prepared, on time
- Nothing negative to
  point out
- contact about
  on/off

# PLANTIFF'S EXHIBIT 7

*Carianne's Disciplinary Action*
*2 pages*



*Plaintiff's Exhibit 13*

LHCC Coaching Note Form, 5/98

## Lighthouse Counseling Center
# COACHING NOTE


PLAINTIFF'S
EXHIBIT
7
PENGAD 800-631-6989
A/S

| Employee Name Carianne Stinson | Position/Status  Business Manager | Date  October 18, 2005 |
|---|---|---|

**Frequency of Coaching:**

_____ Daily        X  Weekly        _____ Monthly        _____ One Time Only

| Type of Note: _____ Recognition of a job well done! _____ Clarification of duties. _____ Review of previous coaching note. | _____ Review of policy and procedures. __X__ Review of job expectations and/or attitude check. _____ Other. Explain __X__ Insubordination_____ |
|---|---|

**Explanation of Note:**
Once again, I find myself having to remind you of your inappropriate, unprofessional behavior towards directives I give to you. Not only were you uncooperative when I informed Sabrina about when to distribute the staff sign-in sheet for today's staff meeting, but you were also condescending. It became obviously clear to me that you have control issues that affect your ability to receive direction.

As the facilitator of the staff meeting, I chose to distribute the sign-in sheet where most efficient to accommodate the aggressive agenda that we had today. As your supervisor, I gave a directive to this affect and your response was again unacceptable.

This coaching note is to bring to your attention your professional misconduct and insubordination towards your supervisor. The feedback provided here outlines the areas you need to make improvements in. I have counseled you on this same matter previously. I acknowledge some positive steps forward, but today's incidence has stifled your growth, and demonstrated the need for more coaching in these areas..

To assist you in making necessary improvements we/you will do the following:

- You must schedule a time with me to discuss the information contained in this coaching note.
- Bring suggestions that you feel will help you to improve your conduct toward your supervisor
- I will provide directives with timelines to assist in corrective action

As always, my doors are open to you.

*See corrective action next page*

| Employee Response: |
|---|
| |
| |
| |
| |

| Supervisor's Signature & Date | Employee Signature & Date |
|---|---|
| *Cecelia Owens  10/18/05* | |

*— 20 to 30 minutes*
*— issue not person*

# MEMORANDUM

**DATE:**      October 21, 2005

**TO:**        Carianne Stinson

**FROM:**      Cecelia Owens

**SUBJECT:**   Week 1 follow-up directives ( 10/19/05 coaching note)

Carianne, I have researched some information that I feel will be helpful for both of us in our leadership quest and in building a productive workplace relationship through communication.   We will need to read the following information on building effective communication in the workplace:

- ❖ Becoming A Credible Communicator
- ❖ Courtesy Counts:  How Rudeness Wrecks Working Relationships
- ❖ Unravelling the Mystery of Conflict
- ❖ Relationships That Work:  How to Get Along with People Who Drive You Crazy

Each of these, research tools are informative and empowering.  Our goal is to improve our communication skills between each other.  The objective is to demonstrate what we have learned in our daily work relationship.

As we read each of the categories, we want to do the following:

1. Be objective and open for new opportunities for learning
2. Examine and contrast our individuals ways of communicating against the research and be able to communicate honestly and openly where we see ourselves in this information.
3. Discuss and share what we have learned with each other on Tuesday, October 25th 4:00pm

Finally, we must make mental notes and be willing to participate fully with each other during our meeting on Tuesday, October 25th, 2005.  If you have a conflict of time, please inform me.  I am flexible and can work with a time convenient for both of us.

I am excited about our on-going journey of communication interaction.  Let's learn together.

/attachments

cc:  Candyce DeKryuff

# PLANTIFF'S EXHIBIT 8

1 page



PLAINTIFF'S
EXHIBIT
2
PENGAD 800-631-6989

Carianne E. Stinson
153 Belser Blvd.
Pike Road, AL 36064

October 25, 2005

Lighthouse Counseling Center
Attn: Mrs. Cecelia Owens and
Mrs. Candyce DeKruyff
14158 East South Blvd.
Montgomery, AL 36116

Dear Cecelia,

I regret to turn in my formal letter of resignation. My last day will be November 23, 2005. As you know, my husband has received a wonderful opportunity in Birmingham, Alabama. He has accepted that position and we feel that it is a wonderful opportunity for his career. I am sad to leave Lighthouse. I fell in love with it right away and the people. I am proud of the mission of the Lighthouse and will miss being apart of that.

I extend the offer to train my replacement and will be open and willing to do all I can to make the transition an easy one. Thank you for the opportunity to be apart of such a GREAT TEAM!!

Sincerely,

Carianne Stinson

accepted by:
Cecelia Owens
10/26/05

**LIGHTHOUSE 0127**

Dekeyuffs Board Reports
10/17/05     11/15/05
11/22/05 Board minutes

# PLANTIFF'S EXHIBIT 9




*Lighthouse Counseling Center, Inc.*

## Executive Director's Report to the Board of Directors
### October 17, 2005

1. **Motions:**    That the Board approves individual performance raises up to a maximum of 5% for employees that have been with the agency a minimum of 6 months and who have completed their probationary period. Performance raise amounts will be determined by the staff supervisor and approved by the Executive Director and would be effective January 1, 2006.

   **Background:**    This is the time of year when we normally look to implementing raises for employees which would be effective January 1, 2006. Raises would be implemented according to the Board approved plan (August 23, 2005), meaning that they are based upon the employee's performance and would range from 0-5% accordingly. Currently, there are 25 staff members who would be eligible for performance raises which would result in a <u>maximum</u> cost of $33,226.00 to the agency (however, the actual cost would be less). Carianne has assured me that we can afford these increases and this was budgeted for in our 2005-2006 budget plans.

2. **Administrative/Financial:**
It may sound like a broken record, but I am thankful to report that we are maintaining our solid financial position. We still do not have the final amounts for our 2005-2006 DMH contracts, but we do not anticipate much change from our current status.

As Carianne has stated, the audit is currently taking place and is going very smoothly and quickly. This is very much a credit to Carianne's hard work and dedication … and a little bit of perfectionism doesn't hurt either!

3. **Chemical Dependency Recovery (CDRP) & Housing Programs:**
As Lisa has stated, we are anticipating our first Kaleidoscope site review to start this Wednesday. The program staff, Lisa, Cecelia & I will all be available for this review and are excited to share our program with the reviewer. I am sure that we will learn a lot from the process and we anticipate the experience to be a very positive one.

Lisa & Rick have worked out an on-call schedule for counselors on the weekends. This will aid us in reducing overtime hours for case managers and will no doubt prove beneficial for the staff and clients both.

4. **Standing Together Against Rape (STAR):**
STAR passed its site review with flying colors thanks in large part to Debby's organization and preparation for the event. Once again, STAR is one of the leading organizations in ACAR for its policies, procedures and operations.

5. **Prevention:**
Regina is working diligently to ensure that all of our prevention programs start on track this year and has had a great start doing so. We are anticipating the CTF (Children's Trust Fund) site visit on Tuesday, October 25th. Mr. Benedict will visit the agency and then accompany Regina to a program site. Mr. Benedict stated that he is "getting the good programs out of the way first" and so we are expecting a very positive review!

**LIGHTHOUSE 0055**

*Lighthouse Counseling Center, Inc.*

### 6. Development:

Cecelia has been hard at work in my absence and has even submitted her first grant proposal for the Lighthouse to CDBG (Community Development Block Grant). She will be continuing to seek additional funding as opportunities arise.

In addition, Cecelia and I met this morning with a representative from the Junior League regarding our recent submission to their organization. The representative was very positive and receptive about our program and seemed extremely favorable. She will keep us informed of the process as it moves forward.

### 7. Other:

You will begin to notice a change in the programmatic reports. The statistics have been moved to a one-sheet matrix at the conclusion of your Board packet and include both the previous month's numbers and the numbers from this month last year. Your feedback on this matrix is appreciated and if there is any other information that you would like to see, we will be more than happy to provide it to you.

In addition, we plan to begin reporting "Success Stories" for the various programs in each month's packet. This will give you a greater feel for the human side of what we are doing and would be great for you to pass along as you speak to others about the Lighthouse.

Respectfully submitted,

Candyce DeKryff
Executive Director

LIGHTHOUSE 0056

*Lighthouse Counseling Center, Inc.*

## Executive Director's Report to the Board of Directors
### November 15, 2005

1. **Motions:**     There are no new motions to discuss at this time.

2. **Administrative/Financial:**
As Carianne has stated in her report, with one month into the fiscal year, we are on track! We are anticipating receiving our final audit report prior to the meeting next week, but we already know that there were no material findings and that the audit will be unqualified. Carianne continues to keep our business office in excellent shape and is to be commended for her diligence.

3. **Chemical Dependency Recovery (CDRP) & Housing Programs:**
Lisa & Rick are working extremely hard to fill the vacancies of last month and to train and bring the new employees up to speed on the Lighthouse processes and procedures. In addition, both Lisa & Rick along with a number of their employees have been working diligently to clean up the various files that were left in disarray when the various employees resigned. It is anticipated that through this increased training, and through additional quality assurance, we will not be left in that position again in the future.

4. **Standing Together Against Rape (STAR):**
The STAR staff remains very busy with both exams and advocacy calls. Debby has been doing a great job of juggling her director duties with her nursing (exams) duties through all of it. The program is in need of more nurses – currently, Debby and her SART/SANE Coordinator ~ Deborah ~ are having to take the lion's share of the call and this is very tiresome. If you know of any nurses that would be available and interested in working in the program, please let either Debby or myself know.

5. **Prevention:**
Regina in continuing to have success in expanding our prevention programs through various sites. She will be meeting this week with a contact in Elmore County that Ms. Grace Bishop has helped to connect us with for additional prevention sites. In addition, as Regina has said in her report, we are looking forward to World AIDS Day on December 1st and Regina will have various activities in place to commemorate the day.

6. **Development:**
Cecelia has made a number of great contacts in her short time with the Lighthouse and we are keeping our fingers crossed that the results will be just as good. I have certainly appreciated the work that she willingly "jumped into" in my absence.

7. **Other:**
I have returned to the Lighthouse full-time and I am glad to be back in place and in a more active role once again. Please let me say thank you for your support and understanding during my maternity leave – I enjoyed the time at home but I am ready to be back.

Respectfully submitted,

Candyce DeKruyff
Executive Director

LIGHTHOUSE 0050

**Lighthouse Counseling Center, Inc.**
**Board of Directors' Meeting Notes**
**November 22, 2005**

**Attendees:** David Belser, Robert Sells, Ramona Blankenship, Ceil Champion, James Carmichael, Grace Bishop, Arthur Britton, Mollie Isaacson

**Staff:** Candyce DeKruyff, Regina Berry, Lisa Carroll, Rick Baity, Carianne Stinson, Debbie Headley

Mr. David Belser called the meeting to order at 12:13pm.

A Quorum was determined and Ms. Ceil Champion made a motion to accept the agenda. Ms. Grace Bishop seconded the motion and it was approved unanimously.

Ms. Ceil Champion made a motion to accept the minutes of the October meeting. Ms. Grace Bishop seconded the motion and it was approved unanimously.

*Board Committee Reports*

**Fund Raising Committee** - Ms. Ceil Champion reminded the Board about the SOS for STAR fundraiser being held at Down the Street Café on November 26th, 2005.

**Finance Committee** - Ms. Ramona Blankenship asked the Board to be thinking about forming an Audit Committee at the first of next year.

*Executive Director's Report -* Candyce reminded the Board that the Christmas luncheon will be held at the Arrowhead Country Club on December 20, 2005 at noon. This will be the December Board meeting date.

She also informed the Board that she and Carianne had examined the possibility of having the current Business Manager work remotely from Birmingham. The executive committee had already discussed the approval of this change prior to the board meeting. Mrs. Stinson will be traveling to the office at least once a week. This will be on a trial basis, for three months, to determine whether it will be viable for both Lighthouse and Mrs. Stinson.

Mrs. DeKruyff asked the Board to be thinking about forming a Task Force at the beginning of next year, to include both Staff and Board Members. This Task Force would address the celebration of our 35 Year Anniversary.

*New Business*

No new business.

There being no further business, the meeting was adjourned at 12:35pm.

The next meeting will be on Tuesday December 20th, 2005 at noon at The Arrowhead Country Club.

Respectfully submitted,

Carianne Stinson

**LIGHTHOUSE00205**

**LIGHTHOUSE 0048**

## DEVELOPMENT

The Lighthouse is presently pursuing three grants.  Our STAR program will apply for a $5000.00 grant on November 18, 2005 from the Office for Victims of Crimes in celebration of National Crime Victims' Rights Week, April 23-29, 2006. If approved, this funding will be used to hold an observance throughout the community under the theme: "Victims Rights:  Strength in Unity".  The second funding opportunity was mentioned in last month's board report.  Approximately $200,000.00 in funds are available through the Center for Disease Control to provide HIV prevention services to African-American females in our service area.  The final funding opportunities are being pursued through Governor Bob Riley's Office discretionary funds.  The details will be made available once I return from the meeting later this week.
 Other funding opportunities are being explored. Future board reports will reflect all other development efforts made.


Respectfully,


Cecelia Owens

LIGHTHOUSE 0052

# PLANTIFF'S EXHIBIT 10

Letters of complaints
from Plantiff And
7 other past employees

32 pages



January 19, 2006

Dear Funders of Lighthouse Counseling Center:

Please receive the following complaints that have been sent to the parties whose names appear on the correspondences. These letters were sent to address concerns of Lighthouse employees, past and present, and most importantly the clients of the Lighthouse who are neglected and their rights being violated.

Now, we send these letters to you with the hope that someone will intervene and address the critical areas of need outlined in these complaints. Please respond to this urgent matter by looking into these facts and providing solutions that will bring justice for clients and staff.

We are thanking you in advance for your understanding and commitment the cause of providing for the needs of those who cannot for whatever reason, provide for themselves. Please reach us individually at numbers listed on contact information sheet.

Respectfully, we are

Sadie Sky, past Masters level Counselor   7 years
Clifton Lovejoy, past Masters Level Counselor 12 years
Cecelia Owens, past Deputy Director 2 months
Marshall Pickard, Self-Sufficiency Coordinator
Pamela Alloway, Past Case Manager 11 years
Shalandra Rogers, Intern
Jewel Ford, Past Case Manager   4 months

(Signature is authorized as typed)

November 20, 2005

Mr. Robert Wynn
Director of Substance Abuse Services
Department of Mental Health
100 North Union Street, RSA Union Bldg.
Montgomery, AL 36130

Subject:  Complaint Against Lighthouse Counseling Center, Inc.

Dear Mr. Wynn:

It is with great reluctance and concern that I write this letter.  I am not a disgruntled, ex-employee of the Lighthouse, but rather a concerned individual for the welfare of the clients and staff.

During my two month tenure as Deputy Director for the Lighthouse, I observed and witnessed the following:

➢ Gross managerial incompetence relative to the executive leadership.  The Lighthouse is attempting to operate programs that do not have adequate staff or infrastructure to carry out.  As a result, clients are neglected, staff are stretched way too thin and punished when they are not able to carry out program requirements.  The staff have no support from the Executive Director, who does not seem to grasp the gravity of the situation as it relates to programs, the budget and services.

➢ Client neglect is at an all time high.  Their needs are not being met under the grant funding. I have witnessed client request for necessary housing items that have been ignored and outright denied while laced with comments about their socio-economic condition that "they just want something for free".  I have been a constant witness to the clients being referred to as "those people".  Clients have been denied access to needed medical treatment and medication.  Staff were punished for addressing the medical needs if they incurred maybe an hour or so of overtime.

➢ Further, the decision-making over budgetary items has been place in the hands an executive director and a business manager who has very little or no clinical and business experience, and who do not understand the issues relative to the client population.

➢ I have witnessed the gross mis-management of grant dollars to benefit the executive director's salary and the business managers' salary only, while the case managers, counselors, and other management that do the work have no salary increases.  The executive directors salary jumped by over $15,000 in three years during which time she was deputy director.  The business managers' salary jumped by $11,000 in three years as well. Both the ED and the BM resumes lack the necessary experience to substantiate their qualifications for either of these

and/or needs of clients and staff. Client and staff morale is the lowest I have ever witnessed in an organization due to a blatent disregard for the welfare of those served. She does not follow policies or procedures as written but rather changes the rules as she goes to suit whatever situation benefits her at the time. Staff are heavily oppressed all the time. They are expected to do more and more with no consideration for pay increases, no support from the ED, and constant punishment for not doing things that were never made clear. Simultaneously, the ED has all the convenience of a paid cell phone bill but no one is allowed to call her. The Lighthouse pays for internet in her home for her convenience when she does not come to the office. The ED and the BM schedules themselves to conferences at the beaches and vacations for a week, all expenses paid by the Lighthouse while staff are not allowed to work any overtime to take care of clients without punishment. With the BM relocating to Birmingham, her expenses are being paid to come to work. No other staff can claim mileage for coming to work. The BM is frequently in the habit of cutting her own checks without proper signature as she has access. Noboby, absolutely nobody checks behind her. She was a direct report to me but when I began checking things behind her, Candyce removed her from my supervision immediately. This had never happened before.

Mr. Wynn, I am seeking your intervention. The staff and the clients have no one to turn to. I did the best I could while there. Things did improve under my leadership, but the day Candyce returned, things reverted back. I addressed their needs immediately and supported the staff as much as my decision-making power allowed. As you know, I'm no longer there.

I am seeking your most serious consideration to look into these concerns for the sake of the clients and the staff. I can provide to you documentation on these issues if necessary. Feel free to reach me at home 270-0810 or cell 404-849-8300.

Respectfully and concerned, I am

Cecelia Owens

December 6, 2005

Board of Directors
The Lighthouse Counseling Center, Inc.

Dear Board Members:

Please allow me to inform you that the Lighthouse Counseling Center, Inc. is fortunate to have some of the most experienced, industrious, dedicated, loyal and professional employees whom I have ever known. While this is true, I do not think that the Lighthouse has done and is doing a good job, looking out for the health, welfare, and morale of its employees and clients, nor has it operated in the absence of intimidation, discrimination, and deception. Prior to providing some details, allow me to share that the only driving force behind this letter is my desire to see a healthier and more effective agency, one that truly demonstrates a genuine concern for its clients and employees.

FACT: The Lighthouse employees were told to give one per cent of their salary to the United Way, and that our contribution or lack of contribution would be considered in determining who would or would not get a pay raise. We were also told that if we did not make our contribution to the Lighthouse, that arrangements needed to be made to insure that we would be employed where the contribution goes. This did two things: first, it forced people to make contributions that many could not afford due to low compensation and financial duress; and second, it took away the freedom to choose where we wanted our contribution to go for those of us who could afford to contribute. Several employees informed

Prior to ending this correspondence, allow me to share that a lack of trust, job security, fair treatment and respect among clients and employees alike, are real and critically important issues at the Lighthouse Counseling Center. While I believe in empowering our clients, they are often enabled instead as a result of the failures of top administrators to provide effective and competent leadership. Tragically, instead of helping many clients, the Lighthouse is actually contributing to their regression, and thus causing them to suffer harm in their efforts at recovery.

Thank you for giving me this opportunity to share my concerns with you. If you need me to assist you in understanding how the way things were done during Junior Dunham's tenure, and how this has impacted and is impacting on the current state of disarray and dysfunction at the Lighthouse, or if I can be of any other assistance, please do not hesitate to contact me.

Sincerely,

Clifton Lovejoy, M.S., L.P.C.
3233 Erinwood Drive
Montgomery, AL 36110
(334) 832-4498

Nov 2, 2005

Mrs. Candyce DeKruyff, Executive Director,
Lighthouse Counseling Center, Inc.
1415 E. South Blvd.
Montgomery, AL 36116

Dear Mrs. DeKruyff

I hope this letter finds every one in the very best of health, doing well, and in excellent spirits. My family and I are doing well thanks to almighty God. Again, congratulations on your newest family member. I do apologize again for contacting you while you were on maternity leave. I wasn't aware that you had not returned to work. Candyce, this letter is in reference to our conversation last week concerning some unresolved issues during my employment at the Lighthouse Counseling Center, Inc. Let me begin by sharing that the driving force behind this letter is my desire to see a healthier and more effective agency, one that truly demonstrates a genuine concern for the health, welfare and morale of all of its employees. In order to avoid the appearance of insulting you intelligence by repeating what I have attempted to resolve, I will not go over them again in this correspondence. I will say however, that I find it incomprehensible that you would ask why I waited so long to raise these issues and to inform me that you don't recall promising to get back with me. As you know, I am not raising but revisiting these, concerns, and that you promised at least twice to get back with me. I do want to thank you for giving the opportunity to address my concerns, and thanks for sharing that bit of information about the Board's decision regarding the salaries of Lighthouse employees.

While there are times when immediate reduction in salaries is in order, I don't think anyone expected it to happen in this case.

However, even with the present situation, there are non ingenious ways to make salaries more equitable in the future. If at anytime you wish to further discuss my concerns and the impact they have had, and can continue to have on organizational effectiveness, and the health, welfare, and morale of the Lighthouse employees, please feel free to contact me. I will be more than happy to discuss them in person with you, at your convience anyone of you choosing.

Please give my regards to everyone, and I look forward to hearing from you soon.

Sincerely,

*Clifton Lovejoy* — *past 12 year ex employee who was discriminated against*

Clifton (Cliff) Lovejoy

3233 Erinwood Dr.
Montgomery, AL 36110

FROM:      Sadie D. Sky                                    3 December 2005
           4120 Johnstown Dr
           Montgomery, AL 36109

SUBJECT:   No Response

TO:        John Houston, Commissioner
           Dept of Mental Health and Mental Retardation
           RSA Union Bldg
           100 North Union St
           P.O. Box 301410
           Montgomery, AL 36130-3417

Dear Mr. Houston:

The attached was hand-delivered to Bob Wynn's office, Eric Gandy's office, as well as Lighthouse board members David Belser and Dr. Arthur Britten. Each of the latter two were provided three extra copies that they might distribute to other board members.

I've had two telephone conversations with Mr. Wynn, during which he said that he would consult with Kent Hunt and return to me. Since then, on November 22nd and 28th I have called Mr. Wynn but have received no response from the messages I left him. Further, I have received no response of any kind from either Mr. Gandy or any Lighthouse board member.

I send you the attached as a courtesy, believing that you might not yet be aware of the conditions at the Lighthouse that it describes, nor the lack of attention that your office seemingly affords them. Those conditions continue, and those of us who wish to see them corrected are being pressed to expand their efforts through legal actions, as well as attentions from broadcast and print media.

Can your personal involvement make a difference, by somehow contributing to a solution? For the rest of this week, through December 10th, I will be available at my home telephone here in Montgomery, 356-5100, to help in any way that I can.

Appreciatively,

SADIE D. SKY

FROM:     Sadie D. Sky                     1 November 2005
              4120 Johnstown Drive
              Montgomery, AL 36109

SUBJECT:  Lighthouse Counseling Center, Inc.

TO:       Bob Wynn, Mental Health Program Coordinator
              100 North Union Street
              Montgomery, AL 36130

              All Lighthouse Counseling Center, Inc. Board Members
              ERIC GANDY
              Mental Health Advocate
              Griel Memorial Psychiatric Hospital
              2140 Upper Wetumpka Road
              Montgomery, AL 36107

Dear Bob, Lighthouse Board Members, and Mental Health Advocate:

I'm sending you this letter and its several attachments because of my extreme concern for clients of Lighthouse Counseling Center, Inc. as well as for its employees, including those employees who for various reasons are no longer there. My hope is that, through your and others' efforts, changes in the Lighthouse's administration, staffing, and direction might be made. The necessity for those changes has been made clear to me not only because of my own experiences as a Lighthouse employee, but also by the others who have contributed the narratives that follow.

The attachments illustrate neglect of clients, employee abuse, professional failure, supervisory incapacity, and general managerial incompetence. Interspersed among them are a few of my comments to them, in *[bracketed italics]*, to differentiate them from the attachment author's story. I also authored an attachment.

I'd like you to conclude your readings with a determination to do what you can to elevate the capacity of the Lighthouse so that it again provides the services and worth to our community that it should. I believe that those with the professionalism, expertise, and motivation are in large part available to alleviate the damages that have been done, and to provide a clearly ethical, trusted, and positive atmosphere in which to do it. The Lighthouse itself urgently needs to be in recovery and, as shown by this letter, I am willing to help provide the necessary treatment. Only an immediate and concentrated intervention can lead to the success of the Lighthouse's mission.

SADIE D. SKY

Attachments:
     By Sadie D. Sky, Memo for Record, 7 October 2005
     By Pamela Alloway, Letter of Resignation, 25 March 2004

1

Attachments (Continued)

By Sadie Sky, Memo to Candyce Decruff, 5 November 2004
By Shalandra Rogers, Memo to Sadie Sky, 11 April 2005
By Sadie Sky, Coaching Note from Lisa Carroll, 14 June 2005
By Marshall Pickard III, Memorandum to Legal Counsel, 3 July 2005
By Phyllis Jewel Ford, Memo for Record, 12 October 2005
By Candyce DeKruyff, Resume, 2005
By Sadie D. Sky, Further Commentary, 30 October 2005
· List of Contributors and Their Contact Information

# MEMO FOR RECORD
## OCTOBER 7, 2005

On October 7, 2005 I did something I have never done before: I left my job without giving notice. I loved my job, but found that I could not endure the maltreatment of myself and of others around me. I had been away from work the previous day to have a cardiac stress test. I had worked very hard that week and the week before to help the Lighthouse be prepared for an audit; I had come in during two days of my vacation for this, and reviewed and closed about fifty clients' folders.

 On that day I came in, checked my mailbox, and went into my office. It was apparent that someone had been there: my paperwork (superbills) of the previous month were missing, as well as much material I had segregated and secured for shredding. I found my immediate supervisor Rick Baity in the hall and asked him if we might talk, and immediately, considering the importance of the missing documents. He declined, saying that he was busy. A few minutes later I went to the office of my next level of supervision, Lisa Carroll. Rick had preceded me there. As I asked who had been in my office, and why, I looked to the floor and noticed my missing papers. Lisa answered me, saying that she went into my office looking for some superbills from (I believe) June. I then asked her if I may have my September superbills so that I could file them, and she responded that no, I may not, and that I was going to be investigated. I asked "What kind of investigation?" She replied "You'll find out." I asked several more questions so that I might understand what was going on, but received only silence from both Lisa and Rick, who only looked at each other, ignoring me. I remained seated for a few long moments, while neither of them spoke to me. Amazed at both of them and the situation I then left, and on the way back to my office I decided I would not abide such continued rude and unprofessional treatment. For six years I had been treated by both administration and management as a somewhat inferior person and professional, and verbally abused by one. In my office I left voice mail messages for both Rick and Lisa that they would need to get someone else to do my evening group that night. I knew that my group would be covered; there were six master's-level counselors in the building.

I went home, prepared a letter of resignation, and mailed it.

SADIE D. SKY

PAMELA ALLOWAY BS
CASEMANAGER
LIGHTHOUSE COUNSELING CENTER

MR. STEVE DAVIS, CDRP DIRECTOR
MR. DUNHAM, DIRECTOR, LIGHTHOUSE COUNSELING CENTER

LETTER OF RESIGNATION (MARCH 25, 2004)

I HAVE BEEN EMPLOYED AT THE LIGHTHOUSE FOR ALMOST 11 YEARS AND HAVE
ALWAYS BEEN A LOYAL EMPLOYEE. OVERALL, MY EXPERIENCES HAVE BEEN
REWARDING. I HAVE HAD A NUMBER OF SUPERVISORS AND HAVE BEEN ABLE TO WORK
EFFECTIVELY WITH ALL OF THEM. HOWEVER, THE PAST SEVERAL MONTHS HAVE BEEN
VERY FRUSTRATING AND THE ENVIRONMENT CREATED BY MR. DAVIS HAS BEEN A VERY
HOSTILE ONE. WHEN MR. DAVIS BECAME SUPERVISOR, I HAD HOPES OF A HEALTHY
WORKING RELATIONSHIP WITH HIM. HOWEVER, HIS BEHAVIOR HAS BEEN VERY HARSH
AND UNREASONABLE AND INTOLERABLE. I HAVE CONSISTENTLY INFORMED MR. DAVIS
OF PROBLEMS FACED BY CLIENTS AND HE WOULD CONTINUE TO IGNORE THEM UNTIL A
CRISIS AROSE, AND THEN HE WOULD OVERREACT. HE WOULD DEMAND THAT I RESOLVE
ISSUES THAT HE CREATED AND THEN REPRIMAND ME FOR THEM OCCURING. HE ORDERS
ME TO GET FOOD, LIFT HEAVY ITEMS, AND ASSEMBLE CRIBS AND BEDS, AND PLACE
CLIENTS INTO APARTMENTS WITHOUT GIVING ME ADEQUATE TIME TO ACCOMPLISH THE
TASKS. HE LOOSES HIS TEMPER, HE SCREAMS AND BLAMES ME FOR HIS INABILITY TO
TAKE CORRECTIVE ACTION IN A TIMELY MANNER. WHEN I REQUESTED REASONABLE
WORK HOURS AND A FAIR DISTRIBUTION OF THE WORKLOAD, HE ACCUSED ME OF
WHINING ABOUT BEING OVERWORKED. I MADE SEVERAL ATTEMPTS TO RESOLVE THESE
CONCERNS WITH MR. DAVIS, BUT EXPERIENCES NO SUCCESS. MRS. DEKURYFF STATED
THAT SHE OVERHEARD PART OF THE DISCUSSION BETWEEN MR. DAVIS AND MYSELF
AND REQUESTED THAT I MEET WITH HER ON MARCH 23, 2004. DURING THE MEETING
WITH MRS DEKURYFF, SHE SUGGESTED THAT MR. DAVIS AND I WORK TOGATHER TO
RESOLVE THE PROBLEMS. WITHOUT GIVING ME AN OPOORTUNITY TO RESOLVE THESE
PROBLEMS WITH MR. DAVIS, I RECEIVED A LETTER OF REPRIMAND FOR
INSUBORDINATION TOWARDS MR. DAVIS. I AM APPALLED AND FEEL BELITTLED BY THE
COACHING NOTE FROM MR. DAVIS AND THE LETTER OF REPRIMAND FROM MRS
DEKRUYFF.
I AM BEING TREATED UNFAIRLY AND WITH DISRESPECT. THIS ORDEAL HAS AND
CONTINUES TO CAUSE ME TO EXPERIENCE HEADACHES, SLEEPLESS NIGHTS, WORRY,
STRESS AND OTHER HEALTH-RELATED PROBLEMS. IN THE INTEREST OF MY HEALTH,
WELFARE, AND MORALE, I FEEL COMPELLED TO SUBMIT THIS LETTER OF RESIGNATION,
TERMINATING MY EMPLOYMENT STATUS WITH THE LIGHTHOUSE COUNSELING CENTER.
MY LAST DAY OF EMPLOYMENT WILL BE APRIL 8, 2004.

RESPECTFULLY YOURS,

PAMELA ALLOWAY, BS
CASEMANAGER

Ph: 220-3006
CELL PHONE

*[For Pamela Alloway's attachment:*

*I worked with her for five years.  She was the best and hardest working case manager the Lighthouse has ever had. ]*

1

**M E M O**

November 5, 2004

**FROM:**        Sadie D. Sky

**TO:**        Candyce Decruff

Several days before today I informed you of the medical procedure scheduled for me to be performed next week. I said that I would need the rest of the week off for recovery and that Rainee Deramus would be assuming the responsibilities of my group counseling. However, early this week he told me that he would not be able to help me on Thursday and Friday (November 11th and 12th), and said that he would ask Paulette Nicholas. Then on Wednesday he left a note for me saying that Paulette could not work for me.

As I was in the records room Lisa Carroll came in and said to me that Rainee came by and told her that someone (she said she did not remember the name) could not work for me during my intended absence. I said "OK, thank you," and told her that it was Thursday and Friday that Paulette could not work.

I filled out my leave slip and put it in Lisa's mailbox on Wednesday, November 3rd. She returned it to me on the 4th. A copy of it is attached to this memo; please see Lisa's note on it below my signature. Later on that Thursday as I was working in the records room Lisa walked by and I said to her, "About my leave slip: we do our scheduling on Mondays when everyone is in the CDRP meeting – we then know who is available to work and who is not, for sick leave or annual leave or continuing education, or whatever." Lisa stopped, turned around and stared at me, *her face turning red*, and said to me in a *raised voice* "I am informing you that things have changed now that I am in charge. You *will* have this covered before you take leave."

I could not believe what I was hearing, nor the scene that she was making. I am not in the habit being spoken to in that way, and I will not tolerate such rudeness. I counted to ten and then said that whether or not I get those two days covered I will not be here next week, due to my having an invasive medical procedure scheduled. At this point Steve Davis came into the room, and I asked him if he could work for me next Thursday and Friday. He responded "You know that Friday is my poker night." Then Vicky Binkly walked in, and I asked her the same question; she said she'd have to get back to me. (All this was heard by Lisa as she was leaving the room). I have left comparable messages for Annie Osbourn, Shiela Wilkins, and Shannon, since none of them were at the Lighthouse at the time..

Candyce, will you please make sure that my group is covered, and my leave slip signed? As you know, no group has ever gone uncovered nor any client gone without needed counseling. We have always covered each other's responsibilities and helped each other in all ways we can. In my many years of working I have *never* been AWOL.

Witness,
Shalandra Rogers
4/11/05

irate and screaming low red.
Mr. Davis did also stated that Mrs.
Sky had told several different untruths
to different people regarding the
"numbers". She lied about working
at the jail she had never
worked at the jail and
the other person did not think
the lies she said.

*[For Shalandra Rogers' attachment:*

*Shalandra was an excellent intern from Troy University's main campus in Troy. She reported this incident to her intern coordinator. As a result, I received no more interns from Dr. Wright at Troy. ]*

LHCC Coaching Note Form, 5/98

## Lighthouse Counseling Center
# COACHING NOTE

| Employee Name | Position/Status | Date |
|---|---|---|
| Sadie Sky | Counselor / & IOP | 6/14/05 |

Frequency of Coaching:

| Daily | Weekly | Monthly | ✓ One Time Only |
|---|---|---|---|

Type of Note:
_____ Recognition of a job well done!
_____ Clarification of duties.
_____ Review of previous coaching note.

_____ Review of policy and procedures.
✓ Review of job expectations and/or attitude check.
✓ Other. Explain  document conversation
about courtesy in dealing with
contract agencies

Explanation of Note:

This note is to verify that we met on Wednesday June 8, 2005 and discussed complaint from Mike King that you were rude to him regarding signing a need for release of information. You did deny rudeness and explained that you informed him of need for client to sign a release in order to speak to him about clients caseload. I am reiterating in this note the need for courtesy and politeness when dealing with all inquiries about clients. While a release of information is required to discuss any client, courtesy is expected and you can listen to concerns anyone calling

Employee Response: It is true that the release was not in the clinical release record when I checked it the day before our meeting.                        information to t

I hAve Never (And do not plAn to do so in the future) spoken rudely nor given information on Anyone who did not sign A Release, to speak with the person wanting the information As you know there was No release to speak to mike King - (And I hAve Never seen the Clie

Lisa Carroll LISWPIP 6/14/05
Supervisor's Signature & Date

Sadie D. Sky LPC 6/14/05
Employee Signature & Date

*[ For my attachment, Coaching Note from Lisa Carroll:*

*Lisa brought this to my office saying that Candyce DeKruyff made her do it.*

*Annie Osborne had done a psychosocial assessment on a young man from either Troy or Dothan. A few days later a man identifying himself as Mike King called me and demanded to know what was on this client's assessment. There was no release that allowed anyone to speak to Mike King. I told the caller that I could not confirm nor deny that this person had been here for an assessment. The next day Mr. King called me again, saying "Apparently you do not know who I am. I manage the apartments where the Lighthouse clients live. Now that you know who I am, give me the information that I want." I said "Mr. King, I do not care who you are, I will neither conform nor deny this client had an assessment. The next day he came to see Ms. DeKruyff; I do not know what was said, but I received this coaching note.*

*(Parenthetically, I don't think our apartment manager could be called a 'contract agency,' as written by Ms. Carroll on the note.)*

*I've never been rude to **anyone** inquiring about a client. I must say, however, that plenty of inquirers have been rude to us employees! ]*

1

---

### ☞ *From The Desktop of W. Marshall Pickard III*

---

*3037 Lansdowne Drive*
*Montgomery, Alabama 36111-1818*
*(334) 354-0976*                   *E-mail: marshall3d@hotmail.com*                   *(334) 354-4138 (Fax)*
*(334) 538-2933 (Cell)*

# Memorandum

---

**TO:**  Legal Counsel                              **DATE:** 07/03/2005
         CONFIDENTIAL: Protected by Attorney-Client Privilege

**RE:**  Facts & Circumstances Pertaining To Forced Resignation

---

On May 11, 2005 at approximately 5:15 P.M., I went to the Emergency Room at Baptist Hospital, South, due to recurrence of symptoms of pulmonary embolism (shortness of breath, tight chest pains and dizziness/slight black-out symptoms). I had been hospitalized due to a pulmonary embolism on April 4, 2005, and was under treatment for this condition.  The next morning (on May 12, 2005,) my physician recommended that I take time off from work due to my condition, which he felt was being exacerbated by job stress.

Also on the morning of May 12, 2005, I informed Lisa Carroll, who was my immediate supervisor at the Lighthouse Counseling Center, of my doctor's recommendation, and that I would need to take time off work due to my health and possibly receive at least short term disability benefits. At approximately 3:30 P.M., I was working in my office at the Lighthouse on an assignment to compile a directory of community aid sources, ~~given by Ms. Carroll~~, when Ms. Carroll summoned me to accompany her to the office upstairs of Candyce DeKryuff, recently made Executive Director of the Lighthouse.  I was to learn that the reason for this meeting was to elicit my resignation as an employee of the Lighthouse, otherwise, I would be involuntarily terminated.

The facts and circumstances that led to this point are as follows:

       1. I was hired by Winfred Dunham, Jr., known as "Junior" to fill the position of "Self-Sufficiency Coordinator" for a program named "New Beginnings" funded by a S.A.M.H.S.A. Grant and coordinated with a H.U.D. Housing grant.  This program's

purpose was to assist those diagnosed with "co-occurring disorders", formerly referred to as those with a "dual diagnosis" (of a major mental health and a substance abuse disorder.") Since the major portion of my most recent employment was in the area of Grantwriting, it was understood that my position would evolve more into this area as time progressed and new funding sources were elicited.

2. This program called for a holistic treatment approach utilizing a therapeutic community model which included treatment of diagnosed/assessed disorders, socialization and improvement where necessary of basic living skills. This program included the housing of 27 individuals (although others could be a part of the group and its therapeutic community process without being in housing.)

3. Radical changes began to occur during my third week of employment at the Lighthouse, when Junior Dunham collapsed that weekend and passed away due to a heart attack. A long period of instability (often disarray and even chaos) ensued, and the facts set out herein support the conclusion that I and others were terminated, or compelled to resign under direct consequence of immediate, involuntary termination without any severance benefits, due to the loss of Junior Dunham as Executive Director and the appointment of Candyce DeKruyff first as Acting Director and then as Executive Director of the Lighthouse.

4. A pattern quickly emerged in which even the basic human needs, as well as therapeutic, treatment and other needs of the clients were subordinated to other concerns, primarily those of upper level staff (primarily the Executive Director, Business Manager and Clinical Director.)

5. The New Beginnings program began with five client/residents. Immediately, issues began to arise where the basic human needs (primarily food and medical/dental care) and other needs (including treatment-related needs) were not being met. Since we did not yet have a location in which to hold self-sufficiency group meetings for the clients, I was called upon to do a host of tasks, many not related to the New Beginnings Program. In fact, for the first five weeks, I conducted evening group meetings in the Kaleidoscope Program. I also responded to requests to look into grant opportunities, and assisted the Clinical Director in so myriad an array of tasks and requests that they cannot be summarized by category. Most often, these requests were made without notice, requiring immediate attention.

6. On a <u>daily basis</u>, I was faced with the unconscionable dilemma of meeting such collateral requests, most of which had little or nothing to do with the New Beginnings program, grants, or anything contemplated in my job description, or meeting often the most basic needs of the clients, primarily for food (nourishing, balanced, and adequate food/diet) and for medical/dental care.

7. The first time I was presented with a 'coaching note', the note alleged that I was not attending to the duties prescribed in my job description, but rather that I

was remiss in attending to other duties and that on occasion I was not present in my office at hours specified in the note. I was understandably dismayed, since the person who wrote this 'coaching note' (Ms. Carroll), was the same person who had assigned many of the alternative, *ad hoc* tasks and assignments that caused the irregularities cited in the note. For the first time in my working career, I protested by not signing even that I would acknowledge the note. The note was rewritten, and with my repeated protest, I was told that it would be withdrawn. However, I was to confine my duties to those as Self-Sufficiency coordinator unless otherwise assigned to do a task by Ms. Carroll, which is precisely what I had been doing since the first day I came to work at the Lighthouse. However, I learned by this baffling experience that I could not rely on Ms. Carroll's consistency and reliability as a supervisor.

8. The shortage and often complete lack of food among residents, the number of which was increasing, continued to be a chronic problem. One of the residents volunteered to teach a self-sufficiency related class in monthly meal preparation where one prepares a variety of meals for each day of the month and then freezes or otherwise preserves the food for quick daily access. I requested and received permission to purchase one month's worth of food from the Food Bank. I budgeted $50.00 worth of discounted food per resident, and remained under that budget, having had this spending presented to and approved by Ms. Carroll.

9. On the day that I purchased the food and had scheduled in advance for this class to be held, the client who had volunteered to teach the class had to be absent due to a previous commitment, of which I was not informed. Moreover, several other residents whom I had confirmed as being required to be present were not present. The food had to be distributed, but no class was held. However, the food was carefully selected, and did in fact last one month- the only period, as client/residents of this program will confirm, that there was adequate food in this program during the first six months of the program. Clients continued to remark that this was the only time that there was adequate food for the clients.

10. Ms. Carroll called me in when the Business Manager became aware of the bill and told me that I had spent too much of the grant's budget for food, and that I would have been reprimanded without her intervention. Again, I was dismayed. I was admonished not to spend any more funds on any clients without prior approval.

11. Twice thereafter, I was present when new clients were accepted into residence without any food. On both occasions, I was unwilling to leave residents in housing who were obviously hungry. On both occasions, I purchased food for these clients from my own private funds and made personal requests to their case managers that they be provided with food. I learned later that these clients had thanked me openly in their group meetings with the program counselors, and hence, it was likely that this became known to my superiors.

12. One reason that I believe this became known to them was that during the same week, I took a client with an abscessing tooth to the dentist at the Lister Hill facility. Prior to the incidents as stated above, I had taken a client to the dentist who had a tooth which was abscessing to Lister Hill, and had paid also from my own personal funds the $25.00 fee, which included examination, treatment, and prescription of antibiotics. However, I had already initiated a request that Lister Hill set up direct billing for the Lighthouse so that bills would be sent directly to the Lighthouse, obviating any expenditure of funds otherwise, such as from personal funds. I had no choice on that day, however, but to pay the $25.00 from my own funds, since there was no other options available at the time (except to cancel the treatment and risk the health of this client.)

13. The next day, I received a coaching note from the Business Manager, Carianne Stinson, citing me for spending my personal funds AGAIN at Lister Hill when told that I could no longer do so. I replied on the coaching note that I had not spent any funds in this second appointment, personal or otherwise, but that I had followed Ms. Stinson's instructions to set up direct billing, and that the Lighthouse would be receiving a direct bill from Lister Hill for this appointment.

14. Ms. Stinson cordially approached me in my office, and asked me if what I had written was true- that I had not spent any of my personal funds in this second instance, which the coaching note was citing as an insubordinate act. I assured her that my response was true, that I had not spent any of my own funds in this second instance, but I had made the necessary arrangements by which Lister Hill would begin billing and sending the Lighthouse a statement as Ms. Stinson had directed. (Indeed, the Lighthouse received a bill for this service approximately one week later.) Ms. Stinson expressed her regret for writing the note, stated that she was misinformed, and that she was tearing up and thus expunging the coaching note.

15. I, and others employed at the Lighthouse, continued to be dismayed as clients, particularly those in housing, continued to suffer from lack of provision for basic human needs as well as therapeutic, treatment and other needs. Numerous incidents occurred, many documented by complaints to the Mental Health Advocacy authority. Past and present clients are expected to be more than willing to document their individual instances of deprivation in this regard.

16. I continued to persist in my efforts to help Lighthouse clients in their efforts to meet their needs. Lack of adequate food, medical/dental care and other basic needs was distressing enough. Equally distressing though was the neglect of social and psychological needs. Clients were openly complaining that the three hours of group meetings were depressing, unhelpful, or otherwise not adequately therapeutic. Clients were openly complaining that they were left for the remaining 21 hours per day without activities or other assistance.

17. To address this problem, I spent several weeks, reporting to Ms. Carroll on a daily basis, and was successful in working out an arrangement with The Caring Center downtown to bring clients there for morning self-sufficiency groups and for socialization at other times. This included access to many programs at The Caring Center, including emergency food assistance, clothing assistance, ID procurement assistance, G.E.D. Tutoring and test preparation, 12-step meetings, and other programs and sources of assistance and outreach.

18. The day before this arrangement was to begin, Ms. Carroll called me to her office and told me that this had been vetoed by Ms. DeKruyff. I was not told any of the details, but apparently there had been a conflict between the Lighthouse and the Caring Center recently which directly involved Ms. DeKruyff. It was apparently a serious conflict. Ms. DeKruyff had directed that no more contact be made with the Caring Center.

19. I was once again dismayed. I did not know the nature of the conflict, but it was clear that the staff of the Caring Center no longer considered it an issue, since they had opened up their facilities and outreach to the Lighthouse. I appealed but was told firmly that there would be no such program to help the clients through the Caring Center.

20. I also set up several efforts to assist clients in obtaining employment, including transporting them to a Job Fair on my off-hours (I was never told I could not donate my time off site). While many clients from other programs obtained good jobs through this effort, none of the New Beginnings clients participated. I was later told by one of these clients that they were fearful that their rent would go up if they were employed and that they could lose their housing. This was another of many miscommunications made to the clients, the specific origins of which were unclear but the existence of which were inexcusable. These matters should have been made clear to the clients by their case managers, and if still unclear, by their counselors or, ultimately, by the Clinical Director.

21. While these matters were the source of intense dismay and concern, I never thought that my employment status was at jeopardy. The Clinical Director continued to assure me that she would resolve these issues, that she cared deeply for the clients and that she held as a top priority their well-being, particularly regarding basic and therapeutic needs.

22. On May 11, 2005, I began to suffer from the symptoms of pulmonary embolism, a condition for which I had been hospitalized and have been under continuous treatment since April 4, 2005, as stated above. The symptoms became acute just before leaving work. As instructed by my physician, Dr. Leslie Harris, in the case of recurrence of such symptoms, I went to the Emergency Room where my vital signs were checked. The symptoms subsided once in the E.R. where I was able

to relax. I called and went by my physician's office the next morning, and was advised to take some time off work due to high job stress. I let Ms. Carroll know that I would need to take some time off. Since I had used most of my sick leave, it would be necessary to apply for short term disability benefits (at least).

23. Also on May 12, 2005, less than a week after the Caring Center project was vetoed and the day after the recurrence of symptoms of pulmonary embolism, and the same day that I informed Ms. Carroll that I would be needing to take some time off, Ms. Carroll came to my office and told me that I was to accompany her to Ms. DeKruyff's office immediately. I was in the middle of preparing a list of immediate community resources which Ms. Carroll had requested, and told her so. She told me that this could wait and to go with her, which I did.

24. Ms. DeKruyff, Ms. Carroll and I met in Ms. DeKruyff's office. Ms. DeKruyff told me bluntly that my six month probationary term had not expired (when in fact it had expired two weeks previously) and that I was "not a good fit" for the Lighthouse Agency, and that my employment would not be continued. She told me I had the choice of resigning; otherwise, I would be involuntarily terminated ('fired'). Before finishing this opening statement, she asserted that there was to be no discussion of the matter, that her decision was final, and my only choice was whether I wished to resign in which case I would not be given a negative reference in any future employment or other matters and would receive two weeks' severance pay and benefits, or whether I wished to be terminated and not receive any benefits and for this termination to become part of my employment record.

25. This obviously placed me into a state of severe shock. My first question was what she meant by the phrase, "not a good fit." She declined to respond, and asked me for my decision regarding the choice she had given me (of resigning or being terminated). I pressed her again as to why I was not considered a "good fit." She then told me that she had spoken to the new Executive Director of the Montgomery Area Mental Health Authority, who had complained about me regarding an alleged incident where I accompanied two New Beginnings clients in meetings with their therapists at the Mental Health Authority, and that I allegedly attempted to gain access to their private mental health folders, and in one case, to transport a folder from one location to another. This was flabbergasting to me. I had only made one trip to the Mental Health Authority, which was a last minute trip at the request of Lorraine Smith, a case manager, who had a sudden conflict and asked me to take the two clients to the Mental Health Authority. Both clients informed me that they routinely asked their Case Manager to accompany them to the sessions with their therapists to report on their good progress in the New Beginnings program. Since I attended weekly staffing meetings regarding these clients, I agreed to respond to questions by the therapists, mainly regarding whether or not the clients were taking their medication and abiding by the treatment objectives and goals set by their counselors.

26. I stated this to Ms. DeKruyff, who responded that she had to believe the Mental Health Authority personnel over me. Then Ms. Carroll made the spontaneous but unwelcome (by Ms. DeKruyff) comment that I had been a client of the Mental Health Authority. I told them that I had terminated my case with them prior to coming to work at the Lighthouse and had obtained another mental health provider to avoid such a conflict. Ms. DeKruyff was palpably irritated that this issue had been raised. She leaned forward in her chair and asserted emphatically, "It doesn't matter. The bottom line, Marshall, is that you are just 'not a good fit' for this Agency."

27. Ms. Carroll agreed (despite the fact that she had stated openly, including in staff meetings, that it was an asset to have a person such as I who had been in the system as a staff member.) Both stated that they regretted that the matter had come to this, but the decision would not change. Ms. DeKruyff repeated the ultimatum first stated: did I wish to resign or be terminated. The suddenness and irrationality of the pretenses were bewildering to me. I attempted to discern further what truly was going on. Ms. DeKruyff persisted in repeating the ultimatum. She added that if I resigned, the matter at the Mental Health Center would be dropped. Otherwise, if terminated, I could face some unspecified and vague adverse action. Because of my past of which I had informed Mr. Dunham and Ms. DeKruyff (who interviewed me together when hired at the Lighthouse), this was an extremely coercive and provocative statement. As I told them, I had no choice considering the way this ultimatum was presented but to resign, especially since I had heart surgery immediately pending, and I could not afford to lose my health benefits which I was told that I would forfeit if I refused to resign and was terminated.

28. I was under extreme and excruciating duress. Even though the circumstances were not accurately presented (for example, I would not lose my health insurance benefits but could extend them under C.O.B.R.A. regardless, even if I was terminated.) I saw no choice but to resign, primarily due to the duress of my health condition and pending surgery. I was also pressured by my physical condition, where I had been suffered the recurrence of the symptoms described above. I was also pressured by the specter of unspecified and vague adverse action that might be taken against me as described above, which was a particularly cruel and coercive means of pressuring me in light of all that I have been through.

29. I most obviously believe that I was not treated fairly and was coerced into resigning unjustly. However, I am far more distressed over the neglect and in some cases the abuse of clients at the Lighthouse as stated above.

Sincerely,
/s/Marshall Pickard

MEMO FOR RECORD

October 12, 2005

On September 19, 2005, I delivered a handwritten note to Lisa Carroll, Clinical Director of the Lighthouse chemical dependency recovery program declaring that I would be resigning effective September 30, 2005, due to excessive stress related illness. The note detailed the source of the stressor, which was as a case manager, involved in a program where no formal training had been provided, excluding two individual sessions in an office with the clinical director. Ample time to read and process program manuals was not given because I had to begin working immediately. The client population was very needed, often abusive but always demanding to be serviced under situations where it was near impossible to meet the demands of the clients with the amount of time and resources available. Case managers at times spent up to 4-5 hours a day to transport clients not including the amount of time it took to get them to their medical, personal or mental health appointments. Documentation in records was often late getting done due to lack of time in the office. The final blow occurred when I received a coaching note because I worked 2 hours overtime, when I had no other choice because the other assigned case manager for housing was in training that week so I took on the majority of the driving for the clients, and their case management. It took more time for me to do these tasks, alone which included doing drug tests, home inspections, getting the clients to the pharmacy, picking them up from doctor appointments, taking them home, and returning after 7 that evening. I was reprimanded for doing my job the only way I could under the circumstances. I and other case managers voiced concerns like these to management but as of the time I left, no remedies were made. My health started to suffer some days I shed tears. After consulting with my doctor on several occasions, I made the decision to leave.

Phyllis Jewel Ford

*[ For Phyllis Jewel Ford's attachment:*

*Jewel did an internship at the Lighthouse. She completed her Masters in Counseling and came to work at the Lighthouse as a case manager. She had an excellent relationship with the clients and hoped to work as a case manager while waiting for a counselor's position to become available. She became ill because of the way she was treated. ]*

1

## FURTHER COMMENTARY BY SADIE D. SKY
### October 30, 2005

For the last five years I have been responsible for the Lighthouse's largest group of clients, as many as thirty-three in a single session, though Mental Health does not recommend more than fifteen in a group counseling session. My client load can be confirmed by checking the censuses and sign-in sheets, if they have not been altered. Rarely have I had fifteen or less clients. During this time, despite my requests (but not complaints), I have never been afforded a case manager or a co-facilitator. I have had several interns, and though they have been some help, they also have been an added responsibility. As you know, an intern participating in a group session cannot be left without supervision. Other counselors have been provided case managers or life coaches, either of which can help ease the very large amount of paperwork required to properly process and account for clients. When client loads top about twenty, the paperwork load is truly daunting, and can easily detract from direct client care. Although the records room is open for counselors twice a week until 7:00 P.M. (on other days closed at 5:00 P.M.), this did not meet my needs; my group began at 5:30 P.M. and lasted until long after the records room was locked and secured from me.

During this past summer I asked my supervisor Lisa Carroll if I could get Lauren Mann, an upper-level student at AUM who had done a complete internship with me, to come in and help me with some records-filing chores. Lauren had agreed to volunteer for this before I approached Lisa. However, Lisa answered with "No, she is a very disturbed young woman; I met her once at a rape retreat." I thought it useless to respond to that.

I had survived to this point, in spite of the tensions explained in this letter and its attachments. But never in my long, varied, and rewarding career of nursing, teaching, supervising, and counseling have I seen employees so abusively treated as I have seen those at the Lighthouse. In my opinion, 'the rubber meets the road' at the employee- or counselor-client interface; it is there that the Lighthouse's purpose is either met or unmet, it is where we exist. Although regulatory and legal restrictions in our work must be considered, all supervisory, managerial, and administrative efforts and intentions should be toward recognizing, enhancing, and supporting this core responsibility.

At the beginning of September of this year, counselor Annie Osborn and I had to either take or lose two weeks of vacation time. My attached 5 November 2004 Memo describes Lisa Carroll's approach to supervision when it comes to covering subordinates' absences: she requires them to extract themselves from extraordinary circumstances, rather than coming together with them – with her power of position – to find an acceptable solution. Annual leave time is not a benefit that an employee can be forced to sacrifice without his consent. This was an instance where Ms. Carroll should have decried poor leave planning, tried to arrange a compromise in scheduling and, failing that, arrange cover for the absent employees even if she must herself work for those employees (or cancel or rearrange the task, if she wishes). A manager/supervisor should not, however, evince such a lack of support as she did, and delivered so brusquely. Such a practice encourages isolation from management and unnecessary bitterness, rather than the consideration and

1

teamwork that mark a motivated, and thus more likely successful workforce. In my experience as a manager and supervisor, this always has been the better approach.

The above situation devolved into my having to cover not only Ms. Osborn's work when she took her week's leave, but also doing a co-occurring group for Eliza Byrd, on top of my very large evening group. By the third week of September I was so far behind in my required paperwork that on Thursday or Friday I asked Mr. Baity and Ms. Carroll if either could come in on either Saturday or Sunday and unlock the records room so I might complete my work. Mr. Baity's answer: "No, I have a life." Ms. Carroll refused, saying that she and Mr. Baity worked the previous weekend and, besides that, this one she was going to work at the Bullock County Hospital (her employment outside the Lighthouse).

Yet another related incident occurred during that month. As we underlings were abandoned to our own devices to get the job done, Ms. Osborn and I agreed that because I was so far behind in my work (paperwork, contacts with parole officers, courts, clients, treatment centers, etc.) that during the fourth week I should do assessments for her only on Tuesday and Wednesday rather than all week. After the Wednesday schedule was filled, further assessments would be scheduled for the following Monday. On Wednesday I learned that Carrianne Stinson, the Lighthouse bookkeeper and not in a counselor's chain of command and without any qualifications in a counseling field, had told the administration staff to ignore Ms. Osborn's and my solution to this mess. Instead, they continued to make appointments into Thursday. Discovering this, I went to Mr. Baity and told him that I could not do those extra assessments, and asked him who it was that gave Ms. Stinson the authority to make counseling decisions and direct the activities of master's-level counselors. As it turned out, Mr. Baity did those Thursday assessments.

An impartial person looking at it should wonder why, when the position of CDRP director has been vacant, that no current qualified employee would apply for it. The same lack of interest was displayed for the assistant director's position. At the time of those vacancies, five highly-qualified and experienced Lighthouse counselors ignored the opportunity or were themselves ignored. Our board of directors, especially, and perhaps Mental Health officials, might have been a little more actively concerned and participatory, or at least a more attentive mentor, when it has come to such crucial events as hiring and firing actions, policies, and procedures. For instance, the board should have found an interesting comparison between the resume and qualifications of the current Director and those of several of the in-house counselors available at the time Ms. DeKruyff was installed. The latter apparently has no substance abuse or addiction counseling experience, few if any roots in the community, no comparable depth of professional associations, and is hampered by a cultural ignorance and insensitivity to our geographic area (the South) and to its people and specifically to the majority of our clientele. Further, her activities at the Lighthouse apparently compose the only job she has ever had. Such qualities are hardly a match to the mission of the Lighthouse, and most certainly not to a position of leadership or of management in it. A copy of her resume is an attachment.

2

By the way, on the day Dr. Jack Wool died, Dr. Tom Wool's office called to tell me (I've known the family for years). I quickly called Ms. DeKruyff at her home to give her this news. Her response was something to the effect of "Well, how about that." She could not see putting a wreath on our door, or some other way to recognize or pay tribute to one of the two founders of the Lighthouse. I could perceive no respect nor concern for this man or his wife, the co-founder, or the sensibilities of the community that we serve.

Also, in the vein of staffing decisions, it seems somewhat surprising the number of case managers that have come and gone since the Kaleidoscpe and the co-occurring disorder program began. Of course personnel turnovers are to be expected now and then, but the numbers experienced in these areas might point toward some necessary corrections. Why, and under what circumstances, did they leave? Were the positions poorly advertised (i.e. not adequately descriptive), or was the workload imposed in some way unreasonable, or might the manner of their supervision have been untenable? Were they to be contacted, a problem might be found that might easily be corrected.

Another personnel practice is disturbing to the employees: the peremptory and preemptive filling of vacancies that are not even known to exist until someone is promoted into them. An instance this year was the elevation of Rick Baity to assistant CDRP Director. Mr. Baity might fairly have won the position in a competition for it, but there was none. At least four of among the most experienced and successful chemical addiction counselors in the state (Shannon Adedokun, Sheila Wilkins, Annie Osborne, and I; Cliff Lovejoy had just left) watched in surprise as, without their prior knowledge of the vacancy, it was announced as filled. This practice in no way promotes trust in or loyalty to management.

There is an interesting Lighthouse management program: I was told by the Director when I began work there that employees were able to earn incentive raises. I asked how they are earned, and was told that one must give 1% of his wages to United Way, buy tickets to anything in which the Lighthouse participates (e.g. charity events at the Capri Theater), contribute food, tickets to the mall, and participate in Christmas and other sales. I did all of this, and bought stuff at the auctions. But I have never received an 'incentive raise.' I'm given to understand that CDRP, our counselor's group, is allocated a quota of two per year. Everyone was very secretive about who got these raises and no one ever knew how they had been earned. An exception: when Steve Davis was CDRP director he announced that Ms. Osborn and case manager Vicki Binkley had received these raises. I feel that I should ask: Are these activities (surrendering pay, etc.) actually where 'the rubber meets the road' and do they impact directly on the quality of care our clients receive? In other words, shouldn't job performance, whatever one's position, be 'incentivized' instead? Is making a pay raise dependent on what is effectively a kind of kickback to one's employer not in some way or degree a coercion? The secretiveness of the awards, and the lack of public criteria as to how winners are to be and then have been determined is interesting and strange, as well. I certainly understand the desire of management that everyone display espirit d' corps and organizational loyalty, and those are fine attributes of any organization, but they must be engendered and developed by

3

good leadership, not by compulsion. Further, several employees have stated that they simply cannot afford to do those things said to produce a pay raise; how are they not being discriminated against, in spite of their perhaps outstanding performance at work?

I should give you at least one illustration of personal abuse of myself: that done by Steve Davis. He and I were together responsible for the adult Intensive Outpatient Program, required to 'draw down' on a contract of over two hundred thousand dollars per year. In late 2004 and in early 2005, I noticed that his reported 'draw' was somewhat lower than it historically had been before his assumption of the job. His sole part was to do counseling at the downtown jail, a job in which I previously had substituted for an earlier incumbent. We were falling behind in the dollar amount that, together, we should be accounting for. I conferred with him on this point, wanting to be sure that he was correctly and fully accounting for his work. It seemed that he was not, so I showed him how to do so. I spoke with him on this subject more than once, as his relatively meager 'draw' continued to not meet our expectations. During this time, fearing that at the end of some accounting period our poor performance would be apparent to Mental Health and that it was even possible for the Lighthouse therefore to lose this contract, I increased my client load significantly. I increased my 'draw' in order to make up for Steve's lost dollars. By April 2005, however, this heavier load I was carrying was taking such a toll on me that I knew that I needed help. I went to my supervisor Lisa Carroll and asked her for help, showing her the numbers, what I had done, and my fear that the contract nevertheless could be at risk. Ms. Carroll apparently wrote Steve a memo on this subject; I don't know what it may have said. Steve then (on April 11th) came to my office – not once, but twice – waving a memo in my face (that I could see was from Ms. Carroll) and actually screaming at me. He not just in a loud voice, but yelling "I know who is behind this!" over and over, his face flushed and reddened. I took the memo out of his hand and my face and handed it back to him. I did not speak to him, and after a few moments he left. This visit occurred at about 2:00 P.M. Later that afternoon at about 4:30, just as my intern Shalandra Rogers had arrived and seated herself in my office, Steve appeared in my office and, red-faced and shaking uncontrollably, began yelling again. This time he screamed that I had repeatedly lied to different people regarding the 'numbers,' and that I had lied about ever having worked at the jail, and that I had lied about the amount worked at the jail by an earlier employee. Shalandra was so upset at this display by Steve that she asked me to complete, at her direction, the note (attached) she made as witness to this incident. I reported this to Ms. Carroll and subsequently she and Ms. DeKruyff came to my office and said that if I wished I could document Steve's actions as a grievance. I considered that, and eventually decided that it would probably have no effect, because there twice before had been documented instances of Steve abusively screaming at employees: Brenda Collier and Pam Alloway (see attachment). Those two incidents did not effect Steve's release from Lighthouse employment (one should have been sufficient), so I felt that reporting my experience would count for nothing.

In late September of this year at about 9:30 one evening, shortly after I got home from the Lighthouse, Steve called me, screaming yet again. This time he accused me of having purposefully locked him into the Lighthouse with the alarm turned on. Of course I did

4

not know he was there (his normal hours were daytime hours), and it made no difference anyway, as he had been given a key and the code for the alarm system. After this assault I considered requesting a restraining order, thinking that his behavior could be more, or could escalate to more, than just harassment. I reported this incident to Ms. Carroll the next day and expressed that concern to her. To date, I have no idea what management has done, or if anything has been done.

I include the following little story not because it has meaning only to me, but also because it contributes in a very important way to a picture of Steve Davis not just as a mentally disturbed person, but because the effects of his disturbance bear clearly and directly on his suitability for any work our profession. Further, he is a Licensed Professional Counselor (LPC) and as such is granted access and professional powers beyond those who do not hold that certification. Here's the story:

A few weeks ago I was speaking to a person highly regarded in our profession who, at Steve's request, was interviewing him for a job. That person told me that Steve volunteered during the interview, in detail and at length, that I was a Satanist and even practiced devil-worshiping at work, that in my office I had satanic emblems and figurines and could be heard chanting to them. He also said that I was 'out to get him.' When the interviewer asked him just how I was doing that, Steve said that he didn't know, but it was happening. This is a man who purports to hold to the highest ethical standards, and even leads classes in ethics for counselor certifications. This is a person who now is allowed to impact the mental health and well-being of others. I suggest that just as a hospital might not want a psychologically disturbed surgeon to practice on its patients, the Lighthouse might consider its legal (and moral?) liability of continuing its sponsorship and protection by employment of Steve Davis.

In closing this commentary, as you consider the atmosphere and conditions that have existed in the Lighthouse workplace I ask that you accept that there were other employees who could have contributed an attachment to this letter but who have expressed a fear of managerial retaliation were they to do so. However, though I never have been considered a whistleblower or a whiner – you may examine my previous employment of over forty-five years for this at your leisure – I will stand up to be heard if I am personally abused or unprofessionally criticized. All I've ever asked is that when I am led to a responsibility that I be supported in the doing of it. I am not one to plot and scheme for personal aggrandizement, I instead admire teamwork toward a common mission, those who are mindful of professional ethics, and managerial transparency. I've found that a little kindness and humor here and there can help, too -- especially when they may alleviate the pressures and intensities felt by employees, as well as by those whom the Lighthouse is intended to serve.

SADIE E. SKY

5

LIST OF CONTRIBUTORS AND THEIR CONTACT INFORMATION

Pamela Alloway
     Home 334-281-6518, Cell 220-3006

Shalandra Rogers
     No contact information available.

Marshall Pickard III
3037 Lansdowne Dr
Montgomery, AL  36111
     Tel 334-354-0976, cell 538-2933

Phyllis Jewel Ford
1851 Grove Hill Lane
Montgomery, AL 36106
     Tel 334-356-7296, work 414-8918

Sadie D. Sky
4120 Johnstown Dr
Montgomery, AL 36109
     Tel 334-356-5100, cell 224-2400

Cecelia Owens
2600 Vaughn Lakes #524
Montgomery, AL 36117
  H 334-270-0810
  C 404-849-8300

Clifton Lovejoy
3233 Erinwood Dr.
Montgomery, AL 36110
Home 334-832-4498

# PLANTIFF'S EXHIBIT 11

EEOC Complaints
Rollins, Kemp
+ Norfolk

EEOC FORM 131 (5/01)

**U.S. Equal Employment Opportunity Commission**

PLAINTIFF'S EXHIBIT

11

PENGAD 800-631-6989

| | PERSON FILING CHARGE |
|---|---|
| Ms. Candyce Dekruyff<br>Executive Director<br>**LIGHTHOUSE COUNSELING CENTER**<br>1415 East South Boulevard<br>Montgomery, AL 36116 | **Mark A. ~~Norris~~** |

*9 pages*

THIS PERSON (check one or both)

☐ Claims To Be Aggrieved

☐ Is Filing on Behalf of Other(s)

EEOC CHARGE NO.
**420-2007-00256**

## NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

☒ Title VII of the Civil Rights Act          ☐ The Americans with Disabilities Act

☐ The Age Discrimination in Employment Act          ☐ The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. ☐ No action is required by you at this time.

2. ☐ Please call the EEOC Representative listed below concerning the further handling of this charge.

3. ☒ Please provide by **15-MAR-07** a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. ☐ Please respond fully by _____ to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. ☒ EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by **01-MAR-07** to **Debra B. Leo, ADR Coordinator, at (205) 212-2146**
If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

**Murry A. Gosa,**
**Intake Supervisor**

*EEOC Representative*

*Telephone* **(205) 212-2119**

**Birmingham District Office - 420**
**Ridge Park Place**
**1130 22nd Street, South**
**Birmingham, AL 35205**

Enclosure(s): ☒ Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

☒ RACE  ☒ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN  ☐ AGE  ☐ DISABILITY  ☐ RETALIATION  ☐ OTHER

**See enclosed copy of charge of discrimination.**

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| **February 15, 2007** | **Delner Franklin-Thomas,**<br>**District Director** | *Delner Franklin Thomas*<br>(HBM) |

LIGHTHOUSE00262

| CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974; See Privacy Statement before completing this form. | AGENCY<br>☐ FEPA<br>☐ EEOC | CHARGE NUMBER<br>420- 2007- 00256 |
|---|---|---|

_____ and EEOC

*State or local Agency, if any*

| NAME *(Indicate Mr. Ms., Mrs.)*<br>MR. MARK A. ROLLINS | HOME TELEPHONE *(Include Area Code)*<br>334 239-8152 |
|---|---|
| STREET ADDRESS        CITY, STATE AND ZIP CODE<br>437 BALLINA WAY    Montgomery AL 36117 | DATE OF BIRTH<br>06/29/57 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME<br>LightHouse Counseling | NUMBER OF EMPLOYEES, MEMBERS<br>Approx 31 | TELEPHONE *(Include Area Code)*<br>334 286-5980 |
|---|---|---|
| STREET ADDRESS        CITY, STATE AND ZIP CODE<br>1445 EAST South Boulevard   Montgomery AL 36116 | | COUNTY |
| NAME | TELEPHONE NUMBER *(Include Area Code)* | |
| STREET ADDRESS        CITY, STATE AND ZIP CODE | | COUNTY |

| CAUSE OF DISCRIMINATION BASED ON *(Check the appropriate box(es))*<br>☐ RACE  ☑ COLOR  ☑ SEX  ☑ RELIGION  ☐ AGE<br><br>☐ RETALIATION ☐ NATIONAL ☐ DISABILITY ☐ OTHER *(Specify)*<br>                    ORIGIN | DATE DISCRIMINATION TOOK PLACE<br>EARLIEST (ADEA/EPA)    LATEST (ALL<br>2 June 06         Oct-6/06<br><br>☐ CONTINUING ACTION |
|---|---|

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

See Attachments

RECEIVED
EEOC

DEC 0 6 2006

BIRMINGHAM DISTRICT OFFICE

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements)<br>Linda Poole |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct.<br><br>Date        Charging Party *(Signature)* | SIGNATURE OF COMPLAINANT<br>Mark Rollins<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Day, month, and year) December 5, 2006 |

LINDA POOLE
Notary Public, AL State at Large
My Comm. Expires Sept. 25, 2009

LIGHTHOUSE00264

Name: Mark A. Rollins
Address: 437 Ballina Way, Montgomery, AL 36117
Phone number: 334-239-8152
Race: Black
Sex: Male
Date of birth: █████
Social Security Number: 4█████████
Date of Hire: October 2005
Position/Job Title: Substance Abuse Counselor


Re: EEOC Complaint based on violation of sex, religion, and color; Equal Pay


Company Name: Lighthouse Counseling Center, Inc.
Discipline: Given a "coaching note-reprimand"
Date of Action: June 2, 2006
Reason Given: Missing treatment plans in client files

On May 24, 2006 Teresa Houser, Director distributed a memo asking all staff to sell
summer magic tickets. I am a born again Christian and elected not to sell the tickets
because of my religious beliefs against any form of magic and its association. On June 2,
2006 the intensity of receiving coaching notes started. My immediate supervisor Annie
Osborne started to harass me by stating that I was not putting treatment plans in my
clients' files and not meeting with them within the appropriate time required. I explained
to her that I had completed the required paperwork. She could not produce the files in
question.


Discipline: Given a "coaching note-reprimand"
Date of Action: June 7, 2006
Reason Given: Not meeting job requirements

On June 7, 2006, Annie Osborne gave me a memo stating that I was not meeting job
requirements. She again stated that I did not complete treatment plans. She accused me of
not providing the clients with the services required. I responded back to her in writing
stating that I disagreed and was completing the requirements as best as possible with the
caseload assigned to me. I explained that my caseload had been three times more than my
coworkers, but had decreased a little since they hired additional help for me on the
evening shift. I also explained that the Director had just given me an accommodation for
doing a good job. Other coworkers expressed in a meeting that they too was overloaded,
but not reprimanded. I also expressed that nobody has given me training other that what I
taught myself I also made it known that by me being on the evening shift, I did not get
equal access to client files like my coworkers on the day shift. I asked that guidance be
provided on how to make the process more efficient. I received no guidance, just more
coaching notes. I became concerned at this point for my job; therefore, I requested an

1

annual performance appraisal because I did not have one at this point. The Lighthouse policy is that new employees should get a performance evaluation after their ninety day on the job. Of course I got one after working 270 days, June 8, 2006. On this evaluation, Annie Osborne indicated that this was my ninety day evaluation. She had only recently assumed supervisory responsibility after my prior boss resigned from the Lighthouse. She had no way of observing my job performance well enough to complete in an objective manner, although the overall evaluation rating was good. She's saying on the coaching notes that I'm not doing my job, but my performance rating overall states that I am "good", which is one step away from getting an "excellent" rating.

Discipline: Given a "coaching note"
Date of Action: July 28, 2006
Reason Given: Not completing treatment plans

On July 28, 2006, Annie Osborne gave me another coaching note stating that I was falling behind on my paperwork and not contacting clients for signatures. I stated at the bottom of the coaching note that my signature did not mean that I agreed with what she was saying and did not understand what discrepancies she was talking about. To this day, she has not explained this to me or provides any specific files in question.

Discipline: Given a reprimand
Date of Action: August 15, 2006
Reason Given: "Refusal" to submit tuberculosis testing

On August 15, 2006, Candyce DeKruyff gave me a reprimand for refusing to submit tuberculosis testing or screening from an agency employee. I previously expressed that I would prefer to get this type of testing from my private physician and that the agency employee did not practice sanitary procedures. Our agency test clients for drugs and many of the clients were/are drug users and some has aids and are HIV positive. I didn't feel comfortable in letting the agency perform this type of testing on me due to sanitary conditions. Candyce DeKruyff openly commented on one occasion that "now the Lighthouse is run by all women" and laughed. I did not find this statement to be humorous at all and so did the other male employees. There are no male employees in a supervisory position.

Discipline: Given a memo
Date of Action: October 5, 2006
Reason Given: Meeting to discuss a coaching note

On October 5, 2006, Annie Osborne gave me a memo stating that a meeting will be held to discuss a coaching note that I didn't receive.

2

LIGHTHOUSE00266

Discipline: Three Day Suspension without pay
Date of Action: October 6, 2006
Reason Given: Previous records in the past

Teresa Houser and Annie Osborne stated that they had decided to put me on three day
suspension without pay because I have not done anything since I worked for the
Lighthouse. They stated that I had coaching notes within my first two weeks of
employment. I don't think this is fair because I did not receive any training for my
position, which I have been addressing in writing since my employment. I also have
evidence that I was given a caseload three times more than my coworkers and inherited
numerous problem files and cases from my predecessor (Ms. Sadie). Many files were left
incomplete and Annie Osborne sent me many clients without following the proper
procedures since October 2005 when she was doing client assessments. Many clients
were placed in my group by her without prior notice not warning or paper work. I took it
initiative to take the many people on my case load and divide them into three phases
which allowed me time to properly handle. There were many nights when I was alone
with the number of clients that exceeded the Department of Mental Health standards (15
clients per counselor) and the building fire code. I was left many nights with no
assistance, but I adapted and overcame. I had so many people until it became the office
joke when people were added to my group.

Teresa Houser and Annie Osborne also stated that my performance had not gotten any
better since I started. This is not so. My performance by Annie Osborne states the
opposite. She gave me a good evaluation. I also received a card from Candyce DeKruyff
(Executive Director) thanking me for working hard and doing a good job. My coworkers
and certainly my clients can vouch for my work habits. The program that was assigned to
me was totally transformed. This "night group" was totally out of control when I started
working at the lighthouse. No other counselor wanted the night group because of the
harsh and abrasive type of clients. The night group is now the best program at the
lighthouse. I get countless testimonies from my clients as to how their lives have changed
and how their self respect was restored. It was hard for me to conduct one-on-one
sessions with these clients as well because I would be on shift alone or with one intern.
The intern is only allowed to do so much with a client. I also did not get equal access to
the client files. Annie Osborne stated that I needed to come in and stay late to work on
my work. My work shift starts at 1:00 pm and I advised that I spend my mornings before
my work shift started on clergy duty at my church. I think that because I would not
violate or neglect my clergy duties, they intensified their efforts to harass me.  There
were times when staff employees were getting ready to engage in physical altercations,
but were not suspended. Another counselor (white male) had his wife in the file room
working on files, which is a violated of the privacy of the clients and company policy, but
he was not placed on suspension without pay. This same counselor discussed sexually
explicit information with clients while covering my night group which is a violation of
sexual harassment policy, but he was not suspended with pay.

3

LIGHTHOUSE00267

Annie Osborne would also take food from which the clients paid for stating that she has to take her husband some food. This is not right to take from the clients who spent their hard earned money to pay for and not even bother to ask if she could have any. This is unethical and abuse of authority. I would use my personal gas to pick up food for Lighthouse events and clients, and not ask for a dime back.

I was also accused of not properly conducting drug screens. I was told that I had to go into the restroom with the clients and watch them urinate in a cup. This is totally demeaning to the clients and will certain violate their privacy, especially female clients. There is no written policy for this procedure.

I was not given notification of the three day suspension according to Lighthouse policy. They did not provide this to me in writing with a written plan to correct whatever they are saying is wrong. This is a continuous problem. The administration will not show an employee how to correct whatever is wrong. There is no training. You are basically left to learn on your own and get penalized for when you do something wrong that you were not aware was wrong.

I was also accused of not turning in super-bills (client billing form) for this week. This was a lie as well. After the meeting, Teresa Houser called me to apologize for saying that I did not turn in my super-bills, that she had them. This is an example of how the harassment of these people has intensified. They accuse me of not turning in my paperwork, then turn around and apologize for the mistake of falsely accusing me.

Annie Osborne is a dark complexion black female and I am a light complexion male, close to a complexion of a Caucasian. I feel that this is one of the reasons for her not liking me.

I put in a written request to be paid for the work done. My female coworkers in similar jobs are getting paid more than me. My caseload is three times more. I was told that I would only get a pay increase after my first year of employment. This month will be my first year. The Lighthouse loss funding for two programs last month and I feel this is one of their ways of cutting staff, trying to force me to quit my job via constructive discharge.

It is very clear that I am being harassed by this individual and treated differently. I feel that Annie Osborne, Teresa Houser, and Candyce Dekruyff is treating me differently because of my sex, religion, and color, which is a violation of my rights under Title VII of the Civil Rights Act of 1964. It is evident that training is not an option for employees, but coaching notes and reprimands. This individual is continuing to harass me since the day I decline selling these tickets. All I want is for this harassment to stop.

Sincerely,

Mark A. Rollins

*RECEIVED*
*EEOC*
*DEC 0 6 2006*
*BIRMINGHAM DISTRICT OFFICE*

4

EOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 420-2007-03288 |
| | | and EEOC |

State or local Agency, if any

| Name (Indicate Mr., Ms., Mrs.) | Home Phone No. (Incl Area Code) | Date of Birth |
|---|---|---|
| Mr. Timothy Kemp | (334) 335-2367 | 07-23-1961 |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| 236 Starhope Church Road, Luverne, AL 36049 | | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| LIGHTHOUSE COUNSELING CENTER | 15 - 100 | (334) 286-5980 |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| 1415 East South Boulevard, Montgomery, AL 36116 | | |

RECEIVED
JUL 24 2007
BIRMINGHAM DISTRICT

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| | | |

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN<br>☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify below.) | Earliest: 12-20-2006  Latest: 06-07-2007<br>☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I am a Black, male. I was hired by the above employer on June 16, 2005. My job title is Self Sufficiency Coach. I am the only Black in this job classification . I am being harassed on a continuing basis by Theresa Houser, Deputy Director and Patricia Thomas, Supervisor. I was accused of being un-ethical, and isolated from consumers which I was hired to serve. Whites who are similarly situated receive reimbursement for millage, I am being denied this benefit and threatened with prosecution. On June 21, 2007, Theresa Houser, entered by office and began calling me names such as a paranoid schizophrenic and stated that I needed counseling. She has stated in the past that I needed counseling. I have been given written warnings on infractions that are overlooked, when committed by Whites. The rule of calling off only applies to me. I was given unfavorable evaluations by Patricia Thomas. I was threatened with discharge due to an anonymous survey and accused of insubordination. I was suspended, on June 22, 2007, after my employer received notice of my charge from the EEOC, and because of my not cooperating with questions concerning a so-called confidential survey.

I believe I have been discriminated against because of my sex, race and protected activity, in violation of Title VII of the 1964, Civil Rights Act, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 7/20/07<br>Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year ) |

LIGHTHOUSE00002

1055 Starhope Church Road, Luverne, Alabama 36049•205-229-2453•Cnotes17@aol.com

# Timothy Kemp

## Objective

Working within an organization or medical facility in assisting clients to define their needs. Examine and generate solutions for resolving their situations and working to provide increase social functioning and empowerment for individual's families and groups.

## Experience

| June 1998 –Oct 2004 | AHRC | Brooklyn , New York |

**Community Resource Trainer**
- Worked directly with people who were developmentally and physically challenged.
- Organized and supervised community based activities to enhance inclusion, independence and productivity.
- Administered prescribed medications. ( AMAP)

| Feb. 1993- May 1998 | Progressive Steps For Life (PS4L) | New York ,New York |

**Case Manager /Counselor**
- Documented daily records through progress notes, court reports, incident reports and treatment plans.
- Assessed clients and coordinated placement into detoxification or rehabilitation using DSM 4R
- Supervised four volunteer staff.

| Feb. 1984-Sept.1992 | Harlem Center For Education | New York ,New York |

**Junior Counselor**
- Initial Intake and assessment of substance abuse clients.
- Assisted with group counseling sessions.
- Provided client services and referrals.

| Dec. 1981- Feb 1991 | United States Army | Brooklyn, NewYork |

**Communication Specialist**
- Repaired and maintained telephone communication equipment.
- Answered telephone lines and kept records for commanders
- Trained in Nuclear, Biological and Chemical decontamination process.

## Education

| Feb. 1992-Dec. 1999 | New York City Technical College | Brooklyn, New York |

**B.S., Health and Human Service**
- Concentration on Mental Health and Substance Abuse

## References

References are available on request.

LIGHTHOUSE00606

PlAINTIFF Exhibit #11

OC Form 5 (5/01)

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 420-2007-03721 |

_____ and EEOC

*State or local Agency, if any*

| Name *(Indicate Mr., Ms., Mrs.)*  Mr. Eugene L. Woolfork | Home Phone No. *(Incl Area Code)*  (334) 288-1525 | Date of Birth  03-04-1962 |
|---|---|---|

Street Address      City, State and ZIP Code

6021 Portsmouth Court, Montgomery, AL 36116

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name  LIGHTHOUSE COUNSELING CENTER | No. Employees, Members  15 - 100 | Phone No. *(Include Area Code)*  (334) 286-5980 |
|---|---|---|

Street Address      City, State and ZIP Code

1415 East South Boulevard, Montgomery, AL 36116

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|

Street Address      City, State and ZIP Code

RECEIVED
JUL 23 2007
E.E.O.C.
BIRMINGHAM DISTRICT

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER *(Specify below.)*

| DATE(S) DISCRIMINATION TOOK PLACE |  |
|---|---|
| Earliest | Latest |
| 06-22-2007 | 06-22-2007 |

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I am a Black, male. I was hired by the above employer on December 19, 2005. My job title is Case Manager. My job is being made more difficult to perform by my supervisor, Patricia Thomas, (Black female). On a regular basis, my character is defamed, in the presence of the clients that I have been hired to assist. I am the only Black male case manager under her supervision, and this conduct is not perpetuated against the White case managers. On June 12, 2007, during my performance evaluation, I was asked to give information regarding my response to a confidential survey. I did not respond to the question, and informed her that she had no right to request it. I have been retaliated against ever since. On June 22, 2007, I was called into a meeting by Deputy Director, Teresa Houser, White female, and Patricia Thomas. During this meeting I was accused of having poor judgment (as it related to a client) and being untrustworthy. I was then suspended. A similarly situated White case worker who was involved in a similar situation was not verbally abused or suspended.

I believe I am being discriminated against, on the bases of race and reprisal, in violation of Title VII of the 1964 Civil Rights Act, as amended. And my sex, male.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.  SIGNATURE OF COMPLAINANT |
| 7/19/07      *Eugene L. Woolfork*  Date      *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

LIGHTHOUSE00003

# PLANTIFF'S EXHIBIT 12

Dekruff's resume
and job description for
Executive Director



5 pages

# CANDYCE L. DEKRUYFF

(334) 244-4057                    303-5600 Carmichael Road, Montgomery, AL 36117

**CAREER OBJECTIVE**

To obtain a counseling position in a Christian organization utilizing the skills of relational ministry, intervention, and utilizing my own relationship with Christ to encourage others in the hope that God has given.

**CAREER EXPERIENCE**

**Resident Director**                        August 1994-May 1996
Northwestern College, Orange City, IA
*Responsibilities Included:*
- manage and supervise 200 plus residents
- maintain direct contact with each resident and extensive contact with the resident assistants
- provide direction for staff of resident assistants, including all staff meetings and individual weekly meetings
- supervise the maintenance of hall facilities and workers
- serve as the advisor to the campus peer counseling group
- counsel students according to needs
- provide programming opportunities for the residents
- instruct in specialized areas of counseling skills and intervention methods
- presented at Association of Christians in Student Development (ACSD), 1995

**EDUCATION**

**Master of Arts in Counseling**              April 1994
Providence Theological Seminary
Otterburne, Manitoba Canada

*Course Highlights*
Addictions and Co-dependancies          Counseling the Abused
Depression and Anxiety Disorders        Marriage and Family
Eating Disorders                        Sexual Dysfunctions

*Related Educational Seminars*
Prepare and Enrich pre-marital and marital counseling
Spiritual Warfare with Neil Anderson

**WORK EXPERIENCE**

**Customer Service Representative**          May-August 1990-1994
Royal Bank of Canada, Winnipeg, Manitoba Canada
*Responsibilities Included:*
- ensured efficient customer service in all financial transactions
- assisted in supervision of training new staff
- demonstrated financial skills in balancing and accounting
- assisted administrative assistant during vacations, completing typing, filing, initial customer service inquiries in person and by telecommunication

**LIGHTHOUSE 0230**

# CANDYCE L. DEKRUYFF

*Page Two*

**WORK**      Evening **Supervisor**          May-August 1989
**EXPERIENCE**   Ye Olde Fudgery, Banff, Alberta Canada
**CONTINUED**     *Responsibilities Included:*
                    ❖ ensured efficient customer service in all purchases
                    ❖ supervised evening staff and lock-up procedures

           **Children's Programs Intern**       July-August 1988
Manitoba Mennonite Brethren Missions and Church Extension,
Leaf Rapids, Manitoba Canada
     *Responsibilities Included:*
        ❖ developed, co-ordinated and implemented childrens
          programming and activities
        ❖ assisted with the programming of all church functions
        ❖ conducted visitations

          **Customer Service**         February 1987-June 1988
McDonald's of Canada Limited, Winnipeg, Manitoba Canada
     *Responsibilities Included:*
        ❖ ensured efficient and effective customer service
        ❖ assisted in the management of quality control
        ❖ maintained a clean and safe working environment
        ❖ demonstrated ability to handle many demands at one time

**ACTIVITIES**     downhill skiing        swimming        walking
**& INTERESTS**   reading              singing             cross-stitch work
                 calligraphy

**REFERENCES**   Available **upon request**

**LIGHTHOUSE 0231**

*Current Deputy Director*

*New Beginnings Project*
*Lighthouse Counseling Center, Inc.*

# Candyce L. DeKruyff, M.A.

## Experience:

Deputy Director                                                    September 2000-present
Lighthouse Counseling Center, Inc.                          Montgomery, AL

> *Oversee the various programs, including chemical dependency recovery, mentoring, prevention programs, HIV/AIDS housing, and Council Against Rape. Represent the agency at various community functions and events and perform various administrative duties including grant writing, supervision, public relations, and outreach activities.*

Program Coordinator                                          June 1999-September 2000
Council Against Rape ~ Lighthouse Counseling Center, Inc.        Montgomery, AL

> *Supervise and coordinate all aspects of the Council Against Rape, including staff, Prevention Education programs, the Sexual Assault Response Team and the Sexual Assault Nurse Examiners, the Crisis Intervention Advocates, and the Counseling Program. Responsible for the fiscal management of the program and for grant writing and expansion of programs.*

Counselor                                                  September 1996-September 1999
Council Against Rape ~ Lighthouse Counseling Center, Inc.        Montgomery, AL

> *Primary Counselor for sexual assault victims and their families. Counseled with 180+ victims in an individual and group setting. Implemented the group counseling process with the Council Against Rape. Accompanied 100+ victims to the hospital, law enforcement interview immediately following their assaults.*

## Education:

Master of Arts in Counseling                                          April 1994
Providence Seminary                                    Otterburne, Manitoba, Canada

Bachelor of Arts in Humanities                                        April 1991
Winnipeg Bible College                                Otterburne, Manitoba, Canada

## LIGHTHOUSE COUNSELING CENTER, INC.
## EXECUTIVE DIRECTOR

**Definition:**

This is a highly responsible administrative and professional position with emphasis in several areas: 1. The development, implementation, and maintenance of Board approved policies and procedures designed to ensure the attainment of the agency's mission, goals and purpose; 2. The recruitment, employment, supervision and termination of all personnel; 3. The administration of the agency's fiscal operations consistent with generally accepted accounting principals and the agency's approved annual budget; 4. Communication of pertinent information in a timely and effective fashion to the Board of Directors, staff members, funding sources, and interested persons and entities within the community regarding the agency's mission, goals and operations; 5. Planning, implementation and coordination of all agency programs and services in compliance with Board approved policies and procedures, agency mission and philosophy, and all applicable local, state, federal and contractual guidelines, laws and regulations.

**Description of Duties:**

Duties encompass three broad areas of responsibility:

    A.    Relationship to the Board of Directors:
- Inform and advise the Board regularly of pertinent information and data related to agency programs, finances, policies, procedures, personnel, contracts and agreements which impact the agency's goals, mission and services.
- Implement the policies, procedures and directions of the Board in all matters.
- Serve as a liaison between the Board and all other funding, planning, regulatory, and service organizations, such as the State Departments of Mental Health, Human Resources, Public Health, local agencies, governmental entities, general public, etal.

    B.    Relationship to the agency:
- Plans, administers, and evaluates programs and services provided by, or provided through, the agency.
- Provides supervision, guidance and support in the recruitment, employment, training, evaluation and termination of all employees, generally through their program director or supervisor, in accordance with all agency policies and procedures, as well as local, state and federal laws and regulations.
- Ensures that the purposes, intent and philosophy of the Board of Directors are observed when planning, implementing, and administering the policies, programs and personnel of the agency.
- Serves as the liaison of all agency personnel to the Board of Directors.
- Ensures that all agency operations comply with regulations/guidelines as delineated in official agreements, contracts and grants.
- Directs the preparation of the agency's annual budget and submits it to the Board of Directors for approval.
- Administers the agency's budget and fiscal operations in accordance with generally accepted accounting principals, agency policies and procedures, and other applicable contractual and governmental guidelines/regulations.

LIGHTHOUSE00196

LIGHTHOUSE 0232

amount to more than 5% of an employee's gross annual salary in a twelve month period of time;
7.  Implementing new, or revised, personnel policies.

**Requirements:**
Strong leadership, administrative and organizational skills.  Ability to communicate clearly and
effectively with a variety of individuals, both orally and in writing.  Ability to develop and
maintain relationships and agreements within and outside of the agency.  Ability to network with
other agencies, organizations and entities cooperatively.  Knowledge of community resources
and their appropriate utilization as applied to the clinical, administrative and financial needs of
the agency.  Extensive knowledge and background experience in the treatment of emotional and
substance abuse disorders.

**Supervisor:**
President, Board of Directors

**Qualifications:**
Graduation from an accredited, degree-granting institution with a Master's degree in a human
services-related field, **plus** a minimum of five years recent management experience and five
years of direct counseling experience.

*Received, read & acknowledge:*

*[signature] 4·14·05*

*4/2005*

**LIGHTHOUSE00197**

**LIGHTHOUSE 0233**

# PLANTIFF'S EXHIBIT 13

All information on
Stinson

29 pages




*JOB DESCRIPTION*
*BUSINESS MANAGER*

*SUPERVISOR:* ~~Executive Director~~ Deputy Director

*DEFINITION:* *This is highly responsible work which includes coordinating the following financial areas: payroll, accounts payable/receivable, vouchers, insurance and budget preparation. Responsible for all accounting matters related to the agency and the timely and accurate production of financial statements in accordance with generally accepted accounting principles.*

*DESCRIPTION OF DUTIES:*

- *strictly monitors and controls the collection and disbursements of agency funds and the resultant cash balances to ensure a positive cash position to meet financial obligations at all times;*
- *produces timely and accurate monthly and annual financial statements in accordance with generally accepted accounting principles;*
- *reconciles all general ledger accounts to supporting detail information*
- *prepares employee payroll (both salaried and contract);*
- *receives invoices for services or goods purchased, verifies accuracy and ensures timely payment of all periodic expenditures; reconciles vendor statements;*
- *bills clients and third parties for services provided; follows up on delinquent accounts; collects fees;*
- *prepares weekly, monthly, annual and other financial reports as requested by staff members;*
- *works cooperatively with and assists staff members with proposals and contracts as needed;*
- *coordinates agency insurance and other employee benefits;*
- *maintains orderly financial and administrative files;*
- *maintains computer programs to assure efficient agency operation;*
- *files payroll tax deposits and quarterly payroll tax returns, year-end payroll tax returns, W-2's, 1099's and other reports as needed;*
- *assists with the interviewing, hiring, training, and supervision of Business Office personnel;*
- *monthly reconciliation of all agency bank accounts; and*
- *related duties as assigned by supervisor.*

*QUALIFICATIONS:*

   *Graduation from an accredited four-year institution of higher learning with a major in Accounting, CPA or eligible. Three years' hands-on accounting experience including payables, receivables, and payroll; extensive computer skills and wide knowledge of a variety of computer systems and software; ability to interact cooperatively with clients, employees, vendors and the general public; excellent communication and organizational skills.*

9/5/02

**LIGHTHOUSE00080**

**LIGHTHOUSE 0117**

Plaintiff
Exhibit 13

## LIGHTHOUSE COUNSELING CENTER, INC.
## BUSINESS MANAGER

**Definition:**
This is a highly responsible work which includes coordinating the following financial areas: payroll, accounts payable/receivable, vouchers, insurance and budget preparation. Responsible for all accounting matters related to the agency and the timely and accurate production of financial statements in accordance with generally accepted accounting principals.

**Description of Duties:**
- Strictly monitors and controls the collection and disbursements of agency funds and the resultant cash balances to ensure a positive cash position to meet financial obligations at all times;
- Produces timely and accurate monthly and annual financial statements in accordance with generally accepted accounting principals;
- Reconciles all general ledger accounts to supporting detail information;
- Prepares employee payroll (both salaried and contract);
- Receives invoices for services or goods purchased, verifies accuracy and ensures timely payment of all periodic expenditures; reconciles vendor statements;
- Bills clients and third parties for services provided; follows up on delinquent accounts; collects fees;
- Prepares weekly, monthly, annual and other financial reports as requested by staff members;
- Works cooperatively with and assists staff members with proposals and contracts as needed;
- Coordinates agency insurance and other employee benefits;
- Maintains orderly financial and administrative files;
- Maintains computer programs to assure efficient agency operation;
- Files payroll tax deposits and quarterly payroll tax returns, year-end payroll tax returns, W-2's, 1099's and other reports as needed;
- Responsible for the interviewing, hiring, training, and supervision of Business Office personnel;
- Monthly reconciliation of all agency bank accounts; and
- Related duties as assigned by supervisor
- This is an exempt employment position

**Supervisor:**
Deputy Director

**Qualifications:**
Graduation from an accredited four-year institution of higher learning with a major in Accounting, CPA or eligible. Three years' hands-on accounting experience including payables, receivables, and payroll; extensive computer skills and wide knowledge of a variety of computer systems and software; ability to interact cooperatively with clients, employees, vendors and the general public; excellent communication and organizational skills.

_____          _10-25-05_____
Incumbent's Signature                      Date

LIGHTHOUSE 0107

*Interview ~ Sat 9:30am*  ⟍    *hire @ $30,00*
*Start 9.5.02*

# Carianne E. Brown

*Plantiff*
*Exhibit 13*    *[initials]*

**487 Skipperville Road**
**Ozark, Alabama 36360**
Home: (334) 445-2044
Work: (334) 793-0083 ext. 104

## OBJECTIVE
Be an effective member of an organization, working individually or as part of a team. Contribute to a positive work environment, while using my training and experience to help the organization run smoothly.

## FINANCE EXPERIENCE
BBG Specialty Foods, Dothan, AL, September 1999-present – Accounting Department Supervisor
Duties and supervision includes:
* Accounts Payable for 37 Fast Food Restaurants
* Payroll for over 700 employees
* Management for all benefit provided for employees (401K, Disability, Insurance, ect.)
* Cash Management for 37 stores
* Payroll Taxes for stores in 3 States
* Income Taxes for stores in 3 States and numerous counties
* Inter-company Transfers
* Workman's Compensation and Liability Claim Management
* Process all Unemployment Compensation Claims
* Calculate Net Sales, Gross Sales, Promotions, and Discounts for all stores
* Compile spreadsheets for comparison and sales analysis

Airspeed Aviation, Inc. Ozark, AL, September 2001 – May 2002 – Accounting Manager
Duties included:
* Accounts Receivable and Payable
* Payroll
* FET Taxes
* Bank Reconciliation's and Financial Statements
* Other various accounting and office manager functions

## EXPERIENCE
Saad's Jewelers, Dothan, AL, September 1997-September 1999 - Sales associate – Part-time
Duties included
* Sales and customer service
* Store displays and inventory maintenance

Dale County Sheriff's Department, Ozark, AL, - September 1996-1997 - Part-time work-study
Duties included
* Clerical
* Public relations – assisting with forms and documentation

## EDUCATION
BS/BA in Finance, August 2001, Troy State University, Dothan, AL
Courses Related to Major:

| | | |
|---|---|---|
| *Money and Banking | *International Finance | Financial Management |
| *Production Management | *Finance Seminar | *Marketing |
| *Financial Institution | *Business Finance | *Accounting 1 & 2 |
| *Business Communications | *Management | *Human Resource Management |
| *Personal Financial Planning | | *Business Law |

LIGHTHOUSE0007⁹

## HONORS
National Honor Society, National Vocational/Technical Honor Society, Math Honor Society, Spanish Honor Society

LIGHTHOUSE 0116



PLAINTIFF'S
EXHIBIT
13

# Memorandum

**To:**    E. Byrd Personnel File

**Copy:**

**From:**  Candyce DeKruyff, Executive Director

**Date:**  6.5.06

**Re:**    Falsified Transcripts

---

Having reviewed the documentation and memos regarding Ms. Byrd's falsification of transcripts for her position with the agency, and having talked with both Ms. Houser, Deputy Director and Ms. Stinson, HR Director regarding the information presented, I am in agreement that Ms. Byrd's employment with the Lighthouse had to be terminated and her resignation accepted immediately.

While the Lighthouse Counseling Center, Inc. requires a master's degree for all counseling positions, Ms. Byrd was still qualified to provide the clinical services to Lighthouse clients according to the State Department of Mental Health and Mental Retardation standards (see standard 3202, part d). In addition, all of Ms. Byrd's clinical work was reviewed and supervised by a master's level clinician while at the Lighthouse.

From this it is apparent that no client was harmed, neglected, or abused with regards to the work performed by Ms. Byrd during her tenure with the agency.

*SEE Eliza Byrd's Job Description Attached*

1

## LIGHTHOUSE COUNSELING CENTER, INC.
## COUNSELOR

**Definition:**
The counselor is responsible for providing the majority of individual and group counseling services to clients in the chemical dependency recovery program. The counselor consults with other community agencies and the public in order to enhance the referral process. The counselor will maintain a caseload of clients and be responsible for primary care from admission through follow-up and case file documentation.

**Description of Duties:**
- May conduct psychosocial assessments for potential clients.
- Provides group therapy, lecture, discussion and didactic group education and counseling, parenting classes, family focus groups, child and adolescent chemical dependency education, individual and family therapy and treatment.
- Provides program information to applicants for services and conducts intake/screening interviews.
- Maintains daily personal contact with clients.
- Consults with community agencies for appropriate services.
- Reports progress of clients to referral source.
- Consults with CDRP Director on continuing progress of cases; consults with staff on treatment plans and goals for clients; develops and implements treatment plans for clients.
- Participate in treatment team staffing.
- Maintains adequate case records and clinical documentation as directed by the CDRP Director in accordance with the Substance Abuse Standards, Substance Abuse Division of the Alabama Department of Mental Health and Mental Retardation.
- Participates in evaluation of treatment services including Quarterly Quality Assurance Reviews.
- Prepares monthly client progress reports for DHR, CRO, PO, Employer, etc.
- Other Duties as assigned by Supervisor
- This is an exempt employment position

**Requirements:**
Knowledge of individual, family and group behavior with special emphasis chemical addictions and HIV/AIDS and other sexually transmitted diseases. Ability to make mental health assessments and develop appropriate therapeutic plans. Knowledge of principals of counseling. Ability to establish and maintain effective counseling relationships by gaining trust, cooperation and understanding of individual concerned. Ability to establish and maintain rapport with community agencies. Ability to make clear and pertinent statements orally and in writing. Ability to relate to a wide variety of clientele.

**Supervisor:**
Chemical Dependency Recovery Program Director

**Qualifications:**
A master's degree from an accredited college or university with a behavioral science or counseling major and two years experience in either a substance abuse services division.

_Eliza A. Byrd_
Incumbent's Signature

_10/26/05_
Date

**LIGHTHOUSE00995**

*Exhibit 13*



Candyce DeKruyff, M.A.
Executive Director

*Lighthouse*
counseling center, inc.

*Celebrating over 30 years of*
*service to the community*

November 9, 2005

Carianne Stinson
Lighthouse Counseling Center, Inc.
1415 East South Boulevard
Montgomery, AL 36116

Re: Business Manager Position

Dear Carianne:

I am delighted to be able to offer you the opportunity to rescind your resignation following our discussions to have you work remotely from Birmingham in your current position as Business Manager for the Lighthouse. As you know, the Board of Directors is very interested in having you stay in your current position and have asked me to determine whether this is a viable option, as you have proved to be a very valuable, ethical and loyal employee with our agency. After our lengthy discussions on the issue, I believe that you can continue your duties in a remote capacity, just coming into the agency one or two days each week.

To ensure that working from Birmingham is both the best option for you and for the agency, we would offer you a three month trial of the position at the end of which both you and the agency would have the opportunity to re-evaluate and determine whether the arrangement is suiting everyone's needs and that the job is able to be done remotely. As I understand that you have not yet sold your home and determined a move date, I would just ask that you inform me of the date when this three month trial period will begin.

Again, thank you for your dedication and commitment to the Lighthouse and please let me know if there is anything that I can do to make your transition to Birmingham any easier.

Sincerely,

Candyce L. DeKruyff, M.A.
Executive Director

I am willingly rescinding my resignation dated October 25, 2005 and will plan to work remotely from Birmingham in my current capacity as Business Manager with a three month trial to commence upon my move.

Signature & Date     Nov 9, 2005

**LIGHTHOUSE00089**

*Member Agency of the River Region United Way*
1415 East South Boulevard • Montgomery, Alabama 36116 • Ph. (334) 286-5980 • Fax (

**LIGHTHOUSE 0126**

## INTEROFFICE MEMORANDUM

**TO:**       CARIANNE STINSON

**FROM:**     CANDYCE DEKRUYFF

**SUBJECT:**  TRAVEL FROM HOME OFFICE

**DATE:**     JANUARY 1, 2006

**CC:**       CARIANNE STINSON'S PERSONNEL FILE

*[handwritten: BOARD MINUTES INCL. STINSON CONT'D. EMPLOYMENT #4]*

This memo is for the record regarding the Board's decision to extend the offer for you to continue as the Lighthouse Business Manager and work remotely from your home office in Birmingham, and traveling into the Lighthouse's Main office (1415 East South Blvd., Montgomery, AL) on a weekly basis.

As per the Board's direction and approval, you will be reimbursed for mileage for travel into the Lighthouse's main office as follows:

- All mileage will be reimbursed at the State of Alabama's approved mileage reimbursement rate.

- You will be asked to come into the Lighthouse's main office a minimum of one time per week (unless prior approval is granted). You will be paid for a round trip from your home office to the Lighthouse's main campus for this trip.

- On weeks where you come into the office for two days and spend the night, the Lighthouse will once again reimburse you for a single round-trip of mileage. Your hotel and meals will not be compensated by the agency. We do understand that at times, due to family obligations, or other situations, you may not have the ability to spend this night. The Lighthouse will pay for a single return trip and a one-way trip as per our mutual agreement in those weeks.

- There will be weeks where you are required to come in for multiple days which are 1) either beyond your control due to emergency coverage of staff absence; 2) for required agency events (eg. Field Day); or 3) for other business office requirements (prelim audit & audit; site reviews, etc). It is understood that these requirements may involved more than 2 days and are scheduled often beyond your control. In this case, the Lighthouse will reimburse you for the multiple trips that you are required to make to the agency.

Sincerely,

Candyce DeKruyff, E.D.

David Belser, Board Chair

LIGHTHOUSE00202



Candyce DeKruyff, M.A.
Executive Director

*Celebrating over 30 years of*
*service to the community*

April 15, 2006

### Memo for Record

To: Carianne Stinson
Copy: Carianne Stinson's Personnel File
From: Candyce DeKruyff, E.D.

On January 9, 2006 Ms. Stinson began working remotely from Birmingham, AL as the Lighthouse's Business Manager. Ms. Stinson had been with the agency for 3+ years at the time of this transition and upon hearing of Ms. Stinson's upcoming move to Birmingham, the Board of Directors asked Ms. Stinson and I to discuss the possibility of having Ms. Stinson work remotely.

Ms. Stinson and I did discuss this option as is shown in Ms. Stinson's appointment letter dated November 9, 2005. Ms. Stinson moved to Birmingham at the beginning of January 2006 and began a three month trial in her remote position on January 9, 2006.

Ms. Stinson and I have met regarding this trial period and have made a mutual determination that this has been a positive move for both Ms. Stinson and for the Lighthouse and that there have been no negatives to the move that would cause us to re-consider this working arrangement. I am therefore pleased to recommend that the Lighthouse continue it's arrangement with Ms. Stinson to have her work remotely from Birmingham, coming into the Lighthouse's main office one or two days each week.

*[signature]* 5.8.06

LIGHTHOUSE 0161

*Member Agency of the River Region United Way*
1415 East South Boulevard • Montgomery, Alabama 36116 • Ph. (334) 286-5980 • Fax (334) 286-5993

# THE
# ROY STATE UNIVERSITY
## SYSTEM



**TROY STATE UNIVERSITY DOTHAN**
P.O. BOX 8368
DOTHAN, ALABAMA 36304
(334) 983-6556

Plaintiff
Exhibit 13

WARNING: Original document has an artificial watermark on reverse side.

# THE
# TROY STATE UNIVERSITY SYSTEM



Plantiff
Exhibit 13

**TROY STATE UNIVERSITY DOTHAN**
P.O. BOX 8368
DOTHAN, ALABAMA 36304
(334) 983-6556

WARNING: Original document has an artificial watermark on reverse side.

LIGHTHOUSE 0149

*pull acct ?*
*Exhibit 6*
*Plantiff's Exhibit 13*

# Cecelia Owens

**From:**     Carianne Stinson [cstinson@lighthousehelp.com]
**Sent:**     Monday, October 03, 2005 12:41 PM
**To:**       cowens@lighthousehelp.com
**Subject:** RE: Peachtree

Again, I may be unclear because of the "issues" that the board had with the policy, and also, what has been being done before you came. I may be confusing the fact that Candyce was the only one to do this and that is why we communicated Executive, rather than either or. If I am incorrect, witch is very possible, I will come to you with these things in the future. I was certainly not trying to hide it, which is why I also sent you a copy. My communication from Candyce when she left for maternity leave was to make sure and send all invoices over $500.00 to her for approval. This invoice will be over $500.00 once tax and shipping is applied.

I apologize that it continues to seem like I am "going over your head". (Investigation File, this approval, and not submitting my travel voucher to you), and I am in no way intending to do that. My intention is and always has been to be a help to you, and not a hindrance. I realize that the last couple of days have been trying for us in this regard, and I just want to make sure that I communicate, what my intentions are.

I desire to communicate with you, and work through these transitions. I have been a dedicated employee to Lighthouse thus far, and desire to continue to do that.

Thanks,

Carianne

---

**From:** Cecelia Owens [mailto:cowens@lighthousehelp.com]
**Sent:** Monday, October 03, 2005 12:29 PM
**To:** cstinson@lighthousehelp.com
**Cc:** cdekruyff@lighthousehelp.com
**Subject:** RE: Peachtree

Where is the policy that outlines the approval amounts and by whom? Is this an organizational policy or one that was set by Candyce or Junior in their role as ED? Further was this policy applicable as a part of Candyce's responsibilities as Deputy?
As we go through this transition process, it is these type issues that must be clear.

I am guessing that Candyce in her role as Deputy approved these things. I am further guessing that in the absence of a Deputy, she was the sole person to do this not necessarily by choice but that she was the only executive in the organization that could do it.

Of course, this has since changed. I'm coming over for us to talk.

---

**From:** Carianne Stinson [mailto:cstinson@lighthousehelp.com]
**Sent:** Monday, October 03, 2005 11:08 AM
**To:** 'Candyce DeKruyff'; 'Cecelia Owens'
**Subject:** Peachtree

Candyce,

**I need this purchased approved by the Executive Director, since it is an amount above my approval ranges.
Peachtree software update and payroll tax updates for $427.00**

10/3/2005

Updated 5/06

Exhibit 13

# Lighthouse Counseling Center
# COACHING NOTE

| Employee Name | Position/Status | Date |
|---|---|---|
| Carianne Stinson | Business Manager/HR Director | June 5, 2006 |

**Frequency of Coaching:**

_____ Weekly        _____ Monthly        _____ Quarterly        **X** One Time Only

**Type of Note:**

| _____ Recognition of a job well done! | _____ Review of policy and procedures. |
|---|---|
| _____ Clarification of duties. | **X** Review of job expectations and/or attitude check. |
| _____ Review of previous coaching note. | _____ Other. Explain _____ |

**Explanation of Note:**

Carianne — As you are well aware, the incident last week concerning an employee's transcript could have been extremely detrimental to the Lighthouse. I want you to know that I do appreciate several things that did happen in the course of this incident: 1) you recognized that you had not followed up on receiving the transcript and was working to ensure that you received it so that the files would be in order prior to site visit; 2) you were honest about your mistake once realized and did not try to cover that mistake up but were forthright in letting your supervisor know about the situation; 3) you have taken full responsibility for the issue and have already begun to work on a process whereby oversights of this nature do not take place again. I am very appreciative of your diligence and am assured that a situation of this nature will not occur again under your direction.

**Employee Response:**

I completly agree. I failed to follow up on this + I realize the implications of missing some thing of this nature. I have taken personal steps to prevent this in the future + hate that this ever happened.

_____ 6·5·06                    _____ 6·5·06
Supervisor's Signature & Date               Employee Signature & Date

When completed provide the employee with a copy and place the original in the employee personnel file.

**LIGHTHOUSE 0122**

Mtgy are $532.00/mth and 599.00/mth respectively, which makes us under the FMR.

Is there any way that we can increase that leasing amount, just to cover our cost. Our month rent cost is $5924.00 (8 - 1bedrooms @ $473 = 3,784.00, and 4 - 2 bedrooms at $535 = $2,140); this makes our yearly rent cost $71,088.00.

Any suggestions?

Thanks,
Carianne

**From:** june_j._franklin@hud.gov
[mailto:june_j._franklin@hud.gov]
**Sent:** Monday, August 29, 2005 1:49 PM
**To:** cstinson@lighthousehelp.com
**Subject:** Renewal Grant

Carianne,

When I was reviewing the renewal application for AL09B404004 - PH for Homeless with HIV and Substance Abuse or other Mental Illness there are a couple of mistakes:

1. The grant number to be renewed is incorrect. It should be AL09B404004.

9/15/2005

2. The grant budget isn't for the same budget line item amounts as the grant to be renewed. It can be changed, but it can't be more than 10%, or 17,772. A copy of the budget in our LOCCS system is below. You either need to revise the budget to correspond with the original budget, or change it with no more than a 10% shift of funds between line items. Then, submit a new page to us.

9/15/2005



Call me if you need more information about this.


June J. Franklin
CPD Representative
Phone: 205-731-2630, Ext. 1052


9/15/2005

**Cecelia Owens**

| From: | cdekruyff-lhh@greenlynk.com |
|---|---|
| Sent: | Monday, September 26, 2005 11:29 AM |
| To: | cstinson@lighthousehelp.com; lcarroll@lighthousehelp.com; cowens@lighthousehelp.com; cdekruyff@lighthousehelp.com |
| Subject: | Re: FW: Telephone number 334-286-3638 |

I think the client also needs to pay the charges for this (as this is not a first offense
with him).

CD

On 26 Sep 2005 08:22 CDT you wrote:

> Lisa,
>
> Please read below first.
>
> This is Victor Leonard.  He is in deep trouble with me!  :)  Not only
> do they charge for all these things, but Bellsouth charges $23.00 to
> move over and Network tel will charge $20.00 to move back over to
> them.  He will be owing us close to $100.00.  Can I, Cecelia, or
> Candyce be in attendance at the next housing meeting so that we can
> put fear into the clients, NOT to make these kindof changes.  Can we
> make sure that he is put on a behavioral contract for this?
>
> Thanks,
>
> Carianne
>
>
>    _____
>
> From: Melissa Hulen [mailto:Melissa.Hulen@networktelephone.net]
> Sent: Friday, September 23, 2005 4:31 PM
> To: cstinson@lighthousehelp.com
> Subject: Telephone number 334-286-3638
>
>
> Carianne
>
> We were checking your records to make sure we have all the features
> you requested and found that someone had told BellSouth to transfer
> this line back to them with the following features:
>
> Voice Mail
> Custom Toll Restriction
> Three-Way Calling
> Call Forwarding
> Message Waiting Indicator
> Call Return
> Call Tracing
> Call Block
> Caller ID Deluxe (Name and Number shows)
>
> They also show this line with a Complet Choice package for 1 Business
> line and Total Messaging
>
> I didn't think you had changed anything back to BellSouth so I need
> you to contact BellSouth and find out what is going on
>
> Let me know

1

```
> Thank you
> Melissa
>
> Melissa Hulen
> Network Telephone, Inc
> Order Manager - Region 1
> 1110 Pennsylvania Ave.
> (888)367-3811 x1619
> (850)469-9904 x1619
>
```

Plantiff
Exhibit 13

/Page __1__ of __1__

## LIGHTHOUSE COUNSELING CENTER, INC.

### TRAVEL VOUCHER

NAME: Carianne Stinson               TITLE: Business Manager

| DATE | FROM | TO | MILES | COST | |
|------|------|----|-------|------|--|
| 08/12/05 | LCC | Zelda Road & Rtn | 5 | 2.43 | |
| 8/14/05 | LCC | RSA Union & Rtn | 12 | 5.82 | |
| 8/21/05 | LCC | STAR, Anniston & Rtn | 244 | 118.34 | |
| 8/22/05 | LCC | MACH Mtg At DPH & Rtn | 10 | 4.85 | |
| 9/28/05 | LCC | STAR & Rtn (Standards Review) | 12 | 5.82 | |
| 8/9/05 | LCC | Bank & Rtn | 4 | 1.94 | |
| 8/22/05 | LCC | Bank & Rtn | 4 | 1.94 | |
| 8/28/05 | LCC | Bank & Rtn | 4 | 1.94 | |
| | | | | | |
| | | | | | |
| | | **Total Miles** | 295 | 143.08 | 7000¹ |
| | | | | | |
| | | September Cell | | 15.00 | 6650¹ |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | TOTAL | | 158.08 | |

"I certify that the above information is correct, and that these expenses were incurred in the course of my duties with Lighthouse."

Signed: _____

Authorized by: _Cecelia Owens_ Date: _10/3/05_

Reimbursement made: _____    Date: _____
                    (initial)

**LIGHTHOUSE00589**

70001   482.57
66501 - 15.00

___ of _1_

## LIGHTHOUSE COUNSELING CENTER, INC.

### TRAVEL VOUCHER

NAME:  Carianne Stinson          TITLE:  Business Manager

| DATE | FROM | TO | MILES | COST |
|------|------|----|-------|------|
| 4/2/07 | Bhm Office | LH | 86 | 41.71 |
| 4/2/07 | LH | Awards & Gifts, Bhm Office | 98 | 47.53 |
| 4/2/07 | LH | Bank & Rtn | 12 | 5.82 |
| 4/5/07 | Bham Office | Post Office (DPH Invoice) | 16 | 7.76 |
| 4/10/07 | Bham Office | Sams & LH | 98 | 47.53 |
| 4/10/07 | LH | First Baptist Church (STAR) | 7 | 3.39 |
| 4/11/07 | LH | Bank & Bham Office | 92 | 44.62 |
| 4/17/07 | Bham Office | LH | 86 | 41.71 |
| 4/17/07 | LH | Awards & Gifts, Bank & Bhm Office | 104 | 50.44 |
| 4/18/07 | Bhm Office | Sams & Rtn | 24 | 11.64 |
| 4/23/07 | Bham Office | LH | 86 | 41.71 |
| 4/23/04 | LH | VIC & Rtn | 16 | 7.76 |
| 4/24/07 | LH | Bank & Bhm Office | 92 | 44.62 |
| 4/30/07 | Bhm Office | LH | 86 | 41.71 |
| 4/30/07 | LH | Bank & Bhm Office | 92 | 44.62 |
|  |  | **Total Miles** | **995** | **482.57** |
|  |  |  |  |  |
|  |  | April |  | 15.00 |
|  |  | TOTAL |  | 497.57 |
|  |  |  |  |  |

"I certify that the above information is correct, and that these expenses were incurred in the course of my duties with Lighthouse."

Signed: _____

Authorized by: _Dayle C Lindy_          Date: _4-30-07_

Reimbursement made: _____          Date: _____
                    (initial)

LIGHTHOUSE00436

of __1__

10001

66501  15.00

Plaintiff Exhibit 13

# LIGHTHOUSE COUNSELING CENTER, INC.

## TRAVEL VOUCHER

NAME:  Carianne Stinson                TITLE:  Business Manager

| DATE | FROM | TO | MILES | COST |
|------|------|----|-------|------|
| 9/6/06 | Home Office | LH | 86 | 38.27 |
| 9/6/06 | LH | Bank & Rtn | 6 | 2.67 |
| 9/6/06 | LH | Home Office | 86 | 38.27 |
| 9/11/06 | Home Office | LH & Rtn | 175 | 76.54 |
| 9/12/06 | Home Office | Post Office & Rtn | 15 | 6.68 |
| 9/19/06 | Home Office | LH & Rtn | 172 | 76.54 |
| 9/21/06 | Home Office | EEOC Training (Medical Forum Building) & Rtn | 41 | 18.25 |
| 9/25/06 | Home Office | LH | 86 | 38.27 |
| 9/25/06 | LH | Post Office, Bank & Rtn | 7 | 3.12 |
| 9/25/06 | LH | Home Office | 86 | 38.27 |
| 9/26/06 | Home Office | LH (1 way) | 86 | 38.27 |
| 9/26/06 | LH | Home Depot, Oh My Catering, & Rtn | 20 | 8.90 |
| | | | | |
| | | | | |
| | | | | |
| | | **Total Miles** | 866 | 385.37 |
| | | | | |
| | | Sept | | 15.00 |
| | | | | |
| | | TOTAL | | 400.37 |

"I certify that the above information is correct, and that these expenses were incurred in the course of my duties with Lighthouse."

Signed: _____

Authorized by: _____        Date:  10·2·06

Reimbursement made: _____        Date: _____
            (initial)

Exhibit 13

# Memorandum

**To:**     C. Stinson's Personnel File

**Copy:**  C. Stinson

**From:** Candyce DeKruyff, Executive Director

**Date:**  6.7.06

**Re:**     Memo for Record

---

Over the past seven months, several situations have become extremely clear which cause me to write this memo for the record to be placed in Ms. Stinson's personnel file. This memo is to refute the negative comments and coaching note placed in Ms. Stinson's file by the former deputy director, Ms. Cecelia Owens, who was with our agency for a total of nine (9) weeks.

During that nine (9) week period of time, Ms. Owens showed a pattern herself of being insubordinate towards her supervisor (me) and towards the directives and desires of the Board. This is what led to Ms. Owens' termination from the agency. It is apparent to the Board and I that Ms. Owens had a personal agenda when she was hired by the Lighthouse and that this agenda including taking over as executive director and having Ms. Stinson fired so that she could replace her with a person of her own choosing.

This pattern was evidenced again when Ms. Owens was subsequently hired by another non-profit agency within Montgomery and attempted to act in the same manner (desiring to take over and to have other persons fired).

I have worked with Ms. Stinson since September of 2002 and know that insubordination and a lack of professionalism do not characterize her work performance or work relationships.

For this reason, I find it very important to place this memo in Ms. Stinson's file which should refute any accusations made by Ms. Owens during her short tenure with our agency.

1

*Plintiff Exhibit 13*

# Memorandum

**To:**     Junior Dunham

**CC:**     File, Personnel File

**From:**   Carianne

**Date:**   5/23/2003

**Re:**     Claim Notes on Employee Fraud

*2nd page documents
Crianne's admitted
issues with
communication 2years
prior to Plantiff's
Employment*

I submitted the claim for the employee fraud file in December 2002, once the Audit was over. At the same time we increase our coverage for this type of loss. The claim was turned over to Professional Claims Management and they contacted me on the 6th of January. She requested any documentation that we had including his employee file and the auditors report. We received the audit report (final copies) in the middle of January. I mail Mr. Peacocks personal file along with the portion of the drafted audit report that I felt was pertinent to this claim by the last week in January. The reason it took me a while is because I was short on help and I had many deadlines in January to include W-2's and quarterly reports for the month ending December. As well and getting my book corrected with the AJE's that the auditors gave me at the end of December.

Before she called me I called several times to see if she needed any thing else. It seemed as if she was irritated with my calling her. I wanted to stay on top of the claim I explained to her. She said that once she finished looking over all of the documentation she would contact me. Ms. Shuman called me on the 11th of February after she received my file which I felt was very comprehensive. She asked me to get her a list of items that were in question. I explained that I had sent that to her. She claimed that she could not put her finger on it so I told her that I would fax another copy. I faxed her a copy that very same day.

I spoke to Ms. Shuman on the 4th of March. I had called her previously and received voicemail each time. She claims she left me a message but I did not receive any. She claimed that she did not receive my fax, however I faxed it on the same day she requested it. I told her that I would re-fax it ASAP.

She contacted me later that afternoon and stated that they need more information. She needed statements from American Express and detail of all questionable claims. This required me to pull out the files from storage and make copies. I also prepared a detailed cover sheet that listed every item, the date, the amount, what form it was purchased by, and a description of the purchase including what page of the fax it was on. I completed that and faxed it to her in April. I told her I would send a hard copy by mail but I remember her telling me that a fax was sufficient since everything was a copy anyways.

I called her back on the 9th frustrated because she had not returned my call. I felt like this was taking way too long. She explained that she only receive half of a fax and was waiting on the hard copy. I told her that I did not mail the hard copy and that I would fax again but I wanted this to be expedited because we had been waiting on this claim for quite some time. I also explained that I was being

1

LIGHTHOUSE 0193

May 23, 2003

questioned frequently about it, and I could not understand the delay.  She explained that she was working on it and that as soon as she got my info she would have a check to me with in a week or so and did not see any problems with the claim being expedited.

She left me a message and stated that she did not receive the documents so I faxed them again , twice. I made sure that she received them.  We received a check within 3 weeks.

Her documentation of our conversations do not list the number of times that I called her and left her messages that were not returned.  I realized that it took a while for this claim to come to a close.  I feel this was due to several factors.  One being a faulty fax machine on one end of the other, second I should have been more persistent in calling and verifying that she received my faxes.  I assumed when I received a confirmation that everything went through okay but that was not enough apparently.  I also realize that I may have been a little strong with her on the 9th.  I will remember that in my conversations that I am representing the company and need to use discretion.  My representation of the company must be in a positive way and for that I apologize.

Respectfully,


Carianne Stinson

Business Manager

$\mathcal{D}$oc

2

PLAINTIFF'S
EXHIBIT
14

Lighthouse ~ Policy & Procedures Manual "Personnel"                                    Revised: August 2000

    and any other deductions approved by the employee.

## F. PERFORMANCE EVALUATION:

As a minimum, each employee's performance will be appraised annually (see the "Guide to Employee Performance Evaluation System" for more details).

## G. COACHING & PROGRESSIVE DISCIPLINE:

It is the policy of the Lighthouse to provide guidelines encompassing supervisory responsibilities. Supervision consists of two primary functions: 1) each supervisor is a Coach with teaching, orienting, and training responsibilities; and 2) supervisors are responsible for administering supervision (progressive disciplinary procedures). The most important skills a supervisor will need to learn are coaching, mentoring, and teaching. These skills will be used by supervisors with every staff member, whereas, the skills developed for administering disciplinary actions are used with a small percentage of employees.

1. **Coaching:** Coaching relates to providing a good faith effort to help employees grow and develop professionally. Coaching also relates to providing employees direct, open, and honest feedback concerning their performance and conduct. Coaching is the process of teaching employees knowledge; it also involves the employees putting the knowledge into practice.

   a.     Coaching teaches employees:

       (1)     New skills.

       (2)     Defines standards and expectations.

       (3)     Clarifies policies and procedures.

       (4)     Gives employees feedback on performance and conduct (strengths and areas needing improvement). Feedback as regards performance and conduct are to be done with dignity, respect, and kindness.

       (5)     Helps employees direct their efforts toward growing with the Center.

   b.     The employee who is easily coached is one who is an active participant in the learning process. Employees are expected to be positive, supportive, and cooperative of job responsibilities and relationships within the agency. Coaching is designed to help the employee succeed.

   c.     All staff will receive coaching sessions monthly, or as needed, by their direct supervisor.

LIGHTHOUSE 0015

Lighthouse ~ Policy & Procedures Manual "Personnel"                    Revised August 2006

2. **Supervision:** Supervision is a progressive step beyond coaching. It is a formal and structured process to help employees clarify and correct performance and/or conduct issues.

    **a.** The first step in progressive supervision is "Counseling". Counseling should take

      place when a deficiency or problem area has not been corrected by Coaching.

    **b.** Counseling is a one-on-one session with the employee to explain how they are not meeting established expectations and to help the employee clarify his/her position in this area. Counseling may result in a documented supervision session or a staff development/action plan.

    **c.** If counseling does not achieve the desired results, the supervisor will progress the employee through the following progressive discipline process.

3. **Progressive Discipline:** The Center strives to provide a safe and productive environment in which to work. Maintaining order in the workplace requires the establishment of rules and regulations. The following prescribes behaviors that warrant disciplinary measures and the necessary measures to assure each individual is afforded a safe and productive work environment.

    **a.** **Behaviors Warranting Discipline:** Engaging in the following activities while on Center property or in the course of employment will not be tolerated and will be subject to employee discipline up to and including termination. Examples of behavior warranting discipline include, but are not limited to the following:

        (1) Incompetency (inability to perform job functions effectively).

        (2) Inefficiency/neglect of duty (failure to perform job functions accurately and in a timely manner as assigned).

        (3) Dishonesty.

        (4) Insubordination.

        (5) Being on duty under the influence of alcohol or other mood or mind altering substance.

        (6) Discourteous treatment of the public.

        (7) Tardiness for work.

        (8) Professional misconduct.

15

**LIGHTHOUSE 0016**

(9)    Leave without authorization (absence from Center work without proper approval).

(10)    Sexual harassment.

(11)    Physical, sexual, or verbal abuse of clients or other employees.

(12)    Theft.

(13)    Carrying a weapon on Center premises or while performing Center job duties.

(14)    Endangering the health or safety of others.

(15)    Destruction or misuse of Center property or use of Center property for personal use without proper authorization (including personal long distance telephone calls and/or excessive personal local telephone calls).

(16)    Reckless driving or failure to adhere to Center policies regarding transportation and use of vehicles or conviction of DUI if driving a Center vehicle is part of an employee's job responsibilities.

(17)    Falsification of documents or records.

(18)    Multiple garnishments of wages.

(19)    Behavior that clearly violates the rights or privileges of others.

(20)    Violation of policies regarding deportment, attitude, and appearance.

(21)    Failure to comply with any other Center policy.

**b.    Disciplinary Measures:**

(1)    When it becomes apparent that an employee is not performing his/her job duties in a satisfactory manner or when an employee has committed an infraction of Center policy, rules or regulations, the supervisor is responsible for taking appropriate action in a timely manner. Repeated violations will be cause for progressively more stringent disciplinary action.

(2)    One or more of the following disciplinary actions may be taken:

Step 1.        Oral warning.
Step 2.        Written reprimand.

16

LIGHTHOUSE 0017

Step 3.      Suspension; Probation; or Demotion.

Step 4.      Termination.

**c.      Procedure:** Supervisors must use discretion in choosing an appropriate disciplinary action for employee offenses based on severity of the offense and the employee's past performance. Supervisors must use judgment regarding such matters as abuse of sick leave, tardiness, etc., to determine acceptable levels of such behavior. There is no requirement that the supervisor follow all of the steps listed below. When deemed appropriate, the supervisor may repeat a step in the disciplinary procedure or delete one or more steps.

(1)      **Oral Warning:** The oral warning is the least severe disciplinary action and provides the supervisor with a mechanism to correct infractions. Employees involved in infractions will be given an oral warning in an interview with the appropriate supervisor. The interview will take place when the infraction occurs or as soon as possible thereafter. The supervisor will inform the employee of expectations for corrections. The interview will be documented, but not placed in the personnel file.

(2)      **Written Reprimand:** When an employee has been verbally warned and violation is repeated, or when actions warrant, the supervisor will reprimand the employee in writing. The written statement will document the date of and corrective steps to be taken. The statement will also provide the employee an appropriate length of time in which to improve the conduct. The supervisor will explain that further violation will be cause for further disciplinary action and will monitor the employee's progress toward improved behavior. The written statement of the problem will be presented to the employee by the supervisor. The employee should be asked to sign the warning acknowledging that he/she has read it. If he/she refuses to sign it, that should be noted. The employee should be given a copy of the warning. Such information will be placed in the personnel file. A written reprimand must be approved by the director of the department where the employee works.

(3)      **Suspension:** The suspension may vary with the severity of the offense. This may include 1-5 days off with loss of pay. The problem and plan of action are documented. The employee should be made aware of what disciplinary action to which the next violation will subject him. A suspension must be approved by the Executive Director.

(4)      **Probation:** Coincident with a written warning or suspension, the supervisor may place the employee on probation during which time the employee will be expected to correct all noted deficiencies. The length of probation will vary but should not extend beyond three (3) months.

LIGHTHOUSE 0018

(5)     **Involuntary Demotion:** Employee may be demoted to another position (if another position is available) when he/she fails to perform in his/her assigned position.

   (a)   The reason for the demotion recommendation will be specific and set forth in detail.

   (b)   The recommendation will then proceed to the Executive Director. If the recommendation is disapproved by the Executive Director, it will be remanded to the submitting supervisor with a memo explaining the basis for such action.

   (c)   If the recommendation is approved by the Executive Director, the employee will be informed, in writing, through the immediate supervisor. The notification to the employee will be specific as to the reason for the action.

   (d)   The immediate supervisor will discuss the action with the employee and inform the employee of his/her right to appeal through Employee Grievance Procedures.

(6)     **Termination:** Employment may be terminated upon evidence that an employee is unable or unwilling to perform in a competent manner the responsibilities of the position for which he/she was employed.

   (a)   This action will be used for repeated violations or, with violations of a serious nature, termination may be deemed necessary upon the violation.

   (b)   Termination procedures are initiated by the employee's supervisor in writing to the Executive Director. The reason(s) for the recommendation should be specific and include all pertinent information. Documentation will support the recommendation and accompany it. If the recommendation is approved, the employee will be informed in writing through the immediate supervisor. The action will be discussed with the employee and he will be informed of his right to appeal through Employee Grievance Procedures.

   (c)   The Director of Human Resources in coordination with the employee's supervisor will secure all Center property.

   (d)   A payroll check will be issued at the end of the next payroll period. The employee who has been terminated for cause will forfeit all accrued annual leave.

18

## H. TERMINATION INITIATED BY CENTER:

1. **Gross misconduct**: The Executive Director or the Board of Directors will have the option of effecting immediate termination of any employee adjudged to be guilty of gross misconduct. Gross misconduct may include client abuse, behaviors that jeopardize Center operation, significantly damage the Center's public image, or which jeopardize positions within the Center.

2. **Reorganization or retrenchment**: Employment may be terminated by reasons of reorganization or retrenchment.

   a. The Executive Director will present recommendations and supporting documentation for approval to the Board.

   b. Employees terminated by reorganization or retrenchment will be given a written lay off notice detailing rationale for the decision by the Board President. Employees will be given thirty (30) days notice.

   c. In the event contract and funds are secured that enable the Center to increase its caseload or expand its program, a call-back of terminated employees will be initiated. Terminated employees will be given priority, if positions are reopened up to six (6) months from the date of termination.

## I. AT WILL EMPLOYMENT:

Notwithstanding the provisions as set forth in this section on Employment Procedures, or the other provisions as set forth in this Manual, all employees of the Center are employees at will, and the employment relationship may be terminated with or without cause and with or without notice at any time at the option of either the Center, acting through its Executive Director and/or its Board of Directors, or the employee.

## J. TERMINATION INITIATED BY EMPLOYEE:

1. Employees wishing to terminate employment with the Center are requested to give written notice of a minimum of two (2) weeks to their supervisor. The supervisor may request that their notice be extended to four (4) weeks. Failure to give a two week notice will result in the employee's forfeiting any future re-hire rights at the Center and all available annual leave.

2. It is anticipated that employees will work during their notice period, therefore, annual leave will not be authorized during the notice period and sick leave of more than one day will require a letter from a physician.

3. An employee will not be allowed to terminate on a Center holiday.

19

LIGHTHOUSE 0020

# CECELIA OWENS

## v.

# LIGHTHOUSE COUNSELING CENTER

# CARIANNE STINSON, Vol. I

## February 19, 2008

```
THIS DEPOSITION IS NOT AVAILABLE FOR VIEWING
ELECTRONICALLY BUT IS AVAILABLE FOR VIEWING
CONVENTIONALLY IN THE CLERK"S OFFICE.
```

**Reagan Reporters, LLC**
**Phone: 334.262.7556**
**Fax: 334.262.4437**
**www.ReaganReporters.com**

# CECELIA OWENS

## v.

# LIGHTHOUSE COUNSELING CENTER

# CARIANNE  STINSON, Vol. II

## February 20, 2008

```
THIS DEPOSITION IS NOT AVAILABLE FOR VIEWING
ELECTRONICALLY BUT IS AVAILABLE FOR VIEWING
CONVENTIONALLY IN THE CLERK"S OFFICE.
```

**Reagan Reporters, LLC**
**Phone: 334.262.7556**
**Fax: 334.262.4437**
**www.ReaganReporters.com**

# CECELIA OWENS v. LIGHTHOUSE COUNSELING CENTER

## CANDYCE DEKRUYFF

### February 19, 2008

```
THIS DEPOSITION IS NOT AVAILABLE FOR VIEWING
ELECTRONICALLY BUT IS AVAILABLE FOR VIEWING
CONVENTIONALLY IN THE CLERK"S OFFICE.
```

**Reagan Reporters, LLC**
**Phone: 334.262.7556**
**Fax: 334.262.4437**
**www.ReaganReporters.com**

# CECELIA OWENS v. LIGHTHOUSE COUNSELING CENTER

## TIMOTHY KEMP

### February 20, 2008

THIS DEPOSITION IS NOT AVAILABLE FOR VIEWING
ELECTRONICALLY BUT IS AVAILABLE FOR VIEWING
CONVENTIONALLY IN THE CLERK"S OFFICE.

**Reagan Reporters, LLC**
**Phone: 334.262.7556**
**Fax: 334.262.4437**
**www.ReaganReporters.com**

# CECELIA OWENS v. LIGHTHOUSE COUNSELING CENTER

# DAVID  BELSER

## February 20, 2008

```
THIS DEPOSITION IS NOT AVAILABLE FOR VIEWING
ELECTRONICALLY BUT IS AVAILABLE FOR VIEWING
CONVENTIONALLY IN THE CLERK"S OFFICE.
```

**Reagan Reporters, LLC**
**Phone: 334.262.7556**
**Fax: 334.262.4437**
**www.ReaganReporters.com**